**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

JAMES GREENE, JENNIFER SHAAL,
OFER SHAAL, JAKE STONE, GUY
SHOSHAN, EINAT EZRA MICHAELI, and
YIFAT SHMILOVICH, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

        v.

KABBALAH CENTRE INTERNATIONAL,
INCORPORATED; KABBALAH CENTRES
OF THE UNITED STATES,
INCORPORATED; KABBALAH CENTRE
OF NEW YORK, INCORPORATED; THE
KABBALAH CENTRE OF FLORIDA, INC.;
KABBALAH CHILDREN'S ACADEMY;
KABBALAH ENTERPRISES,
INCORPORATED; KAF INVESTMENTS,
LLC; 501 N. LA CIENEGA, LLC;
SPIRITUALITY FOR KIDS
INTERNATIONAL, INC.; and KAREN
BERG, YEHUDA BERG, and MICHAEL
BERG,

        Defendants.

**CLASS AND COLLECTIVE ACTION
COMPLAINT**

**Jury Trial Demanded**

No. 19-cv-4304

Plaintiffs James Greene ("Greene"), Jennifer Shaal ("J. Shaal"), Ofer Shaal ("O. Shaal"), Jake Stone ("Stone"), Guy Shoshan ("Shoshan"), Einat Ezra Michaeli ("Ezra Michaeli"), and Yifat Shmilovich ("Shmilovich") bring this action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), state wage and labor statutes, state common law, and Federal Rule of Civil of Procedure 23, on behalf of themselves and all others similarly situated, against Defendants Kabbalah Centre International, Incorporated (the "Centre") and subsidiary and affiliated entities (collectively, the "Corporate Defendants"), and Karen Berg ("K. Berg"), Yehuda Berg ("Y. Berg"), and Michael Berg ("M. Berg") (collectively, the "Bergs" or the "Individual Defendants," and together with the Corporate Defendants, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are former employees of the Kabbalah Centre, a self-proclaimed spiritual organization that purports to spread the teachings of the Kabbalah, a form of Jewish mysticism. As early as 1998, Plaintiffs were induced to join the Centre as "chevre," *i.e.*, spiritual workers who were to help enlighten humanity to the teachings of the Kabbalah. In reality, the individuals who control the Centre – the Bergs – operate a cult that preys upon those seeking to improve the world through the performance of good works.

2.      The Centre is run by the Berg family. K. Berg's husband, Philip Berg, took over the Centre in 1969, and since his death in 2013, K. Berg alone is the ultimate authority on all decisions related to the Centre. Her sons, M. Berg and Y. Berg, assist her. The Centre revolves around the Bergs, their families, and their demands.

3.      The Centre offers events and classes, for a fee, and refers to those who participate in those classes and events as "students." The Centre's operations are run by a mix of "regular" employees and chevre, as well as some students who volunteer to assist with operations. The

Centre pays its non-chevre employees legally adequate wages. It does not pay its chevre employees wages at all.

4.     One of a chevre's primary responsibilities is to generate revenue and solicit donations for the Centre from students. Chevre are instructed to engage in a sophisticated marketing operation, learning intimate details about students' lives in order to target particular students for particular donation requests.

5.     Upon joining the Centre as chevre, many Plaintiffs and those like them were manipulated into giving up their material possessions and their relationships outside the Centre. They lived in overcrowded Centre housing with other chevre. They worked seven days a week, often for 16 to 20 hours a day, and they were always on call for the Bergs. Every aspect of their lives was controlled by the Centre. For many, they ate the food the Centre provided, even when it made them sick. They wore clothes donated to the Centre. Basic household items such as soap and shampoo were Centre-issued. Basic medical care was available infrequently, if at all. And the Centre dictated the chevre's major life decisions, telling them where to live and work, when to marry, and whom to marry.

6.     Isolated, without resources, and totally dependent on the Centre for virtually every aspect of their lives, chevre were tasked with performing household work for the Bergs or performing other jobs that would raise money for the Centre and keep it running. The labor provided by chevre was necessary to the Centre's existence. Yet the Centre did not pay chevre wages. Instead, it essentially used them as the slave labor needed to operate the cult  and enrich the Bergs.

7.     Upon information and belief, the Internal Revenue Service ("IRS") began investigating the Centre for its enrichment of the Bergs in or about 2011. At roughly the same time, the Centre

began reporting "wages" for chevre on W-2 forms, which, on information and belief, were calculated based on the room and board provided to the chevre – not based on their actual work. On information and belief, the Centre sometimes transferred these "wages" to chevre, but with a strict instruction that the money be returned to the Centre immediately. Those "wages" also were woefully inadequate, and Plaintiffs and other chevre additionally lost years of paid employment because they were defrauded into joining the Centre as chevre.

8.      Despite their desperate circumstances, Plaintiffs and those like them ultimately were brave enough to leave the Centre. For some chevre, the impetus for leaving the Centre occurred when Y. Berg was accused of sexually assaulting a Centre student. Despite promises that he would no longer be affiliated with the Centre, he continued to seek donations for it and continued to advise K. Berg on Centre operations and decisions. Upon information and belief, K. Berg also stated that any sexual assault committed by Y. Berg was the fault of the woman he assaulted. Many chevre found this morally repugnant, such that the myth of the Centre became painfully obvious to them – they had been duped into serving the Bergs under the guise of serving humanity.

9.      Not only were Plaintiffs and those like them fraudulently induced into joining the Centre as chevre, their ability to sue the Centre was fraudulently concealed from them. They were uniformly told by the Centre that they were not entitled to just compensation.

10.     After years of financial and other abuse, Plaintiffs now seek to stand up for themselves and others similarly situated, to recover unpaid wages and other damages stemming from years spent working for the Centre.

## **JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, minimal diversity jurisdiction pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction over

Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, this Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b).

12.　　The amount in controversy in this matter exceeds the sum or value of $5,000,000, exclusive of interests and costs.

13.　　At least one member of each proposed class or subclass is a citizen of a state different from that of at least one Defendant. Plaintiffs' claims involve matters of national or interstate interest.

14.　　Defendants are subject to personal jurisdiction in this District. Defendants purposefully direct their conduct at New York, transact substantial business in New York, and have substantial aggregate contacts with New York. Defendant Kabbalah Centre of New York, Incorporated is incorporated in New York, and Defendant M. Berg lives in New York.

15.　　Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

*Plaintiffs*

16.　　Plaintiff James Greene is a former chevre. Greene became a chevre in 2004, after several years of volunteering for the Centre. He worked at Centre locations in Los Angeles, California, and Boca Raton, Florida. While at the Centre, Greene was primarily a fundraiser and emcee for major Centre events. Greene was very successful in these roles:  he obtained $500,000 in donations for the Centre in his first year as a chevre. Greene left the Centre in 2009. Before joining the Centre, he had a successful private psychotherapy practice, which he re-started following his departure. He is a resident of Los Angeles, California.

17.     Plaintiff Jennifer Shaal is a former chevre. J. Shaal became a chevre in 2005. In the United States, she worked at Centre locations in Los Angeles, California, Boca Raton, Florida, and Miami, Florida. Before becoming a chevre, J. Shaal worked at the New York, New York location, where she assisted the head of donor relations and was paid an annual salary of $70,000. After she became a chevre, her responsibilities at the Centre included the day-to-day operations of the Miami location (overseeing expenses, staff, the on-site bookstore, instructors, local Centre property, maintenance, events, marketing, and the expansion of a Spanish department); setting financial revenue and donation goals for the Centre; and identifying prospective donors. J. Shaal also served as a personal assistant to Monica Berg, Defendant Michael Berg's wife. She left the Centre in 2015. Before joining the Centre as chevre, J. Shaal's annual income was nearly $100,000 as an account manager in financial sales. Now, she is out of work. She is a resident of Boca Raton, Florida.

18.     Plaintiff Ofer Shaal, who is married to Plaintiff Jennifer Shaal, is a former chevre. O. Shaal became a chevre in 2002. In the United States, he worked at Centre locations in Los Angeles, California, Boca Raton, Florida, and Miami, Florida. For a time, O. Shaal also commuted regularly to Chicago, Illinois, to meet with students and solicit donations there. In addition to soliciting donations, one of O. Shaal's primary responsibilities was, functionally, to run the Information Technology ("IT") department for the Centre. In that capacity, he was responsible for the architecture of the Centre's websites; managing the websites; monitoring website analytics; and managing the Centre's phone system. O. Shaal also performed personal tasks for the Bergs, such as walking their family dogs and bringing them food. Before joining the Centre, O. Shaal served in the Israeli Air Force, through which he worked on a flight simulator and completed a prestigious computer programming course. He left the Centre in 2015. Based on his prior technical training in

Israel, his annual salary and benefits together now exceed $100,000. He and J. Shaal also co-own a web design company, which last year had revenue in excess of $75,000. O. Shaal is a resident of Boca Raton, Florida.

19.     Plaintiff Jake Stone is a former chevre. He started attending classes at the Centre in approximately 2005, when he was 16 or 17 years old. In 2008, when he was 19, he dropped out of college to become a chevre. Stone worked at Centre locations in Boca Raton, Florida, Miami, Florida, and Los Angeles, California. His responsibilities at the Centre included janitorial work; telemarketing; and maintaining, restocking, and eventually managing an on-site bookstore. Stone's responsibilities also included walking the Berg family dog and caring for the Bergs' children. Eventually, Stone's primary responsibility became fundraising. To fundraise, Stone took on the role of a teacher, which meant that he met with Centre students and, in the context of those meetings, he encouraged them to purchase Centre merchandise and solicited Centre donations. The materials Stone used to prepare for this teaching included non-religious self-help books. Stone left the Centre in 2016. He now works as a life coach and motivational speaker at drug rehabilitation centers. Stone's work today incorporates many of the same ideas he taught as part of his Centre classes. Now, however, he is paid an hourly wage. He is a resident of Fort Lauderdale, Florida.

20.     Plaintiff Guy Shoshan is a former chevre. He first became acquainted with the Centre through his uncle, who attended classes at the Centre regularly in Israel in 1995, when Shoshan was 13. In Israel, Shoshan completed specialized courses in video production. After leaving the Israeli Army in 1998, he became a chevre. In the United States, he worked at Centre locations in New York, New York, and Los Angeles, California. Shoshan's responsibilities included video production for the Centre, creating the DVDs the Centre sells; providing the audio/video

production and direction necessary for major Centre events; and serving food and washing dishes after Centre meals. Shoshan's responsibilities also included driving for the Bergs; walking the Bergs' dogs; draining, cleaning, and refilling daily the Bergs' "mikvah," a Jewish ritual bathing pool; and providing personal technical support to the Berg families. When the Bergs had private movie viewings with friends, Shoshan was on call should any technical issue arise at any hour of the day or night. Shoshan left the Centre in 2018. He is a resident of Brooklyn, New York.

21.     Plaintiff Einat Ezra Michaeli is a former chevre. She became a chevre in 2005, and worked in the Centre's locations in New York, New York, Los Angeles, California, and Boca Raton, Florida. Before joining the Centre as a chevre, Ezra Michaeli was trained in Israel as an attorney. Ezra Michaeli's responsibilities at the Centre included janitorial work; preparing food; overseeing building maintenance; coordinating volunteers; coordinating classes (setting up rooms, printing fliers, and scheduling); and coordinating students. To coordinate students, Ezra Michaeli would meet with teachers to solicit information about students, and then track that information in a database and an excel spreadsheet. This information included details about a student's personal life, his sexual orientation, his financial situation, and his family relationships. The purpose of this tracking was to identify the students most likely to donate substantial sums to the Centre. Ezra Michaeli also worked for a period in the Centre's legal department, and she kept the teachers' revenue records, which listed a teacher's name, the amount she had produced through product sales, and the amount she had produced through donations. K. Berg reviewed these records regularly. Ezra Michaeli left the Centre in 2016. She is a resident of Los Angeles, California.

22.     Plaintiff Yifat Shmilovich is a former chevre. She became a chevre in 2004 at 22, after completing two years of service in the Israeli Air Force. In the United States, she worked at Centre locations in Los Angeles, California, and New York, New York. Shmilovich's responsibilities at

the Centre included managing volunteers, cleaning, providing maintenance, organizing fundraising, and maintaining the Centre's database. Shmilovich's responsibilities also included shifts personally serving the Bergs and their families, such as walking their dogs and running errands for them. Shmilovich left the Centre as a chevre in early 2015, but from May 2015 until 2018 she was an hourly paid employee – performing the same labor for which she had not previously been compensated. She is a resident of Los Angeles, California.

*Defendants*

23.     Defendant Kabbalah Centre International, Incorporated is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

24.     Defendant Kabbalah Centres of the United States, Incorporated is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

25.     Defendant Kabbalah Centre of New York, Incorporated is a New York not-for-profit corporation organized and existing under the laws of New York, with its principal place of business at 155 East 48th Street, New York, New York 10017.

26.     Defendant The Kabbalah Centre of Florida, Inc. is a Florida not-for-profit corporation organized and existing under the laws of Florida, with its principal place of business at 8411 West Palmetto Park Road, Boca Raton, Florida 33433.

27.     Defendant Kabbalah Children's Academy is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 9250 West Olympic Boulevard, Beverly Hills, California 90212.

28. Defendant Kabbalah Enterprises, Incorporated is a California profit-sharing corporation organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

29. Defendant KAF Investments, LLC is a California investment business organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

30. Defendant 501 N. La Cienega, LLC is a California investment business organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

31. Defendant Spirituality for Kids International, Inc., is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 5792 West Jefferson Boulevard, Los Angeles, California 90016.

32. The Corporate Defendants functionally operated as a single corporate entity, under the control of the Bergs.

33. The Corporate Defendants had more than four employees throughout the relevant period.

34. The Corporate Defendants had sales or business of at least $500,000 per annum during the relevant period.

35. Defendant Karen Berg resides in Beverly Hills, California. Karen Berg is the Chief Executive Officer of the Centre.

36. Defendant Yehuda Berg resides in Beverly Hills, California. Yehuda Berg was intimately involved in Centre operations and decision-making during the relevant period.

37.     Defendant Michael Berg resides in New York, New York. Michael Berg was intimately involved in Centre operations and decision-making during the relevant period.

38.     During the relevant period, the Individual Defendants exercised significant control over Centre operations. The Individual Defendants also dictated chevre's work assignments, monitored their performance, and determined the nature and amount of any minimal in-kind compensation chevre received.

## ALLEGATIONS COMMON TO ALL COUNTS

39.     The Kabbalah Centre was founded by Yehuda Ashlag in 1922. Philip Berg became the Centre's director in 1969, and together with his wife, Karen, and their sons, Michael and Yehuda, he led the Centre until his death in 2013. Following his death, Karen Berg has remained the leader of the Centre.

40.     Historically, Jewish leaders have opined that only a limited category of people are permitted to study Kabbalah, and its teachings have not been widely disseminated. By contrast, the Centre states its purported purpose as bringing the teachings of Kabbalah to the masses. The Centre does not follow traditional restrictions on Kabbalistic study, and invites all people, regardless of age, gender, or religious affiliation, to participate in its classes and events. The Centre refers to those who participate in classes and events as "students."

41.     Labor for the Centre's operations is provided by a mix of "regular" employees and chevre. The Centre pays its non-chevre employees legally adequate wages. It does not pay its chevre employees wages at all.

**The True Purpose of the Centre**

42.     The Centre's ultimate objective is not to educate, but to raise revenue and solicit donations that benefit the Individual Defendants and their families.

43. This ultimate objective is evident from the sophisticated marketing operation in which all chevre are involved. For example, a "student" of the Centre attends one-on-one meetings with a chevre, whose role is to be the student's "teacher." Many chevre, including Plaintiffs, develop genuine, personal relationships with their students.

44. Teachers receive no religious or spiritual training from the Centre. Instead, the purpose of these meetings is for the teacher to gather specific, intimate information about the student as the first step in determining how and what to persuade the student to donate to the Centre. This information is then tracked by chevre, as it was by Ezra Michaeli, using customer relationship manager ("CRM") software[1] to meticulously document details such as students' personal finances, their family relationships, their sexuality, and their hopes, dreams, fears, and anxieties.

45. Teachers, such as Greene and Stone, would then meet to strategize with their own supervisors over which students to target, for how much money, and in what manner. Some teachers also were taught this kind of strategy from an assistant to Tony Robbins, the self-described "life coach." In addition, the Centre paid for a service called "WealthEngine," which "is the leading wealth research services firm for nonprofit organizations and financial services companies. Recognizing the value of wealth indicators and identifying links to prospects, WealthEngine gathers information to assist wealth managers, marketers and development professionals to create strategies for up-selling, cross-selling or fundraising."[2]

46. The Centre also has a "student support" department. The purpose of the student support department is to provide personal engagement to students who do not live near a physical Centre location, so that they are more likely to buy merchandise from and donate money to the Centre. Chevre who worked in student support, including O. Shaal, J. Shaal, and Ezra Michaeli, spent their

---

[1] CRM software is typically used by businesses for marketing and sales to customers.
[2] https://www.crunchbase.com/organization/wealthengine#section-overview

days conducting telemarketing calls. They contacted existing students, with a goal of selling them more classes, more event tickets, more literature, and more Centre goods, and of soliciting increasingly large donations from those students. Student support workers, such as Stone, also cold-called potential new students, hoping to pique their interest in the Centre and ultimately identify an additional revenue source.

47.     Central to the cult, chevre also were tasked with persuading students, and each other, that the Centre's leaders were awe-inspiring, capable of performing miracles, and above reproach. Central to the Centre's message was the importance of serving the Bergs and remaining loyal to them.

48.     When some of the Centre's corporate entities applied for tax-exempt status with the IRS, the Individual Defendants represented to the IRS that no funds or property of the Centre were used for the Bergs' "own personal needs and convenience."  Nonetheless, many of the donations solicited by chevre plainly were for the Individual Defendants' benefit alone, and plainly at odds with the mere "subsistence" the Bergs represented to the IRS that they took from the Centre. Such donations have included private plane rides; jewelry and couture handbags; trips to destinations such as Ibiza, Spain, and Punta Cana, Mexico; spa vacations; and plastic surgery. Before Philip Berg's death, he and K. Berg would visit the Centre's location in Las Vegas and stay at casino hotels on the Strip. They gambled so frequently that they received complimentary meals, rooms, and limousine rides from the airport courtesy of the casinos.

49.     According to Nicolas Boord, the Centre's Chief Financial Officer until 2009, during his tenure, the Centre had six nonprofit and three for-profit entities that collectively earned annual revenues of $60 million, owned a $200 million real estate portfolio, and managed a $60 million investment fund.

50.     In 2011, the Los Angeles Times reported that the Centre had become the focus of a federal tax evasion investigation involving the criminal division of the IRS and the U.S. Attorney's Office for the Southern District of New York. A federal grand jury was convened in the SDNY, and agents from the IRS criminal division interviewed Centre-affiliated individuals in Los Angeles. The subject of the investigation, at least in part, was whether nonprofit funds were used to personally enrich the Bergs.

51.     After news reports began surfacing about the IRS investigation, the Centre told chevre that this was a test of a chevre's belief in the Centre and its purported mission, and provided chevre with "talking points" to use should anyone ask them about the investigation. Chevre never learned, however, what the outcome was of the investigation, or whether it continues to this day.

52.     In 2014, Jena Scaccetti, a former student of the Centre, filed a lawsuit in Los Angeles County Superior Court, accusing Yehuda Berg of drugging her and sexually assaulting her in 2012. In 2015, a jury awarded Scaccetti $135,000 in compensatory and punitive damages from Y. Berg for emotional distress, and also found that the Centre supervised him negligently. In trial testimony, Y. Berg admitted to giving Scaccetti alcohol and Vicodin, and to touching her to see if "anything intimate" might happen.

53.     Upon information and belief, in the wake of Y. Berg's trial, many chevre were promised that his involvement with the Centre, including his advising of K. Berg, would cease. Instead, on information and belief, Y. Berg has continued to have deep and ongoing involvement in Centre decisions and operations, even if the Centre no longer publicly represents his involvement.

54.     Chevre were themselves required to solicit donations for the Bergs' benefit. If, for example, a Berg family member were visiting a particular Centre location, the chevre at that Centre

would be responsible for soliciting Centre students to lend the Centre luxury vehicles in which chevre then chauffeured the Berg family during their visit. The personal housing for the Individual Defendants and their families, funded by the Centre, includes multi-million dollar Beverly Hills mansions, a Manhattan townhouse, and a set of luxury apartments above the Centre's Manhattan location for the Bergs' exclusive use.

55. For many years, the Individual Defendants and their families made no distinction between money meant for the Centre's use and money for their personal use. The Individual Defendants and their families placed personal charges, such as room service, in-room movies, and mini bar purchases, on Centre-issued credit cards. The Centre also paid the bills for K. Berg's personal American Express card.

56. Chevre acted as private servants and household employees to the Individual Defendants and their families. Among other things, chevre, such as Shmilovich, Stone, and Shoshan, cared for the Individual Defendants' children, grandchildren, and pets; ran errands, such as food delivery; provided assistance with household audio/video equipment; and drove Individual Defendants and their family members to luxury meals, massage sessions, and plastic surgery appointments. Chevre were assigned shifts for these mandatory tasks, which were referred to as "Toranut," a Hebrew word that translates roughly to "family duties."

57. Further belying the purpose of the Centre, personal tasks for the Individual Defendants uniformly were prioritized over other Centre duties. Other activities were put on hold whenever an Individual Defendant or other Berg family member needed something.

58. By its own admission, the Centre is not a religious organization. Current literature on the Centre's website proclaims that "Kabbalah is a spiritual wisdom, not a religious one," and a 2010 version of the Centre's website explains, "People often ask, '*Is Kabbalah religion?*' The

answer is no! Not at all!" The Centre also does not provide its spiritual wisdom free of charge. Rather, it sells classes, literature, event tickets, and various "spiritual objects," such as holy water and red string bracelets, to students and prospective students. These sales are conducted through in-person interactions, brick-and-mortar and online stores, and sophisticated telemarketing.

59.     Moreover, teachers preparing to teach classes at the Centre received training not in the study of Kabbalah, but in the best methods by which to raise money. Also, teachers often relied on popular self-help literature, or prior professional backgrounds, to inform their messages to students.

**The Chevre Experience**

60.     The Centre employed chevre to provide the labor necessary to maintaining the Centre's commercial operations. This labor included cooking and cleaning, retail sales, stocking and restocking, maintaining the Centre's web operations, and conducting telemarketing calls. Chevre assisted in event planning, event management, video and audio production of materials sold by the Centre, and publication of written materials sold by the Centre. All chevre participated in Centre sales and solicitations. The Centre was able to maintain its operations because of the work provided by chevre. In addition, chevre worked as household employees for the Individual Defendants and their families. Among many other tasks, Shoshan walked the Bergs' dogs, O. Shaal delivered food to the Bergs' homes, J. Shaal served as Monica Berg's personal assistant, and Stone cared for the Bergs' children.

61.     Chevre frequently worked 16 to 20 hour days, seven days a week, and were on call at all times. Shoshan, for example, was required to be available at any time of day or night should a Berg need technical assistance with personal equipment such as a home television and video system.

62.     Some Plaintiffs and others joining the Centre as chevre were told that to commit themselves fully, they should give up all personal possessions and property. Plaintiffs and other chevre donated what they could to the Centre, such as real estate, furniture, and savings accounts. Plaintiffs and other chevre joining the Centre thus became dependent on it for basic necessities. Although they were promised that such necessities would be provided and, indeed, were scolded if they asked any questions about these promises, the reality was different.

63.     Plaintiffs and other chevre lived in Centre-owned housing. A typical arrangement was eight to twelve people in a two-to-three-bedroom apartment, with chevre sleeping in the living room and kitchen. The housing was often in run-down condition.

64.     The Centre provided some meals, which Plaintiffs and other chevre were required to eat even if they were inedible or contained ingredients that might sicken a particular chevre. Some chevre also were instructed to apply for food stamps in order to feed themselves adequately.

65.     Any Plaintiff or other chevre who had medical or dental needs was required to find a Centre student who was willing to pay for or provide this care for free. In the case of an emergency, chevre were instructed to go to the hospital, but to provide a false name and address so that they would not be billed.

66.     Plaintiffs and other chevre who wanted to see family outside the Centre could not do so without permission from the Centre to travel. Moreover, such chevre would need to persuade a Centre student to pay for her travel expenses, or solicit money from her family.

67.     Plaintiffs and other chevre were provided with "allowances."  In 1998, allowances were approximately $25 a month. Over the course of the next twenty years, these allowances crept up to $300 a month – sometimes meant to provide for a couple, or a family with children, and still woefully inadequate – as the Centre, on information and belief, became concerned by negative

press and the IRS investigation. Any chevre who married a non-chevre ceased to receive any allowance.

68.     Since at least 2010, some chevre have had tax returns submitted for them by the Centre.

69.     In or about 2012, instead of a cash allowance, chevre began to be paid a purported "salary," which was deposited into a bank account. Any tax refund received by a chevre was to be returned to the Centre. "Salary" payments were expected to be returned to the Centre as well.

70.     Plaintiffs and other chevre, regardless of other work assignments, participated in the Centre's quest for ever-increasing revenue and donations. A chevre's "value" was measured by her success at soliciting these donations and raising this revenue. Chevre were given revenue "goals," which were tracked on a monthly and yearly basis. Chevre who failed to meet these goals faced significant consequences. A chevre who raised insufficient funds might be sent to a Centre location where he knew no one. He might be excluded from certain Centre activities. And he would be denied permission to date or to marry. Shoshan, for example, could not even ask for permission to date until he "proved" himself by raising sufficient funds.

71.     Chevre also faced extreme psychological pressure to remain as chevre with the Centre and to refrain from any criticism of the Centre or its leaders. For example, the Bergs recorded short audio "teachings" for distribution amongst the chevre. In one such recording, created shortly after several chevre, including O. Shaal and J. Shaal, left the Centre, K. Berg tells a story about a former chevre named Rafi Feig who, after leaving the Centre, experienced a series of unfortunate events that concluded with his being sentenced to two years of prison in Israel. Upon information and belief, this was not true. On the same recording, K. Berg goes on to explain that in 1984, eight teachers left the Centre at once – and four of the eight were dead within three years of their

departure. Many chevre were told that K. Berg could "do magic" and had an ability to make such things happen to people who "betrayed" her.

72.     The Centre's control over Plaintiffs and other chevre, and the threats made if a chevre displeased the Individual Defendants, meant that chevre were completely dependent on the Bergs' approval. That approval affected not only a chevre's sense of self, but also every aspect of their lives and their sense of safety.

**Fraudulent Concealment and Tolling**

73.     The applicable statutes of limitation are tolled by virtue of the Centre's knowing and active concealment of the rights of Plaintiffs, the FLSA Collective (as defined *infra*, ¶ 87), and the Class (as defined *infra*, ¶ 104) under federal and state labor laws and the Centre's ongoing, material representations to Plaintiffs, the FLSA Collective and the Class that they had no rights or recourse under such laws to seek fair compensation for their employment. Indeed, the Centre required many Plaintiffs, and members of the FLSA Collective and the Class, to "waive" FLSA claims that cannot be waived absent court supervision. Plaintiffs, the FLSA Collective and the Class were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part. Other chevre were not even offered "financial support," and when they inquired of the Centre, they were told that the Centre had no legal obligation to pay them.

74.     Chevre who left the Centre typically were penniless. They had committed all possessions to the Centre, and when they left, the Centre would not allow them to keep anything the Centre had provided during their employment.

75.     Defendants ensured that many chevre had no financial footprint when they left: they often had no bank accounts, no credit history, no rental history – not even a utility bill to prove their residence in the cities in which they had lived.

76.     Defendants also ensured that chevre remained dependent on the Centre psychologically. Chevre were required to obtain permission from K. Berg to date, marry, visit family, have children, and move from one Centre location to another. Chevre frequently were made to feel unstable, frequently reassigned from one Centre location to another seemingly at random.

77.     Throughout the tenure of chevres' employment and beyond, Defendants concealed from chevre, including Plaintiffs, that they had a legal entitlement to adequate pay for their work. Instead, Defendants represented to Plaintiffs and other former chevre that their *only* access to financial assistance as they departed was available through the voluntary "generosity" of the Centre. Further, the Centre presented to Plaintiffs and other former chevre what it claimed were legally binding documents and required them to sign the documents in order to receive any assistance. The Centre, a sophisticated corporation with access to legal counsel, then informed Plaintiffs and other former chevre that these documents prevented them from seeking any further compensation from the Centre and waived their legal rights. In fact, the Centre frequently presented Plaintiffs and other former chevre with "legal" documents, provided no explanation, required their signatures, and never returned copies to them. Plaintiffs and other former chevre recall signing many documents over the course of their employment with the Centre, without having any idea what those documents were: they were told that the documents were "necessary" to their continued employment as chevre, their receipt of their meager allowances, and their continuing affiliation with the Centre. Plaintiffs were never informed of their rights to seek alternative counsel to review such documents, and were instead presented with the documents on a "take it or leave it" basis.

78.    The Centre thus exploited the financial desperation of its outgoing employees in an attempt to evade and prevent the employees from learning of or exercising their legal rights.

79.    The information the Centre concealed from Plaintiffs and other former chevre was material. Former chevre, including Plaintiffs, believed they had no ability to pursue legal claims against Defendants in reliance on the Centre's misrepresentations, forgoing the exercise of their legal rights – and therefore the opportunity to obtain compensation owed to them – as a result.

80.    Defendants concealed this information from Plaintiffs and other former chevre with the intention to defraud them of the pay to which they were entitled under the law, and Defendants knew or should have known that they were concealing this information, because Defendants complied with applicable wage and hour laws for their "regular" employees.

81.    The reliance by Plaintiffs and other chevre on the Centre's representations was reasonable. Chevre, including Plaintiffs, were aware that the Centre had access to sophisticated legal counsel. In light of this imbalance of sophistication and power, their reliance upon their employer's representations is reasonable.

82.    Plaintiffs and other chevre were not aware of the information essential to the pursuit of their legal claims, without any fault or lack of diligence on their own part. Having been psychologically, physically, and financially dependent on the Centre, it was difficult, if not impossible, for Plaintiffs and other former chevre to discover that Defendants, Plaintiffs' employers, had actively concealed material information from them about their rights as employees.

83.    The U.S. Department of Labor has recognized that, without adequate notice and disclosure by employers, employees frequently are unaware of the protections accorded them under national labor laws. This is one of the reasons that the Department requires employers to post a notice explaining FLSA requirements in a conspicuous place:  to permit employees to read

and become aware of their rights under the law. On information and belief, the Centre did not post this notice for chevre in any Centre location.

84.      Indeed, many chevre, including Plaintiffs, who signed separation agreements only later came to understand that the sums provided to them by the Centre were grossly inadequate compared to the sums to which they were legally entitled.

85.      At the time the action was filed, Defendants were under a duty to disclose to Plaintiffs, the FLSA Collective and the Class the true nature of their legal rights. Defendants are therefore estopped from relying on any statute of limitations.

86.      Defendants' fraudulent concealment is common to the FLSA Collective and the Class.

## COLLECTIVE ACTION ALLEGATIONS

87.      Plaintiffs bring the First Cause of Action, an FLSA claim, on behalf of themselves and all similarly situated former chevre who worked in the United States for the Corporate Defendants and who elect into this action pursuant to the collective action provision of the FLSA (the "FLSA Collective").

88.      Plaintiffs and other former chevre provided the labor necessary to Centre operations and personally served the Bergs and their families. They were required to work 16 to 20 hour days, seven days a week, and they were always on call.

89.      In court filings and other documents, the Centre has admitted that chevre were employees. Moreover, the Centre employed non-chevre employees in identical roles as chevre roles, but these employees were paid an hourly wage.

90.      The Centre's violations of the FLSA were willful. The Centre referred to chevre as employees; in recent years, used a payroll service to give the appearance of providing chevre with

a meager "salary"; and employed non-chevre in identical positions to chevre but paid them regular wages. Accordingly, the statute of limitations should be three years.

91.     The Centre is a covered employer within the meaning of the FLSA, and chevre were employees within the meaning of the FLSA.

92.     Chevre performed routine, non-exempt tasks and are properly classified as non-exempt from the overtime provisions of the FLSA.

93.     The Centre is a multi-state and multi-national organization in which chevre in every location were involved in the Centre's global reach. Telemarketing phone calls were made to multiple states from Centre locations. Centre written, audio, and video materials were shipped between and among states. By virtue of a chevre's involvement in every aspect of the Centre's multi-state and multi-national operations, chevre regularly were involved in interstate commerce and were covered employees within the meaning of the FLSA.

94.     Defendants constitute an enterprise engaged in interstate commerce within the meaning of the FLSA. Defendants' activities are performed for a "common business purpose," and Defendants have sales or other business of $500,000 or more annually.

95.     Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and the FLSA Collective.

96.     Upon information and belief, Defendants failed to make, keep, and preserve accurate records with respect to Plaintiffs and the FLSA Collective, including hours worked each workday and total hours worked each workweek, as required by 29 U.S.C. § 211(c) and supporting federal regulations.

97.     Defendants' failure to make, keep, and preserve accurate records was willful and intentional.

98.     Plaintiffs and the members of the FLSA Collective are similarly situated in that the Centre's policy, common to all chevre, was to not pay chevre wages. Instead, the Centre provided nominal monthly stipends and minimal in-kind compensation, insufficient to adequately compensate Plaintiffs and the FLSA Collective as required by law. As a matter of policy, chevre were provided no means to log or track their time, and, upon information and belief, the Centre maintained no time records for chevre. Chevre regularly worked in excess of 40 hours a week, for which they were not compensated, and of which Defendants had actual or constructive knowledge.

99.     There are many similarly situated former chevre who have not been paid minimum wages and/or overtime in violation of the FLSA and would benefit from the issuance of a court-supervised notice regarding the present lawsuit and the opportunity to join it. Those former chevre are known to Defendants, are readily identifiable, and can be located through Defendants' records, such that notice should be sent to them pursuant to 29 U.S.C. § 216(b).

100.    As part of its regular business practice, Defendants have intentionally, willfully, and repeatedly engaged in a common policy or plan of violating the FLSA with respect to Plaintiffs and the members of the FLSA Collective. This policy or plan includes, but is not limited to:

   a.   Willfully failing to pay its chevre employees, including Plaintiffs and the members of the FLSA Collective, for the hours that they worked;

   b.   Willfully failing to pay its chevre employees, including Plaintiffs and the members of the FLSA Collective, premium overtime wages for hours that they worked in excess of 40 hours per workweek;

   c.   Willfully failing to adequately record the time that its chevre employees, including Plaintiffs and the FLSA Collective, worked for the benefit of Defendants; and

d.   Willfully failing to provide chevre employees, including Plaintiffs and the FLSA Collective, with any means of recording the hours they worked.

101.   Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the members of the FLSA Collective wages for their work, as well as overtime premiums for hours worked in excess of 40 hours per workweek.

102.   Defendants' unlawful conduct has been widespread, repeated, and consistent.

## CLASS ACTION ALLEGATIONS

103.   Plaintiffs seek class certification of the class and subclasses set forth below pursuant to Rule 23 of the Federal Rules of Civil Procedure.

104.   Plaintiffs seek class certification of the common law claims of unjust enrichment and fraudulent inducement under New York, California, Florida, and Illinois law on behalf of a "Chevre Class," defined as all former chevre who worked without adequate pay for the Kabbalah Centre or any affiliated entity in the States of New York, California, Florida, or Illinois. Plaintiffs Greene, J. Shaal, O. Shaal, Stone, Shoshan, Ezra Michaeli, and Shmilovich are the proposed representatives for the Chevre Class.

105.   Plaintiffs seek class certification of claims for violations of the New York Labor Law on behalf of a New York Subclass of the Chevre Class, defined as all former chevre who worked without adequate pay for the Kabbalah Centre or any affiliated entity in the State of New York. Plaintiff Shoshan is the proposed representative for the New York Subclass.

106.   Plaintiffs seek class certification of claims for violations of the California Labor Code on behalf of a California Subclass of the Chevre Class, defined as all former chevre who worked

without adequate pay for the Kabbalah Centre or any affiliated entity in the State of California. Plaintiff Ezra Michaeli is the proposed representative for the California Subclass.

107.    Plaintiffs seek class certification of claims for violations of the Florida Constitution on behalf of a Florida Subclass of the Chevre Class, defined as all former chevre who worked without adequate pay for the Kabbalah Centre or any affiliated entity in the State of Florida. Plaintiff Stone is the proposed representative for the Florida Subclass.

108.    Plaintiffs seek class certification of claims for violations of the Illinois Minimum Wage Law on behalf of an Illinois Subclass of the Chevre Class, defined as all former chevre who worked without adequate pay for the Kabbalah Centre or any affiliated entity in the State of Illinois. Plaintiff O. Shaal is the proposed representative for the Illinois Subclass.

109.    Excluded from the Class are Defendants, any of their past or present officers, directors, employees, agents, or affiliates, any judge who presides over this action, and all counsel of record.

110.    Plaintiffs reserve the right to expand, limit, modify, or amend the definitions of the Class and Subclasses at the class certification stage of this action or at any other time, as may be desirable or appropriate.

111.    Upon information and belief, Defendants applied the same compensation and employment policies, practices, or procedures to all chevre. No chevre received wages or overtime pay.

112.    Numerosity and Ascertainability. The Class is so numerous and geographically dispersed that the joinder of all Class members is impracticable. Class members may be identified through objective means and notified of this action by recognized methods of notice, such as by

mail, email, or publication in print or on the Internet. It would be impracticable to bring all members of each Class before the court.

113. <u>Commonality and Predominance</u>. This action implicates common questions of law and fact which predominate over the individual issues of each Class member. The questions of law or fact common to the Class are substantially similar. Common questions include, for example:

    a.   Whether Defendants had a policy or practice of failing to pay Plaintiffs and the members of the Class the minimum wage for all hours worked, in violation of New York Labor Law Article 19, § 650 *et seq.*; California Labor Code §§ 1194, 1197, and 1197.1; Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*; and Florida Constitution Article X, § 24;

    b.   Whether Defendants' unlawful wage and hour policies or practices as alleged herein were instituted willfully or with reckless disregard for the law; and

    c.   Whether the Centre was unjustly enriched at the expense of the chevre.

114. <u>Typicality</u>. Plaintiffs are typical of the members of the Class. Each Plaintiff was a chevre who committed himself or herself to the Centre based on false representations, and each was a victim of the same Centre employment policies.

115. <u>Adequacy</u>. Plaintiffs are adequate representatives of the Class because they are members of the Class and are committed to pursuing this matter to obtain relief for themselves and the Class. Plaintiffs have no conflict of interest with the Class. Plaintiffs' attorneys are competent and experienced in class action litigation and are free of conflicts of interest. Plaintiffs and their undersigned counsel will fairly and adequately represent the interests of the Class.

116. <u>Superiority</u>. Class action treatment is superior to individual adjudication of this controversy with respect to each Class member. The members of the Class have been damaged

and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures, and the members of the Class are entitled to recovery as a result of Defendants' violation of the New York Labor Law, the California Labor Code, the Illinois Minimum Wage Law, and the Florida Constitution. Although the relative damages suffered by individual Class and Subclass members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. Individual plaintiffs lack the financial resources to conduct a thorough examination of Defendants' compensation practices and to prosecute vigorously a lawsuit against Defendants to recover damages stemming from such practices. In addition, class litigation is superior because it will prevent unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

### CAUSES OF ACTION

**First Cause of Action**
**Fair Labor Standards Act – Minimum Wage**
**(On Behalf of All Plaintiffs and the FLSA Collective Against All Defendants)**

117.    Plaintiffs reallege and incorporate by reference all allegations in paragraphs 1 through 116 of this Class and Collective Action Complaint.

118.    Defendants employed Plaintiffs and the FLSA Collective.

119.    Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e), 206(a) and 207(a).

120.    Plaintiffs and the FLSA Collective were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

121.    Each Defendant has been an employer engaged in commerce and/or in the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), and/or 203(r) and 203(s).

122.     Defendants have engaged in a widespread pattern, policy, and practice of violating the FLSA, as detailed in this Class and Collective Action Complaint.

123.     Defendants have failed to pay Plaintiffs and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

124.     Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiffs and the FLSA Collective.

125.     As a result of Defendants' willful violations of the FLSA, Plaintiffs and the FLSA Collective are entitled to recover all unpaid wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Second Cause of Action**
**Fair Labor Standards Act – Overtime Wages**
**(On Behalf of All Plaintiffs and the FLSA Collective Against All Defendants)**

126.     Plaintiffs reallege and incorporate by reference all allegations in paragraphs 1 through 125 of this Class and Collective Action Complaint.

127.     Defendants employed Plaintiffs and the FLSA Collective.

128.     Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e), 206(a) and 207(a).

129.     Plaintiffs and the FLSA Collective were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

130.     Each Defendant has been an employer engaged in commerce and/or in the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), and/or 203(r) and 203(s).

131.     Defendants have engaged in a widespread pattern, policy, and practice of violating the FLSA, as detailed in this Class and Collective Action Complaint.

132. Defendants have failed to pay Plaintiffs and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

133. Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiffs and the FLSA Collective.

134. As a result of Defendants' willful violations of the FLSA, Plaintiffs and the FLSA Collective are entitled to recover all unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Third Cause of Action**
**New York Labor Law – Minimum Wage**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass against All Defendants)**

135. Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 134 of this Class and Collective Action Complaint.

136. Defendants employed Shoshan and the New York Subclass.

137. Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of the New York Labor Law ("NYLL") § 650 *et seq.* and the supporting New York State Department of Labor Regulations.

138. Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

139. The minimum wage provisions of Article 19 of the NYLL and the supporting New York State Department of Labor regulations apply to Defendants and protect Shoshan and the New York Subclass.

140. Defendants failed to keep, make, preserve, maintain, and furnish accurate records of hours worked by Shoshan and the New York Subclass, in violation of the NYLL.

141.    Defendants knowingly or intentionally failed to pay Shoshan and the New York Subclass minimum wages for all hours worked, as required by the NYLL and the supporting New York State Department of Labor regulations.

142.    By Defendants' knowing or intentional failure to pay Shoshan and the New York Subclass minimum hourly wages for all hours worked, Defendants have willfully violated NYLL Article 19, §§ 650 *et seq.* and the supporting New York State Department of Labor regulations.

143.    Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Fourth Cause of Action**
**New York Labor Law – Overtime Wages**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass Against All Defendants)**

144.    Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 143 of this Class and Collective Action Complaint.

145.    Defendants employed Shoshan and the New York Subclass.

146.    Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of NYLL § 650 *et seq.* and the supporting New York State Department of Labor Regulations.

147.    Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

148.    The overtime wage provisions of Article 19 of the NYLL and its supporting regulations apply to Defendants and protect Shoshan and the New York Subclass.

149.    Defendants have failed to pay Shoshan and the New York Subclass the overtime wages to which they are entitled under the NYLL and supporting New York State Department of Labor regulations.

150.    Shoshan and the New York Subclass were not exempt from the overtime wage provisions of Article 6 and Article 19 of the NYLL and its supporting regulations, and are entitled to be compensated according to the applicable overtime wage rate, which requires time-and-one-half pay for all hours worked in excess of forty (40) per workweek.

151.    Shoshan and the New York Subclass regularly worked for Defendants in excess of forty (40) hours in a workweek.

152.    Defendants knowingly and intentionally failed to pay Shoshan and the New York Subclass overtime wages for all workweeks during which Shoshan and the New York Subclass worked more than forty (40) hours, as required by the NYLL and the supporting New York State Department of Labor Regulations.

153.    By Defendants' knowing and intentional failure to pay Shoshan and the New York Subclass overtime wages for hours worked in excess of forty (40) per workweek, they willfully, intentionally, recklessly, and/or in bad faith violated the overtime wage provisions of the NYLL and the supporting New York State Department of Labor Regulations.

154.    By Defendants' failure to pay Shoshan and the New York Subclass premium overtime wages for hours worked in excess of 40 hours per workweek, they have willfully violated the NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

155. Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shoshan and the New York Subclass, as required by the NYLL and the supporting New York State Department of Labor Regulations.

156. Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment interest and post-judgment interest.

**Fifth Cause of Action**
**New York Labor Law – Spread-of-Hours Pay**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass Against All Defendants)**

157. Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 156 of this Class and Collective Action Complaint.

158. Defendants employed Shoshan and the New York Subclass.

159. Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of NYLL § 650 *et seq.* and the supporting New York State Department of Labor Regulations.

160. Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

161. The spread-of-hours pay provisions of the NYLL apply to Defendants and protect Shoshan and the New York Subclass.

162. Defendants have willfully failed to pay Shoshan and the New York Subclass additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

163.    By Defendants' knowing and intentional failure to pay Shoshan and New York Subclass spread-of-hours pay, Defendants have willfully violated NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor regulations.

164.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shoshan and the New York Subclass, as required by the NYLL and the supporting New York State Department of Labor Regulations.

165.    Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants their wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**<u>Sixth Cause of Action</u>**
**New York Labor Law – Wage Statements**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass against All Defendants)**

166.    Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 165 of this Class and Collective Action Complaint.

167.    Defendants employed Shoshan and the New York Subclass.

168.    Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of NYLL § 190 and the supporting New York State Department of Labor Regulations.

169.    Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

170.    Defendants have willfully failed to supply Shoshan and the New York Subclass with accurate wage statements with every payment of wages, as required by the NYLL, Article 6 § 195(3), listing: the dates of work covered by that payment of wages; name of employee; name of

employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; and the number of regular and overtime hours worked.

171. Defendants willfully failed to supply Shoshan and the New York Subclass, at the time of hiring and annually thereafter, as required by the NYLL, Article 6, § 195(1), in English or in the language identified as their primary language, wage notices listing: rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable; the regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address, if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary; and the regular hourly and overtime rate of pay.

172. The provisions of Article 6 of the NYLL and the supporting New York State Department of Labor regulations apply to Defendants and protect Shoshan and the New York Subclass.

173. By Defendants' knowing or intentional failure to provide Shoshan and the New York Subclass accurate statements of wages as required by NYLL, Article 6, §§ 195(1) and (3), they have willfully violated NYLL Article 6, § 195 *et seq.* and the supporting New York State Department of Labor regulations.

174.     Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants the maximum statutory penalties provided under the NYLL, declaratory relief, and reasonable attorneys' fees and costs.

**Seventh Cause of Action**
**California Labor Code – Minimum Wage**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

175.     Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 174 of this Class and Collective Action Complaint.

176.     Defendants employed Ezra Michaeli and the California Subclass.

177.     Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the California Labor Code ("Cal. Labor Code").

178.     Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

179.     The minimum wage provisions of the Cal. Labor Code §§ 1194, 1197, and 1197.1 apply to Defendants and protect Ezra Michaeli and the California Subclass.

180.     Defendants have willfully failed to pay Ezra Michaeli and the California Subclass the minimum wages to which they are entitled under the Cal. Labor Code.

181.     Ezra Michaeli and the California Subclass were harmed by Defendants' failure to pay them the minimum wages to which they are entitled.

182.     Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Eighth Cause of Action**
**California Labor Code – Overtime Wages**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

183. Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 182 of this Class and Collective Action Complaint.

184. Defendants employed Ezra Michaeli and the California Subclass.

185. Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

186. Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

187. The overtime wage provisions of Cal. Labor Code § 510 apply to Defendants and protect Ezra Michaeli and the California Subclass.

188. Defendants have failed to pay Ezra Michaeli and the California Subclass the overtime wages to which they are entitled under the Cal. Labor Code.

189. Ezra Michaeli and the California Subclass were not exempt from the overtime wage provisions of the Cal. Labor Code, and are entitled to be compensated according to the applicable overtime wage rate, which requires time-and-one-half the rate of pay for all hours worked in excess of forty (40) per workweek and the first eight (8) hours worked on the seventh day of work, and twice the rate of pay for all hours worked in excess of twelve (12) per day.

190. Ezra Michaeli and the California Subclass regularly worked for Defendants in excess of forty (40) hours in a workweek, twelve (12) hours in a day, and/or on a seventh day of work.

191. Defendants knowingly and intentionally failed to pay Ezra Michaeli and the California Subclass overtime wages for all workweeks during which Ezra Michaeli and the California

Subclass worked more than forty (40) hours, worked for more than twelve (12) hours in a day, and/or worked on a seventh day of work, as required by the Cal. Labor Code.

192. Ezra Michaeli and the California Subclass were harmed by Defendants' failure to pay them overtime wages for hours worked in excess of forty (40) hours in a workweek, twelve (12) hours in a day, and/or on a seventh day of work.

193. Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Ninth Cause of Action**
**California Labor Code – Wage Payment Provisions**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

194. Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 193 of this Class and Collective Action Complaint.

195. Defendants employed Ezra Michaeli and the California Subclass.

196. Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

197. Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

198. Cal. Labor Code §§ 201 and 202 require Defendants to pay Ezra Michaeli and the California Subclass all wages due within the time specified by law.

199. Cal. Labor Code § 203 provides that if an employer willfully fails to timely pay such wages, the employer must continue to pay the wages back until the back wages are paid in full or an action is commenced, up to a maximum of thirty days of wages.

200. Ezra Michaeli and the California Subclass are entitled to unpaid compensation, but to date have not received such compensation.

201. As fully alleged above, Defendants' failure to pay Ezra Michaeli and the California Subclass has been willful and intended to reduce labor costs.

202. More than thirty days have passed since Ezra Michaeli and the members of the California Subclass stopped working for Defendants.

203. Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to thirty days' wages under Cal. Labor Code § 203, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Tenth Cause of Action**
**California Labor Code – Record-Keeping Provisions**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

204. Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 203 of this Class and Collective Action Complaint.

205. Defendants employed Ezra Michaeli and the California Subclass.

206. Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

207. Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

208. Cal. Labor Code § 226(a) and the Wage Orders published by California's Industrial Welfare Commission apply to Defendants and protect Ezra Michaeli and the California Subclass.

209. Cal. Labor Code § 1174(d) applies to Defendants and protects Ezra Michaeli and the California Subclass.

210. Defendants failed to maintain records of hours worked by Ezra Michaeli and the California Subclass as required by the Cal. Labor Code.

211. Defendants knowingly and intentionally failed to provide timely, accurate, and itemized wage statements including, *inter alia*, hours worked, to Ezra Michaeli and the California Subclass as required by the Cal. Labor Code and the California Industrial Welfare Commission's Wage Orders.

212. Defendants' failure to provide timely, accurate, and itemized wage statements injured Ezra Michaeli and the California Subclass by, *inter alia*, impeding them from knowing the amount of wages to which they were entitled.

213. Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to recover from Defendants the amount provided by Cal. Labor Code §§ 226(e) and 1174.5, including the greater of a) all actual damages or b) fifty (50) dollars for the initial pay period in which a violation occurred and one hundred (100) dollars for each violation in a subsequent pay period.

**Eleventh Cause of Action**
**California Wage Orders and California Labor Code – Meal Break and Rest Break Violations**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

214. Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 213 of this Class and Collective Action Complaint.

215. Defendants employed Ezra Michaeli and the California Subclass.

216. Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

217.     Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

218.     The meal break and rest break provisions of the Cal. Labor Code §§ 226.7 and 512, and Wage Order No. 4-2001 §§ 11(a) and 12, apply to Defendants and protect Ezra Michaeli and the California Subclass.

219.     Ezra Michaeli and the California Subclass regularly worked shifts in excess of five (5) hours without being afforded at least a half-hour meal break in which they were relieved of all duty, and regularly worked in excess ten (10) hours without being afforded a second half-hour meal break in which they were relieved of all duty, as required by the Cal. Labor Code and Wage Orders.

220.     Ezra Michaeli and the California Subclass regularly worked shifts in which, per four (4) hours of work performed or major fraction thereof, they were not afforded at least one ten-minute rest break in which they were relieved of all duty, as required by the Cal. Labor Code and Wage Order.

221.     Due to Defendants' violations of the Cal. Labor Code and Wage Orders, Ezra Michaeli and the California Subclass are entitled to recover from Defendants one hour of additional pay at the regular rate of compensation for each workday in which the proper meal periods were not provided, pursuant to the Cal. Labor Code and Wage Order.

222.     Due to Defendants' violations of the Cal. Labor Code and Wage Orders, Ezra Michaeli and the California Subclass are entitled to recover from Defendants one hour of additional pay at the regular rate of compensation for each workday in which proper rest periods were not provided, pursuant to the Cal. Labor Code and Wage Order.

223. Due to Defendants' violations of the Cal. Labor Code and Wage Orders, Ezra Michaeli and the California Subclass are entitled to recover from Defendants reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5.

**Twelfth Cause of Action**
**California Business and Professions Code – Unfair Competition**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

224. Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 223 of this Class and Collective Action Complaint.

225. The foregoing conduct, as alleged, violates the California Unfair Competition Law ("UCL") – California Business and Professions Code §§ 17200 *et seq.* The UCL prohibits unfair competition by prohibiting, *inter alia*, any unlawful or unfair business acts or practices.

226. Beginning at a date unknown to Ezra Michaeli and the California Subclass, but at least as long as four years ago, Defendants committed, and continue to commit, acts of unfair competition, as defined by the UCL, by, *inter alia*, engaging in the acts and practices described in this Class and Collective Action Complaint.

227. Defendants conduct has injured Ezra Michaeli and the California Subclass members by wrongfully denying them earned wages and, therefore, was unethical, unscrupulous, and substantially injurious to them.

228. Defendants engaged in unfair competition by, *inter alia*, violating each of the following laws. Each violation constitutes an independent and separate violation of the UCL:

   d. The FLSA, 29 U.S.C. §§ 201 *et seq.*;

   e. Cal. Labor Code §§ 1194, 1197;

   f. Cal. Labor Code § 510;

g. Cal. Labor Code §§ 201-203, 226;

h. Cal. Labor Code §§ 1174, 1174.5;

i. Cal. Labor Code §§ 512, 226.7; and

j. California Wage Order No. 4-2001.

229. Defendants' course of conduct, acts, and practices in violation of the above laws violate the policy or spirit of such laws or otherwise significantly threaten or harm competition.

230. Due to Defendants' violations of the UCL, Ezra Michaeli and the California Subclass are entitled to recover from Defendants restitution in the amount of their unpaid wages and other statutory remedies, including, but not limited to, reasonable attorneys' fees and costs.

**Thirteenth Cause of Action**
**Florida Constitution - Minimum Wage**
**(On Behalf of Plaintiff Jake Stone and the Florida Subclass Against All Defendants)**

231. Plaintiff Jake Stone and the Florida Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 230 of this Class and Collective Action Complaint.

232. Defendants employed Stone and the Florida Subclass.

233. Defendants deprived Stone and the Florida Subclass of a minimum wage for each hour worked as guaranteed by Article X, § 24 of the Florida Constitution.

234. Defendants' failure and refusal to pay Stone and the Florida Subclass wages constitutes a willful violation of the Florida Constitution.

235. Due to Defendants' violation of the Florida Constitution, Stone and the Florida Subclass are entitled to recover from Defendants the applicable minimum hourly rate specified under Florida law for each hour worked during the five (5) years preceding the filing of this action, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

## Fourteenth Cause of Action
## Illinois Minimum Wage Law – Minimum Wage
### (On Behalf of Plaintiff Ofer Shaal and the Illinois Subclass Against All Defendants)

236.     Plaintiff Ofer Shaal and the Illinois Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 235 of this Class and Collective Action Complaint.

237.     Defendants employed Shaal and the Illinois Subclass as an employer and/or joint employer.

238.     Shaal and the Illinois Subclass were employees and Defendants were their employers within the meaning of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*. ("IMWL").

239.     Defendants engaged in a widespread pattern, policy, and practice of violating the IMWL, as detailed in the Class and Collective Action Complaint.

240.     The minimum wage provisions of the IMWL apply to Defendants and protect Shaal and the Illinois Subclass.

241.     Shaal and the Illinois Subclass were not exempt from the minimum wage provisions of the IMWL, and are entitled to be compensated according to the IMWL's applicable minimum wage rate.

242.     Defendants knowingly and intentionally failed to pay Shaal and the Illinois Subclass the minimum wage for all hours worked, as required by the IMWL.

243.     By Defendants' knowing and intentional failure to pay Shaal and the Illinois Subclass minimum hourly wages, Defendants willfully, intentionally, recklessly, and/or in bad faith violated the minimum wage provisions of the IMWL.

244.     Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shaal and the Illinois Subclass, as required by the IMWL.

245. Due to Defendants' intentional and willful violations of the IMWL, Shaal and the Illinois Subclass are entitled to recover from Defendants their unpaid wages, the maximum statutory interest damages for underpayments permitted under the IMWL, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

### Fifteenth Cause of Action
### Illinois Minimum Wage Law– Overtime Wages
### (On Behalf of Plaintiff Ofer Shaal and the Illinois Subclass Against All Defendants)

246. Plaintiff Ofer Shaal and the Illinois Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 245 of this Class and Collective Action Complaint.

247. Defendants employed Shaal and the Illinois Subclass as an employer and/or joint employer.

248. Shaal and the Illinois Subclass were employees and Defendants were their employers within the meaning of the IMWL.

249. Defendants engaged in a widespread pattern, policy, and practice of violating the IMWL, as detailed in this Class and Collective Action Complaint.

250. The overtime wage provisions of the IMWL apply to Defendants and protect Shaal and the Illinois Subclass.

251. Shaal and the Illinois Subclass were not exempt from the overtime wage provisions of the IMWL, and are entitled to be compensated according to the IMWL's applicable overtime wage rate, which requires time-and-one-half pay for all hours worked in excess of forty (40) per workweek.

252. Shaal and the Illinois Subclass regularly worked for Defendants in excess of forty (40) hours per workweek.

253. Defendants knowingly and intentionally failed to pay Shaal and the Illinois Subclass overtime wages for all workweeks during which Shaal and the Illinois Subclass worked more than forty (40) hours, as required by the IMWL.

254. By Defendants' knowing and intentional failure to pay Shaal and the Illinois Subclass overtime wages for hours worked in excess of forty (40) per workweek, they willfully, intentionally, recklessly, and/or in bad faith violated the overtime wage provisions of the IMWL.

255. Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shaal and the Illinois Subclass members, as required by the IMWL.

256. Due to Defendants' intentional and willful violations of the IMWL, Shaal and the Illinois Subclass are entitled to recover from Defendants their unpaid overtime wages found due at the rate of one-and-one-half times Shaal's and the Illinois Subclass's regular hourly rate of pay for all hours that Shaal and the Illinois Subclass worked in excess of forty (40) hours per workweek, the maximum statutory interest damages for underpayments permitted under the IMWL, reasonable attorneys' fees and costs, and prejudgment interest and post-judgment interest.

<u>**Sixteenth Cause of Action**</u>
**Unjust Enrichment**
**(On Behalf of All Plaintiffs and the Chevre Class Against All Defendants)**

257. Plaintiffs and the Chevre Class reallege and incorporate by reference all allegations in paragraphs 1 through 256 of this Class and Collective Action Complaint.

258. Defendants were enriched by Plaintiffs and the Chevre Class through the provision by Plaintiffs and the Chevre Class of the labor necessary to maintaining the Centre's commercial operations.

259. Defendants received and retained benefits from Plaintiffs and the Chevre Class in the form of the labor they performed, which was necessary to maintaining the Centre's commerical operations.

260. The Individual Defendants also were enriched by and received personal benefits from Plaintiffs and the Chevre Class through Plaintiffs' and the Chevre Class's provision of personal benefits to the Berg family, such as childcare, dog-walking, food delivery, and personal technology support.

261. Defendants had knowledge of these benefits. Defendants were substantially involved in the day-to-day commercial operations of the Centre and were the direct recipients of the personal benefits.

262. Defendants did not pay wages to Plaintiffs and the Chevre Class, thus unjustly retaining these benefits at the expense of Plaintiffs and the Chevre Class. This was to the detriment of Plaintiffs and the Chevre Class, who spent years providing this labor without receiving wages rather than performing labor for a different employer.

263. It violates fundamental principles of justice, equity, and good conscience to permit Defendants to retain the benefit of the unpaid labor performed by Plaintiffs and the Chevre Class without first paying its value to Plaintiffs and the Chevre Class.

264. Plaintiffs and the Chevre Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their unjust enrichment.

<u>**Seventeenth Cause of Action**</u>
**Fraudulent Inducement**
**(On Behalf of All Plaintiffs and the Chevre Class Against All Defendants)**

265. Plaintiffs and the Chevre Class reallege and incorporate by reference all allegations in paragraphs 1 through 264 of this Class and Collective Action Complaint.

266. Defendants uniformly falsely represented to Plaintiffs and the Chevre Class that the Centre's purpose was performing good works and spreading spiritual wisdom.

267. Defendants knew these representations to be untrue. The Bergs were aware of their own personal benefit from chevre work at the expense of the Centre's purported mission.

268. Defendants thus uniformly induced Plaintiffs and the Chevre Class to work for the Centre as chevre and to commit their property and possessions to the Centre on the basis of these false representations.

269. Defendants' uniform false representations were material. Defendants' false representations as to the purpose of the Centre and how chevre's work for the Centre would benefit the world were intended to, and did, influence Plaintiffs and the Chevre Class to forego other available career paths and work solely for the Centre. Plaintiffs and the Chevre Class committed themselves to the Centre because of these representations.

270. Defendants intended for Plaintiffs and the Chevre Class to rely upon these representations, such that Defendants could benefit from the labor of Plaintiffs and the Chevre Class without paying them for it.

271. Plaintiffs and the Chevre Class justifiably relied upon Defendants' fraudulent representations. Plaintiffs and the Chevre Class did not know that the Centre was being operated for the personal enrichment of the Berg family. Had Plaintiffs and the Chevre Class known this material fact, they would not have become chevre.

272. Plaintiffs and the Chevre Class became chevre as a result of Defendants' representations and were damaged thereby.

273.    Plaintiffs and the Chevre Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their fraudulent inducement.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other similarly situated persons, respectfully request that the Court enter judgment in their favor and against Defendants, providing the following relief:

a.    That, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to the members of the FLSA Collective, as defined above. Such notice shall inform such members that this civil action has been filed, the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

b.    Unpaid minimum wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

c.    Unpaid overtime wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

d.    Certification of this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

e.    A declaration that Plaintiffs are proper collective and class representatives;

f.    Appointment of the undersigned as Class Counsel;

g. Unpaid minimum wages, overtime wages, statutory and civil penalties, and liquidated damages as provided for by the New York Labor Law Article 19 and the supporting New York State Department of Labor Regulations;

h. Unpaid minimum wages, overtime wages, statutory and civil penalties, and liquidated damages as provided for by the California Labor Code, §§ 201-203, 218.5, 226, 226.7, 510, 512, 1174, 1174.5, 1194, 1194.2, 1197, 1197.1 and California Wage Order Nos. 4-2000 & 4-2001;

i. Unpaid minimum wages, overtime wages, and the maximum statutory interest damages for underpayments permitted as provided for by the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*.;

j. Unpaid minimum wages pursuant to Article X, § 24 of the Florida Constitution;

k. Compensatory, consequential, general, and punitive damages in an amount to be determined at trial;

l. Statutory damages, treble damages, and punitive or exemplary damages, to the extent permitted by law;

m. Reasonable attorneys' fees and costs, including expert fees;

n. Prejudgment and post-judgment interest at the maximum legal rate; and

All such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and claims so triable.

Dated: July 25, 2019
       New York, New York

**PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

_____
Deborah H. Renner (DR 4225)
Shira Lauren Feldman (SF 4108)
Claiborne R. Hane (CH 2120)
Abbye R. Klamann Ognibene (admission _pro hac vice_
to be requested)
277 Park Avenue, 45th Floor
New York, NY 10172
Telephone: (212) 484-9866
drenner@piercebainbridge.com
sfeldman@piercebainbridge.com
chane@piercebainbridge.com
aognibene@piercebainbridge.com

_Attorneys for Plaintiffs and the Proposed Collective
and Class_