**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JAMES GREENE, JENNIFER SHAAL, OFER SHAAL, JAKE STONE, GUY SHOSHAN, EINAT EZRA MICHAELI, and YIFAT SHMILOVICH, on behalf of themselves and all others similarly situated,

        Plaintiffs,

      v.

KABBALAH CENTRE INTERNATIONAL, INCORPORATED; KABBALAH CENTRES OF THE UNITED STATES, INCORPORATED; KABBALAH CENTRE OF NEW YORK, INCORPORATED; THE KABBALAH CENTRE OF FLORIDA, INC.; KABBALAH CHILDREN'S ACADEMY; KABBALAH ENTERPRISES, INCORPORATED; KAF INVESTMENTS, LLC; 501 N. LA CIENEGA, LLC; SPIRITUALITY FOR KIDS INTERNATIONAL, INC.; and KAREN BERG, YEHUDA BERG, and MICHAEL BERG,

        Defendants.

**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**

**Jury Trial Demanded**

No.  19-cv-4304 (ILG) (SJB)

Plaintiffs James Greene ("Greene"), Jennifer Shaal ("J. Shaal"), Ofer Shaal ("O. Shaal"), Jake Stone ("Stone"), Guy Shoshan ("Shoshan"), Einat Ezra Michaeli ("Ezra Michaeli"), and Yifat Shmilovich ("Shmilovich") bring this action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), state wage and labor statutes, state common law, and Federal Rule of Civil of Procedure 23, on behalf of themselves and all others similarly situated, against Defendants Kabbalah Centre International, Incorporated, Kabbalah Centres of the United States, Incorporated, Kabbalah Centre of New York, Incorporated, The Kabbalah Centre of Florida, Inc., Kabbalah Children's Academy, and Spirituality for Kids International, Inc. (the "Not-for-Profit Affiliated Entities"); Kabbalah Enterprises, Incorporated, KAF Investments, LLC, and 501 N. La Cienega, LLC (the "For-Profit Affiliated Entities") ((together with the Not-for-Profit Affiliated Entities, the "Centre," or the "Corporate Defendants"); and Karen Berg ("K. Berg"), Yehuda Berg ("Y. Berg"), and Michael Berg ("M. Berg") (collectively, the "Bergs" or the "Individual Defendants," and together with the Corporate Defendants, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are former employees of the Centre, a self-proclaimed spiritual organization that purports to spread the teachings of the Kabbalah, a form of Jewish mysticism.  As early as 1998, Plaintiffs were induced to join the Centre as "chevre," led to believe that they would be spiritual workers who were to help enlighten humanity to the teachings of the Kabbalah.  In reality, the individuals who control the Centre – the Bergs – operate a cult that preys upon those seeking to improve the world through the performance of good works.

2.      The Centre is run by the Berg family.  K. Berg's husband, Philip Berg, took over the Centre in 1969, and since his death in 2013, K. Berg alone is the ultimate authority on all decisions

related to the Centre.  Her sons, M. Berg and Y. Berg, assist her.  The Centre revolves around the Bergs, their families, and their demands.

3.     "Chevre" is not a religious term.  It is a secular Hebrew word which, loosely translated, means "a small community of friends," or, more colloquially, "a gang of friends."  The secular nature of chevre was repeatedly demonstrated by their background and training.  No special religious or spiritual training was required to become a chevre.  Chevre did not have to hold a particular set of religious or spiritual beliefs, nor did they consider themselves to be religious workers.  Once they became chevre-employees, chevre received virtually no religious or spiritual training.  Instead, their training was almost entirely focused on exploiting the Centre's outwardly religious mission to obtain ever increasing amounts of money.

4.     In their day-to-day work, chevre did not represent themselves to be religious workers, nor were they considered to be religious workers.  When they were not serving as facilities managers at the Centre's far-flung offices or as personal assistants catering to the whims of the Individual Defendants, chevre worked tirelessly to raise money for the Centre and, by extension, the Individual Defendants.  Chevre even were ordered by the Individual Defendants to perform uncompensated work for Spirituality for Kids International, Inc. ("SFK"), a close affiliate of the Centre dedicated to pulling children into the Centre's orbit at an early age.  Though Defendants had proper employees who were paid legally adequate wages performing many of the same tasks, Defendants did not pay the chevre employees any wage at all.

5.     One of the main ways in which the Centre raised money was through various events and "classes."  The Centre referred to the participants in these events and classes as "students."  Defendants taught chevre how to obtain, track, and exploit intimate details about their students' lives in order to extract ever larger "donations" from them.

6.      Upon joining the Centre, chevre were manipulated into becoming completely dependent upon Defendants for their very survival.  Many Plaintiffs and those like them were manipulated into giving up their material possessions and their relationships outside the Centre.  They lived in overcrowded Centre housing with other chevre.  They worked seven days a week, often for 16 to 20 hours a day, and they were always on call for the Bergs.  Every aspect of their lives was controlled by the Centre.  For many, they ate the food the Centre provided, even when it made them sick.  They wore clothes donated to the Centre.  Basic household items such as soap and shampoo were Centre-issued.  Basic medical care was available infrequently, if at all.  And the Centre dictated the chevre's major life decisions, telling them where to live and work, when to marry, and whom to marry.

7.      The Individual Defendants took advantage of the chevre in more ways than just forcing them to work long hours without pay and under extreme conditions.  Y. Berg also used his position of authority to manipulate already vulnerable female chevre into sleeping with him.  Defendants were undoubtedly aware of Y. Berg's history of problematic relationships with women: Y. Berg testified before a jury that he offered a former student of the Centre an alcoholic drink and Vicodin, and touched her leg to see if "anything intimate" might occur.  The jury ordered Y. Berg to pay the former student $135,000, and also found that the Centre had supervised him negligently. The chevre knew at the time that Y. Berg was abusing his authority to have inappropriate relationships, including sexual relations, with female chevre.

8.      Isolated, without resources, and totally dependent on the Centre for virtually every aspect of their lives, chevre were tasked with performing household work for the Bergs or performing other jobs that would raise money for the Centre and keep it running.  The cheap labor provided by chevre was necessary to the Centre's existence.  Yet the Centre did not pay chevre

wages.  Instead, it essentially used them as the slave labor needed to operate the cult and enrich the Bergs.

9.      Upon information and belief, the Internal Revenue Service ("IRS") began investigating the Centre for its enrichment of the Bergs in or about 2011.  At roughly the same time, the Centre began reporting "wages" for chevre on W-2 forms, which, on information and belief, were calculated based on the room and board provided to the chevre – not based on their actual work. The Centre sometimes "paid" these "wages" to chevre, but with a strict instruction that the money be returned to the Centre immediately.  Those "wages" also were woefully inadequate, and Plaintiffs and other chevre additionally lost years of paid employment because they were defrauded into joining the Centre as chevre.

10.     The Individual Defendants had total control over the Centre, and they used that control to enrich themselves.  Donations solicited and obtained by chevre ostensibly for the Centre were used to purchase multi-million dollar homes across the country for the Bergs' personal use and to pay off personal credit card debt.   The Bergs also used these donations to invest in real estate. These investments were made through the For-Profit Affiliated Entities, even though they were supposedly independent from the Not-for-Profit Affiliated Entities.

11.     Not only were Plaintiffs and those like them fraudulently induced into joining the Centre as chevre, their ability to sue the Centre purposefully was concealed from them.  They were uniformly told by the Centre that they were not entitled to compensation for their work.

12.     After years of abuse and exploitation, Plaintiffs now seek to stand up for themselves and others similarly situated, to recover unpaid wages and other damages stemming from years spent working for the Centre.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, minimal diversity jurisdiction pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  In addition, this Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b).

14.     The amount in controversy in this matter exceeds the sum or value of $5,000,000, exclusive of interests and costs.

15.     At least one member of each proposed class or subclass is a citizen of a state different from that of at least one Defendant.  Plaintiffs' claims involve matters of national or interstate interest.

16.     Defendants are subject to personal jurisdiction in this District.  Defendants purposefully direct their conduct at New York, transact substantial business in New York, and have substantial aggregate contacts with New York.  Defendant Kabbalah Centre of New York, Incorporated is incorporated in New York, and Defendant M. Berg lives in New York.

17.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

*Plaintiffs*

18.     Plaintiff James Greene is a former chevre.  Greene became a chevre in 2004, after several years of volunteering for the Centre.  He worked at Centre locations in Los Angeles, California, and Boca Raton, Florida.  Greene has a Bachelor of Science degree in Sports Medicine from Pepperdine University, a Master's degree in marriage, family, and child therapy from Phillips

Graduate University, and is a certified alcohol and drug addiction counselor through the University of California, Los Angeles. He has been a Licensed Family and Marriage Therapist in California since 1992. The Centre did not require that Greene undertake any religious training or education before he became a chevre, and neither the Centre nor anyone else provided such training or education. While at the Centre, Greene's work primarily was non-religious. He was mainly a fundraiser and emcee for major Centre events. Greene was very successful in these roles: he obtained $500,000 in donations for the Centre in his first year as a chevre. Greene left the Centre in 2009. Before joining the Centre, he had a successful private psychotherapy practice, which he re-started following his departure. He is a resident of Los Angeles, California.

19.    Plaintiff Jennifer Shaal is a former chevre. J. Shaal became a chevre in 2005. The Centre did not require that J. Shaal undertake any religious training or education before she became a chevre, and neither the Centre nor anyone else provided such training or education. In the United States, she worked at Centre locations in Los Angeles, California, Boca Raton, Florida, and Miami, Florida. Before becoming a chevre, J. Shaal worked at the New York, New York location, where she assisted the head of donor relations and was paid an annual salary of $70,000. After she became a chevre, her responsibilities at the Centre primarily were not religious. Mainly, she was a facilities and office manager, supervising the day-to-day operations of the Miami location (overseeing expenses, staff, the on-site bookstore, instructors, local Centre property, maintenance, events, marketing, and the expansion of a Spanish department); setting financial revenue and donation goals for the Centre; and identifying prospective donors. J. Shaal also served as a personal assistant to Monica Berg, Defendant Michael Berg's wife. She left the Centre in 2015. Before joining the Centre, first as a paid employee and then as a chevre, J. Shaal's annual income

was nearly $100,000 as an account manager in financial sales.  She started working again only in August 2019.  She is a resident of Boca Raton, Florida.

20.     Plaintiff Ofer Shaal, who is married to Plaintiff Jennifer Shaal, is a former chevre.  O. Shaal became a chevre in 2002.  The Centre did not require that O. Shaal undertake any religious training or education before he became a chevre, and neither the Centre nor anyone else provided such training or education.  In the United States, he worked at Centre locations in Los Angeles, California, Boca Raton, Florida, and Miami, Florida.  For a time, O. Shaal also commuted regularly to Chicago, Illinois, to meet with students and solicit donations there.  O. Shaal's other primary responsibility was similarly not religious: he functionally acted as the head of the Centre's Information Technology ("IT") department.   In that capacity, he was responsible for the architecture of the Centre's websites, including the SFK sites; managing the websites, including the SFK site; monitoring website analytics; and managing the Centre's phone system.  A paid employee, Ron Johnson, shared these responsibilities.  O. Shaal did video shoots for SFK, including a three-day shoot at a camp in Canyon Creek, near the Los Angeles Centre, with Shoshan.  O. Shaal also performed personal, non-religious tasks for the Bergs, such as walking their family dogs and bringing the Bergs food.  Before joining the Centre, O. Shaal served in the Israeli Air Force, through which he worked on a flight simulator and completed a prestigious computer programming course.  He left the Centre in 2015.  Based on his prior technical training in Israel, his annual salary and benefits together now exceed $100,000.  He and J. Shaal also co-own a web design company, which last year had revenue in excess of $75,000.  O. Shaal is a resident of Boca Raton, Florida.

21.     Plaintiff Jake Stone is a former chevre.  In approximately 2005, at the age of either 16 or 17, he started attending classes at the Centre.   Though these classes loosely discussed

spirituality, their main purpose was to increase individuals' commitment to the Centre.  The classes worked on Stone.  In 2008, when he was 19, he dropped out of college to become a chevre.  The Centre did not require that Stone undertake any religious training or education before he became a chevre, and neither the Centre nor anyone else provided such training or education.  Stone worked at Centre locations in Boca Raton, Florida, Miami, Florida, and Los Angeles, California.  His responsibilities at the Centre primarily were non-religious and included janitorial work; telemarketing; and maintaining, restocking, and eventually managing an on-site bookstore.  Stone also taught break-dancing classes at SFK.  Stone's responsibilities also included walking the Berg family dog and caring for the Bergs' children.  Like all chevre, as Stone became more senior, his primary responsibility shifted to raising more money to benefit the Bergs.  Stone did this by becoming a teacher, meeting with and learning about students to manipulate them into continually donating to the Centre and buying Centre merchandise.  Stone used non-religious self-help books to prepare for the classes he taught.  Stone left the Centre in 2016.  He now works as a life coach and motivational speaker at drug rehabilitation centers.  Stone's work today incorporates many of the same non-religious ideas he taught as part of his Centre classes.  Now, however, he is paid an hourly wage.  He is a resident of Fort Lauderdale, Florida.

22.     Plaintiff Guy Shoshan is a former chevre.  He first became acquainted with the Centre through his uncle, who attended classes at the Centre regularly in Israel in 1995, when Shoshan was 13.  Prior to becoming a chevre, Shoshan completed specialized courses in video production and then joined the Israeli Army.  None of Shoshan's training was religious in nature.  In 1998, he left the Army and became a chevre.  The Centre did not require that Shoshan undertake any religious training or education before he became a chevre, and neither the Centre nor anyone else provided such training or education.  In the United States, he worked at Centre locations in New

York, New York, and Los Angeles, California.  Shoshan's responsibilities at the Centre primarily were not religious.  He ran the Centre's video production services, creating the DVDs the Centre sells; provided the audio/video production and direction necessary for major Centre events; and served food and washed dishes after Centre meals.  Shoshan did video shoots for SFK, including a three-day shoot at a camp in Canyon Creek, near the Los Angeles Centre, with O. Shaal. Shoshan's responsibilities also included driving for the Bergs; walking the Bergs' dogs; and providing personal technical support to the Berg families.  When the Bergs had private viewings of commercially released movies with friends, Shoshan was on call should any technical issue arise at any hour of the day or night.  Shoshan left the Centre in 2018.  He is a resident of Brooklyn, New York.

23.     Plaintiff Einat Ezra Michaeli is a former chevre.  She became a chevre in 2005, and worked in the Centre's locations in New York, New York, Los Angeles, California, and Boca Raton, Florida.  Before joining the Centre as a chevre, Ezra Michaeli was trained in Israel as an attorney.  The Centre did not require that Ezra Michaeli undertake any religious training or education before she became a chevre, and neither the Centre nor anyone else provided such training or education.  Ezra Michaeli's responsibilities at the Centre included janitorial work; preparing food; overseeing building maintenance; coordinating volunteers; coordinating classes (setting up rooms, printing fliers, and scheduling); and coordinating students.  To coordinate students, Ezra Michaeli would meet with teachers to solicit information about students, and then track that information in a database and an excel spreadsheet.  This information included details about a student's personal life, his sexual orientation, his financial situation, and his family relationships.  The spreadsheets did not contain religious information about the students.  The purpose of this tracking was to identify the students most likely to donate substantial sums of

money to the Centre.  Ezra Michaeli also worked for a period in the Centre's legal department, and she kept the teachers' revenue records, which listed teachers' names, the amounts they had produced through product sales, and the amounts they had produced through donations.  K. Berg reviewed these records regularly.  Ezra Michaeli left the Centre in 2016.  She is a resident of Los Angeles, California.

24.     Plaintiff Yifat Shmilovich is a former chevre.  She became a chevre in 2004 at 22, after completing two years of service in the Israeli Air Force.  The Centre did not require that Shmilovich undertake any religious training or education before she became a chevre, and neither the Centre nor anyone else provided such training or education.  In the United States, she worked at Centre locations in Los Angeles, California, and New York, New York.  Shmilovich's responsibilities at the Centre primarily were non-religious.  They included managing volunteers, cleaning, providing maintenance, organizing fundraising, and maintaining the Centre's database.  Shmilovich's responsibilities also included shifts personally serving the Bergs and their families, such as walking their dogs and running errands for them.  Shmilovich left the Centre as a chevre in early 2015, but from May 2015 until 2018 she was an hourly paid employee – performing the same labor for which she had not previously been compensated.  She is a resident of Los Angeles, California.

*Defendants*

25.     Defendant Kabbalah Centre International, Incorporated is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

26.     Defendant Kabbalah Centres of the United States, Incorporated is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

27.     Defendant Kabbalah Centre of New York, Incorporated is a New York not-for-profit corporation organized and existing under the laws of New York, with its principal place of business at 155 East 48th Street, New York, New York 10017.

28.     Defendant The Kabbalah Centre of Florida, Inc. is a Florida not-for-profit corporation organized and existing under the laws of Florida, with its principal place of business at 8411 West Palmetto Park Road, Boca Raton, Florida 33433.

29.     Defendant Kabbalah Children's Academy is a California non-profit corporation organized and existing under the laws of California, with its principal place of business at 9250 West Olympic Boulevard, Beverly Hills, California 90212.

30.     Defendant Kabbalah Enterprises, Incorporated is a California profit-sharing corporation organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

31.     Defendant KAF Investments, LLC is a California investment business organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

32.     Defendant 501 N. La Cienega, LLC is a California investment business organized and existing under the laws of California, with its principal place of business at 1062 South Robertson Boulevard, Los Angeles, California 90035.

33.     Defendant Spirituality for Kids International, Inc., is a California non-profit corporation organized and existing under the laws of California, with its principal place of business

at 5792 West Jefferson Boulevard, Los Angeles, California 90016.  According to its 2009 Restated Articles of Incorporation, SFK's "specific charitable purpose . . . shall be to support charitable and educational efforts of Kabbalah Centre International, Inc. . . . this corporation shall be organized and at all times operated exclusively for the benefit of Kabbalah Centre International, Inc. . . . ." According to SFK's 2008 By-Laws, SFK's Board of Directors is to be appointed by the Board of Directors of the Kabbalah Centre International, Incorporated.

34.    The Centre has a "Confidential and Proprietary Information Agreement" that it has required chevre to sign when they leave the Centre.   This agreement defines each of the Corporate Defendants as a "related entit[y]" with which the chevre had some relationship by virtue of their role as chevre.

35.    The Corporate Defendants functionally operated as a single corporate entity, under the control of the Bergs.

36.    The Corporate Defendants had more than four employees throughout the relevant period.

37.    The Corporate Defendants had sales or business of at least $500,000 per annum during the relevant period.

38.    Defendant Karen Berg resides in Beverly Hills, California.  Karen Berg is the Chief Executive Officer of the Centre.

39.    Defendant Yehuda Berg resides in Beverly Hills, California.   Yehuda Berg was intimately involved in Centre operations and decision-making during the relevant period.

40.    Defendant Michael Berg resides in New York, New York.   Michael Berg was intimately involved in Centre operations and decision-making during the relevant period.

41.     During the relevant period, the Individual Defendants exercised significant control over Centre operations.  The Individual Defendants also dictated chevre's work assignments, monitored their performance, and determined the nature and amount of any minimal in-kind compensation chevre received.

## ALLEGATIONS COMMON TO ALL COUNTS

### I.     Background On The Centre

42.     The Kabbalah Centre was founded by Yehuda Ashlag in 1922.  Philip Berg became the Centre's director in 1969, and together with his wife, Karen, and their sons, Michael and Yehuda, he led the Centre until his death in 2013.  Following his death, Karen Berg has remained the leader of the Centre.

43.     The Centre states its purported purpose as bringing the teachings of Kabbalah to the masses.  The Centre does not follow traditional restrictions on Kabbalistic study, and it invites all people, regardless of age, sex, or religious affiliation, to participate in its classes and events.  The Centre refers to those who participate in classes and events as "students."

44.     Labor for the Centre's operations is provided by a mix of "regular" employees and chevre.  The Centre pays its non-chevre employees legally adequate wages.  It does not pay its chevre employees wages at all.

### II.     The Centre Is Not A Religious Organization But A Way To Enrich The Individual Defendants

45.     By its own admission, the Centre is not a religious organization.  Today, the Centre's website proclaims that "Kabbalah is a spiritual wisdom, not a religious one," and a 2010 version of the Centre's website explains, "People often ask, 'Is Kabbalah religion?' The answer is no! Not at all!"  It is for this reason that the Centre told teachers that they should never describe the

13

Centre as a religious institution, Kabbalah as a religion, or to discuss religion at all.  In fact, chevre who taught classes were careful to not reference the Bible or the Hebrew alphabet when teaching.

46.     Instead, the Centre's ultimate objective is to raise revenue and solicit donations that benefit the Individual Defendants and their families.

### A.     Because Spreading Religion Was Not The Focus Of The Centre, No Religious Training Or Background Was Required Of Potential Chevre

47.     Defendants did not require that individuals had any religious training or background before becoming chevre.  Though certain of the chevre were Jewish, not all were, and being a member of the Jewish faith was not required to become a chevre.  Indeed, Defendants did not ask chevre applicants about their religious training or background or require that applicants complete any religious training before becoming chevre employees.

### B.     Defendants Trained Chevre In One Thing: How To Raise Money

48.     Though chevre received training on many topics while employed by Defendants, virtually none of that training was religious in nature.  Many of the trainings centered on how to act as facilities managers for the Centre.  For example, the chevre were trained in (*i*) how to run a kitchen, (*ii*) how to order Centre supplies, (*iii*) how to decorate, including using flowers and candles to make rooms feel more inviting, (*iv*) how to use the Centre's calendaring system, (*v*) setting up cleaning schedules, (*vi*) building alarm codes, (*vii*) how to manage conflict among employees, and (*viii*) how to ensure that classes were recorded.

49.     The remainder of the trainings were focused on how to raise money.  Again, these trainings were almost entirely divorced from any religion.  Chevre were taught how to manage volunteers, track donations, and handle donors.  Chevre were shown videos instructing them on how to make cold calls and how to build a rapport over the phone.  They were also given a week's training in public speaking.  They were taught how to generate reports on donations and revenue.

Among other things, these reports were regularly given to K. Berg, who eagerly tracked Defendants' financial status.

50.     Chevre, including Eza Michaeli, kept track of their solicitations using commercially available customer relationship manager ("CRM") software.[1]   "WealthEngine" is one CRM software for which the Centre paid.  WealthEngine "is the leading wealth research services firm for nonprofit organizations and financial services companies.  Recognizing the value of wealth indicators and identifying links to prospects, WealthEngine gathers information to assist wealth managers, marketers and development professionals to create strategies for up-selling, cross-selling or fundraising."[2]

51.     To help raise money, chevre drew on their prior, non-religious professional backgrounds.  They also regularly relied on methods espoused by pop self-help gurus.  For example, some chevre were instructed on how to maximize donations by one of Tony Robbins's top employees.  Robbins is a self-described "life coach," who, on information and belief, does not follow or employ religious strictures in his work.  Indeed, the instruction provided to the chevre by Robbins's employee was not religious.

52.     Plaintiffs and other chevre, regardless of other work assignments, participated in the Centre's quest for ever-increasing revenue and donations.  A chevre's "value" was measured by her success at soliciting these donations and raising this revenue.  Chevre were given revenue quotas, or "goals," which were tracked on a monthly and yearly basis.  These quotas were substantial.  In 2008, for example, Greene was told that he was required to bring a minimum of $250,000 to the Centre for that calendar year.

---

[1] CRM software is typically used by businesses for marketing and sales to customers.
[2] https://www.crunchbase.com/organization/wealthengine#section-overview

53.     Chevre who were not meeting their goals were warned that they would be fired and kicked out of the Centre if their performance did not improve.   Given that the chevre were completely dependent upon the Centre, this was a significant threat.   A chevre who raised insufficient funds might be sent to a Centre location where he knew no one.   He might be excluded from certain Centre activities.   And he would be denied permission to date or to marry.   Shoshan, for example, could not even ask for permission to date until he "proved" himself by raising enough money to satisfy K. Berg.

### C.    The Centre's Much-Touted "Kabbalah Education" Was Just A Sophisticated Way For The Individual Defendants To Enrich Themselves

54.     Though teaching spiritual classes to students was supposedly the purpose of the chevre program, chevre received little training in Kabbalah or any other religion or set of spiritual beliefs. Instead, many of the trainings the chevre were given focused on how to use the "lessons" as yet another way to obtain money.   For example, chevre were taught to lure students into classes with discounts.   Chevre also received documents training them on how to guide the "journey" on which the Centre claimed the students should go.   Though dressed up in spiritual language, the documents made clear that each student's "journey" was really about increasing the student's financial commitments to the Centre.

55.     Once enrolled, the chevre were taught to gather as much specific information about the students as possible.   The information chevre gathered included students' personal finances, their family relationships, their sexuality, and their hopes, dreams, fears, and anxieties.   Chevre put this information into Defendants' CRM software.   If this information had a religious purpose, it was never conveyed to the chevre.

56.     Chevre who served as teachers were then taught how to use this intimate information to squeeze money from Centre students.  Chevre would strategize among themselves and with their supervisors over which students to target, for how much money, and in what manner.

57.     Each chevre who worked as a teacher had a supervisor, referred to as a "mentor."  From this mentor, chevre would obtain scripts which instructed them on information to pass along to students.  The majority of these scripts were focused on raising revenue and creating admiration for the Individual Defendants.  To the extent chevre received any religious training, much of it was through these scripts.  The scripts had very high-level information about Kabbalah that chevre could parrot to their students.  However, because there was no actual religious training, if a student asked a chevre any questions about this rote spirituality, the chevre often was unable to answer.

58.     Chevre met with their mentors each week about their students.  These meetings were focused on maximizing each student's contributions to the Centre.

59.     The Centre also has a "student support" department.  The purpose of the student support department is to provide personal engagement to students who do not live near a physical Centre location, so that they are more likely to buy merchandise from and donate money to the Centre. Chevre who worked in student support, including O. Shaal, J. Shaal, and Ezra Michaeli, spent their days conducting telemarketing calls.  They contacted existing students, with a goal of selling them more classes, more event tickets, more literature, and more Centre goods, and of soliciting increasingly large donations from those students.  Student support workers, such as Stone, also cold-called potential new students, hoping to pique their interest in the Centre and ultimately identify an additional revenue source.

60.     Central to the cult, chevre also were tasked with persuading students, and each other, that the Centre's leaders were awe-inspiring, capable of performing miracles, and above reproach.

Central to the Centre's message was the importance of serving the Bergs and remaining loyal to them.

### D. The Individual Defendants Used The Centre And The Corporate Defendants As Their Personal Piggy Banks

61.     Upon information and belief, the Centre has transferred money among domestic and international Centre locations for the apparent benefit of the Bergs' personal interests and not any interests of the Centre.  Some Centre funds also are held in offshore bank accounts.

62.     The Individual Defendants did not respect the distinction between their own assets and those of the Corporate Defendants, nor did they differentiate between the Not-for-Profit Affiliated Entities and the For-Profit Affiliated Entities.  Chevre solicited donations that were intended to benefit the ostensibly religious purpose of the Not-for-Profit Affiliated Entities, but, upon information and belief, this money instead was used by the For-Profit Affiliated Entities for for-profit purposes, such as real estate or stock investments, that personally benefited the Bergs.

63.     The Individual Defendants and their families have numerous multi-million-dollar homes on both coasts, including mansions in Beverly Hills and a townhouse in Manhattan.  The Individual Defendants also have exclusive access to a set of luxury apartments above the Centre's Manhattan location.  These personal homes were all funded by the Centre.

64.     The Centre also paid for many of the Individual Defendants' personal expenses.  For example, the Individual Defendants and their families placed personal charges, such as room service, in-room movies, and mini bar purchases, on Centre-issued credit cards.  On information and belief, the Individual Defendants did not reimburse the Centre for these expenses.  The Centre also paid the bills for K. Berg's personal American Express card.

65.     Not only did chevre have to solicit donations to benefit the Centre, they had to solicit donations that directly benefited the Individual Defendants.  If, for example, a Berg family member

were visiting a particular Centre location, the chevre at that Centre would be responsible for soliciting Centre students to lend the Centre luxury vehicles in which chevre then chauffeured the Berg family during their visit.

### E.     The IRS Investigates The Centre

66.     When some of the Centre's corporate entities applied for tax-exempt status with the IRS, the Individual Defendants represented to the IRS that no funds or property of the Centre were used for the Bergs' "own personal needs and convenience." These representations were false. Many of the donations solicited by chevre plainly were for the Individual Defendants' benefit alone, and not just for the mere "subsistence" the Bergs represented to the IRS that they took from the Centre. Such donations have included private plane rides; jewelry and couture handbags; trips to destinations such as Ibiza, Spain, and Punta Cana, Dominican Republic; spa vacations; and plastic surgery. Before Philip Berg's death, he and K. Berg would visit the Centre's location in Las Vegas and stay at casino hotels on the Strip. They gambled so frequently that they received complimentary meals, rooms, and limousine rides from the airport courtesy of the casinos.

67.     Whenever K. Berg visited a particular Centre location, the chevre there were instructed to solicit cash donations from students before her arrival. Then, the manager of that location would have the cash available during K. Berg's visit so that it could be used for whatever purchases she might want – shoes or jewelry, for example – and so that she could have the cash herself if she wanted it.

68.     According to Nicolas Boord, the Centre's Chief Financial Officer until 2009, during his tenure, the Centre had six nonprofit and three for-profit entities that collectively earned annual revenues of $60 million, owned a $200 million real estate portfolio, and managed a $60 million investment fund.

69.     In 2011, the Los Angeles Times reported that the Centre had become the focus of a federal tax evasion investigation involving the criminal division of the IRS and the U.S. Attorney's Office for the Southern District of New York.  A federal grand jury was convened in the Southern District of New York, and agents from the IRS criminal division interviewed Centre-affiliated individuals in Los Angeles.  The subject of the investigation, at least in part, was whether nonprofit funds were used to personally enrich the Bergs.

70.     After news reports began surfacing about the IRS investigation, the Centre told chevre that this was a test of each chevre's belief in the Centre and its purported mission, and it provided chevre with "talking points" to use should anyone ask them about the investigation.  Chevre never learned, however, what the outcome was of the investigation, or whether it continues to this day.

## II.     Chevre Were Poorly Treated

71.     The Centre first used the term "chevre" in the 1980s.  At the beginning, the vast majority of chevre were Israeli teenagers or young adults, recently finished with their service in the army, who were brought to the United States.  They had no bank accounts, housing, or money, and were totally dependent upon the Centre for their basic needs.  This dependence on the Centre for basic survival continued even as the organization grew and chevre began to join in many locations.

### A.     Though Unpaid, Chevre Worked Around The Clock On Menial, Non-Religious Tasks

72.     On top of their work soliciting donations and "teaching classes," the chevre were forced to provide the labor necessary to the Centre's commercial operations.  Defendants employed chevre to do these tasks because it was cheaper than hiring and legally compensating standard employees. This labor included cooking and cleaning, retail sales, stocking and restocking inventory, maintaining the Centre's web operations, and conducting telemarketing calls.  Chevre

assisted in event planning, event management, video and audio production of materials sold by the Centre, and publication of written materials sold by the Centre.

73.    In addition, chevre worked as personal servants and household employees – all without pay – for the Individual Defendants and their families.  Among many other tasks, Shmilovich, Stone, and Shoshan cared for the Individual Defendants' children, grandchildren, and pets; ran errands, such as food delivery; provided assistance with household audio/video equipment; and drove Individual Defendants and their family members to luxury meals, massage sessions, and plastic surgery appointments.  O. Shaal also delivered food to the Bergs' homes and J. Shaal served as Monica Berg's personal assistant.  Chevre were assigned shifts for these mandatory tasks, which were referred to as "Toranut," a Hebrew word that translates roughly to "family duties."

74.    The Centre required chevre to prioritize personal tasks for the Individual Defendants over other Centre duties.  Other activities were put on hold whenever an Individual Defendant or other Berg family member needed something.  The Centre is run as a family business by the Bergs, rather than as a functioning charitable organization or religious movement.

75.    Chevre frequently worked 16 to 20 hour days, seven days a week, and were on call at all times.  Shoshan, for example, was required to be available at any time of day or night should a Berg need technical assistance with personal equipment such as a home television and video system.

**B.    Defendants Forced Chevre To Become Completely Dependent Upon Them**

76.    Chevre were told that they were working together to build a bright future, and that they did not have to worry for their basic needs anymore – including housing, food, and clothing – as these would be provided by the Centre for the rest of their lives.  This would free the chevre up to focus on their personal growth and spreading the teachings of the Centre.  The reality was much

darker.  Chevre were lulled into becoming completely dependent upon Defendants for their survival.  Chevre were purposefully isolated, cut off from friends and loved ones, and forced to endure extreme working and living conditions.

77.     When they became chevre employees, chevre were strongly encouraged to adopt names selected for them by the Individual Defendants.

78.     Chevre signed vows of poverty in which they promised to forgo employment "outside" the Kabbalah Centre.  The Centre told many chevre, including some Plaintiffs, that to commit themselves fully to the Centre, they had to abandon all their personal possessions and property.  The property that Plaintiffs and others had was often "donated" to the Centre.  This includes real estate, furniture, and savings accounts.  The chevre believed they were working all for one and one for all towards a future where the Centre would meet all of their needs, including housing, food, and clothing, forever.

79.     No life decision – no matter the significance – escaped the Centre's control.  Chevre needed approval to date (and whom) and to marry (and whom).  A chevre was required to obtain permission to have a child, and to obtain a name for the child from K. Berg.  The Centre dictated the chevre's clothing, when they could buy new shoes, and even how much toilet paper they could use.

80.     The Centre controlled where each chevre lived.  It assigned Plaintiffs and other chevre to Centre-owned housing, often moving chevre to other cities, states, or countries in the process.  Housing selections were not permanent, however.  The Centre could move chevre to a different location – sometimes across the country or around the world – at a moment's notice.  Centre-owned housing was often cramped and run-down.  A typical arrangement was eight to twelve people in a two-to-three-bedroom apartment, with chevre sleeping in the living room and kitchen.

If a chevre wanted to spend even one night with another chevre, he or she needed the Centre's permission.

81.     The Centre controlled what and when chevre ate.  To help maintain that control, the Centre provided some meals, which Plaintiffs and other chevre were required to eat.  The meals, which were unpalatable, did not accommodate chevre who had food allergies or sensitivities, so those chevre could not eat these meals without becoming ill.  Some chevre also were instructed to apply for food stamps in order to supplement the limited meals the Centre provided.

82.     Chevre could only leave the Centre with permission.  Even if permission were granted, in practice it was meaningless because chevre lacked a means of transportation.

83.     Medical care for chevre was nonexistent.  Though Defendants promised to take care of chevre for the rest of their lives, chevre with medical or dental needs were suddenly on their own. Because they lacked resources, these chevre often had to find a willing student to pick up the bill. In the case of an emergency, chevre were instructed to go to the hospital, but to provide a false name and address so that Defendants would not be billed.

84.     The Centre told chevre that relationships with friends and family outside of the Centre were "a distraction" and, as a result, were not permitted.  The Centre took many steps to isolate chevre from those outside of its control.  Chevre could not visit friends or family or attend major life events (such as weddings or funerals) without permission.  If permission was granted, Defendants refused to contribute any money should the chevre have to travel.  As a result, chevre would need to persuade a Centre student to pay for her travel expenses or solicit money from her family.  For years, Shoshan's sister sent him letters detailing her feelings of sadness because he was never able to see her.

85.     Although holidays were described as "family" events to students, chevre were pressured to spend them in the Centre, not with their own families.

86.     The Centre also manipulated chevre into having negative perceptions of their families. Y. Berg told Ezra Michaeli, with no basis, that her father might have sexually abused her.  In Ezra Michaeli's experience, Centre astrologers performed "readings" for chevre, during which the chevre were informed that their family members were "bad" people.

87.     Chevre were discouraged from having outside interests.  Shmilovich and Ezra Michaeli were chastised for even expressing an interest in running a marathon for charity.

88.     To maintain this total control, the Centre and the Individual Defendants monitored every moment of the chevre's lives.  K. Berg often personally called Centre locations to ask about the location and activity of a particular chevre at any particular moment.  As a result, the supervisors of the chevre made to sure to know the locations and activities of each chevre at all times.

89.     Chevre's only access to money was in the form of minimal "allowances" that the Centre provided to Plaintiffs and other chevre.  In 1998, allowances were approximately $25 a month, provided in cash in an envelope.  Over the course of the next twenty years, these allowances crept up to $300 a month – sometimes meant to provide for a couple, or a family with children, and still woefully inadequate – as the Centre, on information and belief, reduced the meals it provided to chevre, and became concerned by negative press and the IRS investigation.  In or about 2012, instead of a cash allowance, the Centre began to pay chevre what it called a "salary," which was deposited into a bank account.  The Centre would instruct chevre to return the nominal "salary" to the Centre in the form of a "donation." Oftentimes chevre would do this.

90.     Since at least 2010, some chevre have had tax returns submitted for them by the Centre. On information and belief, the Centre did not claim any exemption on behalf of chevre as "religious workers."  Any tax refund received by a chevre was to be returned to the Centre.

91.     Chevre who asked questions of Centre leadership faced negative consequences:  they were ostracized, blacklisted, and sent away to distant Centre locations.  These actions had a chilling effect on other chevre, discouraging them from questioning the Individual Defendants and the Centre.

92.     As a result of the near absolute control asserted by the Centre and the Individual Defendants over the chevre, the chevre were under extreme psychological pressure to refrain from leaving the Centre or criticizing the Individual Defendants.

**C.     The Centre And The Individual Defendants Psychologically, Verbally, and Physically Abused The Chevre**

93.     Chevre were constantly told that they were worthless, they were wrong, and that they had no rights of any kind.  Chevre were informed that K. Berg could discern their wrongfulness and their lack of rights simply by touching them.

94.     The Centre told chevre of the frightening consequences that would befall them if they left.  This included "joining Satan" and coming down with diseases from which the Centre supposedly protected them. Those who did leave were considered enemies of the Centre, and family members or friends who remained were not permitted to speak with them.  This meant that a chevre who might consider leaving had no example of how to do so, nor anyone to ask for help.

95.     The Individual Defendants also distributed among the chevre recordings they made detailing the horrible things that happened to chevre who left the Centre.  In one such recording, created shortly after several chevre, including O. Shaal and J. Shaal, left the Centre, K. Berg tells a story about a former student named Rafi Feig who, after leaving the Centre, experienced a series

of unfortunate events that concluded with his being sentenced to two years of prison in Israel. None of this was true.

96.     On the same recording, K. Berg goes on to explain that in 1984, eight teachers left the Centre at once – and four of the eight were dead within three years of their departure.  Many chevre were told that K. Berg could "do magic" and had an ability to make such things happen to people who "betrayed" her.

97.     K. Berg also told chevre that they would not "survive" outside the Centre because they were "idiots."

98.     Centre employees and the Individual Defendants verbally abused chevre.  For example, Stone was berated by Y. Berg for making an unknown "mistake" when serving him food.

99.     Y. Berg's actions were particularly egregious.  Y. Berg positioned himself among the female chevre as a sympathetic ear, willing to listen to their problems, many, if not all, of which were caused by the Centre and the Individual Defendants themselves.  Once he gained their trust, Y. Berg took advantage of it by forcing female chevre into inappropriate, sometimes sexual, relationships with him.

100.    Defendants were aware of Y. Berg's problematic relationship with women.  In 2014, Jena Scaccetti, a former student of the Centre, filed a lawsuit in Los Angeles County Superior Court, accusing Yehuda Berg of drugging and sexually assaulting her in 2012.  In 2015, a jury awarded Scaccetti $135,000 in compensatory and punitive damages from Y. Berg for emotional distress, and also found that the Centre supervised him negligently.  In trial testimony, Y. Berg admitted to giving Scaccetti alcohol and Vicodin, and to touching her to see if "anything intimate" might happen.

101.    Upon information and belief, in the wake of Y. Berg's trial, many chevre were promised that his involvement with the Centre, including his role as an advisor to K. Berg, would cease.  Instead, on information and belief, Y. Berg has continued to have deep and ongoing involvement in Centre decisions and operations, even if the Centre no longer publicly acknowledges his involvement.

102.    The Centre's control over Plaintiffs and other chevre, and the threats made to chevre who displeased the Individual Defendants, meant that chevre were completely dependent on the Bergs' approval.  That approval affected not only a chevre's sense of self, but also every aspect of his or her life and sense of safety.  Plaintiffs had no sense of identity when they left and did not believe they knew how to survive in the outside world.

### III.    The Statute Of Limitations Is Tolled

103.    The applicable statutes of limitation are tolled because the Centre knowingly and actively concealed the rights of Plaintiffs, the FLSA Collective (as defined *infra*, ¶ 121), and the Class (as defined *infra*, ¶¶ 145-49) under federal and state labor laws and the Centre's ongoing, material representations to Plaintiffs, the FLSA Collective, and the Class that they had no rights or recourse under such laws to seek fair compensation for their employment.  Indeed, the Centre required many Plaintiffs, and members of the FLSA Collective and the Class, to "waive" FLSA claims that cannot be waived absent court supervision.  Plaintiffs, the FLSA Collective, and the Class were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Other chevre were not even offered "financial support," and when they inquired of the Centre, they were told that the Centre had no legal obligation to pay them.

104.     Chevre who left the Centre typically were penniless.  They had given all their possessions to the Centre, and when they left, the Centre would not allow them to keep anything the Centre had provided during their employment.

105.     Defendants ensured that many chevre had no financial footprint when they left:  they often had no bank accounts, no credit history, no rental history – not even a utility bill to prove their residence in the cities in which they had lived.

106.     When Stone left the Centre, he had only clothes and a handful of books.  Because he had no credit history, and background checks came back blank, he was forced to sublet a decrepit apartment with the small amount of money "gifted" to him by the Centre.  When he left, he spent the day vomiting because his fear of living outside of the Centre was so intense.

107.     When Shmilovich left the Centre, she had $2,000 and no credit history and was unable to rent an apartment.  Her first eight months outside the Centre were spent living on an acquaintance's couch.

108.     When J. Shaal and O. Shaal left the Centre, they moved in with J. Shaal's parents because they had nowhere to go.  When they were able to rent their own apartment, they felt compelled to choose one within walking distance of the Centre because they remained so anxious of being completely removed from it.

109.     When Ezra Michaeli left, there was a rift between her and her family because of Y. Berg's false suggestions that her father had sexually abused her.  She was terrified of the potential health problems and personal problems she might suffer, based on the stories told by K. Berg.

110.     When Shoshan left, he had been in the United States for over a decade but was unacquainted with the banking system and unfamiliar with credit history.  He had no documentation of the seven years he had lived in Los Angeles.  It was as though he did not exist.

Shoshan receives psychological treatment for the traumas he experienced at the Centre, and since the filing of this lawsuit, he has experienced extreme anxiety and related physical problems.

111.    During chevre's employment and after, Defendants concealed from chevre, including Plaintiffs, that they had a legal right to adequate pay for their work.   Instead, Defendants represented to Plaintiffs and other former chevre that they were entitled to nothing and that the only money they would receive would come through the voluntary "generosity" of the Centre.   For example, when she departed, Shmilovich was told explicitly by Miriam Dan, who oversaw much of the Centre's operations, that the Centre owed her nothing.   Ezra Michaeli emailed the Centre when she left to ask about compensation, and was told, in writing, that she was owed nothing and that the Centre would give her nothing.   And when a chevre did leave, the Centre told the remaining chevre that the Centre did not owe that chevre anything.

112.    The Centre failed to post FLSA-mandated notices about employees' rights in a conspicuous location in each workplace.

113.    Further, the Centre presented to Plaintiffs and other former chevre what it claimed were legally binding documents and required them to sign the documents in order to receive any assistance.   In fact, the Centre frequently presented Plaintiffs and other former chevre with "legal" documents, provided no explanation, required their signatures, and never returned copies to them. Plaintiffs and other former chevre recall signing many documents over the course of their employment with the Centre, without having any idea what those documents were:  they were told that the documents were "necessary" to their continued employment as chevre, their receipt of their meager allowances, and their continuing affiliation with the Centre, and in some cases they were not given a chance to read the documents.   The Centre, a sophisticated corporation with access to legal counsel, never told chevre that they could, and should, consult an attorney before

signing these documents.  Instead, Plaintiffs were presented with the documents and told that they had no choice but to sign.

114.   The Centre exploited the financial desperation of its outgoing employees, and the psychological control it had exercised over them for years, to evade liability and to prevent the employees from learning of or exercising their legal rights.

115.   The information the Centre concealed from Plaintiffs and other former chevre was material.  Former chevre, including Plaintiffs, reasonably believed they had no ability to pursue legal claims against Defendants in reliance on the Centre's misrepresentations. As a result, they did not exercise their legal rights to pay for their work.

116.   Defendants concealed this information from Plaintiffs and other former chevre with the intention to defraud them of the pay to which they were entitled under the law, and Defendants knew or should have known that they were concealing this information, because Defendants complied with applicable wage and hour laws for their "regular" employees.

117.   Plaintiffs and other chevre were not aware of the information essential to the pursuit of their legal claims, without any fault or lack of diligence on their own part.  Having been psychologically, physically, and financially dependent on the Centre, it was difficult, if not impossible, for Plaintiffs and other former chevre to discover that Defendants, Plaintiffs' employers, had actively concealed material information from them about their rights as employees.

118.   Indeed, many chevre, including Plaintiffs, who signed separation agreements only later came to understand that the sums provided to them by the Centre were grossly inadequate compared to the sums to which they were legally entitled.

119.    At the time this action was filed, Defendants were under a duty to disclose to Plaintiffs, the FLSA Collective, and the Class the true nature of their legal rights.  Defendants are therefore estopped from relying on any statute of limitations.

120.    Defendants' fraudulent concealment is common to the FLSA Collective and the Class.

## COLLECTIVE ACTION ALLEGATIONS

121.    Plaintiffs bring the First Cause of Action, an FLSA claim, on behalf of themselves and all similarly situated former chevre who worked in the United States for the Corporate Defendants and who elect into this action pursuant to the collective action provision of the FLSA (the "FLSA Collective").

122.    Plaintiffs and other former chevre provided the labor necessary to Centre operations and personally served the Bergs and their families.  They were required to work 16 to 20 hour days, seven days a week, and they were always on call.

123.    In court filings and other documents, the Centre has admitted that chevre were employees.  Moreover, the Centre employed non-chevre employees in identical roles as chevre roles, but these employees were paid an hourly wage.

124.    The Centre's violations of the FLSA were willful.  The Centre referred to chevre as employees; in recent years, used a payroll service to give the appearance of providing chevre with a meager "salary"; and employed non-chevre in identical positions to chevre but paid them regular wages.  Accordingly, the statute of limitations should be three years.

125.    The Centre is a covered employer within the meaning of the FLSA, and chevre were employees within the meaning of the FLSA.

126.    Chevre performed routine, non-exempt tasks and are properly classified as non-exempt from the overtime provisions of the FLSA.

127.     The Centre is a multi-state and multi-national organization in which chevre in every location were involved in the Centre's global reach.  Telemarketing phone calls were made to multiple states from Centre locations.  Centre written, audio, and video materials were shipped between and among states.  By virtue of a chevre's involvement in every aspect of the Centre's multi-state and multi-national operations, chevre regularly were involved in interstate commerce and were covered employees within the meaning of the FLSA.

128.     While employed by the Centre, Greene traveled several times a year to different states, including New York, Florida, and Texas, to work on Centre events.  Greene was the author of several books that the Centre sold throughout the United States, and he appears on several Centre videos that the  Centre sold throughout the United States on DVD.

129.     While employed by the Centre, Stone made upwards of a hundred telemarketing calls a day throughout the United States, selling books, online courses, class enrollments, and Centre events.  He documented these interstate transactions.  Stone also, as part of his work in the Centre bookstores in Los Angeles and Boca Raton, shipped books into the bookstores from out-of-state warehouses, and shipped to out-of-state addresses books that had been sold.

130.     While employed by the Centre, Ezra Michaeli made telemarketing calls from California to Arizona and the East Coast of the United States, which she documented in a CRM system.  Ezra Michaeli also managed social media for several Centre locations, and traveled to Arizona monthly to meet with students.

131.     While employed by the Centre, J. Shaal made telemarketing calls daily throughout the United States, which she documented in a CRM system.  J. Shaal also, as an assistant to Monica Berg, worked on marketing for Centres across the United States, and traveled to several states, including New Mexico, Nevada, and Massachusetts.

132.    While employed by the Centre, O. Shaal created the global Kabbalah University website for the Centre, and tracked the analytics for the Centre's websites, which brought in product purchases and donations from across the United States (and internationally).  O. Shaal also traveled to Chicago every month or every other month to meet with students, and made hundreds of telemarketing calls a day, thoughout the United States, as part of telemarketing "campaigns."

133.    While employed by the Centre, Shoshan oversaw the audio and video production for Centre events, traveling to multiple states, including California, Florida, New York, and Texas. Shoshan also created videos that were sold in streaming form on the Centre website and as DVDs that were shipped throughout the United States.

134.    The Centre is engaged in many non-religious commercial activities.  Its stores sell items such as diamond jewelry, baseball caps, and children's books written by Madonna.  On information and belief, the Centre rents apartments to persons unaffiliated with the Centre.  The Centre has provided studio space to Guy Ritchie for his production of mainstream movies, and it also sells artwork.

135.    Defendants thus constitute an enterprise engaged in interstate commerce within the meaning of the FLSA.  Defendants' activities are performed for a "common business purpose," and Defendants have sales or other business of $500,000 or more annually.

136.    Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and the FLSA Collective.

137.    Upon information and belief, Defendants failed to make, keep, and preserve accurate records with respect to Plaintiffs and the FLSA Collective, including hours worked each workday and total hours worked each workweek, as required by 29 U.S.C. § 211(c) and supporting federal regulations.

138.    Defendants' failure to make, keep, and preserve accurate records was willful and intentional.

139.    Plaintiffs and the members of the FLSA Collective are similarly situated in that the Centre's policy, common to all chevre, was to not pay chevre wages.  Instead, the Centre provided nominal monthly stipends and minimal in-kind compensation, insufficient to adequately compensate Plaintiffs and the FLSA Collective as required by law.  As a matter of policy, chevre were provided no means to log or track their time, and, upon information and belief, the Centre maintained no time records for chevre.  Chevre regularly worked in excess of 40 hours a week, for which they were not compensated, and of which Defendants had actual or constructive knowledge.

140.    There are many similarly situated former chevre who have not been paid minimum wages and/or overtime in violation of the FLSA and would benefit from the issuance of a court-supervised notice regarding the present lawsuit and the opportunity to join it.  Those former chevre are known to Defendants, are readily identifiable, and can be located through Defendants' records, such that notice should be sent to them pursuant to 29 U.S.C. § 216(b).

141.    As part of its regular business practice, Defendants have intentionally, willfully, and repeatedly engaged in a common policy or plan of violating the FLSA with respect to Plaintiffs and the members of the FLSA Collective.  This policy or plan includes, but is not limited to:

      a.  Willfully failing to pay its chevre employees, including Plaintiffs and the members of the FLSA Collective, for the hours that they worked;

      b.  Willfully failing to pay its chevre employees, including Plaintiffs and the members of the FLSA Collective, premium overtime wages for hours that they worked in excess of 40 hours per workweek;

c.   Willfully failing to adequately record the time that its chevre employees, including Plaintiffs and the FLSA Collective, worked for the benefit of Defendants; and

d.   Willfully failing to provide chevre employees, including Plaintiffs and the FLSA Collective, with any means of recording the hours they worked.

142.   Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the members of the FLSA Collective wages for their work, as well as overtime premiums for hours worked in excess of 40 hours per workweek.

143.   Defendants' unlawful conduct has been widespread, repeated, and consistent.

### CLASS ACTION ALLEGATIONS

144.   Plaintiffs seek class certification of the class and subclasses set forth below pursuant to Rule 23 of the Federal Rules of Civil Procedure.

145.   Plaintiffs seek class certification of the common law claims of unjust enrichment and fraudulent inducement under New York, California, Florida, and Illinois law on behalf of a "Chevre Class," defined as all former chevre who worked without adequate pay for the Kabbalah Centre or any affiliated entity in the States of New York, California, Florida, or Illinois.  Plaintiffs Greene, J. Shaal, O. Shaal, Stone, Shoshan, Ezra Michaeli, and Shmilovich are the proposed representatives for the Chevre Class.

146.   Plaintiffs seek class certification of claims for violations of the New York Labor Law on behalf of a New York Subclass of the Chevre Class, defined as all former chevre who worked without adequate pay for any Centre-affiliated entity in the State of New York.  Plaintiff Shoshan is the proposed representative for the New York Subclass.

147.   Plaintiffs seek class certification of claims for violations of the California Labor Code on behalf of a California Subclass of the Chevre Class, defined as all former chevre who worked

without adequate pay for any Centre-affiliated entity in the State of California.  Plaintiff Ezra Michaeli is the proposed representative for the California Subclass.

148.    Plaintiffs seek class certification of claims for violations of the Florida Constitution on behalf of a Florida Subclass of the Chevre Class, defined as all former chevre who worked without adequate pay for any Centre-affiliated entity in the State of Florida.  Plaintiff Stone is the proposed representative for the Florida Subclass.

149.    Plaintiffs seek class certification of claims for violations of the Illinois Minimum Wage Law on behalf of an Illinois Subclass of the Chevre Class, defined as all former chevre who worked without adequate pay for any Centre-affiliated entity in the State of Illinois.  Plaintiff O. Shaal is the proposed representative for the Illinois Subclass.

150.    Excluded from the Class are Defendants, any of their past or present officers, directors, employees, agents, or affiliates, any judge who presides over this action, and all counsel of record.

151.    Plaintiffs reserve the right to expand, limit, modify, or amend the definitions of the Class and Subclasses at the class certification stage of this action or at any other time, as may be desirable or appropriate.

152.    Upon information and belief, Defendants applied the same compensation and employment policies, practices, or procedures to all chevre.  No chevre received wages or overtime pay.

153.    Numerosity and Ascertainability.  The Class is so numerous and geographically dispersed that the joinder of all Class members is impracticable.  Class members may be identified through objective means and notified of this action by recognized methods of notice, such as by

mail, email, or publication in print or on the Internet.  It would be impracticable to bring all members of each Class before the court.

154.  <u>Commonality and Predominance</u>.  This action implicates common questions of law and fact which predominate over the individual issues of each Class member.  The questions of law or fact common to the Class are substantially similar.  Common questions include, for example:

a.  Whether Defendants had a policy or practice of failing to pay Plaintiffs and the members of the Class the minimum wage for all hours worked, in violation of New York Labor Law Article 19, § 650 *et seq.*; California Labor Code §§ 1194, 1197, and 1197.1; Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*; and Florida Constitution Article X, § 24;

b.  Whether Defendants' unlawful wage and hour policies or practices as alleged herein were instituted willfully or with reckless disregard for the law; and

c.  Whether the Centre was unjustly enriched at the expense of the chevre.

155.  <u>Typicality</u>.  Plaintiffs are typical of the members of the Class.  Each Plaintiff was a chevre who committed himself or herself to the Centre based on false representations, and each was a victim of the same Centre employment policies.

156.  <u>Adequacy</u>.  Plaintiffs are adequate representatives of the Class because they are members of the Class and are committed to pursuing this matter to obtain relief for themselves and the Class.  Plaintiffs have no conflict of interest with the Class.  Plaintiffs' attorneys are competent and experienced in class action litigation and are free of conflicts of interest.  Plaintiffs and their undersigned counsel will fairly and adequately represent the interests of the Class.

157.  <u>Superiority</u>.  Class action treatment is superior to individual adjudication of this controversy with respect to each Class member.  The members of the Class have been damaged

and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures, and the members of the Class are entitled to recovery as a result of Defendants' violation of the New York Labor Law, the California Labor Code, the Illinois Minimum Wage Law, and the Florida Constitution. Although the relative damages suffered by individual Class and Subclass members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. Individual plaintiffs lack the financial resources to conduct a thorough examination of Defendants' compensation practices and to prosecute vigorously a lawsuit against Defendants to recover damages stemming from such practices. In addition, class litigation is superior because it will prevent unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

## CAUSES OF ACTION

### First Cause of Action
### Fair Labor Standards Act – Minimum Wage
### (On Behalf of All Plaintiffs and the FLSA Collective Against All Defendants)

158.    Plaintiffs reallege and incorporate by reference all allegations in paragraphs 1 through 157 of this Class and Collective Action Complaint.

159.    Defendants employed Plaintiffs and the FLSA Collective.

160.    Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e), 206(a) and 207(a).

161.    Plaintiffs and the FLSA Collective were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

162.    Each Defendant has been an employer engaged in commerce and/or in the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), and/or 203(r) and 203(s).

163.     Defendants have engaged in a widespread pattern, policy, and practice of violating the FLSA, as detailed in this Class and Collective Action Complaint.

164.     Defendants have failed to pay Plaintiffs and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

165.     Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiffs and the FLSA Collective.

166.     As a result of Defendants' willful violations of the FLSA, Plaintiffs and the FLSA Collective are entitled to recover all unpaid wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Second Cause of Action**
**Fair Labor Standards Act – Overtime Wages**
**(On Behalf of All Plaintiffs and the FLSA Collective Against All Defendants)**

167.     Plaintiffs reallege and incorporate by reference all allegations in paragraphs 1 through 166 of this Class and Collective Action Complaint.

168.     Defendants employed Plaintiffs and the FLSA Collective.

169.     Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e), 206(a) and 207(a).

170.     Plaintiffs and the FLSA Collective were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

171.     Each Defendant has been an employer engaged in commerce and/or in the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), and/or 203(r) and 203(s).

172.     Defendants have engaged in a widespread pattern, policy, and practice of violating the FLSA, as detailed in this Class and Collective Action Complaint.

173.    Defendants have failed to pay Plaintiffs and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

174.    Defendants have not made a good faith effort to comply with the FLSA with respect to their compensation of Plaintiffs and the FLSA Collective.

175.    As a result of Defendants' willful violations of the FLSA, Plaintiffs and the FLSA Collective are entitled to recover all unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

### Third Cause of Action
### New York Labor Law – Minimum Wage
### (On Behalf of Plaintiff Guy Shoshan and the New York Subclass against All Defendants)

176.    Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 175 of this Class and Collective Action Complaint.

177.    Defendants employed Shoshan and the New York Subclass.

178.    Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of the New York Labor Law ("NYLL") § 650 *et seq.* and the supporting New York State Department of Labor Regulations.

179.    Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

180.    The minimum wage provisions of Article 19 of the NYLL and the supporting New York State Department of Labor regulations apply to Defendants and protect Shoshan and the New York Subclass.

181.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of hours worked by Shoshan and the New York Subclass, in violation of the NYLL.

182.     Defendants knowingly or intentionally failed to pay Shoshan and the New York Subclass minimum wages for all hours worked, as required by the NYLL and the supporting New York State Department of Labor regulations.

183.     By Defendants' knowing or intentional failure to pay Shoshan and the New York Subclass minimum hourly wages for all hours worked, Defendants have willfully violated NYLL Article 19, §§ 650 *et seq.* and the supporting New York State Department of Labor regulations.

184.     Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Fourth Cause of Action**
**New York Labor Law – Overtime Wages**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass Against All Defendants)**

185.     Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 184 of this Class and Collective Action Complaint.

186.     Defendants employed Shoshan and the New York Subclass.

187.     Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of NYLL § 650 *et seq.* and the supporting New York State Department of Labor Regulations.

188.     Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

189.     The overtime wage provisions of Article 19 of the NYLL and its supporting regulations apply to Defendants and protect Shoshan and the New York Subclass.

190.    Defendants have failed to pay Shoshan and the New York Subclass the overtime wages to which they are entitled under the NYLL and supporting New York State Department of Labor regulations.

191.    Shoshan and the New York Subclass were not exempt from the overtime wage provisions of Article 6 and Article 19 of the NYLL and its supporting regulations, and are entitled to be compensated according to the applicable overtime wage rate, which requires time-and-one-half pay for all hours worked in excess of forty (40) per workweek.

192.    Shoshan and the New York Subclass regularly worked for Defendants in excess of forty (40) hours in a workweek.

193.    Defendants knowingly and intentionally failed to pay Shoshan and the New York Subclass overtime wages for all workweeks during which Shoshan and the New York Subclass worked more than forty (40) hours, as required by the NYLL and the supporting New York State Department of Labor Regulations.

194.    By Defendants' knowing and intentional failure to pay Shoshan and the New York Subclass overtime wages for hours worked in excess of forty (40) per workweek, they willfully, intentionally, recklessly, and/or in bad faith violated the overtime wage provisions of the NYLL and the supporting New York State Department of Labor Regulations.

195.    By Defendants' failure to pay Shoshan and the New York Subclass premium overtime wages for hours worked in excess of 40 hours per workweek, they have willfully violated the NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

196.     Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shoshan and the New York Subclass, as required by the NYLL and the supporting New York State Department of Labor Regulations.

197.     Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment interest and post-judgment interest.

**<u>Fifth Cause of Action</u>**
**New York Labor Law – Spread-of-Hours Pay**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass Against All Defendants)**

198.     Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 197 of this Class and Collective Action Complaint.

199.     Defendants employed Shoshan and the New York Subclass.

200.     Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of NYLL § 650 *et seq.*  and the supporting New York State Department of Labor Regulations.

201.     Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

202.     The spread-of-hours pay provisions of the NYLL apply to Defendants and protect Shoshan and the New York Subclass.

203.     Defendants have willfully failed to pay Shoshan and the New York Subclass additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

204.    By Defendants' knowing and intentional failure to pay Shoshan and New York Subclass spread-of-hours pay, Defendants have willfully violated NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor regulations.

205.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shoshan and the New York Subclass, as required by the NYLL and the supporting New York State Department of Labor Regulations.

206.    Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants their wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Sixth Cause of Action**
**New York Labor Law – Wage Statements**
**(On Behalf of Plaintiff Guy Shoshan and the New York Subclass against All Defendants)**

207.    Plaintiff Guy Shoshan and the New York Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 206 of this Class and Collective Action Complaint.

208.    Defendants employed Shoshan and the New York Subclass.

209.    Shoshan and the New York Subclass were employees and Defendants were their employers within the meaning of NYLL § 190 and the supporting New York State Department of Labor Regulations.

210.    Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

211.    Defendants have willfully failed to supply Shoshan and the New York Subclass with accurate wage statements with every payment of wages, as required by the NYLL, Article 6 § 195(3), listing: the dates of work covered by that payment of wages; name of employee; name of

employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; and the number of regular and overtime hours worked.

212.    Defendants willfully failed to supply Shoshan and the New York Subclass, at the time of hiring and annually thereafter, as required by the NYLL, Article 6, § 195(1), in English or in the language identified as their primary language, wage notices listing: rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable; the regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address, if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary; and the regular hourly and overtime rate of pay.

213.    The provisions of Article 6 of the NYLL and the supporting New York State Department of Labor regulations apply to Defendants and protect Shoshan and the New York Subclass.

214.    By Defendants' knowing or intentional failure to provide Shoshan and the New York Subclass accurate statements of wages as required by NYLL, Article 6, §§ 195(1) and (3), they have willfully violated NYLL Article 6, § 195 *et seq.* and the supporting New York State Department of Labor regulations.

215.     Due to Defendants' violations of the NYLL, Shoshan and the New York Subclass are entitled to recover from Defendants the maximum statutory penalties provided under the NYLL, declaratory relief, and reasonable attorneys' fees and costs.

**Seventh Cause of Action**
**California Labor Code – Minimum Wage**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

216.     Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 216 of this Class and Collective Action Complaint.

217.     Defendants employed Ezra Michaeli and the California Subclass.

218.     Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the California Labor Code ("Cal.  Labor Code").

219.     Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal.  Labor Code, as detailed in this Class and Collective Action Complaint.

220.     The minimum wage provisions of the Cal.  Labor Code §§ 1194, 1197, and 1197.1 apply to Defendants and protect Ezra Michaeli and the California Subclass.

221.     Defendants have willfully failed to pay Ezra Michaeli and the California Subclass the minimum wages to which they are entitled under the Cal.  Labor Code.

222.     Ezra Michaeli and the California Subclass were harmed by Defendants' failure to pay them the minimum wages to which they are entitled.

223.     Due to Defendants' violations of the Cal.  Labor Code, Ezra Michaeli and the California Subclass are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Eighth Cause of Action**
**California Labor Code – Overtime Wages**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

224.    Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 223 of this Class and Collective Action Complaint.

225.    Defendants employed Ezra Michaeli and the California Subclass.

226.    Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal.  Labor Code.

227.    Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal.  Labor Code, as detailed in this Class and Collective Action Complaint.

228.    The overtime wage provisions of Cal.  Labor Code § 510 apply to Defendants and protect Ezra Michaeli and the California Subclass.

229.    Defendants have failed to pay Ezra Michaeli and the California Subclass the overtime wages to which they are entitled under the Cal.  Labor Code.

230.    Ezra Michaeli and the California Subclass were not exempt from the overtime wage provisions of the Cal.  Labor Code, and are entitled to be compensated according to the applicable overtime wage rate, which requires time-and-one-half the rate of pay for all hours worked in excess of forty (40) per workweek and the first eight (8) hours worked on the seventh day of work, and twice the rate of pay for all hours worked in excess of twelve (12) per day.

231.    Ezra Michaeli and the California Subclass regularly worked for Defendants in excess of forty (40) hours in a workweek, twelve (12) hours in a day, and/or on a seventh day of work.

232.    Defendants knowingly and intentionally failed to pay Ezra Michaeli and the California Subclass overtime wages for all workweeks during which Ezra Michaeli and the California

47

Subclass worked more than forty (40) hours, worked for more than twelve (12) hours in a day, and/or worked on a seventh day of work, as required by the Cal. Labor Code.

233.    Ezra Michaeli and the California Subclass were harmed by Defendants' failure to pay them overtime wages for hours worked in excess of forty (40) hours in a workweek, twelve (12) hours in a day, and/or on a seventh day of work.

234.    Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Ninth Cause of Action**
**California Labor Code – Wage Payment Provisions**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

235.    Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 234 of this Class and Collective Action Complaint.

236.    Defendants employed Ezra Michaeli and the California Subclass.

237.    Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

238.    Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

239.    Cal. Labor Code §§ 201 and 202 require Defendants to pay Ezra Michaeli and the California Subclass all wages due within the time specified by law.

240.    Cal. Labor Code § 203 provides that if an employer willfully fails to timely pay such wages, the employer must continue to pay the wages back until the back wages are paid in full or an action is commenced, up to a maximum of thirty days of wages.

241.    Ezra Michaeli and the California Subclass are entitled to unpaid compensation, but to date have not received such compensation.

242.    As fully alleged above, Defendants' failure to pay Ezra Michaeli and the California Subclass has been willful and intended to reduce labor costs.

243.    More than thirty days have passed since Ezra Michaeli and the members of the California Subclass stopped working for Defendants.

244.    Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to thirty days' wages under Cal. Labor Code § 203, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Tenth Cause of Action**
**California Labor Code – Record-Keeping Provisions**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

245.    Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 244 of this Class and Collective Action Complaint.

246.    Defendants employed Ezra Michaeli and the California Subclass.

247.    Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

248.    Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

249.    Cal. Labor Code § 226(a) and the Wage Orders published by California's Industrial Welfare Commission apply to Defendants and protect Ezra Michaeli and the California Subclass.

250.    Cal. Labor Code § 1174(d) applies to Defendants and protects Ezra Michaeli and the California Subclass.

251.    Defendants failed to maintain records of hours worked by Ezra Michaeli and the California Subclass as required by the Cal. Labor Code.

252.    Defendants knowingly and intentionally failed to provide timely, accurate, and itemized wage statements including, *inter alia*, hours worked, to Ezra Michaeli and the California Subclass as required by the Cal. Labor Code and the California Industrial Welfare Commission's Wage Orders.

253.    Defendants' failure to provide timely, accurate, and itemized wage statements injured Ezra Michaeli and the California Subclass by, *inter alia*, impeding them from knowing the amount of wages to which they were entitled.

254.    Due to Defendants' violations of the Cal. Labor Code, Ezra Michaeli and the California Subclass are entitled to recover from Defendants the amount provided by Cal. Labor Code §§ 226(e) and 1174.5, including the greater of a) all actual damages or b) fifty (50) dollars for the initial pay period in which a violation occurred and one hundred (100) dollars for each violation in a subsequent pay period.

## Eleventh Cause of Action
### California Wage Orders and California Labor Code – Meal Break and Rest Break Violations
### (On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)

255.    Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 254 of this Class and Collective Action Complaint.

256.    Defendants employed Ezra Michaeli and the California Subclass.

257.    Ezra Michaeli and the California Subclass were employees and Defendants were their employers within the meaning of the Cal. Labor Code.

258.     Defendants have engaged in a widespread pattern, policy, and practice of violating the Cal. Labor Code, as detailed in this Class and Collective Action Complaint.

259.     The meal break and rest break provisions of the Cal. Labor Code §§ 226.7 and 512, and Wage Order No. 4-2001 §§ 11(a) and 12, apply to Defendants and protect Ezra Michaeli and the California Subclass.

260.     Ezra Michaeli and the California Subclass regularly worked shifts in excess of five (5) hours without being afforded at least a half-hour meal break in which they were relieved of all duty, and regularly worked in excess ten (10) hours without being afforded a second half-hour meal break in which they were relieved of all duty, as required by the Cal. Labor Code and Wage Orders.

261.     Ezra Michaeli and the California Subclass regularly worked shifts in which, per four (4) hours of work performed or major fraction thereof, they were not afforded at least one ten-minute rest break in which they were relieved of all duty, as required by the Cal. Labor Code and Wage Order.

262.     Due to Defendants' violations of the Cal. Labor Code and Wage Orders, Ezra Michaeli and the California Subclass are entitled to recover from Defendants one hour of additional pay at the regular rate of compensation for each workday in which the proper meal periods were not provided, pursuant to the Cal. Labor Code and Wage Order.

263.     Due to Defendants' violations of the Cal. Labor Code and Wage Orders, Ezra Michaeli and the California Subclass are entitled to recover from Defendants one hour of additional pay at the regular rate of compensation for each workday in which proper rest periods were not provided, pursuant to the Cal. Labor Code and Wage Order.

264.     Due to Defendants' violations of the Cal.  Labor Code and Wage Orders, Ezra Michaeli and the California Subclass are entitled to recover from Defendants reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5.

**Twelfth Cause of Action**
**California Business and Professions Code – Unfair Competition**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Subclass Against All Defendants)**

265.     Plaintiff Einat Ezra Michaeli and the California Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 264 of this Class and Collective Action Complaint.

266.     The foregoing conduct, as alleged, violates the California Unfair Competition Law ("UCL") – California Business and Professions Code §§ 17200 *et seq.*  The UCL prohibits unfair competition by prohibiting, *inter alia*, any unlawful or unfair business acts or practices.

267.     Beginning at a date unknown to Ezra Michaeli and the California Subclass, but at least as long as four years ago, Defendants committed, and continue to commit, acts of unfair competition, as defined by the UCL, by, *inter alia*, engaging in the acts and practices described in this Class and Collective Action Complaint.

268.     Defendants conduct has injured Ezra Michaeli and the California Subclass members by wrongfully denying them earned wages and, therefore, was unethical, unscrupulous, and substantially injurious to them.

269.     Defendants engaged in unfair competition by, *inter alia*, violating each of the following laws.  Each violation constitutes an independent and separate violation of the UCL:

      d.   The FLSA, 29 U.S.C. §§ 201 *et seq.*;

      e.   Cal.  Labor Code §§ 1194, 1197;

      f.   Cal.  Labor Code § 510;

g.   Cal.  Labor Code §§ 201-203, 226;

h.   Cal.  Labor Code §§ 1174, 1174.5;

i.   Cal.  Labor Code §§ 512, 226.7; and

j.   California Wage Order No.  4-2001.

270.   Defendants' course of conduct, acts, and practices in violation of the above laws violate the policy or spirit of such laws or otherwise significantly threaten or harm competition.

271.   Due to Defendants' violations of the UCL, Ezra Michaeli and the California Subclass are entitled to recover from Defendants restitution in the amount of their unpaid wages and other statutory remedies, including, but not limited to, reasonable attorneys' fees and costs.

**Thirteenth Cause of Action**
**Florida Constitution – Minimum Wage**
**(On Behalf of Plaintiff Jake Stone and the Florida Subclass Against All Defendants)**

272.   Plaintiff Jake Stone and the Florida Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 271 of this Class and Collective Action Complaint.

273.   Defendants employed Stone and the Florida Subclass.

274.   Defendants deprived Stone and the Florida Subclass of a minimum wage for each hour worked as guaranteed by Article X, § 24 of the Florida Constitution.

275.   Defendants' failure and refusal to pay Stone and the Florida Subclass wages constitutes a willful violation of the Florida Constitution.

276.   Due to Defendants' violation of the Florida Constitution, Stone and the Florida Subclass are entitled to recover from Defendants the applicable minimum hourly rate specified under Florida law for each hour worked during the five (5) years preceding the filing of this action, liquidated damages, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Fourteenth Cause of Action**
**Illinois Minimum Wage Law – Minimum Wage**
**(On Behalf of Plaintiff Ofer Shaal and the Illinois Subclass Against All Defendants)**

277.    Plaintiff Ofer Shaal and the Illinois Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 276 of this Class and Collective Action Complaint.

278.    Defendants employed Shaal and the Illinois Subclass as an employer and/or joint employer.

279.    Shaal and the Illinois Subclass were employees and Defendants were their employers within the meaning of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*.  ("IMWL").

280.    Defendants engaged in a widespread pattern, policy, and practice of violating the IMWL, as detailed in the Class and Collective Action Complaint.

281.    The minimum wage provisions of the IMWL apply to Defendants and protect Shaal and the Illinois Subclass.

282.    Shaal and the Illinois Subclass were not exempt from the minimum wage provisions of the IMWL, and are entitled to be compensated according to the IMWL's applicable minimum wage rate.

283.    Defendants knowingly and intentionally failed to pay Shaal and the Illinois Subclass the minimum wage for all hours worked, as required by the IMWL.

284.    By Defendants' knowing and intentional failure to pay Shaal and the Illinois Subclass minimum hourly wages, Defendants willfully, intentionally, recklessly, and/or in bad faith violated the minimum wage provisions of the IMWL.

285.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shaal and the Illinois Subclass, as required by the IMWL.

286.    Due to Defendants' intentional and willful violations of the IMWL, Shaal and the Illinois Subclass are entitled to recover from Defendants their unpaid wages, the maximum statutory interest damages for underpayments permitted under the IMWL, reasonable attorneys' fees and costs, and prejudgment and post-judgment interest.

**Fifteenth Cause of Action**
**Illinois Minimum Wage Law – Overtime Wages**
**(On Behalf of Plaintiff Ofer Shaal and the Illinois Subclass Against All Defendants)**

287.    Plaintiff Ofer Shaal and the Illinois Subclass reallege and incorporate by reference all allegations in paragraphs 1 through 286 of this Class and Collective Action Complaint.

288.    Defendants employed Shaal and the Illinois Subclass as an employer and/or joint employer.

289.    Shaal and the Illinois Subclass were employees and Defendants were their employers within the meaning of the IMWL.

290.    Defendants engaged in a widespread pattern, policy, and practice of violating the IMWL, as detailed in this Class and Collective Action Complaint.

291.    The overtime wage provisions of the IMWL apply to Defendants and protect Shaal and the Illinois Subclass.

292.    Shaal and the Illinois Subclass were not exempt from the overtime wage provisions of the IMWL, and are entitled to be compensated according to the IMWL's applicable overtime wage rate, which requires time-and-one-half pay for all hours worked in excess of forty (40) per workweek.

293.    Shaal and the Illinois Subclass regularly worked for Defendants in excess of forty (40) hours per workweek.

294.    Defendants knowingly and intentionally failed to pay Shaal and the Illinois Subclass overtime wages for all workweeks during which Shaal and the Illinois Subclass worked more than forty (40) hours, as required by the IMWL.

295.    By Defendants' knowing and intentional failure to pay Shaal and the Illinois Subclass overtime wages for hours worked in excess of forty (40) per workweek, they willfully, intentionally, recklessly, and/or in bad faith violated the overtime wage provisions of the IMWL.

296.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Shaal and the Illinois Subclass members, as required by the IMWL.

297.    Due to Defendants' intentional and willful violations of the IMWL, Shaal and the Illinois Subclass are entitled to recover from Defendants their unpaid overtime wages found due at the rate of one-and-one-half times Shaal's and the Illinois Subclass's regular hourly rate of pay for all hours that Shaal and the Illinois Subclass worked in excess of forty (40) hours per workweek, the maximum statutory interest damages for underpayments permitted under the IMWL, reasonable attorneys' fees and costs, and prejudgment interest and post-judgment interest.

### Sixteenth Cause of Action
### Unjust Enrichment (New York Law)
### (On Behalf of Plaintiff Guy Shoshan and the New York Class Against All Defendants)

298.    Plaintiff Guy Shoshan and the New York Class reallege and incorporate by reference all allegations in paragraphs 1 through 297 of this Class and Collective Action Complaint.

299.    Defendants were enriched by Shoshan and the New York Class through the provision by Shoshan and the New York class of the labor necessary to maintaining the Centre's commercial operations.

300.    The Individual Defendants also were enriched by Shoshan and the New York Class through their provision of personal benefits to the Berg family, such as providing childcare, dog-walking, food delivery, and personal technology support.

301.    This labor was provided at the expense of Shoshan and the New York Class.  Shoshan and the New York Class spent years providing this labor without receiving wages, rather than performing labor for a different employer.

302.    It is against equity and good conscience to permit Defendants to retain the benefit of the unpaid labor performed by Shoshan and the New York Class.

303.    Shoshan and the New York Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their unjust enrichment.

**Seventeenth Cause of Action**
**Unjust Enrichment (California Law)**
**(On Behalf of Plaintiff Einat Ezra Michaeli and the California Class Against All Defendants)**

304.    Plaintiff Einat Ezra Michaeli and the California Class reallege and incorporate by reference all allegations in paragraphs 1 through 303 .

305.    Defendants received benefits from Ezra Michaeli and the California Class in the form of the labor they performed, which was necessary to maintaining the Centre's commercial operations.

306.    The Individual Defendants also received personal benefits from Ezra Michaeli and the California Class through their provision of personal benefits to the Berg family, such as childcare, dog-walking, and delivering food.

307.    Defendants did not pay wages to Ezra Michaeli and the California Class, thus unjustly retaining these benefits at their expense.

308.    Ezra Michaeli and the California Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their unjust enrichment.

**Eighteenth Cause of Action**
**Unjust Enrichment (Illinois Law)**
**(On Behalf of Plaintiff Ofer Shaal and the Illinois Class Against All Defendants)**

309.    Plaintiff Ofer Shaal and the Illinois Class reallege and incorporate by reference all allegations in paragraphs 1 through 308.  Defendants retained the benefit of labor necessary to maintaining the Centre's commercial operations performed by Shaal and the Illinois Class.

310.    The performance of this labor was to the detriment of Shaal and the Illinois Class, who spent years providing this labor without receiving wages, rather than performing labor for a different employer.

311.    Defendants retention of this benefit violates fundamental principles of justice, equity, and good conscience.

312.    Shaal and the Illinois Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their unjust enrichment.

**Nineteenth Cause of Action**
**Unjust Enrichment (Florida Law)**
**(On Behalf of Plaintiff Jake Stone and the Florida Class Against All Defendants)**

313.    Plaintiff Jake Stone and the Florida Class reallege and incorporate by reference all allegations in paragraphs 1 through 312.

314.    Stone and the Florida Class conferred on Defendants the benefit of their unpaid labor, which was necessary to maintaining the Centre's commercial operations.

315.    Stone and the Florida Class also conferred of the Individual Defendants personal benefits, such as arranging for luxury vehicles in which to chauffeur the Berg family.

316.    Defendants had knowledge of these benefits.  Defendants were substantially involved in the day-to-day commercial operations of the Centre, and were the direct recipients of the personal benefits.

317.    The circumstances are such that it would be inequitable for Defendants to retain these benefits without first paying the value of the benefits to Stone and the Florida Class.

318.    Stone and the members of the Florida Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their unjust enrichment.

### Twentieth Cause of Action
### Fraudulent Inducement (New York Law)
### (On Behalf of Plaintiff Guy Shoshan and the New York Class Against All Defendants)

319.    Shoshan and the New York Class reallege and incorporate by reference all allegations in paragraphs 1 through 318 of this Class and Collective Action Complaint.

320.    Defendants uniformly falsely represented to Shoshan and the New York Class that the Centre's purpose was performing good works and spreading spiritual wisdom.

321.    Defendants knew these representations to be untrue.  The Bergs were aware of their own personal benefit from chevre work at the expense of the Centre's purported mission.

322.    Defendants thus uniformly induced Shoshan and the New York Class to work for the Centre as chevre and to commit their property and possessions to the Centre on the basis of these false representations.

323.    Defendants' uniform false representations were material.   Defendants' false representations as to the purpose of the Centre and how chevre's work for the Centre would benefit the world were intended to, and did, influence  Shoshan and the New York Class to forego other available career paths and work solely for the Centre.  Shoshan and the New York Class committed themselves to the Centre because of these representations.

324.    Defendants intended for Shoshan and the New York Class to rely upon these representations, such that Defendants could benefit from the labor of Shoshan and the New York Class without paying them for it.

325.    Shoshan and the New York Class justifiably relied upon Defendants' fraudulent representations.  Shoshan and the New York Class did not know that the Centre was being operated for the personal enrichment of the Berg family.  Had Shoshan and the New York Class known this material fact, they would not have become chevre.

326.    Shoshan and the New York Class became chevre as a result of Defendants' representations and were damaged thereby.

327.    Shoshan and the New York Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their fraudulent inducement.

### Twenty-First Cause of Action
### Fraudulent Inducement (California Law)
### (On Behalf of Plaintiff Einat Ezra Michaeli and the California Class Against All Defendants)

328.    Ezra Michaeli and the California Class reallege and incorporate by reference all allegations in paragraphs 1 through 327 of this Class and Collective Action Complaint.

329.    Defendants uniformly falsely represented to Ezra Michaeli and the California Class that the Centre's purpose was performing good works and spreading spiritual wisdom.

330.    Defendants knew these representations to be untrue.  The Bergs were aware of their own personal benefit from chevre work at the expense of the Centre's purported mission.

331.    Defendants thus uniformly induced Ezra Michaeli and the California Class to work for the Centre as chevre and to commit their property and possessions to the Centre on the basis of these false representations.

332.    Defendants' uniform false representations were material.    Defendants' false representations as to the purpose of the Centre and how chevre's work for the Centre would benefit the world were intended to, and did, influence Ezra Michaeli and the California Class to forego other available career paths and work solely for the Centre.  Ezra Michaeli and the California Class committed themselves to the Centre because of these representations.

333.    Defendants intended for Ezra Michaeli and the California Class to rely upon these representations, such that Defendants could benefit from the labor of Ezra Michaeli and the California Class without paying them for it.

334.    Ezra Michaeli and the California Class justifiably relied upon Defendants' fraudulent representations.  Ezra Michaeli and the California Class did not know that the Centre was being operated for the personal enrichment of the Berg family.  Had Ezra Michaeli and the California Class known this material fact, they would not have become chevre.

335.    Ezra Michaeli and the California Class became chevre as a result of Defendants' representations and were damaged thereby.

336.    Ezra Michaeli and the California Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their fraudulent inducement.

### Twenty-Second Cause of Action
**Fraudulent Inducement (Illinois Law)**
**(On Behalf of Plaintiff Ofer Shaal and the Illinois Class Against All Defendants)**

337.    Shaal and the Illinois Class reallege and incorporate by reference all allegations in paragraphs 1 through 336 of this Class and Collective Action Complaint.

338.    Defendants uniformly falsely represented to Shaal and the Illinois Class that the Centre's purpose was performing good works and spreading spiritual wisdom.

339.    Defendants knew these representations to be untrue.  The Bergs were aware of their own personal benefit from chevre work at the expense of the Centre's purported mission.

340.    Defendants thus uniformly induced Shaal and the Illinois Class to work for the Centre as chevre and to commit their property and possessions to the Centre on the basis of these false representations.

341.    Defendants' uniform false representations were material.    Defendants' false representations as to the purpose of the Centre and how chevre's work for the Centre would benefit the world were intended to, and did, influence Shaal and the Illinois Class to forego other available career paths and work solely for the Centre.  Shaal and the Illinois Class committed themselves to the Centre because of these representations.

342.    Defendants intended for Shaal and the Illinois Class to rely upon these representations, such that Defendants could benefit from the labor of Shaal and the Illinois Class without paying them for it.

343.    Shaal and the Illinois Class justifiably relied upon Defendants' fraudulent representations.  Shaal and the Illinois Class did not know that the Centre was being operated for the personal enrichment of the Berg family.  Had Shaal and the Illinois Class known this material fact, they would not have become chevre.

344.    Shaal and the Illinois Class became chevre as a result of Defendants' representations and were damaged thereby.

345.    Shaal and the Illinois Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their fraudulent inducement.

**Twenty-Third Cause of Action**
**Fraudulent Inducement (Florida Law)**
**(On Behalf of Plaintiff Jake Stone and the Florida Class Against All Defendants)**

346.   Stone and the Florida Class reallege and incorporate by reference all allegations in paragraphs 1 through 345 of this Class and Collective Action Complaint.

347.   Defendants uniformly falsely represented to Stone and the Florida Class that the Centre's purpose was performing good works and spreading spiritual wisdom.

348.   Defendants knew these representations to be untrue.  The Bergs were aware of their own personal benefit from chevre work at the expense of the Centre's purported mission.

349.   Defendants thus uniformly induced Stone and the Florida Class to work for the Centre as chevre and to commit their property and possessions to the Centre on the basis of these false representations.

350.   Defendants' uniform false representations were material.  Defendants' false representations as to the purpose of the Centre and how chevre's work for the Centre would benefit the world were intended to, and did, influence Stone and the Florida Class to forego other available career paths and work solely for the Centre.  Stone and the Florida Class committed themselves to the Centre because of these representations.

351.   Defendants intended for Stone and the Florida Class to rely upon these representations, such that Defendants could benefit from the labor of Stone and the Florida Class without paying them for it.

352.   Stone and the Florida Class justifiably relied upon Defendants' fraudulent representations.  Stone and the Florida Class did not know that the Centre was being operated for the personal enrichment of the Berg family.  Had Stone and the Florida Class known this material fact, they would not have become chevre.

353.   Stone and the Florida Class became chevre as a result of Defendants' representations and were damaged thereby.

354.   Stone and the Florida Class seek to recover an amount to be determined at trial, plus prejudgment and post-judgment interest, as a remedy from Defendants for their fraudulent inducement.

**<u>DEMAND FOR RELIEF</u>**

Plaintiffs, individually and on behalf of all other similarly situated persons, demand judgment in their favor and against Defendants for the following relief:

a.   That, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to the members of the FLSA Collective, as defined above.  Such notice shall inform such members that this civil action has been filed, the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

b.   Unpaid minimum wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

c.   Unpaid overtime wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

d.   Certification of this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

e.   A declaration that Plaintiffs are proper collective and class representatives;

f.   Appointment of the undersigned as Class Counsel;

g.      Unpaid minimum wages, overtime wages, statutory and civil penalties, and liquidated damages as provided for by the New York Labor Law Article 19 and the supporting New York State Department of Labor Regulations;

h.      Unpaid minimum wages, overtime wages, statutory and civil penalties, and liquidated damages as provided for by the California Labor Code, §§ 201-203, 218.5, 226, 226.7, 510, 512, 1174, 1174.5, 1194, 1194.2, 1197, 1197.1 and California Wage Order Nos. 4-2000 & 4-2001;

i.      Unpaid minimum wages, overtime wages, and the maximum statutory interest damages for underpayments permitted as provided for by the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*.;

j.      Unpaid minimum wages pursuant to Article X, § 24 of the Florida Constitution;

k.      Compensatory, consequential, general, and punitive damages in an amount to be determined at trial;

l.      Statutory damages, treble damages, and punitive or exemplary damages, to the extent permitted by law;

m.      Reasonable attorneys' fees and costs, including expert fees;

n.      Prejudgment and post-judgment interest at the maximum legal rate; and

All such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and claims so triable.

Dated:  November 4, 2019      **PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**
New York, New York

 /s/ Theodore J. Folkman
Theodore J. Folkman
One Liberty Square, 13th Floor
Boston, MA 02109
Telephone:  (617) 229-5415
Fax:  (617) 313-7837
tfolkman@piercebainbridge.com

Shira Lauren Feldman
Claiborne R. Hane
277 Park Avenue, 45th Floor
New York, NY 10172
Telephone:  (212) 484-9866
Fax:  (646) 968-4125
sfeldman@piercebainbridge.com
chane@piercebainbridge.com

Matthew P. Rand
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Telephone:  (213) 262-9333
Fax:  (213) 279-2008
mrand@piercebainbridge.com

*Attorneys for Plaintiffs and the Proposed Collective
and Class*