UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JAMES GREENE, JENNIFER SHAAL, OFER
SHAAL, JAKE STONE, GUY SHOSHAN, EINAT
EZRA MICHAELI, and YIFAT SHMILOVICH, on
behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KABBALAH CENTRE INTERNATIONAL, INCOR-
PORATED; KABBALAH CENTRES OF THE
UNITED STATES, INCORPORATED; KABBALAH
CENTRE OF NEW YORK, INCORPORATED; THE
KABBALAH CENTRE OF FLORIDA, INC.; KAB-
BALAH CHILDREN'S ACADEMY; KABBALAH
ENTERPRISES, INCORPORATED; KAF INVEST-
MENTS, LLC; 501 N. LA CIENEGA, LLC; SPIRIT-
UALITY FOR KIDS INTERNATIONAL, INC.; and
KAREN BERG, YEHUDA BERG, and MICHAEL
BERG,

Defendants.

---

No. 19-cv-4304 (ILG)(SJB)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT FACTS ............................................................................................... 3

    A.    The Kabbalah Centre. ........................................................................ 3

    B.    The Religious Order of Chevre. ......................................................... 5

    C.    James Greene. ................................................................................... 8

    D.    Einat Ezra Michaeli. ......................................................................... 9

THE ORIGINAL COMPLAINT AND AMENDED COMPLAINT ........................... 10

ARGUMENT ....................................................................................................... 12

    I.    PLAINTIFFS' CLAIMS SHOULD ALL BE DISMISSED PURSUANT TO THE MINISTERIAL EXCEPTION. ................................................... 12

        A.    The Ministerial Exception Applies to All Claims Asserted in this Action. ........................................................................................ 13

        B.    The Ministerial Exception Applies to the Centre. ......................... 15

        C.    The Ministerial Exception Applies to the Chevre. ......................... 18

            1.    The Role of Chevre is Religious in Name and in Function. ......... 18

            2.    Plaintiffs' Amended Allegations Underscore that the Ministerial Exemption Applies to This Case. ............................... 20

    II.    THE FAIR LABOR STANDARDS ACT DOES NOT COVER PLAINTIFFS' CLAIMS. ................................................................... 25

        A.    The Centre Is Not Subject to Enterprise Coverage Under the FLSA. ...... 26

        B.    Plaintiffs Are Not Subject to Individual Coverage Under the FLSA. ...... 28

    III.    PLAINTIFFS FAIL TO STATE CLAIMS OF UNJUST ENRICHMENT AND FRAUDULENT INDUCEMENT. ................................................ 30

    IV.    PLAINTIFFS' CLAIMS ARE TIME-BARRED. ................................ 32

        A.    Greene's Claims Are All Time Barred. ......................................... 32

        B.    Ezra Michaeli's Claims Are Time Barred. ................................... 33

        C.    There Is No Basis For Equitable Tolling. ..................................... 34

    V.    PLAINTIFF GREENE RELEASED HIS CLAIMS AGAINST THE CENTRE. ....................................................................................... 38

    VI.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT PERMITTING FURTHER ATTEMPTS TO AMEND. ......... 41

CONCLUSION ................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alberto v. Rico Pollo #2 Rest. Corp.*,
No. 18-cv-4762 (BMC), 2018 WL 6813057 (E.D.N.Y. Dec. 26, 2018) ...........................34, 37

*A.Q.C. ex rel. Castillo v. United States*,
656 F.3d 135 (2d Cir. 2011) ...................................................................................................34

*Acosta v. Cathedral Buffet, Inc.*,
887 F.3d 761 (6th Cir. 2018) .................................................................................................14

*Anderson v. Sara Lee Corp.*,
508 F.3d 181 (4th Cir. 2007) .................................................................................................31

*Andrews v. Blick Art Materials, LLC*,
268 F. Supp. 3d 381 (E.D.N.Y. 2017) ...................................................................................12

*Archdiocese of Miami, Inc. v. Minagorri*,
954 So. 2d 640 (Fla. Dist. Ct. App. 2007) ............................................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................................................................29

*Barr Labs. v. Quantum Pharmics*,
90-cv-4406, 1994 U.S. Dist. LEXIS 2197 (E.D.N.Y. Feb. 2, 1994) .....................................42

*Beauvoir v. Israel*,
794 F.3d 244 (2d Cir. 2015) ..................................................................................................12

*Benjamin v. B & H Educ., Inc.*,
877 F.3d 1139 (9th Cir. 2017) ...............................................................................................26

*Boos v. Runyon*,
201 F.3d 178 (2d Cir. 2000) ..................................................................................................36

*Cohen v. Avanade, Inc.*,
874 F. Supp. 2d 315 (S.D.N.Y. 2012) ...................................................................................32

*Contrera v. Langer*,
278 F. Supp. 3d 702 (S.D.N.Y. 2017) ...................................................................................34

*Ermini v. Vittori*,
758 F.3d 153 (2d Cir. 2014) ..................................................................................................12

*Fay v. Petersen Pub. Co.*,
  No. 88-cv-6499 (MBM), 1990 WL 67397 (S.D.N.Y. May 17, 1990)....................................41

*Fratello v. Archdiocese of N.Y.*,
  863 F.3d 190 (2d Cir. 2017)............................................................................... passim

*Frederick v. JetBlue Airways Corp.*,
  No. 14-cv-7238 (DLI)(RER), 2016 WL 1306535 (E.D.N.Y. Mar. 31, 2016),
  *aff'd*, 671 F. App'x 831 (2d Cir. 2016)............................................................35, 36

*Gaughan v. Rubenstein*,
  261 F. Supp. 3d 390 (S.D.N.Y. 2017)................................................................39

*German v. Pope John Paul II*,
  211 A.D.2d 456 (1st Dep't 1995) ......................................................................15

*Gortat v. Capala Bros., Inc.*,
  No. 07-cv-3629, 2009 WL 3347091, at *3 (E.D.N.Y. Oct. 16, 2009),
  *report and recommendation adopted*, No. 07-CV-3629, 2010 WL
  1423018 (E.D.N.Y. Apr. 9, 2010), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)............................39

*Griffin v. Aldi, Inc.*,
  No. 16-cv-00354 (LEK)(ATB), 2016 WL 7235787 (N.D.N.Y. Dec. 14, 2016) ....................30

*Grys v. ERIndustrial Sales Inc.*,
  553 F. App'x 61 (2d Cir. 2014) ........................................................................34

*Hizbullahankhamon v. Walker*,
  255 F.3d 65 (2d Cir. 2001).................................................................................35

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  565 U.S. 171 (2012)........................................................................12, 13, 14, 24

*Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*,
  311 F.3d 534 (2d Cir. 2002)..............................................................................12

*Ibrahim v. Dep't of Homeland Sec.*,
  669 F.3d 983 (9th Cir. 2012) ............................................................................12

*In re Zyprexa Prod. Liab. Litig.*,
  549 F. Supp. 2d 496 (E.D.N.Y. 2008) ................................................................36

*Int'l Fin. Corp. v. Carrera Holdings Inc.*,
  82 A.D.3d 641 (1st Dep't 2011) ........................................................................32

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
  655 F.3d 136 (2d Cir. 2011)..............................................................................39

*Jeune v. Crew*,
  No. 16-cv-1107 (MKB), 2017 WL 4357382 (E.D.N.Y. Sept. 29, 2017) ...............................41

*Jones v. SCO Family of Servs.*,
  202 F. Supp. 3d 345 (S.D.N.Y. 2016)...................................................................26, 28, 29, 30

*Kasparov v. Ambit Texas*,
  No. 12-cv-3488 (WFK)(JO), 2016 WL 10749156 (E.D.N.Y. Mar. 10, 2016)......................20

*Katz v. DNC Servs. Corp.*,
  No. 16-cv-5800, 2018 WL 692164 (E.D. Pa. Feb. 2, 2018)...................................................16

*Lanqing Lin v. Everyday Beauty Amore Inc.*,
  No. 18-cv-729 (BMC), 2018 WL 6492741 (E.D.N.Y. Dec. 10, 2018) ..................................37

*Lewis v. NYC Dept. of Educ.*,
  Civ. No. 12-cv-675, 2013 WL 5405534 (S.D.N.Y. Sept. 25, 2013)......................................39

*Linde v. Arab Bank, PLC*,
  950 F. Supp. 2d 459 (E.D.N.Y. 2013) ..............................................................................35, 36

*Litle v. Arab Bank, PLC*,
  507 F. Supp. 2d 267 (E.D.N.Y. 2007) ..................................................................................35

*Locke v. St. Augustine's Episcopal Church*,
  690 F. Supp. 2d 77 (E.D.N.Y. 2010) ...............................................................................26, 27

*Magnotti v. Crossroads Healthcare Mgmt., LLC*,
  126 F. Supp. 3d 301 (E.D.N.Y. 2015) ...................................................................................41

*Mangini v. McClurg*,
  24 N.Y.2d 556 (1969) ............................................................................................................39

*Marte v. Westbury Mini Mart, Inc.*,
  No. 16-cv-53 (SJF)(ARL), 2017 WL 9485667 (E.D.N.Y. Jan. 18,
  2017), *report and recommendation adopted*, No. 16-cv-53 (SJF)(ARL),
  2017 WL 838194 (E.D.N.Y. Mar. 3, 2017)............................................................................16

*Matamoro v. Khomari*,
  No. 16-cv-9004 (KBF), 2017 WL 6542954 (S.D.N.Y. Dec. 19, 2017)...................................39

*McCabe v. Lifetime Entm't Servs., LLC*,
  No. 17-cv-908 (ERK)(SJB), 2018 U.S. Dist. LEXIS 3212 (E.D.N.Y. Jan. 4, 2018),
  *aff'd*, 761 F. App'x 39 (2d Cir. 2019)...................................................................................42

*McKeon v. Risner*,
  No. 16-cv-02467, 2017 Cal. Super. LEXIS 6276 (Cal. Dec. 4, 2017) ...................................31

iv

*Menominee Indian Tribe of Wisc. v. United States*,
    136 S. Ct. 750 (2016)..................................................................................36

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*,
    No. 15-cv-4971 (JMF), 2016 WL 344980 (S.D.N.Y. Jan. 27, 2016),
    *aff'd*, 681 F. App'x 64 (2d Cir. 2017)......................................................40

*Mitchell v. Washingtonville Cent. Sch. Dist.*,
    190 F.3d 1 (2d Cir. 1999) .........................................................................22

*Moreno v. Episcopal Diocese of Long Island*,
    No. 14-cv-7231 (JS)(AKT), 2016 WL 8711448 (E.D.N.Y. Jan. 20,
    2016), *report and recommendation adopted*, No. 14-cv-7231 (JS)(AKT),
    2016 WL 8711394 (E.D.N.Y. Mar. 4, 2016)..................................13, 15

*Morris Cerullo World Evangelism v. Superior Court of San Diego Cty.*,
    No. D038029, 2001 WL 1654473 (Cal. App. 4 Dist. Dec. 12, 2001) ....................15

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)......................................................................16

*Nevius v. Afr. Inland Mission Int'l*,
    511 F. Supp. 2d 114 (D.D.C. 2007) ..........................................................15

*Omaha Indem. Co. v. Johnson & Towers, Inc.*,
    599 F. Supp. 215 (E.D.N.Y. 1984) ...........................................................41

*Pampillonia v. RJR Nabisco, Inc.*,
    138 F.3d 459 (2d Cir. 2011).......................................................................39

*Patsy's Italian Rest., Inc. v. Banas*,
    575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011)............................12

*Penn v. N.Y. Methodist Hosp.*,
    884 F.3d 416 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 424 (2018)..............................17, 22, 24

*Petras v. Johnson*,
    No. 92-cv-8298 (CSH), 1993 U.S. Dist. LEXIS 8464 (S.D.N.Y. June 16, 1993)............30, 31

*Reich v. Waldbaum, Inc.*,
    52 F.3d 35 (2d Cir. 1995) ..........................................................................33

*Rezvani v. Jones*,
    No. 18-cv-06244-CAS (Ex), 2018 U.S. Dist. LEXIS 213842 (C.D. Cal. Dec. 17, 2018).......32

*Romain v. Capital One N.A.*,
    No. 13-cv-3035 (JS)(WDW), 2013 WL 6407731 (E.D.N.Y. Dec. 9, 2013) ......................20

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)...................................................................................12

*Ruso v. Morrison*,
    695 F. Supp. 2d 33 (S.D.N.Y. 2010)......................................................................38

*Rweyemamu v. Cote*,
    520 F.3d 198 (2d Cir. 2008).................................................................13, 15, 21

*Saudagar v. Walgreens Co.*,
    No. 18-cv-437 (KPF), 2019 U.S. Dist. LEXIS 20967 (S.D.N.Y. Feb. 8, 2019)...............36, 37

*Schleicher v. Salvation Army*,
    518 F.3d 472 (7th Cir. 2008) ...............................................................14, 16, 24

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
    363 F.3d 299 (4th Cir. 2004) ..........................................................13, 14, 16, 18

*Shu Qin Xu v. Wai Mei Ho*,
    111 F. Supp. 3d 274 (E.D.N.Y. 2015) ...............................................................37, 38

*Shukla v. Sharma*,
    No. 07-cv-2972 (CBA), 2009 WL 10690810 (E.D.N.Y. Aug. 21,
    2009), *report and recommendation adopted*, No. 07-cv-2972 (CBA),
    2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009) .............................................. passim

*Sosnowy v. A. Perri Farms, Inc.*,
    764 F. Supp. 2d 457 (E.D.N.Y. 2011) ................................................................30

*United States v. Twenty MILJAM-350 IED Jammers*,
    669 F.3d 78 (2d Cir. 2011).................................................................................40

*VKK Corp. v. Nat'l Football League*,
    244 F.3d 114 (2d Cir. 2001)..............................................................................40

*Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*,
    987 F. Supp. 2d 267 (E.D.N.Y. 2013) ................................................................39

*Waksman v. Cohen*,
    No. 00-cv-9005 (WK), 2002 WL 31466417 (S.D.N.Y. Nov. 4, 2002) ....................41

*Walker v. Interfaith Nutrition Network, Inc.*,
    No. 14-cv-5419 (DRH)(GRB), 2015 WL 4276174 (E.D.N.Y. July 14, 2015)......25, 26, 27, 28

*Warren v. Garvin*,
    219 F.3d 111 (2d Cir. 2000).............................................................................35

*Young Min Lee v. New Kang Suh Inc.*,
  No. 17-cv-9502 (NSR), 2019 WL 689085 (S.D.N.Y. Feb. 15, 2019) ....................................39

*Zerilli-Edelglass v. New York City Transit Auth.*,
  333 F.3d 74 (2d Cir. 2003)..........................................................................................................34

*Zhongwei Zhou v. Wu*,
  No. 14-cv-1775 (RJS), 2017 WL 1233994 (S.D.N.Y. Mar. 31, 2017)................................35

STATUTES

29  U.S.C. § 201 *et seq*................................................................................................... passim

29 U.S.C. § 203(r)(1) ....................................................................................................................26

29 U.S.C. § 206(a) ........................................................................................................................25

29 U.S.C. § 207 (a)(1) ..................................................................................................................25

29 U.S.C. § 225 .............................................................................................................................33

Fed. R. Civ. P. 12(b)(6)................................................................................................... passim

Fla. Const. Article X, § 24(b) ....................................................................................................26

Fla. Stat. Ann. § 95.11 (3)(j)-(k)................................................................................................33

Ill. Comp. Stat. Ann. 105/3(d)(5)..............................................................................................26

OTHER AUTHORITIES

29 C.F.R § 779.214 .......................................................................................................................26

Cal. Bus. & Prof. Code § 17208 ................................................................................................33

Cal. Civ. Proc. Code § 338(a) ....................................................................................................33

Cal. Civ. Proc. Code § 338(d) ....................................................................................................33

Ill. Admin. Code Title 56, § 210.110 ........................................................................................26

N.Y. Lab. Law § 651(5)(f)...........................................................................................................26

Division of Labor Standards Enforcement (DLSE) Enforcement Policies &
  Interpretations Manual § 43.6.7 (2002) ................................................................................25

Internal Revenue Code § 501(c)(3)..............................................................................................3

Internal Revenue Code § 170(b)(1)(A)(i) ....................................................................................3

U.S. Department of Labor Opinion Letter (December 21, 2018), 2018 WL
    6839426 .......................................................................................................... 14, 22, 23, 24

Black's Law Dictionary (11th ed. 2019) ....................................................................... 16

Field Operations Handbook,
    *available at* https://www.dol.gov/whi/FOH/ ......................................................... 14

Defendants Kabbalah Centre International, Incorporated; Kabbalah Centres of the United States, Incorporated; Kabbalah Centre of New York, Incorporated; The Kabbalah Centre of Florida, Inc.; Kabbalah Children's Academy; Kabbalah Enterprises, Incorporated; KAF Investments, LLC; 501 N. La Cienega, LLC; Spirituality For Kids International, Inc; Karen Berg, Michael Berg and Yehuda Berg (collectively, "Defendants," "the Kabbalah Centre," or "the Centre") respectfully move this Court for an Order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing with prejudice all of the claims asserted in the Amended Class and Collective Action Complaint (Dkt. 44) ("Amended Complaint" or "Am. Compl.") by Plaintiffs James Greene and Einat Ezra Michaeli.[1]

## PRELIMINARY STATEMENT

The Kabbalah Centre is a non-profit religious organization that provides spiritual services based on the wisdom and teachings of Kabbalah, an ancient strand of Judaism.  The Centre's mission is to make sacred practices and beliefs contained in classic Jewish texts, such as the Zohar, a commentary on the Torah, available to a broader community.  Plaintiffs are former members of the Centre's Religious Order of Chevre (referred to herein as "Chevre"), a group of individuals who each agreed to dedicate themselves to fulfilling the spiritual mission of the Centre.  Chevre participate in religious services, assist in teaching aspects of Kabbalah to the Centre's congregants or students, and exemplify Kabbalistic principles through their devoted service to the Centre and its spiritual teachings as opposed to the pursuit of material wealth.  Among other things, Chevre

---

[1] Defendants previously moved this Court to compel arbitration as to Plaintiffs Jennifer Shaal, Ofer Shaal, Jake Stone, Guy Shoshan, and Yifat Shmilovich ("the Arbitration Plaintiffs") on the grounds that all of their claims are subject to confidential arbitration under valid arbitration agreements.  (Dkt. 38.)  Plaintiffs appear to have conceded the arbitrability of the Arbitration Plaintiffs' claims by virtue of having failed to oppose Defendants' motion.  Moreover, none of the new allegations in the Amended Complaint even purport to address the issues raised by Defendants regarding the arbitrability of the claims.  Defendants have nonetheless renewed their Motion to Compel Arbitration in conjunction with the present motion, and accordingly, this motion to dismiss is formally brought only with respect to the claims of Plaintiffs Greene and Ezra Michaeli, who did not enter into arbitration agreements.  Defendants reserve the right to seek dismissal of the Arbitration Plaintiffs' claims on the same grounds as those set forth in this motion should the Court not compel arbitration.

disavow material possessions, donate their assets and belongings when no longer needed, and have depended on the Centre for room, board, and other sustenance in lieu of wages, as a reflection of their dedication to live a spiritual life in support of the mission of the Centre.  In this regard, they are similar to monks and nuns associated with other religious orders.

Having abjured standard professions or jobs, and having taken a literal vow of poverty in the course of becoming Chevre, the Plaintiffs now—somewhat incredibly—bring claims against the Centre pursuant to federal and state wage-and-hour laws (as well as related common law claims), seeking overtime and minimum wages for the services they performed as Chevre.  The Centre previously filed a motion to dismiss the initial Complaint ("Original Complaint") on grounds essentially identical to those set forth in the present motion (Dkt. 39.), in response to which Plaintiffs filed their Amended Complaint (Dkt. 44.).[2]  The Amended Complaint reflects Plaintiffs' futile attempts to erase their prior admissions (which, after having read Defendants' motion, they now understand are dispositively problematic) and to incorporate new conclusory allegations, in hopes of circumventing the pleading defects raised by Defendants.  Even despite their heavy-handed revisions, however, Plaintiffs' claims cannot withstand scrutiny and should be dismissed in full for several independent reasons.

*First*, the Establishment and Free Exercise Clauses of the First Amendment bar this action under a constitutional doctrine known as the "ministerial exception":  the assessment of Plaintiffs' claims—all of which relate solely to their service as religious figures in a religious organization— would impermissibly require the Court to entangle itself in the religious doctrine of Kabbalah. *Second*, Plaintiffs fail to state a claim pursuant to the Fair Labor Standards Act ("FLSA") 29 U.S.C.

---

[2] References to the exhibits attached to the Declaration of Elise M. Bloom in Support of the Motion to Dismiss the Amended Complaint ("Bloom Decl.") are cited as "Bloom Decl., Ex. __."  A redline comparing the Amended Complaint to the Original Complaint is attached as Ex. A to the Bloom Decl.

§ 201 *et seq.*, or state wage-and-hour laws because the Kabbalah Centre is not a covered enterprise, nor are Plaintiffs covered individuals, under the relevant statutes. *Third*, Plaintiffs' common law claims are facially deficient because they are duplicative of the statutory claims, and are still insufficiently pled even after Plaintiffs incorporated their amended allegations. *Fourth,* Plaintiffs' claims are time-barred by the applicable statutes of limitations. *And finally*, Greene's claims are precluded because he expressly released them in a clear and unambiguous agreement he entered into with the Centre at the time of his departure.

## RELEVANT FACTS

### A.   THE KABBALAH CENTRE.

Originally founded in 1922 by Rabbi Yehuda Ashlag, the Kabbalah Centre is a non-profit religious organization registered as a tax-exempt religious organization under Section 501(c)(3) and Section 170(b)(1)(A)(i) of the Internal Revenue Code of 1986.[3]  (*See* Am. Compl. ¶¶ 1, 23, 42;[4] Bloom Decl., Ex. B.[5])  Rabbi Philip Berg became Director of the Centre in 1969 and, together with his wife, Defendant Karen Berg, ran the Centre until his passing in 2013.  (Am. Compl. ¶¶ 2,

---

[3] Plaintiffs have also named three Defendants that are not non-profits (Kabbalah Enterprises, Inc.; KAF Investments, LLC; and 501 N. La Cienega, LLC (the "For-Profit Defendants")), but have still failed to allege any specific facts regarding services they purportedly performed for those entities, even after having had the opportunity to amend their Original Complaint.  Accordingly, the For-Profit Defendants are improperly joined and should be dismissed as a matter of law, *see* n.16, *infra*, and all references to the Centre as being a non-profit organization do not include the For-Profit Defendants.  Relatedly, Defendants Karen Berg, Michael Berg and Yehuda Berg are individuals and thus are excluded from Defendants' characterizations of the Centre as a non-profit organization.

[4] References to factual allegations in the Amended Complaint (as well as in the Original Complaint) are assumed to be true for purposes of this motion only.

[5] Exhibits B-I to the Bloom Decl. are screenshots from publicly available websites (the Centre's official website and gift shop, available at https://kabbalah.com/en and https://store-us.kabbalah.com; Plaintiff Greene's personal website, available at https://jamiegreene.com/; and Madonna's "Author's Statement" regarding her children's book "The English Roses," available at http://www.englishrosescollection.com/).  Exhibits J-L are copies of documents signed by Plaintiffs Greene and Ezra Michaeli.  Exhibit M is a copy of Plaintiff Ezra Michaeli's "R1" immigration visa.  As discussed *infra* at pp. 11-12 and n.13, the exhibits to the Bloom Decl. should be considered in conjunction with this Rule 12(b)(6) motion to dismiss because the exhibits are either incorporated by reference in the Amended Complaint or are subject to judicial notice.

42; Bloom Decl., Ex. B.)  Defendant Michael Berg, a son of Rabbi Berg and Karen Berg, is currently the Director of the Centre.  (Bloom Decl., Ex. B.)

Historically, Kabbalah has been regarded as an esoteric form of spiritual wisdom available only to a privileged few (typically older, male scholars) whose years of study rendered them suited for its teachings.  In contrast, the Centre aims to make the teachings of Kabbalah available on a broader basis.  (Bloom Decl., Ex. B.) The Centre is dedicated to collecting and translating the holy texts of ancient Kabbalists (including the Zohar), and to sharing the spiritual wisdom and practices within those texts with all of its students.  Toward this end, the Kabbalah Centre, with the assistance of its Chevre, provides spiritual services, including prayer services, events (such as those in celebration and observance of Jewish holidays), and classes, and fosters a community between its students and the Chevre.  (Bloom Decl., Exs. B-D.)  Like other non-profit organizations and religious institutions, the Centre supports its religious mission primarily through soliciting charitable donations, as well as through other fundraising efforts, including selling tickets to events and classes, and selling a selection of products that are related to the Centre's religious practices, such as holy water, sacred red string bracelets, prayer books, and other books related to Kabbalah.[6]  (*See, e.g.* Original Complaint ¶ 17; Am. Compl. ¶¶ 19, 21, 134 (referencing the bookstore); Bloom Decl.,

---

[6] Plaintiffs initially alleged that Defendants sold red string bracelets and holy water, but revised their allegations to instead refer to the Centre's sale of jewelry, baseball caps, and a book published by Madonna, presumably because these items sound less "religious."  Nonetheless, these items are *all* related to the Centre's spiritual practices.  (*Compare* ¶ 17 of Original Complaint *with* ¶ 134 of Amended Complaint.)  Much like a Catholic organization might sell a necklace with a cross or rosary beads, the Centre also sells jewelry as a representation of faith (featuring significant emblems of the Kabbalists, such as the mandala, or Hebrew phrases.).  (*See* Bloom Decl., Ex. H (jewelry sold on Kabbalah Centre website featuring a mandala (symbolic of the internal search for the image of God) and the Hebrew word "והו" which refers to the first of the seventy-two names of God as taught in the Kabbalah).)  Similarly, the baseball cap sold on the website is offered because it is used by students and leaders at the Centre as a religious head covering in lieu of a *yarmulke* or *kippah* (since all Chevre men—and some Chevre women, as well as students—cover their heads for religious reasons).  The Centre also currently sells one of Madonna's children's books, "The English Roses," which is based on Madonna's learnings from her studies with the Centre as a student.  (*See* Am. Compl. ¶ 134; *see also* Bloom Decl., Ex. I (author's note from Madonna explaining the Kabbalist origins of the book, located on the publicly available webpage of "The English Roses").)

Ex. E (listing books for sale).)

As do many religious organizations, the Centre hires employees to assist with the day-to-day logistics and administration of the Centre's events and activities.  It is undisputed that the Centre pays its employees legally adequate wages and that the claims in this lawsuit do not involve the Centre's employees.  (Am. Compl. ¶¶ 4, 44.)

### B.   THE RELIGIOUS ORDER OF CHEVRE.

Plaintiffs were not employees of the Centre.  Quite distinct from the Centre's employees, in fact, Plaintiffs were members of the Chevre.  (Am. Compl. ¶¶ 1, 18, 19, 23; Bloom Decl., Ex. L.)  Not dissimilar to nuns or monks, Chevre are members of a Religious Order who, after completing a "Chevre-in-Training" period (and often, after having previously joined the Centre as students), agree to renounce their worldly possessions and wages in exchange for accepting their calling to the Religious Order and for dedicating their lives to supporting the mission of the Centre. (Bloom Decl., Ex. L.)  As Plaintiffs allege, they became Chevre in expectation of serving as "spiritual workers who were to help enlighten humanity to the teachings of the Kabbalah"; of "working together to build a bright future"; and of "working all for one and one for all…."  (Am. Compl. ¶¶ 1, 76, 78.)

As Plaintiffs allege, all Chevre make spiritual vows upon accepting their roles, including a vow of poverty.  (Am. Compl. ¶ 78.)  Some Chevre even sign written agreements with the Centre to capture those vows, such as the "Chevre Agreement" executed by Ezra Michaeli.  (Bloom Decl., Ex. L.)  In making these vows, Chevre agree to numerous terms, including:

- to make a "lasting commitment to the furtherance of the purposes and principles of the Chevre…";

- to commit themselves as "fully committed Member[s] of the Order…";

- to engage in "constant study and personal development…";

5

- to dedicate their lives to spreading the message of Kabbalah in order to "further[] the Centre's mission of spreading the light and ending pain, suffering, negativity and darkness in the world by performing assigned work duties and participating in the daily spiritual and educational activities of the Centre…";

- to behave "in accordance with the principles and beliefs" of the Centre and the "Chevre Code," which includes, for instance, a vow to live communally with other Chevre, and a commitment to "moral and spiritual behavior," including keeping relationships with the opposite sex "pure and in line with the Centre's Kabbalistic principles";

- to "live a simple life, embrace a modest lifestyle, and engage in unconditional caring and sharing";

- to endeavor towards the "essential aim of the Order," which is "for each Chevre…to be a rock in the Holy Temple of Jerusalem, which is the source of all blessings and Light for the entire world";

- to "recognize and honor the supreme importance of the Zohar" – the "authoritative body of knowledge on Kabbalah…[which permits one to] connect us with the Creator's light, and ultimately to fulfill our birthright of true spiritual transformation" – and to "commit to sharing and dissemination of the Zohar and to studying the teachings of the Zohar"; and

- to dedicate themselves "completely and cooperatively to fulfilling the mission of the Centre…[which] includes making themselves available at all times to ensure that the work of the Centre is carried out with purpose and direction locally and worldwide..."

*Id.*  Similarly, some Chevres' vows of poverty were made in formal written agreements, in which they agree to "forgo all worldly possessions"; "commit all possessions…to the common ownership of the Kabbalah Religious Order;" "to live in community with the other members of the Kabbalah Religious Order;" and "to forego employment outside of the Kabbalah Religious Order."  (Am. Compl. ¶ 78; Bloom Decl., Ex. K.)  To that end, Chevre are asked to consider donating some of their personal assets and property to the Centre. (Am. Compl. ¶ 78.)  Because all Chevre commit to these vows of abstinence (regardless of whether they sign formal documents), the Centre pro-

vides Chevre with full room and board, necessities like clothing, soap, and shampoo, and allow-ances for additional personal needs.[7]  (Am. Compl. ¶¶ 6, 76, 78-81; Bloom Decl., Ex. L at 7 of 13.)

Chevre play an essential role in the mission of the Centre, primarily by providing spiritual services and disseminating the wisdom and teachings of Kabbalah.  (*See, e.g.* Am. Compl. ¶ 1 (alleging that Plaintiffs understood Chevre to be "spiritual workers who were to help enlighten humanity to the teachings of the Kabbalah"); Bloom Decl., Ex. L at 9 of 13 ("my focus is only on spreading the wisdom and teachings of Kabbalah and the spiritual growth of the students…I com-mit to…participating in the daily spiritual and educational activities of the Centre.").)  Chevre are tasked with developing deep, personal relationships with the Centre's students, in order to become their trusted spiritual advisors.  (Bloom Decl., Ex. L at 12 of 13 ("[Chevre] take an active role in teaching and guiding mekusharim[8] with the greatest potential to reveal Light.").)  Chevre also assist the Centre in soliciting charitable donations from its students in order to fund the operations of the Centre.  (*See, e.g.* Am. Compl. ¶¶ 5, 49, 54.)  In addition, Chevre perform various adminis-trative and logistical tasks for the Centre, such as bookkeeping and janitorial services.  (*See, e.g.* Am. Compl. ¶¶ 23, 48, 72.)  Indeed, the Centre and its Chevre believe that "performing assigned work duties"—even tasks that some would consider menial—is essential to the tenets of the reli-gion, which include "liv[ing] humbly and with a lack of ego."  (*See, e.g.* Bloom Decl., Ex. K;

---

[7] Plaintiffs make allegations regarding these same conditions of the Chevre lifestyle (albeit more pejoratively).  For instance, Plaintiffs allege that upon joining the Centre, the Chevre were "manipulated into giving up their material possessions and their relationships outside the Centre" (Am. Compl. ¶ 6); that they "lived in overcrowded Centre housing with other chevre" (*id.* ¶¶ 6, 80); that they "ate the food the Centre provided" (*id.* ¶¶ 6, 81); and that they were issued "[b]asic household items such as soap and shampoo" (*id.* ¶ 6).

[8] "Mekusharim" (which means "are connected" in Hebrew) is used by the Centre to refer to the Centre's students and community.

Bloom Decl., Ex. L at 2 of 2 (Chevre vow to "further[] the Centre's mission…by performing as-signed work duties…"); *id.* at 12 of 13 (Chevre are expected to "[make] themselves available at all times to ensure that the work of the Centre is carried out with purpose and direction locally and worldwide"); *see also* Am. Compl.  ¶ 78 ("The chevre believed they were working all for one and one for all…").)

C.    JAMES GREENE.

Prior to becoming a Chevre, Greene obtained a Bachelor of Science in Sports Medicine from Pepperdine University, a Master's degree in marriage, family, and child therapy, and was certified as an alcohol and drug addiction counselor through the University of California, Los An-geles.  (Am. Compl. ¶ 18.)  He practiced as a Licensed Family and Marriage Therapist since 1992 (and purportedly continues to practice today).  (*Id.*)

Greene became a member of the Religious Order of Chevre in 2004.  (*Id.*)  As a Chevre, Greene allegedly "mainly" performed fundraising duties and served as an "emcee" for Centre events.  (*Id.*)  Greene alleges that his work was "primarily"—though not entirely—non-religious. (*Id.*)  He also alleges to have authored books that the Centre sold and to have appeared on videos sold by the Centre on DVD, all of which were presumably religious in nature.  (*Id.* ¶ 128.)

Greene left the Centre as a member of the Chevre in 2009.  (Am. Compl. ¶ 18.)  In con-nection with the cessation of his membership in the Chevre, Greene entered into a separation agreement with the Centre on or around March 9, 2009 in exchange for valuable consideration (the "Greene Agreement").  (Bloom Decl., Ex. J.)  The Greene Agreement contains a broad general release, in which Greene expressly agreed to release "any and all claims (known or unknown)" against the Centre, including, as pertinent here, any claims under the FLSA or California Labor Code, as well as any claims for fraudulent inducement, breach of implied or express contract, and "any other tort."  (*Id.* ¶ 1.)

Greene maintains a blog in which he recalls his time as a Chevre.  In one post, Greene explained that his "rose had bloomed at last" when he left private practice "to follow [his] dream as a Kabbalah teacher full time at the Kabbalah Centre in LA."  (Bloom Decl., Ex. F.)  Greene further recalls:

> I *loved* teaching and I felt very blessed to have been given the opportunity to find my voice as a '*Kabbalistic raconteur*' and it all made sense…Discovering teaching…was truly a God-send…Though, it wasn't just the teaching, I would spend my days meeting with students and guiding them through their challenges, using Kabbalistic teachings as I learned them from my teachers and we developed very close bonds and friendships that I deeply cherish.

(*Id.*) (emphasis in original).  However, over time, Greene observed that he "would hear [himself] teach concepts that were astounding" but questioned whether he was "truly so committed to be on this mission to change the world and bring about it's entire redemption?" [sic]  (*Id.*)  Ultimately, he reports having realized that he "did not aspire to becoming righteous… I don't believe I personally came here to change the world nor attempt to save it."  (*Id.*)

### D.   EINAT EZRA MICHAELI.

Einat Ezra Michaeli was trained as an attorney in Israel.  (Am. Compl. ¶ 23.)  According to the Amended Complaint, she became a member of the Religious Order of Chevre in the United States in 2005.  (*Id.*)[9]  An Israeli citizen, she obtained an R1-Visa to immigrate to the United States.  (Bloom Decl., Ex. M.)  An R1-Visa is "intended for religious workers whose lives are dedicated to religious practices and functions, as distinguished from secular members of the religion."[10]

---

[9] Ezra Michaeli's signed Vow of Poverty indicates that she became a member of the Chevre as early as 2001 when she previously joined the Centre in Israel.  (*See* Bloom Decl., Ex. K.)

[10] *See* https://www.uscis.gov/working-united-states/temporary-workers/r-1-temporary-nonimmigrant-religious-workers ("An R-1 is a foreign national who is coming to the United States temporarily to be employed as a minister or in another religious vocation or occupation at least part time…This visa program is intended for religious workers whose lives are dedicated to religious practices and functions… To qualify, the foreign national must have been a member of a religious denomination having a bona fide non-profit religious organization in the United States for at least two years immediately before the filing of the petition.").

As a Chevre, Ezra Michaeli allegedly performed tasks such as janitorial work, preparing food, supervising building maintenance, and coordinating volunteers, classes and students.  (Am. Compl. ¶ 23.)  She also allegedly performed services for the Centre's legal department and kept revenue records, and made "telemarketing calls…with a goal of…soliciting increasingly large donations…" and "managed social media for several Centre locations."  (*Id*. ¶¶ 59, 130.)[11]

Ezra Michaeli allegedly left the Centre in 2016.  (*Id*. ¶ 23.)  She alleges that at that time, she requested compensation from the Centre for the services she provided as a Chevre, but was purportedly told in writing that she was not owed compensation.  (*Id.* ¶ 111.)

### THE ORIGINAL COMPLAINT AND AMENDED COMPLAINT

Plaintiffs filed the Original Complaint on July 25, 2019.  (Dkt. 1.)  On September 23, 2019, Defendants filed separate motions (i) to compel arbitration as to the Arbitration Plaintiffs (Dkt. 38); and (ii) to dismiss as to Greene and Ezra Michaeli (Dkt. 39).  Rather than opposing Defendants' motions, Plaintiffs filed the Amended Complaint on November 4, 2019.  (Dkt. 44.)  As discussed further below, Plaintiffs—having been educated by Defendants about the dispositive fatal flaws in their Original Complaint—made a strained effort at both cleansing the Original Complaint of the concessions regarding the Centre's and the Chevre's religious roles, and of incorporating new allegations (many of which are contrary to the allegations in the Original Complaint) in an effort to paper over the problems addressed in Defendants' motions.  However, as set forth below, Plaintiffs *cannot* plead around the defects in their claims, which must be dismissed as a matter of law even as alleged in the Amended Complaint.

The Amended Complaint alleges twenty-three Causes of Action ("COA").  COA 1 and 2

---

[11] Notably, the Amended Complaint adds allegations with respect to *each* of the other Plaintiffs, including the Arbitration Plaintiffs, claiming that their duties or work were "primarily…non-religious."  *See, e.g.* Bloom Decl., Ex. A at pp. 8-14.  However, Plaintiffs make *no* such allegations with respect to Ezra Michaeli, suggesting that unlike the others, she does not allege that her duties were primarily non-religious in nature.  (*Id.*)

allege violations of the FLSA for failure to pay minimum wage and overtime (the "FLSA Claims").
COA 3 through 15 allege violations of various wage-and-hour laws under the New York Labor
Law (COA 3-6), the California Labor Code (COA 7-11), the California Business and Professions
Code (COA 12), the Florida Constitution (COA 13), and the Illinois Minimum Wage Law (COA
14-15) (collectively, the "State Wage-and-Hour Claims"). Plaintiffs also bring common law claims
for unjust enrichment and fraudulent enrichment under the laws of New York, California, Illinois
and Florida (COA 16-23) (collectively, the "Common Law Claims").

As relevant to this motion, Greene brings FLSA Claims, but does not allege any State
Wage-and-Hour Claims or Common Law Claims.[12]   (Am. Compl. ¶¶ 158-175.)  Ezra Michaeli
similarly brings FLSA Claims (*id*.), and further brings Common Law Claims and State Wage-and-
Hour Claims under California law as a purported representative of the putative California Rule 23
class. (Am. Compl. ¶¶ 216-271, 304-308, 328-336.)

In the Amended Complaint, Plaintiffs make numerous allegations with respect to their al-
leged legal obligations upon joining the Centre as Chevre, and refer to "legally binding documents"
presented to them by the Centre.  (*See, e.g.* Am. Compl. ¶ 113 ("[T]he Centre presented to Plaintiffs
and other former chevre what it claimed were legally binding documents and required them to sign
the documents in order to receive any assistance."); *id.* ¶ 118 ("Indeed, many chevre, including
Plaintiffs…signed separation agreements…".)   Plaintiffs also refer to and rely upon their
vows of poverty," as well as the Centre's website in their allegations.  (*See, e.g.* Am. Compl. ¶¶
45, 78, 132-33 (referring to their vows of poverty as well as statements on the Centre's website
and items sold online by the Centre).)  It is well-established that documents that are incorporated

---

[12] Although the Amended Complaint initially identifies Greene as a class representative for the Common Law Claims,
*see* Am. Compl. ¶ 145, Greene does not appear to bring any Common Law Claims.  (*Id.* ¶¶ 298-354.)

11

by reference into the Complaint, or that are otherwise relied upon and integral to the Complaint, are deemed part of the pleading and may be considered in conjunction with a Rule 12(b)(6) motion. *See, e.g. Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Accordingly, Defendants submit copies of documents signed by Plaintiffs Ezra Michaeli and Greene, which exemplify the "legally binding documents" and "vows of poverty" relied upon and referenced in the Amended Complaint (Bloom Decl., Exs. J-L) as well as screenshots from the Centre's website (Bloom Decl., Exs. B-H), all of which should be considered incorporated into the pleadings.[13]

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS SHOULD ALL BE DISMISSED PURSUANT TO THE MINISTERIAL EXCEPTION.

Plaintiffs' claims all fail as a matter of law because they fall under the constitutional "ministerial exception." *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012). Grounded in the First Amendment, the ministerial exception protects from judicial scrutiny any decisions "made by religious organizations with respect to their ministers." *Shukla v. Sharma*, No. 07-cv-2972 (CBA), 2009 WL 10690810, at *3 (E.D.N.Y. Aug. 21, 2009), *report and recommendation adopted*, No. 07-cv-2972 (CBA), 2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009). The purpose of the ministerial exception is to prevent the government (including courts)

---

[13] In addition, the Court independently may take judicial notice of publicly available websites, *see, e.g., Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 386 (E.D.N.Y. 2017) (citing cases supporting finding that a court may take judicial notice of information publicly announced on a party's website); *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 549 (2d Cir. 2002) (taking judicial notice of a party's website), and of Ezra Michaeli's immigration visa, *see, e.g., Ermini v. Vittori*, 758 F.3d 153, 159 n.4 (2d Cir. 2014) (taking judicial notice of individuals' nonimmigrant visa status); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 988 (9th Cir. 2012) (taking judicial notice of a letter revoking student visa status).

from "interfere[ing] with the internal governance of [a] church" and to "prohibit government in-volvement in…ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 173; *see also Rweyemamu v. Cote*, 520 F.3d 198, 204-05 (2d Cir. 2008) ("[C]ourts have declined to 'interfere with ecclesias-tical hierarchies, church administration, and appointment of clergy' … [but] the ministerial excep-tion cannot be ascribed solely to judicial self-abnegation … It is also required by the Constitu-tion."); *Moreno v. Episcopal Diocese of Long Island*, No. 14-cv-7231 (JS)(AKT), 2016 WL 8711448, at *10 (E.D.N.Y. Jan. 20, 2016), *report and recommendation adopted*, No. 14-cv-7231 (JS)(AKT), 2016 WL 8711394 (E.D.N.Y. Mar. 4, 2016) (granting motion to dismiss on the basis of the ministerial exception).

A.   THE MINISTERIAL EXCEPTION APPLIES TO ALL CLAIMS ASSERTED IN THIS AC-TION.

Although the ministerial exception was most recently reaffirmed by the Supreme Court in the context of discrimination claims, *see Hosanna-Tabor*, 565 U.S. at 206, it is well-accepted that the longstanding constitutional doctrine prohibiting government entanglement with religious doc-trine and institutions—which far predates the Supreme Court's decision—applies to all of the claims asserted in this action.

In the context of federal and state wage-and-hour claims, courts have found that when faced with the question of whether it is proper for a religious figure to perform services without pay—or whether the services provided by a religious figure fall within the scope of religious duties—the court would be required to intervene too closely in matters of religious doctrine, thus warrant-ing dismissal. *See, e.g. Shukla*, 2009 WL 10690810, at *6 ("Certainly, the case law is clear that plaintiff's claims relating to overtime wage law violations under the FLSA and state law fall clearly within the ministerial exception"); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d

299 (4th Cir. 2004) (applying ministerial exception to wage-and-hour claims brought by an employee of a Jewish nursing home); *Schleicher v. Salvation Army*, 518 F.3d 472 (7th Cir. 2008) (applying the ministerial exception to wage-and-hour claims).  Indeed, the Supreme Court implicitly endorsed the application of the ministerial exception to wage-and-hour claims by virtue of the fact that it cited *Schleicher* in support of the proposition that "the Courts of Appeals have uniformly recognized the existence of a 'ministerial exception.'" *Hosanna-Tabor*, 565. US. at 188 n.2.

As a result of this policy concern, the ministerial exception has also been adopted as a common law "exemption" to the FLSA, according to which "[p]ersons such as nuns, monks, priests, lay brothers, ministers, deacons, and other members of religious orders who serve pursuant to their religious obligations in the schools, hospitals, and other institutions operated by their church or religious order shall not be considered to be 'employees.'" *See* Field Operations Handbook 10b03(b) (available at https://www.dol.gov/whd/FOH/); U.S. Department of Labor Opinion Letter (December 21, 2018) ("2018 DOL Opinion Ltr."), 2018 WL 6839426; *Shukla*, 2009 WL 10690810, at *6 (citing the DOL's exemption for religious figures); *Schleicher*, 518 F.3d at 477-78 (adopting a presumption that "clerical personnel are not covered by the [FLSA]"); *Shaliehsabou*, 363 F.3d at 305 (recognizing a "ministerial exception to the FLSA").[14]  Similarly, the state wage-and-hour laws which Plaintiffs invoke have all incorporated some form of related exemption for religious personnel such as the Chevre.  *See infra* n.26.

---

[14] As discussed below (*see infra* Section II), Plaintiffs' FLSA Claims and State Wage-and-Hour Claims are not covered by the applicable statutes in the first instance.  However, the ministerial exception precludes Plaintiffs' wage-and-hour claims *regardless* of whether such coverage exists.  *See* 2018 DOL Opinion Ltr., at *2 ("The ministerial exception is available regardless of whether the entity is a covered enterprise under the FLSA"); *Shaliehsabou*, 363. F.3d at 305 (individual not a covered employee under the FLSA pursuant to ministerial exception, despite the defendant's concession that it is an enterprise under the FLSA).  Moreover, the 2018 DOL Opinion Ltr. further establishes that religious figures (such as Chevre) are also exempt from coverage under the FLSA because they are volunteers, rather than employees: "we note that the community members do not work at a for-profit enterprise and do not expect to receive compensation in exchange for their services, which are factors that indicate they are not employees under the FLSA."  2018 DOL Opinion Ltr., at *2; *see also Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 763 (6th Cir. 2018) (church members were religious volunteers, not employees under the FLSA).

Plaintiffs' Common Law Claims are also barred by the ministerial exception because, as discussed further in Section III, *infra*, they arise from the same facts as Plaintiffs' wage-and-hour claims. *See Shukla*, 2009 WL 10690810, at *3 ("Given that the ministerial exception is grounded in the First Amendment, it may be applied 'to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers.'") (citation omitted).[15]  Accordingly, because the court's inquiry into the merits of the Common Law Claims would involve the same impermissible entanglement with questions of religious doctrine, the ministerial exception precludes review of these claims as well.

### B.    THE MINISTERIAL EXCEPTION APPLIES TO THE CENTRE.

For the ministerial exception to apply, "an employer need not be a traditional religious organization such as a church, diocese or synagogue, or an entity operated by a traditional religious organization."  *See Moreno*, 2016 WL 8711448, at *9.  Rather, the ministerial exception broadly applies to any religious institution facing claims brought by individuals who perform religious functions.  *See, e.g. Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 206 (2d Cir. 2017) (ministerial exception applies to Catholic school); *Rweyemamu*, 520 F.3d at 206-07 (noting that the name of the exception is imprecise "judicial shorthand" and citing cases to establish that the exception

---

[15] *See also Archdiocese of Miami, Inc. v. Minagorri*, 954 So. 2d 640, 643-44 (Fla. Dist. Ct. App. 2007) (noting that the ministerial exception applies "to common law claims brought against a religious employer" and citing cases); *Nevius v. Afr. Inland Mission Int'l*, 511 F. Supp. 2d 114, 123 (D.D.C. 2007) (dismissing unjust enrichment claim pursuant to the ministerial exception because "any inquiry into whether [defendant] has unjustly retained the funds would infringe upon territory that is protected by the ministerial exception…"); *Morris Cerullo World Evangelism v. Superior Court of San Diego Cty.*, No. D038029, 2001 WL 1654473, at *11 (Cal. App. 4 Dist. Dec. 12, 2001) (plaintiff's allegation that he was fraudulently induced to join a religious organization as a minister but actually ended up functioning as a secular administrator was dismissed on the basis of a ministerial exception since the record "demonstrates an inescapable religious character…that is inextricably tied up with the spiritual beliefs of the participants"); *German v. Pope John Paul II*, 211 A.D.2d 456, 457 (1st Dep't 1995) (noting that in the context of a former priest's common law claims (including fraud and unjust enrichment) that "to the extent plaintiff's claims are based upon his allegation that the various defendants failed to fulfill their promises to provide plaintiff with the opportunity to 'live his life within the religious community in accordance with the vows and the established principles of the [church]', such matters may not properly be determined by a civil court").

actually covers a wide variety of individuals and institutions); *Shaliehsabou*, 363 F.3d at 309 (ministerial exception applies to a Jewish nursing home); *Schleicher*, 518 F.3d at 474 (proposing that doctrine be renamed the "internal affairs" doctrine to avoid an unnecessarily narrow application).

Here, there can be no legitimate doubt that the Centre is covered by the ministerial exception because it is a religious organization. Black's Law Dictionary defines "religion" as a "system of faith and worship [usually] involving belief in a supreme being and [usually] containing a moral or ethical code," and further notes that "[i]n construing the protections under the Establishment Clause and the Free Exercise Clause, courts have interpreted the term *religion* broadly to include a wide variety of theistic and nontheistic beliefs." Black's Law Dictionary (11th ed. 2019) (emphasis in original). The Centre—which provides spiritual services and disseminates the wisdom and teachings of Kabbalah, an ancient form of sacred spiritual knowledge and practices, and is designated as a non-profit[16] religious organization by the IRS—falls squarely within this definition.[17]

---

[16] Whether an organization is designated as not-for-profit or for-profit is immaterial for purposes of the ministerial exception. *See, e.g. Shukla*, 2009 WL 10690810, at *5 ("[P]laintiff has failed to cite a single authority that supports the proposition that an entity's not-for-profit status is determinative of whether it is a religious organization entitled to invoke the ministerial exception."). Accordingly, Plaintiffs' attempt to evade the ministerial exception by naming three For-Profit Defendants, *see* n.3, *supra*, fails. Moreover, other than making the conclusory allegation that the Defendants "operated as a single corporate entity, under the control of the Bergs" (Am. Compl. ¶ 35), Greene and Ezra Michaeli do not allege that they performed *any* services for entities other than the Centre. And, despite having had the opportunity to clarify in their Amended Complaint, Plaintiffs do not allege with *any* factual specificity how these entities functioned as a single enterprise, or for which entity(ies) each Plaintiff specifically provided services. Accordingly, even though all of Plaintiffs' claims should be dismissed in full, to the extent any claims remain, the For-Profit Defendants should be dismissed from the case because Plaintiffs Greene and Ezra Michaeli still fail to allege *any* facts specific to those entities and therefore do not state a claim pursuant to Rule 12(b)(6) and also fail to establish Article III standing with respect to those Defendants. *See, e.g. Marte v. Westbury Mini Mart, Inc.*, No. 16-cv-53 (SJF)(ARL), 2017 WL 9485667, at *7 (E.D.N.Y. Jan. 18, 2017), *report and recommendation adopted*, No. 16-cv-53 (SJF)(ARL), 2017 WL 838194 (E.D.N.Y. Mar. 3, 2017) (dismissing plaintiff's FLSA and NYLL claims pursuant to 12(b)(6) against entities for whom they did not perform services); *Katz v. DNC Servs. Corp.*, No. 16-cv-5800, 2018 WL 692164, at *6 (E.D. Pa. Feb. 2, 2018) (dismissing nonprofit entity pursuant to 12(b)(6) after finding the pleadings insufficient to establish unified operation or common control between for-profit and not-for-profit entities); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (no Article III standing unless "for every named defendant there [is] at least one named plaintiff who can assert a claim directly against that defendant").

[17] To the extent the Centre resists the title of a "religion," *see* Am. Compl. ¶ 45, it does so only because the Centre believes that the truths founded in the wisdom of Kabbalah predate religion and that the study of Kabbalah can enhance

Plaintiffs seemingly believe that by stripping their Original Complaint of references to the Centre's religious purpose and origins they can avoid the application of the ministerial exemption, but this is untrue. Rather, Plaintiffs' attempts to complicate the analysis of whether the Centre serves a religious purpose actually only underscore the applicability of the ministerial exemption, since in order for the Court to rule on whether the practice of Kabbalism and the services performed by the Centre are sufficiently "religious" in nature, the Court would necessarily be required to immerse itself in questions of religious doctrine, which is prohibited under the First Amendment. *See Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 420 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 424 (2018). This, alone, confirms the fact that the ministerial exemption applies and ends the analysis.

Even if it did not end the analysis, however, Plaintiffs' revisions do not actually change the conclusion that the Kabbalah Centre is a religious organization. For instance, Plaintiffs edited away their description of the Jewish origin of the Kabbalah (*see* Original Complaint ¶ 40; Bloom Decl., Ex. A at p. 15) as well as a reference to the Centre's *mikvah* (a "jewish ritual bathing pool") (*see* Original Complaint ¶ 20; Bloom Decl., Ex. A at pp. 10-11). However, these topical deletions do not change the indisputable fact that the Centre—an organization created for the singular purpose of disseminating the teachings of the Kabbalah—is a "religiously affiliated entity" that is

---

any individual's spiritual life and bring a new depth of understanding to *all* religions. (*See* Bloom Decl., Ex. B.) In other words, the study of Kabbalah is the truest and most essential form of religion, and thus the lay term "religion" does not capture the spiritual significance and universality of Kabbalah. Plaintiffs further note that the Centre considers Kabbalah to be a "spiritual wisdom" more so than a "religious one" – but the ministerial exemption applies to organizations with "spiritual" missions as much as explicitly "religious" ones. *See, e.g. Fratello*, 863 F.3d at n.3 (emphasizing that the stated mission of a Catholic school is to enhance "each child's *spiritual*, emotional, intellectual and social growth" in the course of determining that the school is a covered religious organization, even though the mission statement contains no reference to the term "religion.") (emphasis added). Notwithstanding this semantic distinction, the Kabbalah Centre is a religious organization for all intents and purposes and thus is covered by the ministerial exemption. *See Penn*, 884 F.3d at 419 (finding that a hospital was governed by the ministerial exception despite referring to itself as "now a secular institution" since it nonetheless "was acting as a religious organization"). It bears emphasis that the Centre continues to be recognized by the IRS as a religious non-profit – *i.e.*, a church.

"marked by clear or obvious religious characteristics," which is all that is required for an organization to be deemed a "religious institution" for purposes of the ministerial exemption.  *See, e.g.* *Shaliehsabou*, 363 F.3d at 309-310.  As corroborated by the fact that the IRS has classified the Centre as a religious nonprofit, the Center features innumerable "religious characteristics" associated with traditional religions, including sacred texts (such as the Torah and Zohar), commandments (such as the Chevre Code and vows), ritual practices, and structured religious leadership (including rankings of Chief Spiritual Leaders and Head Rabbis).  Therefore, the Centre fits even more neatly into the paradigm of a "religious institution" than do many organizations for which courts have found the ministerial exemption to apply (such as hospitals, private schools, and nursing homes).  *Id.*[18]

### C.   THE MINISTERIAL EXCEPTION APPLIES TO THE CHEVRE.

#### 1.   *The Role of Chevre is Religious in Name and in Function.*

There is similarly no question that Plaintiffs, as Chevre, are covered by the ministerial exception.  There is universal consensus that the ministerial exception is *not* limited to "ministers," nor to members of the Christian religion or churches specifically.[19]  *See, e.g. Shaliehsabou*, 363 F.3d at 309 (applying ministerial exception to FLSA claims brought by a "mashgiach," a supervisor in a Jewish nursing home's kitchen tasked with ensuring food is prepared in accordance with

---

[18] Plaintiffs also appear to ascribe significance to the fact that Chevre were not required to be Jewish.  (*See* Am. Compl. ¶ 47.)  This is irrelevant.  The question at issue is whether the practice of Kabbalism—a practice derivative of but distinct from the practice of Judaism, and which explicitly celebrates inclusion of all individuals who previously identified with other faiths (or none at all)—is covered by the ministerial exception.

[19] For this reason, whether or not Chevre were instructed to reference "the Bible" or the "Hebrew alphabet," *see* Am. Compl. ¶ 45, is entirely irrelevant.  The extent to which one traditional religious text or language is "taught" by members of Religious Orders has no bearing on the analysis under the ministerial exemption.  Indeed, it would be fair to guess that the Hindu priest who brought claims against his employer in *Shukla* presumably did not teach the Bible or the Hebrew alphabet, but was nonetheless covered by the ministerial exemption.  2009 WL 10690810, at *2.

kosher rules).  In the Second Circuit, determining whether the exception applies to plaintiffs de-pends *not* just on their formal title, but also on an assessment of the "substance" reflected in their title (meaning what the organization expected the role to entail); the individuals' "use" of their titles (meaning what the employee personally understood the role to entail); and the extent to which the individuals "performed important religious functions" for the organization.  *Fratello*, 863 F.3d at 207-09.  For instance, in *Fratello*, the Second Circuit found that a "lay principal" of a Catholic school, despite her explicitly secular title, was nonetheless covered by the ministerial exception because the employer expected the employee filling the role of "lay principal" to embody religious principles and messages (*i.e.* the title reflected religious "substance"); because the employee "un-derstood that she would be perceived as a religious leader" (*i.e.* the individual "used" her title in a religious capacity); and because as a matter of function, she "conveyed religious messages … and expressed the importance of Catholic prayer and spirituality in newsletters to parents," as well as other similarly spirituality-related duties.  *Id.* at 208-09.

Under this framework, Chevre are covered by the ministerial exception.  Since the role of "Chevre" is designated as a "Religious Order," the title is explicitly religious in nature.[20]  More-over, the "substance" of the title of Chevre—*i.e.* what the Centre expected the Chevre to do in their roles, *see Fratello*, 863 F.3d at 207-08—confirms that the role is indeed a religious one.  The Centre expects its Chevre to not only commit to a vow of poverty and to abnegate their personal property and wages in exchange for accepting their role in the Centre, but also to adhere to a lengthy code of conduct and behavior, which sets forth in great detail the religious significance

---

[20] The etymology of the term "chevre"—meaning "a community of friends" in Hebrew—does not render it a secular title, despite Plaintiffs' new allegation otherwise.  *See* Am. Compl. ¶ 3.  For instance, the fact that "monk" derives from the Greek word for "single" or "alone" (*see https://www.merriam-webster.com/dictionary/monk*) as opposed to some intrinsically religious etymology does not therefore render the role of monk non-religious.  In fact, the translation of "chevre" as "community of friends" can be understood as underscoring the religious role of the Chevre, which, in part, is dedicated to fostering the bonds between the Chevre as teachers and the students of the Centre.

and expectations of the role.  *See supra* pp. 5-6 (Chevre must agree to endeavor towards "the essential aim of the Order," which   is "For each Chevre…to be a rock in the Holy Temple of Jerusalem, which is the source of all blessings and Light for the entire world"; Chevre must "commit to sharing and dissemination of the Zohar and to studying the teachings of the Zohar"; Chevre must "further[] the Centre's mission of spreading the light and ending pain, suffering, negativity and darkness…").  Similarly, Plaintiffs made religious "use" of their titles—*i.e.* they personally understood the religious nature of their roles, *see Fratello*, 863 F.3d at 20.  Despite their conclusory new allegations to the contrary (*see* Am. Compl. ¶ 3 ("Chevre…[did not] consider themselves to be religious workers"),[21] Plaintiffs nonetheless allege that they understood their role as Chevre to be "spiritual workers who were to help enlighten humanity to the teachings of the Kabbalah" (Am. Compl. ¶ 1); that they joined the Religious Order in order to "work[] together to build a bright future" (Am. Compl. ¶ 76); and that they believed "the Centre's purpose was performing good works and spreading spiritual wisdom" (Am. Compl. ¶¶ 320, 329, 338, 347).

    **2.**    ***Plaintiffs' Amended Allegations Underscore that the Ministerial Exemption Applies to This Case.***

Plaintiffs amended their Complaint to incorporate new allegations regarding the Chevre's allegedly non-religious functions – but these allegations confirm that the ministerial exemption applies to this case.  For instance, even if Plaintiffs' allegations are true that Chevre performed secular duties, their claims are still barred under the ministerial exception because the Second Circuit has established that there is "no question" that the ministerial exception applies where, as

---

[21] The Court should consider the allegations made in the Original Complaint which were removed by Plaintiffs in the Amended Complaint and replaced with contradictory statements; a party may not amend a complaint in a way that "blatantly contradicts previous factual allegations" in an attempt to revise damaging concessions. *Kasparov v. Ambit Texas*, No. 12-cv-3488 (WFK)(JO), 2016 WL 10749156, at *3 (E.D.N.Y. Mar. 10, 2016); *Romain v. Capital One N.A.*, No. 13-cv-3035 (JS)(WDW), 2013 WL 6407731 (E.D.N.Y. Dec. 9, 2013) (choosing not to credit an allegation in an amended complaint which contradicted prior allegations, and which was incorporated only after defendant filed a motion regarding that allegation).

here, the plaintiff is in a role ordained by the religious organization, and where the plaintiff's "duties are determined by [religious] doctrine and they are drawn into question in this case." *Rweyemamu*, 520 F.3d at 209. The Court should not, and cannot, be faced with determining which duties performed for a religious organization by its Religious Order are "religious" *enough* for purposes of Constitutional protection, or whether the Kabbalists' belief system is a *legitimate enough* religious principle justifying the Chevre vows of poverty. *See id.* at 207 ("[E]ven when we permit suits by lay employees, we will not subject to examination the genuineness of a proffered religious reason for an employment action.").

Regardless, Plaintiffs' new allegations do not actually undermine the conclusion that the Chevre were religious figures. For instance, Plaintiffs also added new allegations about the purported "control" the Centre maintained over the Chevre, but their descriptions of the rules and regulations governing the Chevre actually only strengthen the analogy between Chevre and other mainstream religious figures, like monks and nuns. For instance, the Chevre allegedly were "strongly encouraged to adopt names selected for them by the Individual Defendants," just as monks and nuns are titled as "Brother" and "Sister," respectively; the Chevre allegedly were required to seek permission to date and to marry, while monks and nuns are forbidden altogether from engaging in romantic relations; and the Centre allegedly "dictated the chevre's clothing," just as monks are required to wear their robes, and nuns their habits. *See* Am. Compl. ¶¶ 79-80.

Moreover, despite having edited away their allegations regarding their religious duties,[22] Plaintiffs cannot deny that they performed important religious roles as Chevre. Ezra Michaeli, who had already occupied the role of Chevre since at least 2001 (*see supra* n.9), identified herself

---

[22] Plaintiffs originally alleged that the Chevre's role is "to be the student's 'teacher'" and that "[m]any chevre, including Plaintiffs, develop genuine, personal relationships with their students," but removed that allegation after reviewing Defendants' motion to dismiss, likely because they did not want to concede having performed duties as spiritual leaders on behalf of the Centre. (*See* Original Complaint ¶ 43; Bloom Decl., Ex. A at p. 16.)

to the United States government in 2004 as a "religious worker whose [life is] dedicated to *religious practices and functions*, as distinguished from secular members of the religion" when she applied for and obtained an R1-Visa to immigrate to the United States.  (*See supra* n.10) (emphasis added).[23]  Greene, after having departing from his role as Chevre, described having been a "Kabbalistic raconteur" who would "spend [his] days meeting with students and guiding them through their challenges, using Kabbalistic teachings…" on a "mission to change the world and bring about it's entire redemption…"[sic]).  *See supra* p. 9.  Moreover, Plaintiffs further admit in the Amended Complaint that they were "tasked with persuading students…that the Centre's leaders were awe-inspiring [and] capable of performing miracles…."  *See* Am. Compl. ¶ 60.  Thus, Plaintiffs indisputably performed religious duties for the Centre and made religious "use" of their titles, and therefore fall squarely in the definition of religious figures as established by the Second Circuit.  *See Fratello*, 863 F.3d at 207-10.[24]

In fact, in the 2018 DOL Opinion Ltr., the DOL found that members of a religious order closely analogous to the Chevre were not entitled to FLSA coverage pursuant to the ministerial exception.  The DOL analyzed whether members of an unidentified religious organization who gather in small communities dedicated to sharing "in a community of goods" and who donate all personal possessions to the community upon joining are owed wages for the work they perform to

---

[23] The doctrine of judicial estoppel, which "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding," prohibits Ezra Michaeli from now taking the contradictory position that she was *not* a religious workers when she was a Chevre after she successfully petitioned the United States Department of Homeland Security for a visa on the basis that she, as a Chevre, was dedicated to performing religious practices and functions.  *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).

[24] Even if the Plaintiffs did not so obviously perform religious duties, which they did, courts have found that the ministerial exception should be viewed as a sliding scale, "where the more pervasively religious an institution is, the less religious the employee's role need be" in order for the exception to apply.  *See Penn*, 158 F. Supp. 3d at 182.

sustain themselves and their organization.  2018 DOL Opinion Ltr. at *1.  To this religious community, work is a "religious tenet" and a "form of worship" and is not compensated – but the community otherwise provides food, shelter, medical care, and allowances to the members.  *Id.*  The DOL found that the members of this religious organization fell within the doctrine of the ministerial exception because it was "difficult to distinguish them from the nuns, monks, and others who believe themselves called to lead lives of service and are exempted from the FLSA even when they … are not just in positions of ecclesiastical leadership."  *Id.*, at *3.

The Chevre and the Centre fall neatly within this paradigm: they live in a shared community; donate their personal property and assets to the Centre; rely fully on the Centre for room, board, and care; and embrace a disavowal of material goods as a fundamental tenet.  And, like the religious community evaluated by the DOL, Chevre agree to perform work (without pay) as a central premise of their religious beliefs.  *See* Bloom Decl., Ex. L (Chevre agree to "further[] the Centre's mission of spreading the light and ending pain, suffering, negativity and darkness in the world ***by performing assigned work duties*** and participating in the daily spiritual and educational activities of the Centre" (*id.* at 9 of 13); Chevre dedicate themselves "completely and cooperatively to fulfilling the mission of the Centre…[which] includes ***making themselves available at all times to ensure that the work of the Centre is carried out with purpose and direction***...." (*id.* at 12 of 13)) (emphasis added).  Accordingly, under the DOL's rubric, Chevre are also governed by the ministerial exception.

Moreover, the fact that Plaintiffs also allege to have performed secular services for the Centre does not change the conclusion that their claims are barred by the ministerial exception.[25]

---

[25] Plaintiffs also incorporated new allegations that the Chevre had no religious training.  (*See, e.g.* Am. Compl.  ¶¶ 3, 18, 23.)  Even if these new allegations are true (which they are not), they are irrelevant for purposes of determining whether the ministerial exemption applies, as the Second Circuit explicitly found that the ministerial exemption ap-

As the DOL observed, in similarly "monastic" settings, work is an "inextricable part of their religious communal life" and therefore "does not transform the community members into employees under the FLSA." 2018 DOL Opinion Ltr. at *3. To impose the FLSA on these individuals would "force them to recognize private property, wages, and hierarchical economic relationships…vitiating their central religious tenets." *Id.* Similarly, as Judge Posner observed in *Schleicher*, a monk who engages in the secular duty of selling wine in order to finance the monastery's operations— but who is paid no wages—is nonetheless exempt from the FLSA pursuant to the ministerial exception, because "[t]he vow of poverty is a hallowed religious observance; an intent to destroy it cannot reasonably be ascribed to the draftsmen of the Fair Labor Standards Act." *Schleicher*, 518 F.3d at 476; *see also Hosanna-Tabor*, 565 U.S. at 193 (questioning whether any religious figures actually fully commit themselves to purely religious duties and holding that it was insignificant that the plaintiff performed only 45 minutes of religious activities a day and otherwise taught "secular" subjects).

Ultimately, by bringing this action against the Centre, Plaintiffs ask that the Court do exactly what the Constitution prohibits: to analyze the theology underpinning the Chevre's abnegation of material possessions and wages and the religious doctrines of Kabbalah, and to "take sides in a religious matter" by determining whether it is proper for the Centre to accept this type of sacrifice from the Centre's Religious Order of Chevre. *See Penn*, 884 F.3d at 420. However, as noted by the Second Circuit, "Judges are not well positioned to determine whether ministerial

---

plied to a Catholic school principal, even though she had "no formal training in religion or theology" and her "academic credentials are in education." *Fratello*, 863 F.3d at 208. Moreover, Plaintiffs actually concede that they received religious training, insofar as they admit that they received instruction on how to "guide the 'journey'" for their students which were "dressed up in spiritual language," Am. Compl. ¶ 54, and that their "religious training" was conveyed through "scripts" containing "high-level information about Kabbalah," Am. Compl. ¶ 57. If Plaintiffs expect the Court to determine whether this type of spiritual training is *sufficiently* spiritual, such an analysis would dispositively implicate the ministerial exception.

employment decisions rest on practical and secular considerations or fundamentally different ones that … are perfectly sensible – and perhaps even necessary – in the eyes of the faithful." *Fratello*, 863 F.3d at 203; *see also Shukla*, 2009 WL 10690810, at \*6 ("[T]he aspects of this case relating to the duties plaintiff was required to perform … implicate many of the concerns that have motivated courts to hesitate in interfering in the relationship between religious organizations and their clergy."). This type of judicial evaluation of religious doctrine is squarely prohibited by the Establishment and Free Exercise Clauses of the First Amendment, and all of Plaintiffs' claims should therefore be dismissed in full pursuant to Rule 12(b)(6).

## II.   THE FAIR LABOR STANDARDS ACT DOES NOT COVER PLAINTIFFS' CLAIMS.

Plaintiffs' FLSA Claims are also independently subject to dismissal because the Centre is not a covered enterprise subject to the FLSA and Plaintiffs are not subject to individual coverage under the FLSA. Therefore, Plaintiffs fail to state a claim with respect to their FLSA Claims. The FLSA only protects employees who are either (1) employed by an enterprise "engaged in commerce or in the production of goods for commerce" (referred to as "enterprise coverage"); or (2) "themselves engaged in commerce or in the production of goods for commerce" (referred to as "individual coverage"). *See* 29 U.S.C. § § 206(a), 207 (a)(1); *Walker v. Interfaith Nutrition Network, Inc.*, No. 14-cv-5419 (DRH)(GRB), 2015 WL 4276174, at \*1 (E.D.N.Y. July 14, 2015). Because the Centre is a non-profit religious organization that is not engaged in commerce or in the production of goods for commerce, and because Plaintiffs are not themselves sufficiently engaged in commerce or in the production of goods for commerce to warrant coverage, Plaintiffs cannot meet these requirements and their FLSA Claims fail as a matter of law.[26]

---

[26] Ezra Michaeli's State Wage-and-Hour Claims under California law fail for similar reasons. *See, e.g.*, Division of Labor Standards Enforcement (DLSE) Enforcement Policies & Interpretations Manual § 43.6.7 (2002) ("Volunteers, who intend to donate their services to religious, charitable, or similar non-profit corporations without contemplation

## A.     THE CENTRE IS NOT SUBJECT TO ENTERPRISE COVERAGE UNDER THE FLSA.

The Centre is not subject to "enterprise" coverage under the FLSA.  The FLSA defines "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose …." 29 U.S.C. § 203(r)(1); *Walker*, 2015 WL 4276174, at *3.  Critically, the DOL's regulations establish that an organization which performs "nonprofit educational, religious, and eleemosynary activities" does *not* perform these activities for a "business purpose," and thus is not considered an "enterprise" under the FLSA, unless the activities "compete in the marketplace with ordinary commercial enterprises."  29 C.F.R § 779.214; *Walker*, 2015 WL 4276174, at *3; *Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 86-87 (E.D.N.Y. 2010); *see also Jones v. SCO Family of Servs.*, 202 F. Supp. 3d 345, 350 (S.D.N.Y. 2016) (no enterprise coverage of a non-profit entity where the entity does not qualify as one of the categories of institutions explicitly covered by the FLSA, such as a hospital, school, transit carrier, or public agency).  The Centre, a tax exempt religious organization, performs exactly those services which render an entity exempt from enterprise coverage: it provides spiritual services and disseminates the wisdom and teachings of Kabbalah.  These are not activities that compete in the commercial market, and thus the Centre is not a covered enterprise.

Plaintiffs make the unsubstantiated and conclusory allegation that "the Centre is a covered employer within the meaning of the FLSA" (Am. Compl. ¶ 125), and further allege that Defendants

---

of pay and for public service, religious, or humanitarian objectives, are not employees."); *Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1149 (9th Cir. 2017) ("Here, Plaintiffs were never hired by any entity as an employee. They are not entitled to be paid any wages.").  In addition, although Ezra Michaeli and Greene do not themselves bring State Wage-and-Hour Claims under the laws of New York, Florida or Illinois, the wage-and-hour laws of those states similarly do not cover the claims brought in this action.  *See* N.Y. Lab. Law § 651(5)(f) (excluding from coverage volunteers who perform services for entities "organized and operated exclusively for religious, charitable or educational purposes"); Fla. Const. art. X, § 24(b) (incorporating FLSA definition of employee); 820 Ill. Comp. Stat. Ann. 105/3(d)(5) (excluding from coverage those working as "a member of a religious corporation or organization"); Ill. Admin. Code tit. 56, § 210.110 (defining that term as meaning "an individual whose functions are spiritual or religious, such as a priest, rabbi, minister, nun, reverend or other such individuals who perform similar functions as their primary duties.").

"constitute an enterprise engaged in interstate commerce within the meaning of the FLSA" because the Centre engages in "many non-religious commercial activities" such as selling religious items in a gift shop, renting apartments to people unaffiliated with the Centre, and providing studio space to a film producer (Am. Compl. ¶¶ 134-135).  These allegations are plainly deficient.  A "non-profit organization is not an enterprise merely because it receives income."  *Walker*, 2015 WL 4276174, at *3.  None of Plaintiffs' allegations are sufficient to establish enterprise coverage because each alleged activity still falls within the DOL's exemption for nonprofits.  Significantly, in *Locke*, the court concluded that similar profitable activities performed by a church fell squarely within the FLSA's enterprise exemption for nonprofits: "the religious services and sales of candles and wafers [are exempt] as religious activities, fundraising from congregants [are exempt] as charitable activities, and the operation of a Sunday school and music lessons [are exempt] as educational activities."  *Locke*, 690 F. Supp. 2d at 87; *see also Walker*, 2015 WL 4276174, at *3 (no enterprise coverage because defendant was a 501(c)(3) non-profit, and because sale of land and leasing of properties to tenants "fail to support a reasonable inference that Defendants competed in the marketplace with ordinary  commercial enterprises").  The same is true in this case: the sale of books related to Kabbalah, event tickets, and religious items constitute religious activities; fundraising from students are charitable activities; and alleged real estate activities do not "compete[]" in the marketplace with ordinary commercial enterprises."  *Id.*  Moreover despite having been put on notice of their pleading deficiencies in Defendants' original motion to dismiss, Plaintiffs still do not make *any* allegations, conclusory or otherwise, that the activities performed by the Centre "compete[d] in the marketplace with ordinary commercial enterprises," nor do they make allegations regarding the "actual frequency of Defendants' activities."  Both of these pleading requirements are essential to establishing enterprise coverage.  *See Walker*, 2015 WL 4276174, at *3.

Thus, for numerous reasons, Plaintiffs fail to plead a plausible claim that the Centre—a 501(c)(3) religious non-profit that engages only in income-generating activities that constitute religious, charitable or educational services—is covered by the FLSA.[27]

### B. PLAINTIFFS ARE NOT SUBJECT TO INDIVIDUAL COVERAGE UNDER THE FLSA.

Nor are Plaintiffs individually covered under the FLSA.  In addition to the fact that Plaintiffs are not covered by the FLSA pursuant to the ministerial exception, *see* Section I(A), *supra*, Plaintiffs are also not individually covered because a "substantial part" of their work did not relate to interstate commerce, nor do they allege as much, as is required under the FLSA.  *See, e.g. Walker*, 2015 WL 4276174, at *4.  Where Plaintiffs fail to allege that they *personally* and *regularly* engaged in duties involving interstate commerce, and fail to provide factual allegations regarding their *frequency* of contacts with persons and organizations from out of state, Plaintiffs fail to establish individual coverage under the FLSA.  *See, e.g. Jones*, 202 F. Supp. 3d at 351.

Despite having been educated by Defendants about the pleading requirements in their initial motion to dismiss, and having received the opportunity to amend their Complaint, Plaintiffs still make *no* allegations, whatsoever, that a "substantial part" of Greene's or Ezra Michaeli's duties involved interstate commerce, nor do they allege the frequency of their commercial contacts

---

[27] Although the Centre's sales of goods (books, religious items, etc.) are not commercial activities and do not compete in the commercial marketplace, even if they were, Greene and Ezra Michaeli do not allege that they personally engaged in the sale of these goods at the gift shop or bookstore, and therefore the enterprise coverage would not extend to their claims.  *See* DOL Fact Sheet #14A ("For a non-profit organization, enterprise coverage applies only to the activities performed for a business purpose; it does not extend to the organization's charitable activities."); Am. Compl. ¶¶ 18, 128 (Greene alleges that he solicited donations and served as an "emcee" for Centre events, and also authored a book and appeared in a DVD, but *does not* allege that he sold either the books or the DVDs on behalf of the Centre); *id.* ¶¶ 23, 59, 130 (Ezra Michaeli alleges to have solicited donations; performed janitorial work, food preparation, building maintenance, coordination of volunteers, events, and students, and bookkeeping; and performed services in the Centre's legal department.)  To the extent Ezra Michaeli claims to have engaged in "telemarketing," the Amended Complaint makes it clear that such "telemarketing" efforts are actually the solicitation of donations from students, which is *not* considered a commercial activity.  *See, e.g.* Am. Compl. ¶ 59 (explaining that Ezra Michaeli's "telemarketing" efforts involved "contact[ing] existing students…[and] soliciting increasingly large donations from those students").

with out-of-state entities.  Indeed, Plaintiffs notably *excluded* their description of allegedly "inter-

state" duties[28] (*e.g.* authoring books, appearing on DVDs, managing social media) from the section

of the Amended Complaint in which they describe their "primary" or "main" duties.  (*Compare*

Am. Compl. ¶¶ 18, 23 *with* ¶¶ 128, 130.)  One can infer from this omission that their purportedly

"interstate" duties were thus *not* their primary or main duties, and thus do not warrant individual

coverage under the FLSA.

Plaintiffs also continue to make generic allegations that regurgitate the statutory require-

ments for individual coverage under the FLSA—but again, these allegations cannot, and do not,

make up for their deficient pleadings with respect to any of the individual Plaintiffs.  In Paragraph

127 of the Amended Complaint, for example, Plaintiffs summarily allege that:

> [C]hevre in every location were involved in the Centre's global
> reach. Telemarketing phone calls were made to multiple states from
> Centre locations. Centre written, audio, and video materials were
> shipped between and among states. By virtue of a chevre's involve-
> ment in every aspect of the Centre's multi-state and multi-national
> operations, chevre regularly were involved in interstate commerce
> and were covered employees within the meaning of the FLSA.

(Am. Compl. ¶ 127.)[29]  Plaintiffs' generalizations about the "interstate" services provided by

"chevre in every location" are the very "threadbare" and factually bereft allegations disallowed by

the heightened pleading standard established in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  In fact, in

*Jones*, the court explicitly rejected the plaintiff's analogous allegation that the employer (rather

than the plaintiff herself) engaged in interstate activities in finding a lack of individual coverage

---

[28] It is questionable in the first instance whether Greene and Ezra Michaeli's new allegations regarding their additional duties, such as authoring a book or promoting the Centre on social media, constitute interstate activities in the first place, especially since Plaintiffs do not explicitly allege as much.  (*See* Bloom Decl., Ex. A at p. 39; Am. Compl. ¶¶ 128, 130.)  Regardless, their failure to plead specific facts regarding the regularity and duration of these duties renders this analysis irrelevant, since their pleadings are facially deficient.  (*See id.*)

[29] Plaintiffs' decision to use passive voice in describing these duties—"telemarketing phone calls *were made*"; "materials *were shipped*" (Am. Compl. ¶ 127, emphasis added)—is particularly notable, insofar as Plaintiffs intentionally avoid asserting *who* engaged in those activities and *which* Defendant was allegedly served or benefited.

under the FLSA, observing that "Plaintiff fails to allege that she *herself* regularly engaged in these duties." *Jones*, 202 F. Supp. 3d at 351 (emphasis added). Accordingly, Plaintiffs' failure to allege specific and individualized facts pertaining to their alleged participation in interstate commerce is dispositive for purposes of the individual coverage analysis. Coupled with Plaintiffs' failure to state a claim for enterprise coverage, their FLSA claims are fatally defective and therefore must be dismissed as a matter of law.

## III.   PLAINTIFFS FAIL TO STATE CLAIMS OF UNJUST ENRICHMENT AND FRAUDULENT INDUCEMENT.

In addition to the fact that they are covered by the ministerial exception (*see supra* Section I(A)), Plaintiffs' Common Law Claims for unjust enrichment and fraudulent inducement must be dismissed for additional independent reasons.[30]

*First*, Plaintiffs' unjust enrichment and fraudulent inducement claims are preempted by their federal and state wage-and-hour claims. Where Plaintiffs do not make allegations regarding consideration, contractual terms or obligations "independent of the federal and state statutory obligations underlying their other statutory causes of action," and where the allegations of the complaint "do not demonstrate the existence of an independent, enforceable agreement," unjust enrichment claims are preempted by the FLSA and state wage-and-hour claims. *Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 469 (E.D.N.Y. 2011); *see also Griffin v. Aldi, Inc.*, No. 16-cv-00354 (LEK)(ATB), 2016 WL 7235787, at *4 (N.D.N.Y. Dec. 14, 2016) (holding that unjust enrichment claims are preempted by the FLSA where they are "parasitic on the FLSA claim"). A similar principle applies to fraudulent inducement claims. *See, e.g. Petras v. Johnson*, No. 92-cv-

---

[30] Plaintiff Greene does not appear to assert any Common Law Claims in the Amended Complaint, even after Plaintiffs took the opportunity to clarify and expand upon those claims. *See supra* n.12. However, since Plaintiffs incorporated one contradictory reference to Greene being a "class representative" of these claims, Defendants set forth the reasons why Greene's Common Law Claims would fail as a matter of law even if they were pled.

8298 (CSH), 1993 U.S. Dist. LEXIS 8464, at *8 (S.D.N.Y. June 16, 1993) (fraud claims preempted by the FLSA where the "alleged fraud lies simply in concealing plaintiff's rights under the FLSA"); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007) (fraud claims preempted by the FLSA where the allegations are duplicative).

Here, Plaintiffs' unjust enrichment claims—which are premised on their allegation that they performed labor for the Centre, that the labor was uncompensated, and that the Centre therefore benefited from the uncompensated labor (Am. Compl. ¶¶ 298-318)—are indistinguishable from their wage-and-hour claims.  Similarly, Plaintiffs' fraudulent inducement claims involve the same narrative: that the Centre "fraudulently" represented that the Centre's purpose was "performing good works and spreading spiritual wisdom," thus convincing Plaintiffs to abjure from receiving wages, and as a result, "Defendants could benefit from [their labor]…without paying them for it." (*See, e.g.* Am. Compl. ¶¶ 319-54.)  These claims are indistinguishable from their FLSA Claims and State Wage-and-Hour Claims.   Therefore, Plaintiffs' Common Law Claims are fully preempted and should be dismissed.

*Second*, the fraudulent inducement claims are deficiently pled, because they are conclusory and totally lacking in supporting factual allegations.  For instance, in order to state a claim of fraudulent inducement under California law, Ezra Michaeli must allege "with particularity specific facts about what misrepresentations or concealments" the Centre made; the "legal duty" under which the Centre had an obligation to disclose specific facts; the "manner in which" the Centre intended Plaintiffs to "justifiably rely" on the statements; and the "specific manner in which reliance resulted in detriment." *McKeon v. Risner*, No. 16-cv-02467, 2017 Cal. Super. LEXIS 6276, at *4-5 (Cal. Dec. 4, 2017).  Plaintiffs' allegations, even after having been amended, contain no such particular allegations.  Instead, Plaintiffs still offer nothing but generic and legally untenable

allegations that the Defendants "falsely represented…that the Centre's purpose was performing good works and spreading spiritual wisdom" and thus purportedly induced the Plaintiffs to become Chevre.  (*See, e.g.* Am. Compl. ¶¶ 320, 329.)  These allegations fail to plausibly allege specific facts pertaining to an alleged misrepresentation; any legal duty or obligation to disclose; any basis for justifiable reliance; and any specific detriment suffered.

Moreover, the fraudulent inducement allegations exclusively turn on the Plaintiffs' personal opinions that the Centre's purpose was not as holy as they originally believed it to be, which may not form a basis for a fraudulent inducement claim.  *See, e.g. Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 323 (S.D.N.Y. 2012) (dismissing fraud claim, in part, because plaintiff failed to allege sufficient facts that defendants knew or should have known that their "statements of subjective opinion" were false) (citing *Int'l Fin. Corp. v. Carrera Holdings Inc.*, 82 A.D.3d 641, 642 (1st Dep't 2011)) (holding that the plaintiffs' purportedly fraudulent statements were "expressions of hope and opinion," and therefore were not sufficient grounds to support defendants' fraudulent inducement counterclaim); *Rezvani v. Jones*, No. 18-cv-06244-CAS (Ex), 2018 U.S. Dist. LEXIS 213842, at *21 (C.D. Cal. Dec. 17, 2018) (fraud claims may not be based on purported misrepresentations that constitute subjective opinions; misrepresentations must be with respect to "knowingly false statements of fact.").  Thus, Plaintiffs' conclusory allegations with respect to the claims of fraudulent inducement are too thinly pled to state a claim for relief.

## IV.   PLAINTIFFS' CLAIMS ARE TIME-BARRED.

### A.   GREENE'S CLAIMS ARE ALL TIME BARRED.

Greene alleges to have left the Centre in March 2009.  (*See* Am. Compl. ¶ 18; Bloom Decl., Ex. J ¶ 1.)  Accordingly, his FLSA claims are time-barred in their entirety by the FLSA's two-year

statute of limitations which bars any claims arising prior to July 25, 2017.  *See* 29 U.S.C. § 225.[31]

Similarly, if he did purport to bring Common Law Claims, *see supra* n.12, such claims would also

be time-barred under any applicable statutes of limitations.[32]

### B.    EZRA MICHAELI'S CLAIMS ARE TIME BARRED.

Ezra Michaeli vaguely alleges that she left the Centre in 2016 but does not specify when

in 2016 she left.  (Am. Compl. ¶ 23.)  Accordingly, since this case was filed on July 25, 2019, her

FLSA Claims are time-barred under a two-year statute of limitations.[33] Similarly, her State Wage-

and-Hour Claims[34] and Common Law Claims[35] are time-barred under any applicable statutes of

limitations.  Therefore, all of Ezra Michaeli's claims arising outside of the applicable limitations

periods should be dismissed.

---

[31] The Centre's decision not to pay its religious workers was not a willful violation of the FLSA, since—as this motion makes evident—if the decision was not lawful in the first instance, it at least was based on an unsettled question of law.  *See, e.g. Reich v. Waldbaum, Inc.*, 52 F.3d 35, 41 (2d Cir. 1995).  Therefore, a two-year statute of limitations should govern.  However, even if a three-year statute of limitations applied (thus barring any claims arising prior to July 25, 2016), Greene's claims would still be time-barred.

[32] Greene alleges that he performed services at Centre locations in California and Florida.  (Am. Compl. ¶ 18.)  Without conceding that California or Florida law govern his claims or that he did sufficiently allege such claims, if Greene had brought Common Law Claims, they would be time-barred under the laws of both states.  *See* Cal. Civ. Proc. Code § 338(d) (three year statute of limitations for fraudulent inducement and unjust enrichment claims in California); Fla. Stat. Ann. § 95.11 (3)(j)-(k) (four year statute of limitations for fraudulent inducement and unjust enrichment claims in Florida).  Greene does not bring any State Wage-and-Hour Claims.

[33] If a three-year statute of limitations applies, which it should not, her FLSA Claims are restricted to the period between July 25, 2016 and whenever she allegedly left the Centre in 2016, *if* she left after July 25, 2016. *See supra* n.32.  If she left before July 25, 2016, her FLSA Claims are entirely time-barred, regardless of which statute of limitations applies.

[34] Ezra Michaeli brings individual state wage-and-hour claims under the California Labor Code (COA 7-11) and a related claim for unfair competition under the California Business and Professions Code (COA 12).  California has a three-year statute of limitations for wage-and-hour claims, Cal. Civ. Proc. Code § 338(a), which can be extended to four years if the plaintiff establishes a claim for unfair competition, Cal. Bus. & Prof. Code § 17208.  Accordingly, the longest statute of limitations for any of Ezra Michaeli's wage-and-hour claims is four years, which would bar any claims arising before July 25, 2015.

[35] Ezra Michaeli's Common Law Claims are brought under California Law, and thus are governed by a three-year statute of limitations.  *See supra* n.33.

C.     THERE IS NO BASIS FOR EQUITABLE TOLLING.

Plaintiffs attempt to circumvent the fact that most of their claims are time-barred by alleging that the applicable statutes of limitations should be equitably tolled, *see* Am. Compl. ¶¶ 103-120, but there are no facts whatsoever to support equitable tolling.  "The Second Circuit has repeatedly cautioned that 'equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances.'"  *Contrera v. Langer*, 278 F. Supp. 3d 702, 723 (S.D.N.Y. 2017) (quoting *A.Q.C. v. United States*, 656 F.3d 135, 144 (2d Cir. 2011)); *accord Grys v. ERIndustrial Sales Inc.*, 553 F. App'x 61, 62-63 (2d Cir. 2014) (quoting *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003)).  "When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply.*"  *Alberto v. Rico Pollo #2 Rest. Corp.*, No. 18-cv-4762 (BMC), 2018 WL 6813057, at *5 (E.D.N.Y. Dec. 26, 2018) (quoting *Zerilli-Edelglass*, 333 F.3d at 80-81).  Neither of these factors is alleged here.

*First*, Plaintiffs do not allege that they acted with "reasonable diligence" to understand their rights.  It bears emphasis at the outset that both Greene and Ezra Michaeli are educated professionals – a psychotherapist[36] and an attorney, respectively.  Accordingly, neither has any legitimate basis to justify their dilatory timing in pursuing litigation.  In support of their argument for equitable tolling, Plaintiffs allege only that they were unaware of their rights because they relied upon the Centre's representations and because Karen Berg allegedly "could discern…their lack of rights

---

[36] In fact, Greene amended the Complaint to *underscore* his sophisticated educational history, now listing off a litany of degrees and certifications.  (*See* Am. Compl. ¶ 18; Bloom Decl., Ex. A at pp. 7-8.)

simply by touching them," (*see, e.g.* Am. Compl. ¶¶ 93, 115), but nowhere do Plaintiffs allege, as they must, what efforts they made to understand their rights. *See Frederick v. JetBlue Airways Corp.*, No. 14-cv-7238 (DLI)(RER), 2016 WL 1306535, at *6 (E.D.N.Y. Mar. 31, 2016), *aff'd*, 671 F. App'x 831 (2d Cir. 2016) (noting, in denying equitable tolling and granting a 12(b)(6) motion to dismiss, that "[t]he party seeking to extend the limitations period bears the burden of proving that tolling is appropriate"). Nor do Plaintiffs allege why they waited so long after departing the Centre before bringing this action. Their lengthy delay in bringing suit cannot be characterized "as anything other than a marked lack of diligence." *Warren v. Garvin*, 219 F.3d 111, 113-14 (2d Cir. 2000) (rejecting request for equitable tolling where plaintiff waited nearly two years before filing suit).[37]

Similarly, Plaintiffs' allegation that they were aware of news reports regarding multiple government investigations into the Centre's finances as early as 2011, as well as their awareness that the Centre started paying wages to Chevre and reporting same on W-2 forms after the 2011 publicity (Am. Compl. ¶¶ 9, 69-70, 89), should have amply put them on notice if they believed themselves to be owed wages as well (and if Ezra Michaeli, herself an attorney, was not already aware of basic wage-and-hour laws before the airing of these news reports). Plaintiffs' failure to investigate their legal rights after they became aware of this information shows that they did not act with "reasonable diligence" to understand their alleged rights. *See Litle v. Arab Bank, PLC*, 507 F. Supp. 2d 267, 275 (E.D.N.Y. 2007), vacated in part sub nom. *Linde v. Arab Bank, PLC*,

---

[37] *See also Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) ("[I]f the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing.") (emphasis omitted); *Zhongwei Zhou v. Wu*, No. 14-cv-1775 (RJS), 2017 WL 1233994, at *5 (S.D.N.Y. Mar. 31, 2017) (denying equitable tolling where plaintiffs waited between three and seven years after departing defendant's employ before bringing suit, explaining that "even if the Court were to credit the assertion that Defendants somehow prevented Plaintiffs from learning about their right to sue, the lack of activity in moving their cases forward *after* leaving their jobs … undermines the suggestion that Defendants were responsible for Plaintiffs failure to file claims before the statutes of limitations had lapsed") (emphasis in original).

950 F. Supp. 2d 459 (E.D.N.Y. 2013) (equitable tolling inapplicable where alleged wrongful conduct was widely publicized since "there was more than sufficient evidence available from which plaintiffs could have learned of [defendant's] involvement within the limitations period"); *In re Zyprexa Prod. Liab. Litig.*, 549 F. Supp. 2d 496, 541 (E.D.N.Y. 2008) (no basis for equitable tolling where reasonable plaintiff would have been aware of issues from media coverage).

*Second*, Plaintiffs have failed to allege "rare and exceptional circumstances" sufficient to support equitable tolling. As the Supreme Court has explained, "the second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Frederick*, 2016 WL 1306535, at *6 (quoting *Menominee Indian Tribe of Wisc. v. United States*, 136 S. Ct. 750, 756 (2016)) (emphasis in original) (internal citation omitted). Even though they are both sophisticated professionals, nowhere do Greene or Ezra Michaeli allege any circumstances beyond their control that prevented them from learning their alleged rights. Plaintiffs added allegations in the Amended Complaint regarding their alleged emotional distress upon leaving the Centre, *see* Am. Compl. ¶¶ 106–110, but these allegations are insufficiently pled to warrant equitable tolling, as neither of the Plaintiffs have alleged a "severe impairment that compromised his [or her] ability to comply with the filing deadlines." *Saudagar v. Walgreens Co.*, No. 18-cv-437 (KPF), 2019 U.S. Dist. LEXIS 20967, at *13 (S.D.N.Y. Feb. 8, 2019); *see also Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (Plaintiff's allegations of suffering from "paranoia, panic attacks, and depression" are insufficient to justify equitable tolling). Ezra Michaeli alleges only that she was "terrified" of potential health problems and personal problems she might suffer after leaving the Centre. *See* Am. Compl. ¶ 109. But these allegations in no way justify her failure to seek timely legal recourse. In fact, Ezra Michaeli—herself a lawyer— alleges to have requested compensation from the Centre when she left, *see* Am. Compl. ¶ 111,

meaning that despite her alleged distress, she was amply aware of her perceived legal rights at the time of her departure. *See Saudagar*, 2019 U.S. Dist. LEXIS 20967, at *13 (no equitable tolling on basis of emotional distress, especially where "Plaintiff's efforts suggest an awareness of [her] rights and some ability to act on them.").

Moreover, the Amended Complaint incorporates new allegations regarding the purported trauma each Plaintiff experienced after their departure – *except* with respect to Greene. Unlike the other six Plaintiffs, Greene makes no such allegation, perhaps because he contemporaneously suggested that his departure from the Centre was not a trauma, but rather more like an enlightened journey, analogous to "brav[ing] the seas at [his] leisure in [his] own private yacht into uncharted seas." (*See* Bloom Decl. at Ex. F.) This notable omission in the pleadings suggests a concession from Plaintiffs that Greene has no basis to invoke equitable tolling—for more than a decade in his case—on the basis of his alleged emotional distress.

*Third*, Plaintiffs' suggestion that the Centre prevented them from learning about their legal rights because it did not post notices explaining the requirements of the FLSA in a conspicuous place (Am. Compl. ¶ 112), is insufficient to warrant equitable tolling (and regardless, is untrue). *See Rico Pollo #2 Rest. Corp.*, 2018 WL 6813057, at *5 (agreeing with courts in this Circuit which have denied requests for equitable tolling where plaintiffs rely on defendants' failure to notify plaintiffs of their rights, as to hold otherwise would "effectively eliminate the requirement of extraordinary or unique circumstances" for equitable tolling in FLSA cases); *Lanqing Lin v. Everyday Beauty Amore Inc.*, No. 18-cv-729 (BMC), 2018 WL 6492741, at *7 (E.D.N.Y. Dec. 10, 2018) (same); *Shu Qin Xu v. Wai Mei Ho*, 111 F. Supp. 3d 274, 279 (E.D.N.Y. 2015) (failure to notify plaintiffs of their rights "is insufficient basis for equitable tolling, as it would provide for equitable

tolling whenever a defendant violated FLSA and NYLL by failing to post notices or provide statements of hours and wages").  Notably, this is *not* a case in which the plaintiffs allege that they were not put on notice of some nuance of wage-and-hour laws, such as a discrepancy between their pay rate and the minimum wage, or a special method of calculating overtime.  To the contrary, Plaintiffs allege that "the Centre does not pay its chevre employees wages at all."  (Am. Compl. ¶¶ 44, 139, 152.)  Plaintiffs were well aware of the fact that they would receive *no* wages and that they would not be considered employees when they agreed to join the Centre as Chevre—and took their vows of poverty—and thus they cannot claim ignorance of some subtlety of wage-and-hour law.

Finally, Plaintiffs also suggest that the Centre "fraudulently concealed" from them the fact that they would not receive pay for their services.  (*See, e.g.* Am. Compl. ¶¶ 103, 111, 115-116.) However, the Plaintiffs literally signed a vow of poverty at the outset of becoming Chevre.  (Am. Compl. ¶ 78.)  It was no secret that they were signing up to become members of the Centre's Religious Order and that their services would not be compensated.[38]  Accordingly, there is no basis for equitable tolling here and Greene and Ezra Michaeli's untimely claims should be dismissed.

## V.   PLAINTIFF GREENE RELEASED HIS CLAIMS AGAINST THE CENTRE.

Greene's claims should also be fully dismissed for yet another independent reason:  Greene (as well as each of the Arbitration Plaintiffs) entered into a broad and enforceable agreement with the Centre in which he agreed to release any and all claims against the Centre, which includes each

---

[38] Plaintiffs fail to elaborate on how anything was "fraudulently concealed" from them since the Centre's representations that they were not owed compensation constitute a legitimate legal position.  Regardless, where Plaintiffs invoke fraudulent concealment as a basis for equitable tolling, they must show that they exercised "reasonable due diligence to discover [their] claim; tolling is not available if it is "reasonable to assume that [plaintiff] should have known that he had [a claim] well before the end of the … period he seeks to toll." *See, e.g. Ruso v. Morrison*, 695 F. Supp. 2d 33, 47 (S.D.N.Y. 2010).  As set forth in this Section *supra*, Plaintiffs certainly did not exhibit due diligence in discovering their alleged claims, since Ezra Michaeli (an attorney) admits that she was on notice of her rights when she left the Centre, *see* Am. Compl. ¶ 111, and Greene (a psychotherapist) waited more than *ten years* to bring his claims.

claim he has asserted in this action.

Under New York Law, general releases are governed by principles of contract law. *Lewis v. NYC Dept. of Educ.*, Civ. No. 12-cv-675, 2013 WL 5405534, at *4 (S.D.N.Y. Sept. 25, 2013) (granting motion to dismiss on the grounds that Plaintiff's claims were released by valid settlement agreement). "[A] valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 142 (2d Cir. 2011). Courts will not treat a release lightly because it is "a jural act of high significance without which the settlement of disputes would be rendered all but impossible." *Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 277 (E.D.N.Y. 2013) (citing *Mangini v. McClurg*, 24 N.Y.2d 556, 563 (1969)). Consequently, "New York courts will enforce valid releases that are clear and unambiguous on their face and which were knowingly and voluntarily entered into and were not the product of fraud, duress or undue influence."[39] *Gortat v. Capala Bros., Inc.*, No. 07-cv-3629, 2009 WL 3347091, at *3 (E.D.N.Y. Oct. 16, 2009), *report and recommendation adopted*, No. 07-CV-3629, 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) (Glasser, J.), *aff'd*, 568 F. App'x 78 (2d Cir. 2014) (internal quotations and citation omitted); *see also Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 2011).

Greene entered into a broad agreement with the Centre in which he agreed to release "any and all claims (known or unknown)" against the Centre.[40] (Bloom Decl., Ex. J ¶ 1.) Specifically,

---

[39] Greene, as a psychotherapist and holder of an advanced degree (Am. Compl. ¶ 18), was undoubtedly well-equipped to enter into a contractual agreement with the Centre. However, should there be any doubt as to Greene's sophistication, it bears emphasis that Greene advertises having taught a two-part seminar at the University of Southern California on "The Art of Negotiation," in which he taught methods to "embrace challenges in the workplace" and "discover the most essential quality of a good negotiator." (Bloom Decl., Ex. G.)

[40] FLSA-related claims can be released without court approval in an agreement—like Greene's Agreement here—that was entered into prior to litigation. *See Young Min Lee v. New Kang Suh Inc.*, No. 17-cv-9502 (NSR), 2019 WL 689085, at *2-3 (S.D.N.Y. Feb. 15, 2019) (granting motion to dismiss FLSA claim on the basis of settlement agreement releasing FLSA claims that was entered into entirely outside the context of litigation); *Matamoro v. Khomari*, No. 16-cv-9004 (KBF), 2017 WL 6542954, at *2-3 (S.D.N.Y. Dec. 19, 2017) (same); *Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 402 (S.D.N.Y. 2017) (same). Moreover, to the extent that the Amended Complaint can be construed to

in exchange for valuable consideration,[41] Greene agreed as follows:

> 1.  you … hereby forever release, waive, discharge and covenant not to sue The Kabbalah Centre or any of its employees, directors, and/or related entities of any nature (collectively "Releasees"), with respect to any and all claims (known or unknown), assertions of claims (known or unknown), debts, demands, actions, suits, expenses, attorneys' fees, costs, damages, and liabilities of nature, type and description whatsoever, in law, equity or otherwise that have accrued prior to the date hereof.  This includes, but is not limited to, a release of any rights or claims (known or unknown) you may have under: … (8) the California Labor Code (9) the Fair Labor Standards Act; … .  This also includes a release by you of all claims (known or unknown) or rights for … breach of implied or express contract, … fraudulent   inducement, breach of the implied covenant of good faith and fair dealing, … [and] any other tort … ."

(*Id.*)  By remaining silent for more than a decade after accepting and retaining the consideration paid to him by the Centre in exchange for the release, Greene has ratified the agreement.  *See United States v. Twenty MILJAM-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011); *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122 (2d Cir. 2001).  Moreover, Greene cannot claim ignorance of his legal rights when he signed the agreement.  Greene expressly and unambiguously agreed to release "any and all claims (***known or unknown***)" against the Centre.  (Bloom Decl., Ex. J ¶ 1, emphasis added.)  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, No. 15-cv-4971 (JMF), 2016 WL 344980, at *3 (S.D.N.Y. Jan. 27, 2016), *aff'd*, 681 F. App'x 64 (2d Cir. 2017) (enforcing release agreement even though the plaintiff alleged that he did not discover defendant's wrongdoing until years later after signing the agreement where the release extended to

---

assert Common Law Claims on behalf of Greene, such claims unquestionably fall within the scope of the broad general release.

[41] The sum paid to Greene as valuable consideration has been redacted in the exhibit filed with the court, (Bloom Decl., Ex. J), but the full document has been made available to Plaintiffs' counsel and if necessary, can also be made available to the Court for *in-camera* review or for filing upon the entry of an appropriate protective order.

"all unknown, unsuspected and unanticipated injuries and damages" that "arose" prior to the defendant's execution of the agreement).[42] Regardless, there is no basis for Greene to claim ignorance as to the fact that he was not being paid as an employee by the Centre.  *See supra* Section IV(C).  Accordingly, Greene's claims should be dismissed in full pursuant to his release, in addition to the other grounds set forth above.

## VI.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT PERMITTING FURTHER ATTEMPTS TO AMEND.

Plaintiffs' claims should be fully dismissed with prejudice.  Where plaintiffs are unable to demonstrate that amendments would permit the complaint to survive dismissal—and *especially* where they have already had an opportunity to amend, and where they are "represented by counsel since the inception of [the] litigation"—an opportunity to replead is "rightfully denied." *Jeune v. Crew*, No. 16-cv-1107 (MKB), 2017 WL 4357382, at *17 (E.D.N.Y. Sept. 29, 2017) (citing cases). Plaintiffs already took the opportunity to attempt to cure the defects in the Original Complaint by filing the Amended Complaint in response to Defendants' initial motion to dismiss.  As set forth above, those amendments were futile; they do not cure the numerous, independent grounds warranting full dismissal.  *See Magnotti v. Crossroads Healthcare Mgmt., LLC*, 126 F. Supp. 3d 301, 317 (E.D.N.Y. 2015) (Glasser, J.) (dismissing complaint with prejudice where Plaintiff already amended his complaint once in response to an earlier motion to dismiss which raised "substantially

---

[42] *See also Waksman v. Cohen*, No. 00-cv-9005 (WK), 2002 WL 31466417, at *11 (S.D.N.Y. Nov. 4, 2002) (Plaintiff who agreed to release claims "unknown" to him at the time of the settlement "cannot now avoid the effect of the … release of claims by arguing that the Stipulation and release do not apply to claims which were then unknown to him"); *Fay v. Petersen Pub. Co.*, No. 88-cv-6499 (MBM), 1990 WL 67397, at *3 (S.D.N.Y. May 17, 1990) ("Although at the time of signing plaintiff may have had no inkling that he would bring an age discrimination claim in the future, he should have understood from the language of the agreement that he was giving up 'any known or unknown claims' against the company related to his termination."); *Omaha Indem. Co. v. Johnson & Towers, Inc.*, 599 F. Supp. 215, 220 (E.D.N.Y. 1984) ("Lack of awareness of elements of … the existence of a cause of action is not a mutual mistake of fact sufficient to set aside the General Release. The Release in this case bars all claims against Johnson & Towers, those existing at the time of the Release, both known and unknown. This is dictated by both the law and the language of the Release. The result may seem harsh, but it is the result Mr. Singer bargained for.").

the same issues as the present motion"); *Barr Labs. v. Quantum Pharmics*, 90-cv-4406, 1994 U.S. Dist. LEXIS 2197, at *34 n.15 (E.D.N.Y. Feb. 2, 1994) (Glasser, J.) (same).  Plaintiffs cannot cure these defects in a future amended pleading, especially because there is no way to avoid the inescapable and dispositive conclusion that this case involves religious figures in a religious institution, and thus would require the Court to engage in questions of religious doctrine in violation of the Constitution.[43]  *See supra* Section I.  Therefore, Plaintiffs should not be given another bite at the proverbial apple (thereby requiring Defendants to incur further costs in renewing this motion yet again) when their first two attempts have proven fruitless.

## **CONCLUSION**

For all of the foregoing reasons, the Centre respectfully requests that this Court dismiss all of Plaintiffs' claims with prejudice.

Dated: New York, New York
November 25, 2019

PROSKAUER ROSE LLP                                    SHAPIRO ARATO BACH LLP


*/s/ Elise M. Bloom*_____                  */s/Jonathan P. Bach*_____
Elise M. Bloom                                                   Jonathan P. Bach
Steven D. Hurd
Pinchos N. Goldberg                                         500 Fifth Avenue, 40th Floor
Samantha R. Manelin                                        New York, New York 10110
                                                                         (T)  212.257.4880
Eleven Times Square                                         (F)  212.202.6417
New York, New York 10036                              jbach@shapiroarato.com
(T)  212.969.3000
(F)  212.969.2900                                             *Attorneys for Defendants*
ebloom@proskauer.com                                   *Karen Berg and Michael Berg*
shurd@proskauer.com
pgoldberg@proskauer.com
smanelin@proskauer.com

---

[43] Similarly, Plaintiffs cannot cure the issue of untimeliness, *see supra* Section IV, thus further warranting dismissal with prejudice. *See, e.g. McCabe v. Lifetime Entm't Servs., LLC*, No. 17-cv-908 (ERK)(SJB), 2018 U.S. Dist. LEXIS 3212, at *19 (E.D.N.Y. Jan. 4, 2018) (Bulsara, J.), *aff'd*, 761 F. App'x 39 (2d Cir. 2019) (holding that it is appropriate to dismiss a complaint with prejudice where the statute of limitations bars the claim).

*Attorneys for Defendants Kabbalah Centre International, Incorporated; Kabbalah Centres of the United States, Incorporated; Kabbalah Centre of New York, Incorporated; The Kabbalah Centre of Florida, Inc.; Kabbalah Children's Academy; Kabbalah Enterprises, Incorporated; KAF Investments, LLC; 501 N. La Cienega, LLC; and Spirituality for Kids International, Inc.*

LAW OFFICE OF JOHN D. CLINE

*/s/ John D. Cline*_____
John D. Cline

50 California Street, Suite 1500
San Francisco, CA 94111
(T) 415.662.2260
(F) 415.662.2263
cline@johndclinelaw.com

*Attorneys for Defendant
Yehuda Berg*