# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES GREENE, JENNIFER SHAAL, OFER SHAAL, JAKE STONE, GUY SHOSHAN, EINAT EZRA MICHAELI, and YIFAT SHMILOVICH, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>KABBALAH CENTRE INTERNATIONAL, INCORPORATED; KABBALAH CENTRES OF THE UNITED STATES, INCORPORATED; KABBALAH CENTRE OF NEW YORK, INCORPORATED; THE KABBALAH CENTRE OF FLORIDA, INC.; KABBALAH CHILDREN'S ACADEMY; KABBALAH ENTERPRISES, INCORPORATED; KAF INVESTMENTS, LLC; 501 N. LA CIENEGA, LLC; SPIRITUALITY FOR KIDS INTERNATIONAL, INC; and KAREN BERG, YEHUDA BERG, and MICHAEL BERG,<br><br>    Defendants. | No. 19-cv-4304 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................1

II.    INTRODUCTION .........................................................................2

III.   STATEMENT OF FACTS ..............................................................6

IV.    ARGUMENT ................................................................................8

       A.   The Court Should Not Consider The Defendants' Improper References
            To The Superseded Complaint Or The Documents Attached To The
            Bloom Declaration ................................................................8

       B.   The Defendants Cannot Avail Themselves Of The Ministerial Exception
            ...........................................................................................10

            1.   The Exception Applies Only To Religious Institutions And
                 Ministers ....................................................................10

            2.   The Centre Is Not A Religious Institution Because It Is Not
                 Marked By Clear Or Obvious Religious Characteristics ...........11

            3.   Chevre Are Not "Ministers" Within The Ministerial Exception 14

            4.   The Defendants' Arguments Are Unavailing .............................17

       C.   The Centre is a Covered Enterprise Under the FLSA............................29

            1.   The Corporate Defendants Are Not A Not-for-Profit Institution
                 ...................................................................................30

            2.   The Centre's Activities Are Neither Religious Nor Charitable ..33

            3.   The Centre's Revenue-Generating Activities Compete in the
                 Commercial Marketplace...........................................................34

            4.   The Centre Meets The FLSA's Commerce Requirement..........37

       D.   Greene and Ezra Michaeli Also Are Covered Individuals Under the
            FLSA.......................................................................................38

       E.   The Plaintiffs Sufficiently Pleaded Common Law Claims....................39

            1.   The Plaintiffs' Unjust Enrichment Claims Are Sufficient..........39

            2.   The Plaintiffs State Claims For Fraudulent Inducement............42

            3.   The Claims Are Not Preempted...................................................45

       F.   Greene's and Ezra Michaeli's Claims Are Not Time-Barred.................51

            1.   Consideration of the Statute of Limitations Defense at this Stage
                 Is Premature ..............................................................................51

2.     Equitable Tolling Clearly Applies To Greene And Ezra Michaeli ......................................................................................52

3.     The Statute of Limitations For The Plaintiffs' FLSA Claims Should Be Three Years ...............................................................57

G.     Green has not Released His Claims .......................................................59

1.     Greene's Agreement was the Product of Undue Influence and is Unenforceable ..............................................................................59

2.     Greene Could Not Have Released His FLSA Claims Because There Was No Court Approval ...................................................63

3.     The Cases The Defendants Cite Do Not Warrant A Different Result ..............................................................................................67

H.     Should The Court Grant The Defendants' Motion, It Should Provide Leave To Amend..................................................................................69

V.     CONCLUSION....................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life
    Assurance Co.*,
    96 F. Supp. 3d 182 (S.D.N.Y. 2015) ..................................................................................8

*Acosta v. Cathedral Buffet, Inc.*,
    887 F.3d 761 (6th Cir. 2018) ...........................................................................................28

*Ahn v. Scarlett*,
    No. 5:16-CV-05437 (EJD), 2017 WL 1196828 (N.D. Cal. Mar. 31, 2017) .......................40

*Alpha Capital Anstalt v. Oxysure Sys., Inc.*,
    252 F. Supp. 3d 332 (S.D.N.Y. 2017) ..............................................................................40

*Anderson v. Sara Lee Corp.*,
    508 F.3d 181 (4th Cir. 2007) ...........................................................................................45

*Arboireau v. Adidas-Salomon AG*,
    347 F.3d 1158 (9th Cir. 2003) .........................................................................................25

*Arcadia Aviation PHF, LLC v. Aero-Smith, Inc.*,
    No. 12-CV-6177 (PAC), 2013 WL 3717651 (S.D.N.Y. July 16, 2013) ..............................2

*Archdiocese of Miami, Inc. v. Minagorri*,
    954 So. 2d 640 (Fla. Dist. Ct. App. 2007) .......................................................................27

*Aruanno v. Martin Cty. Sheriff*,
    343 F. App'x 535 (11th Cir. 2009) ...................................................................................49

*Bakalian v. Central Bank of Republic of Turkey*,
    932 F.3d 1229 (9th Cir. 2019) .........................................................................................49

*Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*,
    No. 90-CV-4406 (ILG), 1994 WL1743983 (E.D.N.Y. Feb. 7, 994) (Glasser,
    J.) ....................................................................................................................................64

*Bedoya v. Aventura Limousine & Transportation Service, Inc.*,
    No. 11-24432-CV-Altonaga, 2012 WL 13081980 (S.D. Fla. Mar. 20, 2012) ...................39

*Biel v. St. James School*,
    911 F.3d 603 (9th Cir. 2018), *cert. granted*, No. 19-348, 2019 WL 6880705
    (Dec. 18, 2019) ......................................................................................................... *passim*

*Boekmeier v. Fourth Universalist Soc'y,*
    86 F. Supp. 2d 280 (S.D.N.Y. 2000)................................................................28

*Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.,*
    532 F. Supp. 2d 1350 (M.D. Fla. 2007)...........................................................40

*Bowrin v. Catholic Guardian Soc'y,*
    417 F. Supp. 2d 449 (S.D.N.Y. 2006)...............................................32, 35, 36

*Boyd v. J.E. Robert Co.,*
    No. 05-CV-2455 (KAM)(RER), 2011 WL 477547 (E.D.N.Y. Feb. 2, 2011).....................52

*BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC,*
    No. 07-CV-186 (DRH), 2010 WL 331732 (S.D. Ill. Jan. 26, 2010) ..................40

*Brooklyn Savings Bank v. O'Neil,*
    324 U.S. 697 (1945)........................................................................................58

*Cannata v. Catholic Diocese of Austin,*
    700 F.3d 169 (5th Cir. 2012) .........................................................................12

*Chalusian v. Simsmetal East LLC,*
    698 F. Supp. 2d 397 (S.D.N.Y. 2010).............................................................43

*Cheeks v. Freeport Pancake House, Inc.,*
    796 F.3d 199 (2d Cir. 2015)...........................................................3, 59, 60, 61

*Chen v. Grand Harmony Rest., Inc.,*
    2011 WL 4703074 (S.D.N.Y. Aug. 10, 2011)..................................................51

*Chime v. Peak Sec. Plus, Inc.,*
    137 F. Supp. 3d 183 (E.D.N.Y. 2015) .....................................................35, 53

*Christensen v. Harris Cty.,*
    529 U.S. 576 (2000).......................................................................................26

*City of Benkelman, Nebraska v. Baseline Eng'g Corp.,*
    867 F.3d 875 (8th Cir. 2017) .........................................................................2

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.,*
    637 F.3d 169 (2d Cir. 2011)...........................................................................47

*Matter of Collins,*
    124 A.D.2d 48, 510 N.Y.S.2d 940 (1987).......................................................56

*Congregation Kol Ami v. Abington Twp.,*
    309 F.3d 120 (3d Cir. 2002)...........................................................................24

*Conlon v. InterVarsity Christian Fellowship,*
    777 F.3d 829 (6th Cir. 2015) ........................................................10, 11, 12, 13

*D'Onofrio v. Mother of God with Eternal Life*,
    79 N.Y.S.3d 902 (N.Y. Sup. Ct. 2018) ...................................................................5, 54, 57

*D.A. Schulte, Inc. v. Gangi*,
    328 U.S. 108 (1946) ...........................................................................................................58, 59

*Davis v. Baltimore Hebrew Congregation*,
    985 F. Supp. 2d 701 (D. Md. 2013) ...........................................................................15, 16, 22

*Davis v. Lenox Hill Hosp.*,
    No. 03-CV-3746 (DLC), 2004 WL 1926087 (S.D.N.Y. Aug. 31, 2004) ............................44

*De La Salle Inst. v. United States*,
    195 F. Supp. 891 (N.D. Cal. 1961) .....................................................................................24

*Dias v. Archdiocese of Cincinnati*,
    No. 1:11-CV-00251, 2013 WL 360355 (S.D. Ohio Jan. 30, 2013) ...............................19, 20

*Diaz v. Local No. 241*,
    No. 17-CV-8898, 2019 WL 3765924 (S.D.N.Y. Aug. 8, 2019) ...........................................21

*E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018), *cert. granted in part*, 139 S. Ct. 1599 (2019) .............. *passim*

*Evans v. Waldorf-Astoria Corp.*,
    827 F. Supp. 911 (E.D.N.Y. 1993) .....................................................................................54

*Fargas v. Cincinnati Mach., LLC*,
    986 F. Supp. 2d 420 (S.D.N.Y. 2013) ................................................................................47

*Frankel v. Cole*,
    313 F. App'x 418 (2d Cir. 2009) ........................................................................................47

*Fratello v. Archdiocese of N.Y.*,
    863 F.3d 190 (2d Cir. 2017) ...............................................................................................20

*Friedlander v. Port Jewish Ctr.*,
    588 F. Supp. 2d 428 (E.D.N.Y. 2008), *aff'd,* 347 F. App'x 654 (2d Cir.
    2009) .....................................................................................................................................27

*Garcia v. Pancho Villa's of Huntington Village, Inc.*,
    268 F.R.D. 160 (E.D.N.Y. 2010) .......................................................................................48

*Gaughan v. Rubenstein*,
    261 F. Supp. 3d 390 (S.D.N.Y. 2017) ......................................................................61, 62, 63

*General Conference Corp. of Seventh-Day Adventists v. McGill*,
    617 F.3d 402 (6th Cir. 2010) ................................................................................................9

*German v. Pope John Paul II*,
    211 A.D.2d 456 (1st Dep't 1995) .......................................................................................27

*Gibbs v. City of New York*,
  87 F. Supp. 3d 482 (S.D.N.Y. 2015)........................................................................26

*Giordano v. Legal Aid Soc'y*,
  No. 17-CV-5569 (ILG), 2018 WL 6199553 (E.D.N.Y. Nov. 27, 2018)
  (Glasser, J.) ............................................................................................................64

*Glob. Beauty Grp., LLC v. Visual Beauty, LLC*,
  No. 16-CV-9214 (KPF), 2018 WL 840102 (S.D.N.Y. Feb. 12, 2018)...........41, 42

*Gortat v. Capala Bros., Inc.*,
  No. 07-CV-3629(ILG), 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010), *aff'd*,
  568 F. App'x 78 (2d Cir. 2014) ...............................................................................63

*Gregorio v. Hoover*,
  238 F. Supp. 3d 37 (D.D.C. 2017) ...........................................................................26

*Griffin v. Aldi, Inc.*,
  No. 5:16-CV-00354 (LEK) (ATB), 2016 WL 7235787 (N.D.N.Y. Dec. 14,
  2016) ........................................................................................................................45

*Guobadia v. Irowa*,
  103 F. Supp. 3d 325 (E.D.N.Y. 2015) ......................................................................39

*Hallmark Aviation Ltd. v. AWAS Aviation Services, Inc.*,
  No. 12-CV-7688 (JFK), 2013 WL 1809721 (S.D.N.Y. Apr. 30, 2013) .................30

*Herx v. Diocese of Fort Wayne-South Bend Inc.*,
  48 F. Supp. 3d 1168 (N.D. Ind. 2014) .........................................................15, 22, 23

*Hirsch v. Qingdao Orien Commercial Equip. Co.*,
  No. 12-CV-952 (RRM), 2015 WL 1014352 (E.D.N.Y. Mar. 6, 2015) ....................2

*Hochroth v. William Penn Life Ins. Co. of New York*,
  No. 03-CV-7286 (RJH)(HBP), 2003 WL 22990105 (S.D.N.Y. Dec. 19,
  2003) ........................................................................................................................37

*Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment
  Opportunity Commission*,
  565 U.S. 171 (2012)......................................................................................... *passim*

*Int'l Finance Corp. v Carrera Holdings Inc.*,
  No. 601705/2007 (EB), 2009 WL 6442869 (N.Y. Sup. Ct. Sep. 28, 2009) .......... 46

*Johnson v. Nyack Hosp.*,
  86 F.3d 8 (2d Cir. 1996)...........................................................................................49

*Jones v. SCO Family of Services*,
  202 F. Supp. 3d 345 (S.D.N.Y. 2016)................................................................31, 36

*Jordan v. Wonderful Citrus Packing LLC*,
No. 1:18-CV-00401 (AWI) (SAB), 2018 WL 4350080 (E.D. Cal. Sept. 10, 2018) ............................................................................................................37, 38

*Kabbalah Centre Int'l, Inc. v. Youdkevitch*
(C.D. Cal. Complaint filed 2008).............................................................4, 33, 34

*Kane v. Carlson*,
527 F.2d 492 (2d Cir. 1975)...............................................................................24

*Kassman v. KPMG LLP*,
No. 11-CV-3743 (LGS), 2015 WL 5178400 (S.D.N.Y. Sept. 4, 2015) .................50, 51, 52

*Kattu v. Metro Petroleum, Inc.*,
No. 12-CV-54 (RJA), 2013 WL 4015342 (W.D.N.Y. Aug. 6, 2013) .................................48

*Kazaras v. Manufacturers Trust Co.*,
4 A.D.2d 227 (1st Dep't 1957) ...........................................................................54

*Knipe v. Skinner*,
999 F.2d 708 (2d Cir. 1993)...............................................................................21

*Kossian v. Am. Nat'l Ins. Co.*,
254 Cal. App. 2d 647 (Cal. Ct. App. 1967) ...................................................39, 40

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991)...................................................................................2

*Lazar v. Superior Court*,
12 Cal. 4th 631 (C.A. 1996)..............................................................................44

*Ledbetter v. Goodyear Tire & Rubber Co.*,
550 U.S. 618 (2007)..........................................................................................26

*Locke v. St. Augustine's Episcopal Church*,
690 F. Supp. 2d 77 (E.D.N.Y. 2010) ...........................................................31, 34

*Lopez v. Nights of Cabiria, LLC*,
96 F. Supp. 3d 170 (S.D.N.Y. 2015)..................................................................61

*Ltd. v. Patriarch Partners, LLC*,
286 F. Supp. 3d 643 (S.D.N.Y. 2017)...................................................................9

*Lynn's Food Stores, Inc. v. United States*,
679 F.2d 1350 (11th Cir. 1982) ................................................................57, 58, 61

*Magnoti v. Crossroads Healthcare Management, LLC*,
126 F. Supp. 3d 301 (E.D.N.Y. 2015) (Glasser, J.).............................................64

*Matamoro v. Khomari*,
No. 16-CV-9004 (KBF), 2017 WL6542954 (S.D.N.Y. Dec. 19, 2017)................................62

*Mears v. Allstate Indem. Co.*,
336 F. Supp. 3d 141 (E.D.N.Y. 2018) ..................................................................63

*Medeiros v. John Alden Life Ins. Co. of New York*,
No. 88-CV-4399 (KMW), 1990 WL 115606 (S.D.N.Y. Aug. 10, 1990)............................54

*Medidata Solutions, Inc. v. Veeva Sys. Inc.*,
748 F. App'x 363 (2d Cir. 2018) ....................................................................7

*Michael Miller Fabrics, LLC v. Studio Imports Ltd.*,
No. 12-CV-3858 (KMW)(JLC), 2012 WL 4513546 (S.D.N.Y. Oct. 1, 2012)....................64

*Mikhaylov v. Y & B Transportation Co.*,
No. 15-CV-7109 (DLI)(VMS), 2017 WL 1048071 (E.D.N.Y. Mar. 17,
2017) ..............................................................................5, 42, 43, 44

*Mitchell v. Washingtonville Cent. Sch. Dist.*,
190 F.3d 1 (2d Cir. 1999)..........................................................................25

*Montgomery v. Commissioner of Social Security*,
403 F. Supp. 3d 331 (S.D.N.Y. 2018)..............................................................47

*Morris Cerullo World Evangelism v. Superior Court of San Diego Cty.*,
No. D038029, 2001 WL 1654473 (Cal. App. Dist. Dec. 12, 2001)
(unpublished) .....................................................................................27

*Morrissey-Berru v. Our Lady of Guadalupe Sch.*,
769 F. App'x 460 (9th Cir. 2019), *cert. granted*, No. 19-267, 2019 WL
6880698 (Dec. 18, 2019) ................................................................15, 21, 25

*Mraz v. JPMorgan Chase Bank, N.A.*,
No. 17-CV-6380 (ILG), 2018 WL 2075427 (E.D.N.Y. May 3, 2018)
(Glasser, J.) ......................................................................................45

*Nevius v. Afr. Insland Mission Int'l*,
511 F. Supp. 2d 114 (D.D.C. 2007)................................................................27

*Ouedraogo v. A-1 Int'l Courier Serv., Inc.*,
No. 12-CV-5651 (AJN), 2013 WL 3466810 (S.D.N.Y. July 8, 2013) ..............................43

*Parada v. Banco Industrial De Venezuela, C.A.*,
753 F.3d 62 (2d Cir. 2014).........................................................................53

*Peco Pallet, Inc. v. Nw. Pallet Supply Co.*,
No. 1:15-CV-06811 (ARW), 3:15-CV-50182 (ARW), 2016 WL 5405107
(N.D. Ill. Sept. 28, 2016) ..........................................................................39

*Penn v. New York Methodist Hospital*,
884 F.3d 416 (2d Cir. 2018).................................................................17, 19, 20

*People v. Debt Resolve, Inc.*,
   387 F. Supp. 3d 358 (S.D.N.Y. 2019)...........................................................................29, 30

*Petras v. Johnson*,
   No. 92-CV-8298 (CSH), 1993 WL 228014 (S.D.N.Y. June 22, 1993)................................45

*Pincus v. Speedpay, Inc.*,
   161 F. Supp. 3d 1150 (S.D. Fl. 2015) ..............................................................................37

*Pratt v. City of N.Y.*,
   929 F. Supp. 2d 314 (S.D.N.Y. 2013)..................................................................................7

*Pu v. Russell Publ'g Grp., Ltd.*,
   No. 15-CV-3936 (VSB), 2016 9021990 (S.D.N.Y. Sept. 2, 2016), *aff'd*, 683
   F. App'x 96 (2d Cir. 2017) ................................................................................................25

*R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*,
   139 S. Ct. 1599 (2019)......................................................................................................10

*Reich v. Waldbaum, Inc.*,
   52 F.3d 35 (2d Cir. 1995)..................................................................................................53

*Robinson v. Deutsche Bank Tr. Co. Ams.*,
   572 F. Supp. 2d 319 (S.D.N.Y. 2008)...................................................................41, 54, 55

*Rweyemamu v. Cote*,
   520 F.3d 198 (2d Cir. 2008)..............................................................................................27

*Saunders v. City of New York*,
   594 F. Supp. 2d 346 (S.D.N.Y. 2008).................................................................................51

*Schleicher v. Salvation Army*,
   518 F.3d 472 (7th Cir. 2008) .......................................................................................23, 24

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*,
   363 F.3d 299 (4th Cir. 2004) .......................................................................................10, 12

*Shu Qin Xu v. Wai Mei Ho*,
   111 F.Supp.3d 274 (E.D.N.Y. 2015) ..................................................................................53

*Shukla v. Sharma*,
   No. 07-CV-2972 (CBA), 2009 WL 10690810 (E.D.N.Y. Aug. 21, 2009)....................19, 27

*Sosnowy v. A. Perri Farms, Inc.*,
   764 F. Supp. 2d 457 (E.D.N.Y. 2011) ................................................................................45

*Spirit Locker, Inc. v. EVO Direct, LLC*,
   696 F. Supp. 2d 296 (E.D.N.Y. 2010) ................................................................................37

*Stabler v. Congregation Emanu-El of the City of N.Y.*,
   No. 16-CV-9601 (RWS), 2017 WL 3268201 (S.D.N.Y. July 28, 2017).......................10, 12

*In re Stein & Day Inc.*,
  83 B.R. 221 (Bankr. S.D.N.Y. 1988) ................................................................2

*Sterlinksi v. Catholic Bishop of Chicago*,
  934 F.3d 568 (7th Cir. 2019) .........................................................................17

*Su v. Stephen S. Wise Temple*,
  32 Cal. App. 5th 1159, 244 Cal. Rptr. 3d 546 (Ct. App. 2019), *reh'g denied*
  (Apr. 2, 2019), *review denied* (June 19, 2019) .......................................15, 19, 23

*Summa v. Hofstra Univ.*,
  No. 07-CV-3307 (DRH)(ARL), 2008 WL 3852160 (E.D.N.Y. Aug. 14,
  2008) ..........................................................................................................51

*Sumner v. Simpson Univ.*,
  27 Cal. App. 5th 577, 238 Cal. Rptr. 3d 207 (Ct. App. 2018), *reh'g denied*
  (Oct. 23, 2018), *review denied* (Jan. 2, 2019) ..................................................27

*Sun Forest Corp. v. Shvili*,
  152 F. Supp. 2d 367 (S.D.N.Y. 2001) .....................................................5, 54, 56

*Tenet Healthsystem Desert, Inc. v. Blue Cross of California*,
  245 Cal. App. 4th 821 (Cal. Ct. App. 2016) ................................................44, 45

*Thycon Constr., Inc. v. Nat'l Equip. Servs., Inc.*,
  No. 08 C 824 (WJH), 2009 WL 723040 (N.D. Ill. Mar. 2, 2009) .........................37

*Tianjin Port Free Trade Zone Int'l Trade Service Co., Ltd. v. Tiancheng
  Chempharm, Inc. USA*,
  No. 17-CV-4130 (JS)(AYS), 2018 WL 2436990 (E.D.N.Y. May 30, 2019) ...........8

*Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt.
  Cooperation, Pension, Welfare Funds v. Syracuse Floor Sys., Inc.*,
  No. 13-CV-1509 (SJF), 2015 WL 222133 (E.D.N.Y. Jan. 13, 2015) ....................2

*United States v. Kahane*,
  396 F. Supp. 687 (E.D.N.Y. 1975) ................................................................24

*Upadhyay v. Sethi*,
  848 F. Supp. 2d 439 (S.D.N.Y. 2012) ...................................................5, 48, 51

*Vasquez v. Reilly*,
  No. 15-CV-95289 (KMK), 2017 WL 946306 (S.D.N.Y. Mar. 9, 2017) .................8

*Veltri v. Building Serv. 32B-J Pension Fund*,
  393 F.3d 318 (2d Cir. 2004) ...................................................................49, 50, 51

*Walker v. The Interfaith Nutrition Network, Inc.*,
  No. 14-CV-5419 (DRH)(GRB), 2015 WL 4276174 (E.D.N.Y. July 14,
  2015) ...................................................................................................4, 32, 36

*Wang v. Palmisano,*
  51 F. Supp. 3d 521 (S.D.N.Y. 2014)................................................................47

*Weber v. Burman,*
  880 N.Y.S.2d 228 (N.Y. Sup. Ct. 2008) ...............................................5, 54, 56

*Weisblum v. Prophase Labs, Inc.,*
  88 F. Supp. 3d 283 (S.D.N.Y. 2015)................................................................45

*Wilk v. VIP Health Care Services, Inc.,*
  No. 10-CV-5530 (ILG)(JMA), 2012 WL 560738 (E.DN.Y. Feb. 21, 2012)
  (Glasser, J.) ......................................................................................................44

*Yin v. Columbia Int'l University,*
  No. 3:15-CV-03656-JMC, 2017 WL 4296428 (D.S.C. Sept. 28, 2017) .............14

*Young Min Lee v. New Kang Suh Inc.,*
  No. 17-CV-9502 (NSR), 2019 WL 689085 (S.D.N.Y. Feb. 15, 2019) ...............62

*Yu G. Ke v. Saigon Grill, Inc.,*
  595 F. Supp. 2d 240 (S.D.N.Y. 2008)...............................................................51

*Zerilli-Edelglass v. New York City Transit Auth.,*
  333 F.3d 74 (2d Cir. 2003)...............................................................................50

*Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC,*
  No. 15-CV-6519 (ILG)(RLM), 2019 WL 5103870 (E.D.N.Y. Oct. 11, 2019)
  (Glasser, J.) ......................................................................................................45

**Statutes**

29 C.F.R. § 779.214 ........................................................................... *passim*

29 C.F.R. § 790.21(b) ...................................................................................5, 48

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA").......................... *passim*

# I.    PRELIMINARY STATEMENT

Plaintiffs James Greene ("Greene"), Jennifer Shaal ("J. Shaal"), Ofer Shaal ("O. Shaal"), Jake Stone ("Stone"), Guy Shoshan ("Shoshan"), Einat Ezra Michaeli ("Ezra Michaeli"), and Yifat Shmilovich ("Shmilovich") (collectively, the "Plaintiffs") respect-fully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint[1] (the "Motion" or the "MTD Br."), filed by Defendants Kabbalah Centre International, Incorporated, Kabbalah Centres of the United States, Incorporated, Kabbalah Centre of New York, Incorporated, The Kabbalah Centre of Florida, Inc., Kab-balah Children's Academy, and Spirituality for Kids International, Inc. (the "Not-for-Profit Affiliated Entities"); Kabbalah Enterprises, Incorporated, KAF Investments, LLC, and 501 N. La Cienega, LLC (the "For-Profit Affiliated Entities") ((together with the Not-for-Profit Affiliated Entities, the "Centre," or the "Corporate Defendants"); and Karen Berg ("K. Berg"), Yehuda Berg ("Y. Berg"), and Michael Berg ("M. Berg") (collectively, the "Bergs" or the "Individual Defendants," and together with the Corporate Defendants, the "Defend-ants").[2]

---

[1] The Defendants are seeking to dismiss only the claims of Greene and Ezra Michaeli, but they also purport to reserve the right to seek dismissal of the claims brought by J. Shaal, O. Shaal, Stone, Shoshan, and Shmilovich. *See* MTD Br. at 1 n.1. In fact, the Defendants have waived that right. Pursuant to the Stipula-tion, the Defendants had until November 25, 2019 "to file their reply to Plaintiffs' opposition or to respond to any amended complaint," Dkt. 27 at 2, and the Defendants moved only to compel arbitration regarding the claims of J. Shaal, O. Shaal, Stone, Shoshan, and Shmilovich. *See* Dkt. 50 at 1. A party that makes a motion under Rule 12 "must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2); *see Arcadia Aviation PHF, LLC v. Aero-Smith, Inc.*, No. 12-CV-6177 (PAC), 2013 WL 3717651, at *4 (S.D.N.Y. July 16, 2013) (denying supplemental motion to dismiss for failure to state a claim brought after original motion to dismiss for lack of jurisdiction and improper venue). Motions to compel arbitration are generally understood to be brought under Rule 12(b), particularly where, as here, they seek dismissal of claims. Dkt. 50 at 2; *see Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension, Welfare Funds v. Syracuse Floor Sys., Inc.*, No. 13-CV-1509 (SJF), 2015 WL 222133, at *5 n.3 (E.D.N.Y. Jan. 13, 2015). The Defendants may not, therefore, file later a Rule 12(b) motion.

## II. INTRODUCTION

The Plaintiffs are the victims of a cult that cynically preys upon people who wished to improve the world so that its leaders can enrich themselves. They worked as "chevre," toiling unpaid for years to support the Defendants' business operations and to act as personal servants to the Bergs. They are now simply seeking the compensation that the Defendants have always been legally required to pay them.

The Defendants do not wish to confront the allegations of the First Amended Complaint (the "FAC"). Instead, they confront a strawman made up of allegations taken from the now-superseded original complaint (the "Superseded Complaint") and several exhibits that the Defendants have improperly asked the Court to consider on its motion to dismiss for failure to state a claim. *See* Declaration of Elise M. Bloom, Esq., in Support of Defendants' Motion to Dismiss (the "Bloom Declaration"); Plaintiffs' Motion to Strike Certain Exhibits to the Bloom Declaration in Support of Defendants' Motion to Dismiss and References Thereto (the "Motion to Strike"). This violates the basic rule that a Rule 12(b)(6) motion to dismiss must accept as true the facts of the Plaintiffs set forth in the FAC. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (explaining that, as a general matter, "a district court must confine itself to the four corners of the complaint

---

[2] By amending their complaint in response to the Defendants' motions, the Plaintiffs did not concede the arbitrability of certain claims or waive their right to oppose the Defendants' motion to compel arbitration, as the Defendants argue. *See* MTD Br. at 1 n.1. First, the parties stipulated to, and the Court ordered, this precise series of events: "In the event that any of Defendants files a motion in lieu of an answer, Plaintiffs . . . will have to and including November 4, 2019 to file their opposition **or to amend the Complaint** . . . . and Defendants will have to and including November 25, 2019 to file their reply to Plaintiffs' opposition or to respond to any amended complaint." Dkt. 27 at 2 (emphasis added). The Defendants cannot now argue against their own stipulation. *Hirsch v. Qingdao Orien Commercial Equip. Co.*, No. 12-CV-952 (RRM), 2015 WL 1014352, at *7 (E.D.N.Y. Mar. 6, 2015) (stipulation is both a contract and court order); *In re Stein & Day Inc.*, 83 B.R. 221, 226 (Bankr. S.D.N.Y. 1988) (same). This stipulation explicitly provided that the Plaintiffs could amend their complaint with the Defendants' consent and the Court's permission. *See* Dkt. 27 at 2-3. Second, Rule 15 specifically contemplates the filing of an amended complaint as a response to Rule 12(b) motions. *See* Fed. R. Civ. P. 15(a)(1)(B). Because motions to compel arbitration that request dismissal, like the Defendants' motion here, are typically brought under Rule 12(b), *see City of Benkelman, Nebraska v. Baseline Eng'g Corp.*, 867 F.3d 875, 880-82 (8th Cir. 2017), the relationship between Rules 12 and 15 reinforce the conclusion that filing an amended complaint was a proper response to the Defendants' motion to compel arbitration.

when deciding" a Rule 12(b)(6) motion). And it suggests that the Plaintiffs know that if they had to address the allegations of the FAC, without improperly supplementing the record in a one-sided way, without even allowing discovery, they could not prevail.

The Centre opportunistically embraces religion in its affairs. It embraces religion to shield itself from the laws requiring it to pay its workers a fair wage. But it distances itself from religion when it wants to punish those employees who leave the fold and try to spread Kabbalah on their own. It uses religion as a shield, to hide its role in extracting ever larger amounts of money from its students so that it can line the pockets of its founders, the Bergs. But then it proclaims on its own website that Kabbalah is not a religion so as to maximize its appeal to as many donors as possible.

This tension plays itself out throughout the Defendants' papers. The Defendants claim that the Centre is a religious institution, protected from judicial scrutiny of its employment practices by the ministerial exception. But the Defendants are unable to identify the religion that the Centre espouses. They state instead that the Centre promotes "truths" that "predate religion" and can "bring a new depth of understanding to all religions." MTD Br. at 16-17 n.17. The Defendants' attempts to untether the ministerial exception from religious institutions would broaden the exception so much as to make it virtually meaningless.

Even if the Centre could show that it is a religious institution, it must also show that its employees are "ministers" in order to take advantage of the ministerial exception. *See Biel v. St. James School*, 911 F.3d 603, 607 (9th Cir. 2018), *cert. granted*, No. 19-348, 2019 WL 6880705 (Dec. 18, 2019). The Centre attempts to meet this burden by analyzing the chevre to monks or nuns. *See, e.g.*, MTD Br. at 2. But this analogy only lays bare why the ministerial exception is inapplicable. Monks spend their days in prayer and good works. The Defendants force the chevre spend their days raising money to satisfy the greed of the

– 3 –

Bergs.  The chevre lack any of the hallmarks of ministers identified by the Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012).

As employees of an enterprise designed to enrich its founders, the chevre are easily covered by the broad remedial mandate of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA").  *See Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015).  Employees are subject to the FLSA's protections in two scenarios, namely, when (1) the business is a "covered enterprise," or (2) its employees are covered individuals.

Both requirements are satisfied here.  The Defendants claim that they are not a covered enterprise because they engage in religious and charitable activities.  But as the FAC alleges, the Centre is actually a slush fund, raising substantial amounts of money to subsidize the expensive whims of the Bergs.  Moreover, the Centre, by its own admission, engages in commercial activity in the marketplace.  In 2008, the Centre sued Osnat and Shaul Youdkevitch and Universal Kabbalah Communities, Inc. for "unfair competition."  *See* No. 2:08-CV-04599 (FMC)(RZx), *Kabbalah Centre Int'l, Inc. v. Youdkevitch* (C.D. Cal. Complaint filed 2008) (the "Unfair Competition Complaint").  The Centre explained that "[o]ver the past approximately twenty (20) years," it "expended millions of dollars advertising, promoting and marketing its programs, products and services and has experienced tremendous success."  Unfair Competition Complaint ¶ 22.  The Centre made similar admissions in the separation agreement that it forced Shoshan to sign and which the Defendants attached to their motion to compel arbitration.  In that agreement, the Centre required Shoshan to protect the Centre's so-called confidential information, which included

– 4 –

"proprietary information relating to the present or future business, operations, activities, services, or products of the Centre."  Dkt. 50-6 at 10.

Even if the Centre were not a covered enterprise, Plaintiffs Greene and Ezra Michaeli certainly are covered individuals, as they engaged in commerce or in the production of goods for commerce.  These activities included multistate telemarketing, producing the DVDs and books that the Centre sold around the world, and traveling repeatedly for Centre events.  *See Walker v. The Interfaith Nutrition Network, Inc.*, No. 14-CV-5419 (DRH)(GRB), 2015 WL 4276174, at *5 (E.D.N.Y. July 14, 2015).

The Plaintiffs also included claims for unjust enrichment and fraudulent inducement in the FAC.  Perhaps recognizing that these common law claims were sufficient to state a claim for relief, the Defendants did not argue that the Plaintiffs failed to satisfy the claims' elements.  Instead, they argued that the claims are preempted by the Plaintiffs' wage-and-hour causes of action.  *See* MTD Br. at 30-31.  However, FLSA claims preempt common law claims only to the extent the claims are duplicative, *Mikhaylov v. Y & B Transportation Co.*, No. 15-CV-7109 (DLI)(VMS), 2017 WL 1048071, at *5-6 (E.D.N.Y. Mar. 17, 2017), and the Plaintiffs' common law claims are not duplicative of the FLSA claims.  The Plaintiffs' unjust enrichment claims are not based just on the value of their labor while they were chevre, but on the increase in the Individual Defendants' wealth that resulted from the Plaintiffs' tireless efforts.  The fraudulent inducement claim is based on the Defendants' repeated representations to the Plaintiffs that the Defendants would take care of the chevre's needs, which turned out to be false.  The common law claims are also not preempted because the Plaintiffs have pleaded them in the alternative.  *See id*. at *6.

The Defendants make two final arguments, neither of which can succeed.  First, they claim that Greene and Ezra Michaeli's claims are time barred.  This defense is premature.  Discovery is necessary in order to determine when the Plaintiffs' FLSA claims accrued—

– 5 –

which is based on the date of the Plaintiffs' last payday, *see* 29 C.F.R. § 790.21(b), a factual issue that cannot be resolved from the face of the complaint—and whether equitable tolling applies. *See Upadhyay v. Sethi*, 848 F. Supp. 2d 439, 445 (S.D.N.Y. 2012). Second, the Defendants assert that Greene released any claims he may have against the Centre. Contracts that are the product of undue influence are invalid, and the Centre, which dominated and dictated every decision in Greene's life, had a degree of control such that it "destroy[ed]" Greene's "free will and substitute[d] for it the will" of the Centre. *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 393 (S.D.N.Y. 2001) (quotation and citation omitted). Indeed, in New York this relationship of control is assumed where one party is a religious institution. *See Weber v. Burman*, 880 N.Y.S.2d 228, at *6 (N.Y. Sup. Ct. 2008). Thus, if the Centre is, as it asserts, a religious institution, then it has the burden to show that the contract was not the product of undue influence. *D'Onofrio v. Mother of God with Eternal Life*, 79 N.Y.S.3d 902, 920 (N.Y. Sup. Ct. 2018). Even if the contract containing the release were valid, the release itself is not because it was not approved by a court. Though the Second Circuit has yet to weigh in on this issue, it is clear from its precedent that a court would need to approve a release such as this, especially given, as the Defendants continually stress, its broad nature. *See* MTD Br. at 39.

## III.   STATEMENT OF FACTS

The Centre is a self-proclaimed spiritual organization that operates to enrich its leaders, the Bergs. *See* FAC ¶¶ 1-2. By its own admission, the Centre is not a religious organization. *See id*. ¶ 45. Indeed, it specifically forbade its teachers from describing it as a religious institution, or describing Kabbalah as a religion, or discussing religion at all. *Id.* Instead, it trained the employees it refers to as "chevre" to raise ever-increasing amounts of money that the Bergs put to use for themselves, or gambled away on the Las Vegas Strip. *See id*. ¶ 49, 54, 61, 66. These dollars also disappeared into the Centre's murky corporate

– 6 –

structure, comprised of both not-for-profit and for-profit entities that operated as a single slush fund.  *See id*. ¶¶ 61-62, 68.  And chevre solicited in-kind donations for the personal use of the Bergs:  jewelry and couture handbags; trips to destinations such as Ibiza, Spain, and Punta Cana, Dominican Republic; spa vacations; and plastic surgery.  *See id*. ¶ 66.

The Centre's operations rely on the work of the chevre.  *See id*. ¶ 3.  The chevre work as facilities managers and telemarketers, as personal assistants and website developers.  *See id*. ¶¶ 4-5, 18-24.  The Centre controls every aspect of the chevre's lives, ensuring that the chevre are entirely dependent on it for the necessities of life.  *See id*. ¶ 76.  It gives them new names.  *See id*. ¶ 77.  It persuades them to abandon their personal possessions and property.  *See id*. ¶ 78.  It dictates romantic partnerships, marriages, and childbearing, clothing, and food, and even controls the amount of toilet paper used.  *See id*. ¶¶ 79, 81.  It places chevre in housing, crowded several to a room, some sleeping in the living room or kitchen—and then relocates them across the country on a moment's notice.  *See id*. ¶ 80.

The Centre forbids chevre to leave its premises for any reason without permission. *See id*. ¶ 82.  It does not provide medical care or dental care, and, indeed, in emergencies, chevre were told to give a false name at the emergency room so that they could receive free care and the Centre would not have to pay for it.  *See id*. ¶ 83.  And it takes extraordinary steps to separate chevre from "outside" friends and family—for example, telling Ezra Michaeli, with no basis, that her father had sexually abused her.  *See id*. ¶ 86.  Many chevre joined the Centre at a young age, with little experience of the outside world.  *See id*. ¶¶ 18-24.  When they were ultimately able to leave the Centre, they had nothing: no money, no shelter, and no footprint or identity.  *See id*. ¶¶ 104-110.  They could not obtain credit cards

or rent apartments.  *Id.*  Because of the Centre, they had few, if any, friends or family for support.  *Id.*

## IV.  ARGUMENT

### A.  The Court Should Not Consider The Defendants' Improper References To The Superseded Complaint Or The Documents Attached To The Bloom Declaration

The Defendants *say* they are moving to dismiss the FAC for failure to state a claim. In fact, they have set up a strawman patched together from references to the Plaintiffs' Superseded Complaint and to documents outside of the record attached to the Bloom Declaration, and they move to dismiss this strawman.  This is improper.[3]

"It is hardly a novel proposition that an amended complaint supersedes an original complaint and renders it of no legal effect."  *Medidata Solutions, Inc. v. Veeva Sys. Inc.*, 748 F. App'x 363 (2d Cir. 2018) (quotation and citation omitted); *see also Pratt v. City of N.Y.*, 929 F. Supp. 2d 314, 319 n.3 (S.D.N.Y. 2013).  If a defendant subsequently moves to dismiss, the motion must be directed to the amended complaint and not the superseded one.  If a defendant references a prior complaint in its motion to dismiss, those references will be set aside and not considered as part of the motion.  *See id*. at 319 n.3 ("Thus the

---

[3] Further demonstrating that they are not properly applying the Rule 12 standard, the Defendants repeatedly question the veracity of the Plaintiffs' allegations.  *See, e.g.*, MTD Br. at 22 n.24 ("Even if the Plaintiffs did not so obviously perform religious duties, which they did"); *id*. at 23 n.25 ("Even if these new allegations are true (which they are not)"); *id*. at 37 ("and regardless, is untrue").  As the Defendants themselves purport to recognize, this is improper.  *See id*. at 3 n.4 ("References to factual allegations in the Amended Complaint . . . are assumed to be true for purposes of this motion only.").

Court will decide this motion to dismiss based on the facts in the Amended Complaint, not based on the superseded Original Complaint.").

The Defendants' Motion is replete with references to the Superseded Complaint, which the Defendants attached to the Bloom Declaration as a redline comparing it to the FAC. *See* Bloom Decl. Ex. A.  No authority permits this, and certainly the Defendants cite none.  Instead, they allude, without providing many specifics, to alleged inconsistencies between the Superseded Complaint and the FAC.  *See* MTD Br. at 20 n.21.[4]  Such vague references are insufficient to warrant the drastic remedy of setting aside an amended complaint in favor of a prior one.  *See Vasquez v. Reilly*, No. 15-CV-95289 (KMK), 2017 WL 946306, at *4 (S.D.N.Y. Mar. 9, 2017) ("Here, Defendants have not directed the Court to any statements in the Second Amended Complaint that contradict earlier statements.").

Even if there were some inconsistency between the FAC and the Superseded Complaint, the Defendants' references to the Superseded Complaint would still be improper.  "In rare circumstances, courts in the Second Circuit will consider prior pleadings.  However, courts only do this when the plaintiff directly contradicts the facts set forth in [the] original complaint . . . ."  *2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assurance Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015) (quotation and citation omitted).  The Defendants have not met this standard.  They mostly claim that the Plaintiffs removed allegations that support their defenses, such as the ministerial exception.  *See, e.g.,* MTD Br. at 17.  That is not enough.  *See 2002 Lawrence R. Buchalter Alaska Trust*, 96 F. Supp. 3d at 205-06 (declining to take judicial notice of

---

[4] In a footnote, the Defendants claim that the Court may consider the Superseded Complaint because the FAC contains "contradictory statements."  MTD Br. at 20 n.21.  The Defendants do not provide any support for this assertion or a single example to support this statement.  They may not do so on reply.  *See Tianjin Port Free Trade Zone Int'l Trade Service Co., Ltd. v. Tiancheng Chempharm, Inc. USA*, No. 17-CV-4130 (JS)(AYS), 2018 WL 2436990, at *5 (E.D.N.Y. May 30, 2019).

allegations that the plaintiff removed from the prior complaint and which, the defendant alleged, were removed so as to defeat one of the defendant's defenses).  Further, not every allegation that the Defendants claim the Plaintiffs "stripped" was removed from the FAC. For example, they claim the "Plaintiffs edited away their description of the Jewish origin of the Kabbalah."  MTD Br. at 17.  This description is still there, in the first paragraph: "Plaintiffs are former employees of the Centre, a self-proclaimed spiritual organization that purports to spread the teachings of Kabbalah, a form of Jewish mysticism."  FAC ¶ 1.

The Defendants' strawman also relies on documents attached to the Bloom Declaration.  For the reasons set forth in the Motion to Strike, the Court should also refuse to consider those documents.  This is a motion directed to the pleadings, not a motion for summary judgment.  And it is particularly inappropriate for the Defendants to proffer material outside of the pleadings when they have moved to prevent discovery.  *See* Dkt. No. 40; *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 643, 646 n.4 (S.D.N.Y. 2017) ("To consider detailed testimony [submitted by defendants] would permit the improper transformation of the Rule 12(b)(6) inquiry into a summary-judgment proceeding—one featuring a bespoke factual record, tailor-made to suit the needs of defendants." (quotation and citation omitted)).

**B.**     **The Defendants Cannot Avail Themselves Of The Ministerial Exception**

**1.**     **The Exception Applies Only To Religious Institutions And Ministers**

"The ministerial exception is a highly circumscribed doctrine," *General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 409 (6th Cir. 2010), that "bars an employee's suit under otherwise generally applicable employment laws."  *Biel v. St.*

*James School*, 911 F.3d 603, 607 (9th Cir. 2018), *cert. granted*, No. 19-348, 2019 WL 6880705 (Dec. 18, 2019).  The Defendants bear the burden of establishing the exception's applicability.  *Stabler v. Congregation Emanu-El of the City of N.Y.*, No. 16-CV-9601 (RWS), 2017 WL 3268201, at *5 (S.D.N.Y. July 28, 2017).

The exception applies only to institutions "marked by clear or obvious religious characteristics," that outweigh the institutions' secular qualities.  *E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 582 (6th Cir. 2018), *cert. granted in part*, 139 S. Ct. 1599 (2019).[5]  If a defendant meets this high bar, it then must show that the employee bringing the suit is a ministerial employee under *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012).  *See Biel*, 911 F.3d at 607.  The Defendants cannot show that the Centre is a religious institution or that the chevre are ministers.

### 2.     The Centre Is Not A Religious Institution Because It Is Not Marked By Clear Or Obvious Religious Characteristics

The line between those institutions that are religious and those that are not is illustrated by *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299 (4th Cir. 2004), and *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015), on the one hand, and *R.G. & G.R. Harris Funeral Homes, Inc.*, on the other.  In *Shaliehsabou*, a case the Defendants cite, *see* MTD Br. at 13, 14, 16, 18, the Fourth Circuit found that a retirement home was a religious institution.  The home's by-laws defined the

---

[5] The Supreme Court granted certiorari on a limited question not relevant here, *viz.*, whether Title VII prohibits discrimination against transgender people based on (1) their status as transgender, or (2) sex stereotyping.  *See R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 139 S. Ct. 1599 (2019).

home as religious and "declare[d] that its mission is to provide elder care to 'aged of the Jewish faith in accordance with the precepts of Jewish law and customs.'" *Shaliehsabou*, 363 F.3d at 310 (citation omitted). It had a rabbi on staff, employed mashgichim (to ensure compliance with Jewish dietary rules), and placed mezuzot on every resident's doorposts. *Id*. at 310-11. Similarly, in *Conlon*, the Sixth Circuit held that the InterVarsity Christian Fellowship, the express purpose of which was to "establish and advance" "witnessing communities" at colleges and universities "who follow Jesus as Savior and Lord," was a religious institution. *Conlon*, 777 F.3d at 830, 831, 833-34. The Fellowship's religious nature was evident on its website: it described the Fellowship as "a faith-based religious organization," stated that the Fellowship "hir[ed] staff based on their religious beliefs so that all staff share the same religious commitment," and "state[d] that all employees must annually reaffirm their agreement with [the Fellowship's] Purpose Statement and Doctrinal Basis." *Id*. at 831 (quotation and citation omitted).

In contrast, in *R.G.*, the Sixth Circuit held that an ostensibly Christian funeral home did not qualify as a religious institution. *R.G.*, 884 F.3d at 582-83. The Sixth Circuit noted that the funeral home did "not purport to seek or to establish and advance Christian values," "is not affiliated with any church," has "articles of incorporation [that] do not avow any religious purpose," has "employees [that] are not required to hold any particular religious views," and "employs and serves individuals of all religions." *Id*. (quotation and citation omitted). Further, the funeral home "does not decorate its rooms with religious figures because it does not want to offend people of different religions" and Easter was not a paid holiday. *Id*. at 582 (quotation, citations, and alteration omitted). Thus, the Sixth Circuit concluded that the funeral home "has virtually no religious characteristics," even though the home's mission statement declared that "its highest priority is to honor God in all that we do as a company and as individuals," and it placed "'Daily Bread' devotionals and

– 12 –

'Jesus Cards'" that quoted scripture on public display throughout the house.  *Id.* (citations omitted).

Time and again, through its words and deeds, the Centre has shown that it is not a religious institution.  In response to the rhetorical question, "Is Kabbalah a religion," and in direct contrast to *Conlon*, the Centre proudly and publicly declared on *its own website* that, "The answer is no! Not at all!"  FAC ¶ 45.  The Defendants try to walk back this admission in a footnote, claiming that the Centre eschews the title of a religion because "the truths founded in the wisdom of Kabbalah predate religion and that the study of Kabbalah can enhance any individual's spiritual life and bring a new depth of understanding to all religions."  MTD Br. at 16-17 n.17.  But just like the funeral home in *R.G.*, the Centre cannot claim to be a religious institution at the same time it explicitly avoids affiliation with any church or organized religion and takes steps to avoid offending people of different faiths.  *See R.G.*, 884 F.3d at 582.[6]

*Shaliehsabou* and *Conlon* show that an institution is religious for purposes of ministerial exception if its purpose is to advance a religion.  The purpose of the Centre is to advance the Individual Defendants' personal interests.  Rather than training chevre in how to "provide[ ] spiritual services and disseminate[ ] the wisdom and teachings of Kabbalah," as the Defendants claim, MTD Br. at 16, the Defendants trained chevre in one thing: how to raise ever increasing amounts of money.  That money was used to satisfy the

---

[6] Even if the Court believes that there is a colorable argument that the ministerial exception applies, the Court should not dismiss the Plaintiffs' claims.  Instead, it should wait until a motion for summary judgment.  *See Stabler*, 2017 WL 3268201, at *6 ("Because the analysis is fact-intensive, whether the ministerial exception applies is often addressed at the motion for summary judgment stage." (collecting cases)); *see also Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 n.3 (5th Cir. 2012) ("Given the nature of the ministerial exception, we suspect that only in the rarest of circumstances would dismissal under Rule 12(b)(6)—in other words, based solely on the pleadings—be warranted.").

Individual Defendants' extravagant, and decidedly non-religious, impulses.  *See* FAC ¶ 66.[7]  The Defendants do not even mention—let alone defend—the FAC's specific, numerous allegations that lay bare this true, non-religious purpose.

The Centre's employment practices also differed from those in *Conlon*.  In *Conlon*, the Fellowship only employed individuals who ascribed to its religious beliefs.  *Conlon*, 777 F.3d at 831.  The Centre, in contrast, imposes no religious or spiritual litmus test on candidates for employment.  It also does not make employees affirm or reaffirm adherence to any particular belief.  *See id*.  Instead, employment decisions were based on two factors, submission to the Bergs' whims and the ability to raise funds.  *See, e.g.*, FAC ¶¶ 52-53, 74, 91.  Neither factor is religious.  The Centre also does not make any demands of religious uniformity of its "students," as its classes are open to anyone, irrespective of religion, so long as they can pay.  *See id*. ¶¶ 3, 5, 43, 44, 47, 54-60.

Accordingly, the Centre is not "marked by clear or obvious religious characteristics."  *R.G.*, 884 F.3d at 582.

### 3.    Chevre Are Not "Ministers" Within The Ministerial Exception

Following *Hosanna-Tabor*, courts have identified four factors that guide the determination of whether an individual is a minister: "(1) whether the employer held the employee out as a minister, (2) whether the employee's title reflected ministerial substance and training, (3) whether the employee held herself out as a minister, and (4) whether the employee's job duties included 'important religious functions.'"  *Biel*, 911 F.3d at 607 (quoting *Hosanna-Tabor*, 565 U.S. at 192).   The analysis focuses on "the function

---

[7] Further, the way the Defendants solicited money was divorced from religion.  For example, the Defendants targeted for donations the individuals from whom it could extract embarrassing personal information.  *See* FAC ¶ 55.

performed by persons who work for" the purportedly religious institution.  *Hosanna-Tabor*, 565 U.S. at 198.  These factors only provide guidance, as the Supreme Court was "reluctant [ ] to adopt a rigid formula for deciding when an employee qualifies as a minister."  *Hosanna-Tabor*, 565 U.S. at 190.  The application of each of these factors here shows that chevre were not ministers.

First, the Defendants did not hold chevre out as ministers.  *See* FAC ¶ 4; *see also Biel*, 911 F.3d at 608 ("Nor did St. James hold Biel out as a minister by suggesting to its community that she had special expertise in Church doctrine, values, or pedagogy beyond that of any practicing Catholic.").

Second, the title "chevre" does not reflect ministerial substance and training as it is not a religious term,[8] but a secular Hebrew word meaning "a small community" or "gang" of friends.  FAC ¶ 3.[9]  Such a secular title is insufficient to apply the ministerial exception.  The employees' secular title reflected their secular employment.  Applicants did not need any religious or spiritual beliefs or training, including a belief or training in Judaism, to be hired as chevre.  *See id.* ¶¶ 3, 18-24, 43, 47.  Once they received the job, chevre underwent

---

[8] Of course, there is a title that reflects ministerial training: "rabbi," meaning "teacher."  But, while one of the Bergs claimed the title rabbi, none of the Plaintiffs were rabbis or acted as rabbis.

[9] The Defendants argue that "the title is explicitly religious in nature" because "the role of Chevre is designated as a 'Religious Order.'"  MTD Br. at 19.  In support, the Defendants cite to Exhibit L to the Bloom Declaration, an improperly joined agreement between Ezra Michaeli and the Centre.  *See* MTD Br. at 5; *see also* Motion to Strike.  The Defendants reliance on facts not included in the complaint to alter the title assigned to the Plaintiffs is inappropriate.  *See Biel*, 911 F.3d at 608 n.2 (chastising the dissent for altering the plaintiff's title from "Grade 5 Teacher" to "Catholic school educator," because the latter title was not in the briefing).  Regardless, that the title "chevre" is sometimes modified by the designation "Religious Order" does not mean that the ministerial exception applies to the Plaintiffs.  *See Yin v. Columbia Int'l University*, No. 3:15-CV-03656-JMC, 2017 WL 4296428, at *5-6 (D.S.C. Sept. 28, 2017) (holding that the court could not conclude that the plaintiff was a minister even though her employment contract "describe[d] her as an 'associate professor' and 'faculty of the minister'" (citation omitted)).  Further, the Defendants' argument about the secular origins of "chevre" and "monk" is deceptive.  *See* MTD Br. at 19 n.20.  Merriam-Webster, the source the Defendants cite for the derivation of the word monk, makes clear that the word's religious connotation has existed since "before the 12th century."  *See* http://www.merriam-webster.com/dictionary/monk.  There are no allegations in the FAC or the Defendants' strawman complaint that "chevre" has had a religious meaning for over 900 years.

extensive training, "virtually none of [which] was religious in nature." *Id.* ¶ 48.  The training was almost entirely secular and almost entirely focused on fundraising.  *Id.* ¶¶ 3, 49; *see also id.* ¶ 48 (alleging that other trainings included how to order supplies, run a kitchen, and decorate).  Even most of the "religious training" was not actually religious.  Instead, the Centre taught its employees how to dress up their constant requests for money in the language of spirituality to increase donations.  *Id.* ¶¶ 54, 57.  Thus, it is unsurprising that when students asked chevre about the bits of spiritual "content" the Centre gave to chevre to use in their classes, the chevre were often unable to answer.  *See id.* ¶ 57; *see Morrissey-Berru v. Our Lady of Guadalupe Sch.*, 769 F. App'x 460, 461 (9th Cir. 2019), *cert. granted*, No. 19-267, 2019 WL 6880698 (Dec. 18, 2019) (finding that the ministerial exception does not apply when the plaintiff's "formal title" was "secular" and the plaintiff had no "religious credential, training, or ministerial background" except for one class); *Biel*, 911 F.3d at 608 (holding that the plaintiff was not a minister when her title had a secular "meaning," she had no religious background, and limited religious training); *R.G.*, 884 F.3d at 583 (finding that the ministerial exception does not apply when the plaintiff's title "conveys a purely secular function" and "[t]he record does not reflect that [the plaintiff] has any religious training"); *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (finding that the ministerial exception does not apply when the plaintiff "has no religious training or title").

Third, the Plaintiffs did not hold themselves out to be religious workers, in part because the Centre explicitly told them "never [to] describe the Centre as a religious institution, Kabbalah as a religion, or to discuss religion at all."  FAC ¶¶ 4, 45; *see Herx v. Diocese of Fort Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) (finding that the exception does not apply when the plaintiff did not hold herself out as a priest or minister); *Su*, 32 Cal. App. 5th at 1167 (concluding individuals did not hold

themselves out to be and were not held out to be ministers where they described themselves as teachers and where the "teachers [were] not required to adhere to the Temple's religious philosophy, to be Temple members, or, indeed, even to be Jewish").

Fourth, the chevre's responsibilities did not generally include important religious functions. Chevre spent most of their time raising money to be spent by or on the Individual Defendants. That raising funds was the chevre's most important responsibility is clearly demonstrated by the fact that the Defendants evicted those chevre who fell short of aggressive fundraising goals. *See* FAC ¶ 53. Chevre also provided free or cheap labor for the Defendants, cooking and cleaning, stocking and restocking inventory, maintaining the Centre's website, delivering food, fundraising, and shuttling Berg family members to extravagant meals, massages, and plastic surgery appointments. *See id*. ¶¶ 4-5, 8, 54-60, 72-73. The Plaintiffs, too, overwhelmingly performed non-religious jobs during their employment. They emceed events, worked as facilities managers, maintained the Defendants' IT systems, performed janitorial work, and ran an on-site bookstore. They also performed extensive tasks for the Bergs, walking their dogs, caring for their children, driving them around town, and fetching their food. *See id*. ¶¶ 4, 18-24, 48, 63, 73; *see R.G.*, 884 F.3d at 583 (finding that the exception did not apply when the plaintiff's work included "mostly secular tasks"); *Davis*, 985 F. Supp. 2d at 711 (holding that the ministerial exception does not apply when the plaintiff's primary duties, "maintenance, custodial, and janitorial work[,] were entirely secular").

### 4. The Defendants' Arguments Are Unavailing

The Defendants' motion is a motion for failure to state a claim under Rule 12(b)(6). It is directed at the pleadings. The Defendants should assume the truth of the allegations

of the FAC and argue that they are insufficient.  Here, the Defendants have instead offered their own facts or supposed facts and argued that on *those* facts the ministerial exception applies.  For example, the Defendants reference the Centre's mikvah, "that the truths founded in the wisdom of Kabbalah predate religion," the nature of the relationship between the chevre and their students, and the so-called "Chevre Agreement."  MTD Br. at 16 n.17, 17, 21 n.22, 23.

The Defendants repeatedly assert that the Plaintiffs ask this Court to evaluate whether Kabbalah is a religion, worthy of protection under the First Amendment.  *See, e.g.*, MTD Br. at 17 (stating that the Plaintiffs are "necessarily [ ] requir[ing the Court] to immerse itself in questions of religious doctrine"), 24 ("Ultimately, by bringing this action against the Centre, Plaintiffs ask that the Court do exactly what the Constitution prohibits: to analyze the theology underpinning the Chevre's abnegation of material possession and wages and the religious doctrines of Kabbalah . . . .").[10]  Nonsense.  The ministerial exception allows courts to avoid evaluating theology by focusing instead on whether the employer and employee are marked by clear and obvious religious characteristics.  *See R.G.*, 884 F.3d at 582-83.  The Plaintiffs merely ask the Court to find that, based on the FAC's allegations, the Centre is not a religious institution and the chevre are not ministers. This kind of inquiry has to be proper; otherwise, no plaintiff could bring an FLSA case against an employer claiming to be a religious institution.  That is not the law.  *See Sterlinksi v. Catholic Bishop of Chicago*, 934 F.3d 568, 570-71 (7th Cir. 2019) ("The

---

[10] The Defendants rely on *Penn v. New York Methodist Hospital*, 884 F.3d 416 (2d Cir. 2018) to support this argument.  *See* MTD Br. at 17.  *Penn* is inapposite because none of the concerns the Second Circuit raised in that case that led it to apply the ministerial exception are present in this case.  *See Penn*, 884 F.3d at 428.  For example, this case does not require the Court to evaluate how the Centre should conduct religious services or provide spiritual support, the importance of any particular religious practice to the chevre, or the Defendants' choice of one religious practice over another.  *See id.*

answer[, to when to apply Title VII to purported religious institutions and ministers,] lies in separating pretextual justifications from honest ones.").

a.    *The Defendants' Claims That The Centre Is A Religious Institution Are Contradictory And Unsupported*

The Defendants contend that "there can be no legitimate doubt that the Centre is covered by the ministerial exception because it is a religious organization." MTD Br. at 16. Yet, despite selectively and advantageously supplementing the FAC, the Defendants set forth very few factual allegations to support this assertion. One fact the Defendants primarily rely on is the Centre's "designat[ion] as a non-profit religious organization by the IRS," *id*. (footnote omitted),[11] a fact that the Defendants themselves acknowledge—as they must—is "*immaterial* for purposes of the ministerial exception." *Id*. at 16 n.16 (emphasis added); *see also Biel*, 911 F.3d at 603 (finding that the ministerial exception did not apply despite the defendant's nonprofit status).[12]

Otherwise, the Defendants' factual support is threadbare. Two allegations the Defendants cite, "the Jewish origin of Kabbalah" and "the Centre's *mikvah* (a 'jewish ritual bathing pool')," MTD Br. at 17, are both from the Original Complaint and, therefore, should not be considered in the Motion.[13] The other facts the Defendants refer to—the "sacred texts," the "commandments," the "ritual practices," and the "structured religious

---

[11] *See also* MTD Br. at 16-17 n.17 ("It bears emphasis that the Centre continues to be recognized by the IRS as a religious non-profit."), 18 ("As corroborated by the fact that the IRS has classified the Centre as a religious nonprofit . . . .").

[12] As set forth in the FAC, the IRS and the U.S. Attorney's Office for the Southern District of New York investigated whether the Defendants abused their nonprofit status to enrich the Bergs personally. The Plaintiffs are unaware whether this investigation is continuing or, if it finished, what its outcome was. *See* FAC ¶¶ 69-70.

[13] The Defendants are incorrect when they say, "Plaintiffs edited away their description of the Jewish origin of the Kabbalah." MTD Br. at 17. In fact, the *very first paragraph* of the FAC states that Kabbalah is "a form of Jewish mysticism." FAC ¶ 1.

leadership," MTD Br. at 18—are all vague, ambiguous, and undefined.  Even if the Court considers all these allegations, including those solely in the Superseded Complaint, the Defendants have still not met their burden, as these token references to religion pale in comparison to the overwhelming allegations that the Centre is the Bergs' personal piggybank.  *See R.G.*, 884 F.3d at 582 (concluding that a funeral home could not avail itself of the exception because it had "virtually no 'religious characteristics,'" even though the home's mission statement declared that "its highest priority is to honor God in all that we do as a company and as individuals" and it placed "'Daily Bread'" devotionals and "'Jesus Cards'" that quoted scripture on public display throughout the house (citations omitted)).

Any significance these supposed hallmarks of religion have is undermined by the Defendants' own arguments.  Most, if not all, of these characteristics are rooted in Judaism. Yet, the Defendants claim that the Plaintiffs' factual allegations that Judaism played little role in the Centre, *see* FAC ¶¶ 45, 47, are "irrelevant."  MTD Br. at 18 nn.18, 19.[14]  The

---

[14] The Defendants confusingly claim that the fact that chevre were careful to avoid referencing the Bible and the Hebrew alphabet, *see* FAC ¶ 45, is "entirely irrelevant" and "has no bearing on the analysis of the ministerial exemption."  MTD Br. at 18 n.19.  This is absurd.  Courts, including the Supreme Court, consider whether employees used religious texts in evaluating the ministerial exception's applicability.  *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 192 ("Once a week, she took her students to a school-wide chapel service, and—about twice a year—she took her turn leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible."); *Penn*, 884 F.3d at 425 ("The Department of Pastoral Care required chaplains, like Mr. Penn, to distribute Bibles, perform religious rituals and organize and conduct religious services, including Easter services and memorial services.").  Thus, whether a Hindu priest taught the Vedas is relevant in a case like *Shukla*, just as whether a group claiming derivatization from Judaism used the Bible or Hebrew is relevant here.

– 20 –

Defendants are trying to have it both ways, espousing Judaism when it is convenient and claiming it is "irrelevant" when it is not.[15]

The Defendants repeatedly try to minimize much of the evidence the Plaintiffs set forth that the Centre is not a religious institution by claiming that the Centre espouses "wisdom" that "predates religion," thus applying to people of "all religions," MTD Br. at 16-17 n.17,[16] and welcomes people of "other faiths" than Judaism or "none at all." *Id*. at 18 n.18. The Court should reject this argument. The Sixth and Seventh Circuits have made clear that this opportunistic embracing of religion does not warrant the application of the ministerial exception. Moreover, the Defendants' argument threatens to eviscerate the careful balance the ministerial exception strikes by decoupling it from the First

---

[15] The Defendants' contention that the fact that "Chevre were not required to be Jewish" is "irrelevant" is also incorrect. MTD Br. at 18 n.18; *see Su v. Stephen S. Wise Temple*, 32 Cal. App. 5th 1159, 1167, 244 Cal. Rptr. 3d 546, 552 (Ct. App. 2019), *reh'g denied* (Apr. 2, 2019), *review denied* (June 19, 2019) (finding that the ministerial exception did not apply because the synagogue employed as teachers practicing Jews, non-Jews, and those who identify with no faith); *see also Dias v. Archdiocese of Cincinnati*, No. 1:11-CV-00251, 2013 WL 360355, at *4 (S.D. Ohio Jan. 30, 2013) ("The Court reiterates its view that because Plaintiff, as a non-Catholic, was not permitted to teach Catholic doctrine, she cannot genuinely be considered a 'minister' of the Catholic faith. Plaintiff therefore retains her Title VII protection against pregnancy discrimination.").

[16] The Defendants misleadingly rely on *Fratello* and *Penn* to buttress this argument. They cite *Fratello* for the proposition that "the ministerial exception applies to organizations with 'spiritual' missions as much as explicitly 'religious' ones." MTD Br. at 16-17 n.17. However, they omit from their quotation of the school's mission the explicit reference to religion. *See Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 193 n.3 (2d Cir. 2017) (stating that the school's mission was, in part, to "prepare [its] students to become future leaders and responsible *stewards of God's creation*" (emphasis added)). The Defendants also ignore other explicit references to Catholicism that the Second Circuit relied on, including: (1) that the Archdiocese's school manual states that its "foundation and mission" is "formation in the faith, for the lived experience of Gospel values and for the preservation of Catholic culture," and training students "to be disciples of Jesus Christ;" (2) that it also says that "Gospel teaching is the fundamental element in the educative process;" and (3) that the Catholic Archdiocese charged the school to "advance [its] mission through . . . the explicit study of the Catholic faith." *Id*. at 193 (quotations, citations, and alteration omitted). The Centre lacks similar religious hallmarks.

Similarly, the Defendants cite *Penn* to show that the Centre is a religious institution even though it does not describe itself as such. They claim that *Penn* holds "that a hospital was governed by the ministerial exception despite referring to itself as 'now a secular institution' since it nonetheless 'was acting as a religious organization.'" MTD Br. at 16-17 n.17 (quoting *Penn*, 884 F.3d at 419). This mischaracterizes *Penn's* holding, which was limited to New York Methodist Hospital's "Department of Pastoral Care," the hospital division in which the plaintiff worked as a "Duty Chaplain." *Penn*, 884 F.3d at 418, 424 (holding that "NYMH is a 'religious group,' at least with respect to its Department of Pastoral Care"). Here, the ministerial exception does not apply to the entire Centre because the entire Centre has disavowed religion.

Amendment's protection of religious freedom and turning it into a protection of vaguely defined "wisdom" applicable to all peoples, regardless of whether they share a faith or belong to any faith at all.  *See Fratello*, 863 F.3d at 198-99 (describing the "balance" that the ministerial exception strikes "between [the] two core values underlying much of our constitutional doctrine and federal law: equal protection and religious liberty"); *see also Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring) (explaining that "[t]he First Amend-ment protects the freedom of religious groups to engage in certain key religious activities" and "[t]he 'ministerial' exception should be tailored to this purpose"); *Dias*, 2013 WL 360355, *4 (rejecting the defendants' "attempt to swallow up the ministerial exception"). If the Defendants were right, then programs in stoicism or other practical philosophy, clas-ses on meditation or mindfulness, or other entities aimed at helping people lead better lives would all be within the ministerial exception, even without any religious content.

      b.    *The Defendants' Arguments That The Chevre Are Ministers Are Deceptive And Baseless*

The Defendants rely on cherry-picked factual allegations to support their argument that chevre are ministers.  Specifically, they rely on: (1) the "explicitly religious [ ] nature" of the title "chevre," MTD Br. at 19; (2) the chevre's purported monastic life, including the code of conduct, their vow of poverty, their adoption of new names, and communal living, *see id*. at 19, 21, 23-24; (3) the chevre's minimal and cursory religious teaching, *see id*. at

22; and (4) the chevre's so-called religious training, *see id.* at 23-24 n.25.[17]  Even assuming

the Defendants correctly describe these facts, they are insufficient to establish that the

Plaintiffs are ministers.  An employee's status as a minister is evaluated holistically after

"assessing," as the Supreme Court emphasized, "both the amount of time spent on religious

functions and 'the *nature* of the religious functions performed.'"  *Biel*, 911 F.3d at 609

(quoting *Hosanna-Tabor*, 565 U.S. at 194); *see also Morrissey-Berru*, 769 F. App'x at 461

(reaching the conclusion that the district court erred in finding that the plaintiff was a

minister after "[c]onsidering the totality of the circumstances in th[e] case").  The totality

of the circumstances set forth in the FAC make clear that the chevre are not ministers.

Religion only factored into the chevre's jobs on limited occasions and in

insubstantial ways.  The religious training that the chevre received—including instruction

on "how to guide the 'journey' on which the Centre claimed [its] students should go" and

the provision of "scripts" from which the chevre could read in class, FAC ¶¶ 54, 57—was

mostly pretext, specifically designed to hide the Bergs' true, selfish motivations.  But, even

if the invocation of religion was genuine, the cursory *nature* of the religious instruction is

such that the chevre cannot qualify as ministers.  *Cf. Biel*, 911 F.3d at 609 (concluding that

an employee was not a minister despite teaching the Catholic faith four days a week).  The

same is true of the teaching done by the chevre.  Religion did not factor into most of the

---

[17] The Defendants argue in a footnote that "[t]he Court should consider the allegations made in the Original Complaint which were removed by Plaintiffs in the [FAC] and replaced with contradictory statements." MTD Br. at 20 n.21. The Defendants do not cite any allegations that they allege are contradictory and should not be permitted to do so on reply.  *See Knipe v. Skinner*, 999 F.2d 708, 710-11 (2d Cir. 1993).  Moreover, as explained above, the fact that the Plaintiffs omitted certain information in the FAC "do[es] not warrant the rare action of disregarding the Amended Complaint."  *Diaz v. Local No. 241*, No. 17-CV-8898, 2019 WL 3765924, at *3 (S.D.N.Y. Aug. 8, 2019) (quotation and citation omitted).

classes and, when it was invoked, it was almost exclusively pretext for obtaining more donations.

Courts have recognized that minor amounts of religious teaching or training in the context of predominantly non-religious work is insufficient to invoke the ministerial exception.  In *Biel*, the Ninth Circuit held that a teacher was not a minister even though she had a half-day of religious training, taught "Catholic religious education . . . from a book required by the school," and "incorporat[ed] religious themes into her other lessons."  911 F.3d at 605, 609; *see also Herx*, 48 F. Supp. 3d at 1177 (stating that "[l]abeling [the plaintiff] a 'minister'" based on her supervision of and attendance and participation in religious services with her students "would greatly expand the scope of the ministerial exception");[18] *Davis*, 985 F. Supp. 2d at 711 (finding that the plaintiff was not a minister even though "he instructed students in [the defendant's] religious school about the significance of a religious object such as the Sukkah after he set it up"); *Su*, 32 Cal. App. 5th at 1168 (holding that the teachers were not ministers though they had "a role in transmitting Jewish religion and practice to the next generation" and were "responsible for implementing the school's Judaic curriculum by teaching Jewish rituals, values, and

---

[18] The similarities between the plaintiff in *Herx* and the chevre are instructive.  The Court explained why the ministerial exception was inapplicable:

> Nothing in the summary judgment record suggests that Mrs. Herx was a member of the clergy of the Catholic Church. Mrs. Herx has never led planning for a Mass, hasn't been ordained by the Catholic Church, hasn't held a title with the Catholic Church, has never had (and wasn't required to have) any religious instruction or training to be a teacher at the school, has never held herself out as a priest or minister, and was considered by the principal to be a "lay teacher." The religion teachers for the Diocese schools have different contracts than the non-religion teachers and are required to have religious education and training. For example, Cynthia Wolf, a religion teacher in the Diocese, has a Master's Degree in Theology. Labeling Mrs. Herx a "minister" based on her attendance and participation in prayer and religious services with her students, which was done in a supervisory capacity, would greatly expand the scope of the ministerial exception and ultimately would qualify all of the Diocese's teachers as ministers, a position rejected by the *Hosanna–Tabor* Court.

*Herx*, 48 F. Supp. 3d at 1177.

holidays, leading children in prayers, celebrating Jewish holidays, and participating in weekly Shabbat services").[19]

Further, the Defendants misleadingly present many of the facts on which they rely. For example, the Defendants claim that the chevre are ministers because they live like monks or nuns. *See* MTD Br. at 14, 19 n.20, 21, 23, 24. This is disingenuous for several reasons. The lives of monks and nuns are not marked solely by vows of poverty, communal sequestration, and the adoption of the titles Brother and Sister. *See id.* They dedicate their lives to their religions, placing their chosen faith above all else. They are cloistered to remove themselves from earthly temptations so that they may focus on prayer and study. In a monastery, the monks are under the authority of a superior and they may engage in economic activity to benefit the community. But, the superior lives under the same rules as the monks, and their labor is for the benefit of the community, not the superior himself. To the extent they engage in commercial activity, those activities follow their own rules detached from the larger economy. *See Schleicher v. Salvation Army*, 518 F.3d 472, 476 (7th Cir. 2008) ("No one could think the curious precapitalist economy of a monastery an ordinary commercial activity actuated by a business purpose");[20] *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 128 (3d Cir. 2002) ("The nuns used the convent to receive daily instruction on religious life, engaging in prayer for up to two and a half hours per day."); *United States v. Kahane*, 396 F. Supp. 687, 694 (E.D.N.Y. 1975), modified sub

---

[19] The Defendants contend "that the ministerial exception should be viewed as a sliding scale." MTD Br. at 22 n.24 (citing *Penn*, 158 F. Supp. 3d at 182). Thus, even if the Court finds credence in the Defendants' arguments that the chevre engaged in tasks that are ordinarily religious, they still do not qualify as ministers due to the overwhelmingly non-religious nature of the Centre.

[20] The Defendants use *Schleicher* to support their argument that the chevre are monks. *See* MTD Br. at 24. As set forth above, this is untrue. The Defendants also rely on this case to support their argument that the ministerial exception applies here. In *Schleicher*, the Salvation Army was "acknowledged to be a completely legitimate church." *Schleicher*, 518 F.3d at 478. Here, the FAC is replete with allegations that the Centre was anything other than legitimate.

nom. *Kane v. Carlson*, 527 F.2d 492 (2d Cir. 1975) (noting that "monks in cloisters" have an "orderly and disciplined daily ritual of prayer, meditation, mass and communal meals" that is "separated from" "earthly life"); *De La Salle Inst. v. United States*, 195 F. Supp. 891, 902 (N.D. Cal. 1961) (noting that monks "endeavor to think religious thoughts and live by their religious creed at all times").  In contrast, the chevre are dedicated to serving and enriching the Bergs.  They are cloistered so that they may be easier to control and at the Bergs' beck and call.  Rather than being removed from earthly temptations, the chevre are surrounded by them, only those temptations are reserved for the Bergs, who, unlike the chevre, are not required to take a vow of poverty to show their piety.  Rather than being removed from the larger economy, they are integrated into it, as the Centre is a well-oiled money raising machine.  *See* FAC ¶¶ 4-5, 8, 18-19, 21, 23, 48, 54-60, 72-74.[21]

The Defendants also bolster their claim that the chevre were ministers by relying on purported admissions by Ezra Michaeli and Greene.  According to the Defendants, Ezra Michaeli identified herself in her visa application as a "'religious worker whose life is dedicated to religious practices and functions, as distinguished from secular members of the religion,'" MTD Br. at 21-22 (emphasis and alterations omitted), and Greene wrote that as "a 'Kabbalistic raconteur' [he] would 'spend his days meeting with students and guiding them through their challenges, using Kabbalistic teachings' on a 'mission to change the world and bring about it's entire redemption.'"  *Id*. at 22 (alterations omitted).  The Court

---

[21] Similarly, the Defendants argue that "Plaintiffs nonetheless allege that they understood their role as Chevre to be 'spiritual workers who were to help enlighten humanity to the teachings of the Kabbalah'; that they joined the Religious Order in order to 'work together to build a bright future'; and that they believed the Centre's purpose was performing good works and spreading spiritual wisdom.'"  MTD Br. at 20 (citing FAC ¶¶ 1, 76, 320, 329, 338, 347) (alteration omitted).  In their proper context, these allegations show that the Defendants represented to the Plaintiffs that their work as chevre would be spreading Kabbalah but, in reality, they were cut off from the outside world and dependent upon the Defendants for their survival, all for the purpose of serving the Bergs.  *See* FAC ¶¶ 1, 76, 320, 329, 338, 347.

cannot consider these statements in the context of this motion, which is a motion directed to the sufficiency of the pleadings.  But, the allegations do not alter the fact that the Plaintiffs were not ministers.  The statements Ezra Michaeli made in Israel about her expectation of what she would do in the United States have no bearing on what she did when she arrived.  *See* FAC ¶ 23.[22]  No one who knew what the Plaintiffs know now about the real work and living conditions of the chevre would have wanted to become one.  Moreover, that Kabbalah was part of Greene's teaching, does not mean that religion dominated his job or that Kabbalah was a substantial part of his lessons.  *See Morrissey-Berru*, 769 F. App'x at 461 (concluding that the plaintiff was not a minister even though she had "significant religious responsibilities as a teacher").

Additionally, the Defendants' reliance on a U.S. Department of Labor Opinion Letter (the "Letter"), *see* MTD Br. at 14 & n.14, 22-24, is inapposite.  Agency opinion letters interpreting common law are not entitled to any deference.  *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 643 n.11 (2007) ("Agencies have no special claim to deference in their interpretation of [judicial] decisions."); *Christensen v. Harris*

---

[22] The Defendants claim that based on her visa application, Ezra Michaeli is estopped from claiming she was not a minister.  MTD Br. at 22 n.23.  Nonsense.  First, as set forth above, Michaeli made statements about what she intended her work to be in the United States, not what it was.  *See Arboireau v. Adidas-Salomon AG*, 347 F.3d 1158, 1166 n.10 (9th Cir. 2003) ("Appellants argue that the misrepresentations in the visa applications justify judicially estopping the Appellees from challenging the falsity of the representations on the visa applications. But there was no falsity in the visa applications. Appellants' citation to the Mignano deposition that the Appellees did not 'have an expectation that ... [Arboireau] would work in the United States for three years' is misleading unless read in conjunction with Mignano's testimony clarifying his definition of 'expectation.' Moreover, these representations do not meet the standard of being 'tantamount to a knowing misrepresentation to or even fraud on the court' necessary for judicial estoppel.  There are no grounds for judicial estoppel.").  At worst, Ezra Michaeli made a good faith mistake, which cannot form the basis of an estoppel claim.  *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 n.2 (2d Cir. 1999) ("We have recognized that judicial estoppel does not apply when the first statement resulted from a good faith mistake or an unintentional error." (quotation and citation omitted)).  Second, estoppel only applies to statements made to tribunals, and the Defendants have not shown that a visa application is a tribunal.  *See id*. at 6.  Third, the affirmative defense of estoppel may not be raised based on documents wrongly attached to a factual declaration submitted in opposition to a motion to dismiss.  *See Pu v. Russell Publ'g Grp., Ltd.*, No. 15-CV-3936 (VSB), 2016 9021990, at *7 (S.D.N.Y. Sept. 2, 2016), *aff'd*, 683 F. App'x 96 (2d Cir. 2017); *see also* Motion to Strike.

– 27 –

*Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters . . . do not warrant *Chevron*-style deference." (citations omitted)); *Gibbs v. City of New York*, 87 F. Supp. 3d 482, 496 n.18 (S.D.N.Y. 2015) (explaining that the Department of Labor's "practical guide" to the FLSA is not a definitive interpretation of the FLSA and courts are not bound by such interpretations). Even if the Letter warranted some deference, it is inapplicable on the facts, as it pertains to an organization that was trying to establish a community that "emulate[d] the early Christian communities described in the Book of Acts." *See* Letter, 2018 WL 6839426, at *1. The Defendants—with their use of CRM software to track donations, pop self-help gurus, multi-million dollar mansions, private jets to Ibiza, and plastic surgery, *see* FAC ¶¶ 50, 51, 63, 66—cannot be said to be like an "early Christian community."

The Defendants argue that the Plaintiffs' common law claims must also be dismissed as a result of the ministerial exception. This is incorrect. At the motion to dismiss stage, a common law claim against a purported religious institution will not be dismissed if "it is not entirely clear that resol[ving]" the "claim will require anything other than 'neutral methods of proof.'" *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 49 (D.D.C. 2017). Here, the Plaintiffs' common law claims require the Court to do what courts do every day: determine whether the Defendants fraudulently induced the Plaintiffs to become chevre and, thereby, unjustly enriched themselves. Thus, they should survive even if the wage-and-hour claims do not.[23] *See Sumner v. Simpson Univ.*, 27 Cal. App. 5th 577, 594,

---

[23] The Defendants rely on a sundry of other cases to support their argument. Each of them is easily distinguished from this case. In *Moreno v. Episcopal Diocese of Long Island*, "[t]here [was] no dispute that Plaintiff both held himself out as a minister to his congregants and predominantly engaged in religious functions," and the plaintiff "admitted[ ]" in his complaint that the defendant Episcopal Diocese is "a traditional religious organization within the meaning of the exception." No. 14-CV-7231 (JS)(AKT), 2016 WL 8711448, at *9 (E.D.N.Y. Jan. 20, 2016), *report and recommendation adopted*, 2016 WL 8711394 (E.D.N.Y. Mar. 4, 2016). Similarly, in *Shukla* and *Minagorri*, the parties conceded that the employee was a minister. *See Shukla v. Sharma*, No. 07-CV-2972 (CBA), 2009 WL 10690810, at *5 (E.D.N.Y. Aug. 21, 2009), *report and*

238 Cal. Rptr. 3d 207, 221 (Ct. App. 2018), *reh'g denied* (Oct. 23, 2018), *review denied* (Jan. 2, 2019) (ministerial exception did not bar breach of contract claim for termination of minister by religious institution where termination was for insubordination, not religious reasons); *Friedlander v. Port Jewish Ctr.*, 588 F. Supp. 2d 428, 431 (E.D.N.Y. 2008), *aff'd*, 347 F. App'x 654 (2d Cir. 2009) ("As the Plaintiff points out, the ministerial exception plainly does not create for religious institutions a charmed existence free from liability for 'their torts and upon their valid contracts.'").

### C.  The Centre is a Covered Enterprise Under the FLSA

The employees of an enterprise are covered by the FLSA when that enterprise has an "annual gross volume of sales made or business done [that] is not less than $500,000," and *some* employees that are: "(1) engaged in commerce; (2) engaged in the production of goods for commerce; or (3) engaged in handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce." *Boekmeier v. Fourth Universalist Soc'y*, 86 F. Supp. 2d 280, 285 (S.D.N.Y. 2000). The Defendants do not contest the volume of sales made or business done by the Centre. They argue instead that the Centre is not a covered enterprise under the FLSA because it qualifies for the exemption

---

*recommendation adopted*, 2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009) (noting also that the plaintiff led "all devotional prayers at the Ashram and congregants' homes" and that the allegations demonstrated that the Ashram was "an institution with substantial religious character" (quotation and citation omitted)); *Archdiocese of Miami, Inc. v. Minagorri*, 954 So. 2d 640, 642 (Fla. Dist. Ct. App. 2007). In *Rweyemamu*, *Nevius*, and *Morris*, the employees' duties were either entirely or materially religious in nature. *See Rweyemamu v. Cote*, 520 F.3d 198, 209 (2d Cir. 2008) (stating that the duties of the employee, an ordained Roman Catholic priest, were determined by "Catholic doctrine"); *Nevius v. Afr. Insland Mission Int'l*, 511 F. Supp. 2d 114, 119-20 (D.D.C. 2007) ("As evidenced by the plain language of the complaint and the documents incorporated therein, Nevius's duties certainly involved a material element of 'teaching' and 'spreading the faith.'"); *Morris Cerullo World Evangelism v. Superior Court of San Diego Cty.*, No. D038029, 2001 WL 1654473, at *11 (Cal. App. Dist. Dec. 12, 2001) (unpublished) (stating that "[n]one" of the employee's "duties can strictly be characterized as purely secular in nature"). Finally, *German v. Pope John Paul II*, 211 A.D.2d 456 (1st Dep't 1995), is not a ministerial exception case.

at 29 C.F.R. § 779.214, which applies to not-for-profit institutions that "[are] not engaged in commerce or in the production of goods for commerce" because they engage in "non-profit educational, religious, and eleemosynary activities" and do not compete in the commercial marketplace.  MTD Br. at 25-26.[24]  But the Plaintiffs' allegations make clear that the Centre is actually a *for*-profit institution for purposes of the FLSA, without religious or charitable endeavors, and *is* "(1) engaged in commerce; (2) engaged in the production of goods for commerce; or (3) engaged in handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce."[25]  *Boekmeier*, 86 F. Supp. 2d at 285.

### 1.    The Corporate Defendants Are Not A Not-for-Profit Institution

The Plaintiffs' allegations establish that the Centre is in fact a common enterprise, consisting of for-profit and not-for-profit entities, and that this common enterprise is liable for the chevre's employment within the meaning of the FLSA.  When determining the existence of a common enterprise for liability purposes, courts consider factors such as whether the corporate entities: "(1) maintain officers and employees in common, (2) oper-ate under common control, (3) share offices, (4) commingle funds, and (5) share

---

[24] The Defendants argue that the Plaintiffs' state wage-and-hour claims fail because they performed services for a religious institution.  *See* MTD Br. at 25-26 n.26.  However, as explained previously, the Centre was not a religious institution, *see* supra § III.A, and, accordingly, the Plaintiffs' state wage-and-hour claims are well-pleaded.  The Defendants also claim that the chevre were volunteers.  *See* MTD Br. at 14 n.14, 25-26 n.26.  But *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761 (6th Cir. 2018), which the Defendants cite for this proposition, makes clear that the chevre were employees.  In *Acosta*, the court specifically noted that "the volunteers were not economically dependent upon [the defendant] is any way . . . [and] neither expected nor received any wages or in-kind benefits in exchange for their service."  *Id.* at 766.  The Centre ensured that the chevre were dependent on it, *see* FAC ¶¶ 77-89, and explicitly promised them in-kind benefits.  *See id.* ¶ 76.

[25] The Defendants do not dispute that they are subject to the FLSA under this prong, probably because the Plaintiffs' allegations make clear that they are.  *See* FAC ¶¶ 127-34.

advertising and marketing." *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 365 (S.D.N.Y. 2019) (citation omitted).  "No single factor is dispositive." *Id.* at 365.

The Plaintiffs' allegations easily satisfy these factors.  They allege that: (1) the Centre itself defines the Corporate Defendants as related entities with which the chevre have a relationship through their role as chevre; (2) the Corporate Defendants operate as a single entity; (3) the Corporate Defendants are collectively under the common control of the Bergs; (4) the Individual Defendants do not distinguish between their assets and those of the Corporate Defendants; (5) the Individual Defendants do not differentiate between the Not-for-Profit Affiliated Entities and the For-Profit Affiliated Entities; (6) all three For-Profit Affiliated Entities share an address with two of the Not-for-Profit Affiliated Entities; (7) the donations solicited by chevre for the Not-for-Profit Affiliated Entities were used by the For-Profit Affiliated Entities for for-profit purposes; (8) the Bergs made investments through the For-Profit Affiliated Entities while using funds from the Not-for-Profit Affiliated Entities, even though the For-Profit Affiliated Entities were supposedly independent from the Not-for-Profit Affiliated Entities; and (9) the Plaintiffs are former employees of the enterprise, which includes the Not-for-Profit Affiliated Entities and the For-Profit

Affiliated Entities.  *See* FAC ¶¶ 1-2, 6, 10, 25-26, 30-32, 34-35, 44, 62.[26]  Because the

Corporate Defendants are not a not-for-profit institution, they do not meet the requirements

of 29 C.F.R. § 779.214 and cannot invoke it to escape liability under the FLSA.

The Defendants' claim of ignorance of the chevres' relationships with the For-

Profit Affiliated Entities is disingenuous.  The Plaintiffs allege in the FAC that the agree-

ments that the Defendants require each chevre to sign before the chevre are allowed to

leave the Centre specifically name each For-Profit Affiliated entity as a "related entit[y]"

with which the chevre had a relationship, *see* FAC ¶ 34. Indeed, the Defendants attached

one of these agreements, with just such a provision, to their motion to compel arbitration.

*See* Defendants' Motion to Compel Arbitration, Ex. D at 9 (Dkt. 50-6) ("Shoshan

---

[26] The Defendants assert improper joinder and challenge Greene's and Ezra Michaeli's Article III standing to sue the For-Profit Affiliated Entities.  *See* MTD Br. at 3 n.3, 16 n.16.  But as the Plaintiffs' allegations make clear, chevre labored for the benefit of a common enterprise that included the For-Profit Affiliated Entities.  "Where multiple corporate entities operate a 'common enterprise,' each of the interrelated companies may be held liable for the actions of the other.  As a result, complaints alleging the liability of a common enterprise need not allege that each defendant committed a particular unlawful act."  *Debt Resolve, Inc.*, 387 F. Supp. 3d at 365 (internal citation omitted).  Moreover, after claiming that the For-Profit Affiliated Entities are improperly joined, the Defendants make no other argument that they are not liable, assuming the truth of the allegations in the FAC.  If, therefore, the Court concludes that the For-Profit Affiliated Entities are properly joined, the Defendants have waived any argument for dismissal at this stage. This is a particular problem for the Defendants, because even if the Court does not conclude that the Defendants constitute a common enterprise, dismissal of the For-Profit Affiliated Entities would be inappropriate at this stage, as the Defendants should not benefit from their purposefully opaque corporate structure.  *See Hallmark Aviation Ltd. v. AWAS Aviation Services, Inc.*, No. 12-CV-7688 (JFK), 2013 WL 1809721, at *7 (S.D.N.Y. Apr. 30, 2013) ("The Court declines to dismiss the complaint because of the confusion over Defendant's corporate structure.").

Agreement").  The Defendants should not be permitted to claim that chevre did not perform services for these entities when the Defendants have themselves stated that chevre did.

### 2.    The Centre's Activities Are Neither Religious Nor Charitable

Even if the Corporate Defendants were a not-for-profit institution, 29 C.F.R. § 779.214 would still not shield them from liability, because the Defendants do not meet its additional requirements.[27]

First, the Centre's activities are not religious.  The Defendants claim that the Centre provides "spiritual" services and spreads "the wisdom and teachings of Kabbalah," which they claim are religious activities.  MTD Br. at 26; *see id*. at 16-17 & n.17.  But the Defendants' invocation of the word "religion" when it suits them does not actually make them a religious institution performing religious activities.  As the Plaintiffs explain in more detail *supra*, the Centre explicitly disclaims religious status, and the "classes" it offers are not religious in nature.

Second, the Centre's activities are not charitable, notwithstanding the Defendants' self-serving statement that "fundraising from students are charitable activities."  MTD Br. at 27.  The Centre's operation as a family slush fund is evident from the fact that cash donations to the Centre have financed the Bergs' multi-million dollar residences, such as mansions in Beverly Hills, a townhouse in Manhattan, and luxury apartments above the Centre's New York City location, real estate investments, stock purchases, credit card spending, hotel indulgences, such as room service, in-room movies, and mini bar

---

[27] The Defendants cite *Jones v. SCO Family of Services*, 202 F. Supp. 3d 345 (S.D.N.Y. 2016) to suggest that a not-for-profit entity is not a covered enterprise under the FLSA *unless* it is "one of the categories of institutions explicitly covered by the FLSA, such as a hospital, school, transit carrier, or public agency."  MTD Br. at 26.  This is not the law.  A not-for-profit has no exemption from FLSA coverage unless it "performs religious, educational, or charitable activities" that do not "compete in the marketplace with ordinary commercial enterprises."  *See Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 87 (E.D.N.Y. 2010).  *Jones* concerned a different provision of the FLSA regarding not-for-profits, 29 U.S.C. § 203(r)(2). *See Jones*, 202 F. Supp. 3d at 349-50.

purchases, K. Berg's personal American Express bills, K. Berg's and Philip Berg's Las Vegas casino outings, and K. Berg's fancy shoes and jewelry. *See* FAC ¶¶ 10, 46, 62-67, 74. In-kind donations for the Bergs have taken the form of private plane rides, jewelry and couture handbags, trips to Ibiza, Spain, and Punta Cana, Dominican Republic, spa vacations, plastic surgery, and the use of luxury vehicles (in which the Bergs are chauffeured by chevre). *See id*. ¶¶ 65-66. The Defendants cannot reasonably claim that these expenditures and in-kind contributions constitute charitable donations, much less that they further the Centre's "mission." Because the Centre's activities are not of the kind specified in 29 C.F.R. § 779.214, the exemption does not apply to the Defendants.

### 3. The Centre's Revenue-Generating Activities Compete in the Commercial Marketplace

Even if the Centre were a not-for-profit within the meaning of 29 C.F.R. § 779.214, the Centre would remain subject to FLSA enterprise coverage because it engages in commercial activity that competes in the marketplace. *See Bowrin v. Catholic Guardian Soc'y*, 417 F. Supp. 2d 449, 459 (S.D.N.Y. 2006) (citing *Tony and Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 297 n.14).

First, the Centre's ultimate purpose of enriching the Bergs was realized in part through programs and services such as "classes" and "events," which enabled the Centre to extract additional money from its students. *See* FAC ¶¶ 5, 21, 43, 51, 54, 57-59. As explained in *Walker v. The Interfaith Nutrition Network, Inc.*, No. 14-CV-5419 (DRH)(GRB), 2015 WL 4276174, at *3 (E.D.N.Y. July 14, 2015), a case the Defendants rely on, one key consideration in determining whether such an activity is commercial is the extent to which it competes in the marketplace, "for example, through advertisement or solicitation." This measure of commercial activity underscores the commercial nature of

the Defendants' activities and the Defendants' awareness that they were competing with other such classes and events.  For example, in the Unfair Competition Complaint, the "unfair competition" of which the Centre complains is that of a "new commercial venture," which it characterizes as a "business" that is "competing" with the Centre.  *See* Unfair Competition Complaint ¶¶ 40-42.  The Centre explains that:

- [The Centre] has invested a substantial amount of time, money and other resources advertising, promoting and marketing its goods and services, including through the use of its website located at www.kabbalah.com, where visitors can obtain information about [the Centre] and [the Centre]'s various services and programs, as well as [Centre] products for sale.
- Over the past approximately twenty (20) years, [the Centre] has expended millions of dollars advertising, promoting and marketing its programs, products and services and has experienced tremendous success.
- [The Centre] advertises and promotes its programs, products and services through its website [and] print media . . . .
- [The Centre]'s promotional efforts, along with the high quality of the programs, products and services themselves, have made [the Centre]'s programs, products and services extremely popular.
- Through [the Centre's] extensive use, advertising and promotion of its marks and trade dress . . . .

Unfair Competition Complaint ¶¶ 18, 22-25.

Second, in the Shoshan Agreement, the Defendants describe themselves as a "Company" that has "proprietary information," "proprietary business information," and "trade secret[s]."  Shoshan Agreement ¶¶ 7-9.  Moreover, the Defendants insisted on an additional "Confidential and Proprietary Information Agreement" ("CPIA"), annexed to the Shoshan Agreement.  *See* Dkt. 50-6 at 9.  The CPIA concerns "proprietary information relating to

the present or future business, operations, activities, services, or products of the Centre,"

and defines "confidential information" to include:

> [F]inancial and other business information of the Centre or its Affiliates which has not been made publicly available, including but not limited to business methods, operations, activities, programs, curricula, products, services, designs, training materials, fundraising and program development or other business activities and strategies, information regarding any current, former, or potential donor or financing source (including information regarding gift capacity), plans, analyses, proposals, business contacts and partners, distributors, vendors, research and development activities and plans, sales and marketing activities and plans, technical data, reports or other compilations of data . . . ."

CPIA § 1(a), Dkt. 50-6 at 10.


Third, the Centre sells merchandise that is not religious, *see* FAC ¶ 134, and the

Defendants do not contest that such items compete in the commercial marketplace. *See*

MTD Br. at 4 n.6. Rather, they try to imbue the merchandise with some religious associa-

tion by claiming that the merchandise is "related" to the Centre's "spiritual practices." *Id.*

They point to a "religious meaning" behind a children's book, authored by Madonna, for

sale on the Centre's website, and attempt to equate branded baseball caps and diamond

jewelry with the wafers used in a Catholic mass. *See* MTD Br. at 27.[28] Under the Defend-

ants' reasoning, any object is a religious object that does not compete in the commercial

marketplace if a consumer can find a use for it in his religious practice. In reality, however,

merchandise like baseball caps, diamond jewelry, and children's books are available from

any number of competing sellers, and the Defendants acknowledge that they have, for

---

[28]*Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 87-88 (E.D.N.Y. 2010), on which the Defendants rely for this absurd comparison, also was premised on a finding that the defendant in that case was a not-for-profit organization, which, the Plaintiffs argue, is not the case here. *See Locke*, 690 F. Supp. 2d at 87.

years, aggressively and persistently promoted their wares in the marketplace.  *See* Unfair

Competition Complaint ¶ 22.

Fourth, the very DOL regulation on which the Defendants rely for their claimed

exemption shows that the type of additional commercial activities in which the Defendants

engage, such as their operation of a film studio, *see* FAC ¶ 134, do *not* qualify for the

exemption.  *See* 29 C.F.R. § 779.214 ("Thus, where such organizations engage in ordinary

commercial activities, *such as operating a printing and publishing plant*, the business ac-

tivities will be treated under the [FLSA] the same as when they are performed by the ordi-

nary business enterprise.") (emphasis added).

### 4.    The Centre Meets The FLSA's Commerce Requirement

Finally, the Defendants argue, somewhat cursorily, that the Centre does not meet

the commerce requirement for FLSA enterprise coverage because the Plaintiffs have not

properly alleged that either Greene or Ezra Michaeli were engaged in this commerce.  *See*

MTD Br. at 28 n.27.  As explained *infra*, the Plaintiffs have made numerous allegations

about Greene and Ezra Michaeli's involvement, but Greene and Ezra Michaeli's personal

involvement is also irrelevant to establishing FLSA enterprise coverage.  "[A]s long as the

employer achieves an annual gross business volume of $500,000 or more, *all* of the em-

ployer's employees are covered under the [FLSA] so long as at least *some* handle, sell, or

otherwise work on goods or materials that have been moved in or produced for commerce."

*Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 190-91 (E.D.N.Y. 2015) (quoting *Jones*

*v. E. Brooklyn Sec. Servs. Corp.*, No. 11-CV-1021 (JG)(SMG), 2012 WL 3235784, at *4

(E.D.N.Y. Aug. 7, 2012) (citing 29 U.S.C. § 203(s)(1)(A)(i)-(ii))) (emphasis in the original).

### D.   Greene and Ezra Michaeli Also Are Covered Individuals Under the FLSA[29]

Greene and Ezra Michaeli additionally are protected by the FLSA because they qualify as covered individuals within the meaning of the statute. *See* 29 U.S.C. § 207(a)(1). "Under the FLSA's individual coverage provision, any employee 'engaged in commerce or in the production of goods for commerce' is covered by the [FLSA]." *Bowrin v. Catholic Guardian Soc'y*, 417 F. Supp. 2d 449, 465 (S.D.N.Y. 2006). "[A]n employee is engaged in commerce when," for example, "regularly using the mails and telephone for interstate communication, or when regularly traveling across state lines while working." *Id.* (citing 29 C.F.R. § 779.103). These activities may be "performed to, *inter alia*, obtain or communicate information, or to order goods or services across state lines." *Id.* at 468 (citing 29 C.F.R. § 776.10).[30]

Although the FAC specifies in detail how Greene and Ezra Michaeli engaged in commerce or in the production of goods for commerce, *see* FAC ¶¶ 18, 23, 59, 128, 130, the Defendants ignore those allegations and instead point to the FAC's descriptions of the Centre's overall operations. *See* MTD Br. at 29. Oddly, they quibble about the precise order in which the Plaintiffs' allegation appear. *See id.* at 29 n.28. It is uncontested that Greene worked for the Centre as a fundraiser and emcee. FAC ¶ 18. The Defendants try to avoid

---

[29] The Defendants challenge only Plaintiffs Greene's and Ezra Michaeli's individual coverage allegations, and have waived any challenge as to O. Shaal, J. Shaal, Shoshan, Stone, or Shmilovich.

[30] *Walker* and *Jones*, which the Defendants cite, are not to the contrary. Indeed, *Walker* itself recognizes that, for example, "employees engage in commerce when their duties require regular and recurrent telephone use for interstate communication," *Walker*, 2015 WL 4276174, at *5 (quotation marks omitted), as the Plaintiffs allege for Ezra Michaeli, *see* FAC ¶¶ 59, 130. The Plaintiffs also make similar allegations for other Plaintiffs. For example, they allege that Stone made upwards of a hundred calls a day. *See id.* ¶ 129.

the obvious connection, however, by suggesting, incorrectly, that, (1) those roles were un-related to the specific allegations about Greene's recurrent travel to multiple states—in-cluding New York, Florida, and Texas—each year, *see id.* ¶ 128, or (2) that his fundraising had no relationship to his production of books and DVDs, sold throughout the United States, that generated income for the Centre.  *See id.*  Similarly, the Defendants would have the Court believe there is some disconnect between the allegation that Ezra Michaeli "spent [her] days conducting telemarketing calls," *id.* ¶ 59, and the allegation that she made those telemarketing calls from California to Arizona and the East Coast, that she documented the results in the Centre's CRM, and that she also traveled monthly to Arizona for related tasks. *See id.* ¶ 130.  The Defendants conclude by claiming that Greene and Ezra Michaeli have made no allegations specific to themselves, *see* MTD Br. at 29-30, but, as this section demonstrates, that is simply not true.  No rule of pleading requires plaintiffs to plead their factual allegations in precisely the order and manner the defendant thinks best.  *See Hochroth v. William Penn Life Ins. Co. of New York*, No. 03-CV-7286 (RJH)(HBP), 2003 WL 22990105, at *1 (S.D.N.Y. Dec. 19, 2003) ("It is well established that the plaintiff is the 'master of his complaint'").  There is more than enough in the FAC to compel the conclusion that Greene and Ezra Michaeli are covered individually under the statute.

### E.     The Plaintiffs Sufficiently Pleaded Common Law Claims

#### 1.     The Plaintiffs' Unjust Enrichment Claims Are Sufficient

The Plaintiffs allege that the Defendants were unjustly enriched because they benefited from years of unpaid labor.  They bring these claims under the laws of four

states.[31]  In three of those states—New York, Illinois, and Florida—the Plaintiffs only need

to allege that the Defendants were enriched at the Plaintiffs' expense and that the

circumstances are such that in equity and good conscience, the Defendants should return

the money or property to the Plaintiffs.[32]  In California, courts treat unjust enrichment

claims as "quasi-contract claim[s] seeking restitution," and the plaintiff only needs to allege

that the defendant "obtains a benefit that he or she may not justly retain because the benefit

was received at another's expense." *Jordan v. Wonderful Citrus Packing LLC*, No. 1:18-

CV-00401 (AWI) (SAB), 2018 WL 4350080, at *3, *4 (E.D. Cal. Sept. 10, 2018) (citations

omitted).

There is no question that the Corporate Defendants and the Individual Defendants

were substantially enriched.  The Plaintiffs raised money for the Defendants and performed

services for their benefit.  *See, e.g.*, FAC ¶¶ 5, 18, 20-22, 24, 48-60, 65, 73.  The Corporate

Defendants received significant revenue, and the Individual Defendants, in turn, used that

revenue to enrich themselves, paying off personal debts and purchasing luxury goods,

multi-million-dollar mansions, and investment portfolios.  *See id*. ¶¶ 61-68.  The Bergs also

flew on private jets to far-flung, exotic destinations like Ibiza and Punta Cana and

---

[31] *See* FAC ¶¶ 56-59 (detailing causes of action 16-19).

[32] *See Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150, 1156 (S.D. Fl. 2015) ("A claim for unjust enrichment requires that: 1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value." (quotation and citation omitted)); *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 306 (E.D.N.Y. 2010) ("To prevail on a claim of unjust enrichment under New York law, the plaintiff must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." (quotation and citation omitted)); *Thycon Constr., Inc. v. Nat'l Equip. Servs., Inc.*, No. 08 C 824 (WJH), 2009 WL 723040, at *2 (N.D. Ill. Mar. 2, 2009) ("To succeed on a claim of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience." (quotation and citation omitted)).

"freshened up" with plastic surgery, all courtesy of "donations" to the Centre that the Plaintiffs had solicited and raised.  *See id*.

The Defendants were enriched at the Plaintiffs' expense in two ways.  First, through their cold-call telemarketing, "teaching," and fundraising through donor "students," the Plaintiffs raised the revenue that went to the Corporate Defendants and, ultimately, lined the pockets of the Individual Defendants.  *See id*. ¶¶ 48-60, 64-67.  Second, the Defendants had the benefit of free, or nearly free, labor.  For the Corporate Defendants, chevre had to perform menial tasks, including cooking, cleaning, retail sales, and inventory maintenance.  For the Individual Defendants, chevre served as their personal assistants, caring for children, grandchildren, and pets, running personal errands, and chauffeuring the Individual Defendants for luxury meals and plastic surgery appointments.  *See id*. ¶¶ 48, 72-74.  The Defendants necessarily knew they were receiving significant benefits for which they were not paying.  They instructed chevre to put the Defendants' needs, and specifically the Individual Defendants' needs, above their own.  *Id*. ¶¶ 74-75.  And when the Defendants thought chevre were not sufficiently attentive to the Bergs' need and wants, they punished the chevre by, for example, denying them permission to date or marry.  *See id*. ¶ 53.  Permitting the Defendants to retain the benefit of the money and services they received without compensating the chevre whose free or nearly free labor produced the benefits is patently unjust.  It would reward the Defendants' inhumane treatment of chevre, *see id*. ¶¶ 53, 76-102, and incentivize similar treatment of "volunteers" in the future.  The Plaintiffs' claim is similar in its essentials to the claims of other unpaid or underpaid workers in the relevant states.  *See Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, No. 1:15-CV-06811 (ARW), 3:15-CV-50182 (ARW), 2016 WL 5405107, at *12 (N.D. Ill. Sept. 28, 2016) (permitting unjust enrichment claim where defendant accepted services for free); *Guobadia v. Irowa*, 103 F. Supp. 3d 325, 342 (E.D.N.Y. 2015) (finding that the plaintiff plausibly established

an unjust enrichment claim where the plaintiff provided "free child-care and household labor" and the defendants' alleged "physical and emotional abuse" of the plaintiff); *Bedoya v. Aventura Limousine & Transportation Service, Inc.*, No. 11-24432-CV-Altonaga, 2012 WL 13081980, at *4-5 (S.D. Fla. Mar. 20, 2012) (finding that plaintiff stated an unjust enrichment claim, in addition to an FLSA claim, when he alleged that defendants "inequitably accepted and retained" the plaintiff's "driver services" and "driving expenses and fuel charges"); *Kossian v. Am. Nat'l Ins. Co.*, 254 Cal. App. 2d 647, 649-51 (Cal. Ct. App. 1967) (permitting the plaintiff to recover for clean-up work performed under an unjust enrichment theory).

### 2.    The Plaintiffs State Claims For Fraudulent Inducement

To show fraudulent inducement in New York, California, Illinois, or Florida,[33] the Plaintiffs must show: (1) a misrepresentation or omission of material fact; (2) the defendant knew or should have known that the statement was false; (3) the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the defendant's material misrepresentation; and (5) the plaintiff suffered damages.[34]

The Plaintiffs satisfy these elements.    First, the Defendants materially misrepresented to the chevre that they would take care of all of the chevre's needs.  *See*

---

[33] *See* FAC ¶¶ 59-64 (detailing causes of action 20-23).

[34] *See Ahn v. Scarlett*, No. 5:16-CV-05437 (EJD), 2017 WL 1196828, at *2 (N.D. Cal. Mar. 31, 2017) ("To state a claim for fraud in the inducement, a plaintiff must show that (1) the defendant misrepresented a past or existing material fact, (2) the defendant knew that the statement was false at the time it was made, (3) the defendant intended to deceive the plaintiff, (4) the plaintiff justifiably relied on the representation, and (5) the plaintiff suffered damages as a result."); *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 339 (S.D.N.Y. 2017) ("Under New York law, a claim for fraud in the inducement requires: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused the injury to the plaintiff."  (quotation and citation omitted)); *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, No. 07-CV-186 (DRH), 2010 WL 331732, at *3 (S.D. Ill. Jan. 26, 2010) (stating that fraud in the inducement "requires a showing that (1) the defendant made a false statement of material fact; (2) the

FAC ¶¶ 76, 78, 83.  The Defendants made these misrepresentations before and during the course of the chevre's employment.  *See id.*  They knew that the representations were false. The purpose of employing the chevre was to minimize costs and maximize profits, which went to line the Individual Defendants' pockets.  *See id.* ¶¶ 4, 8, 10, 49, 52-55, 61-69, 72-75.  The chevre's living situation was no different.  *See id.* ¶¶ 6, 80.  Second, the Defendants' knowledge of the representation's falsity can also be seen in their actions.  For example, when chevre were so sick that they needed hospital care, the Defendants instructed them to provide the hospital with a false name and address, so that the costs would not be passed onto the Defendants.  *See id.* at ¶ 83.  Third, the Defendants made this misrepresentation for the purpose of deceiving people dedicated to helping humanity generally into committing their lives to helping a select few.  *See id.* ¶¶ 1, 8, 10, 49, 53-54, 61-69, 72-76, 78.  The Defendants purposefully spread falsehoods about the horrors that would befall chevre who questioned the Defendants or left the Centre in order to cause chevre to rely further on the Defendants' misrepresentations.  *See id.* ¶¶ 91-97.

Fourth, the Plaintiffs' reliance on the Defendants' misrepresentation is reasonable. Before becoming chevre, the Plaintiffs were all associated with the Centre, and they were taught or even indoctrinated to believe that they should trust the Defendants, particularly the Individual Defendants.  Given that indoctrination, the Plaintiffs' trust in the Defendants was completely reasonable.  *See id.* ¶¶ 19, 21, 22, 53, 57, 60, 70, 71, 96-97.  Once the Plaintiffs had become chevre, the Defendants induced them to continue relying on their

---

defendant knew the statement was false at the time of making it; (3) the statement was made with the intent to induce the plaintiff to act; (4) the plaintiff acted in reliance on the truth of the alleged statement; and (5) the plaintiff suffered damages because of the reliance" (citation omitted)); *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1365 (M.D. Fla. 2007) ("[The plaintiff] must show that (1) [the defendant] made a misrepresentation of material fact; (2) [the defendant] knew or should have known of the falsity of the statement; (3) [the defendant] intended that the representation would induce [the plaintiff] to rely and act on it; and (4) [the plaintiff] suffered injury in justifiable reliance on the representation." (citation omitted)).

representations that they would be cared for.  The Defendants systematically stripped chevre of their autonomy, making chevre completely dependent on the Defendants for their survival.  *See id.* ¶¶ 6-8, 71, 75-89, 92-96.  The Defendants were quick to crush dissent, ostracizing and banishing chevre who dared to question their actions, spreading falsehoods to chevre about those who quit, and berating those who made even the slightest mistakes. *See id.* ¶¶ 91, 93-98.  These actions further show the reasonableness of the Plaintiffs' reliance.  *See id.* ¶¶ 325, 334, 343, 352; *see Glob. Beauty Grp., LLC v. Visual Beauty, LLC*, No. 16-CV-9214 (KPF), 2018 WL 840102, at *8 (S.D.N.Y. Feb. 12, 2018) ("Plaintiffs do not allege that David Schieffelin lied when he told them that YBF had suffered losses in 2015; they allege that this statement, coupled with his omission of the fact that he was negotiating possible funding for YBF—a fact known only to him—was misleading and that they relied on this in making their decision to sell their stakes in YBF. The Court finds that these allegations are sufficient to show reliance."); *see also Robinson v. Deutsche Bank Tr. Co. Ams.*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) ("Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").

Finally, the Plaintiffs were damaged.  But for the Defendants' actions, the Plaintiffs could have—and would have—had alternative sources of income.  *See* FAC ¶¶ 18-24. Accordingly, the Plaintiffs have properly pleaded claims for fraudulent inducement.  *See Glob. Beauty*, 2018 WL 840102, at *8 ("To survive a motion to dismiss, Plaintiffs need only plead facts that, taken as true, suggest that their reliance was reasonable.  Whether Plaintiffs' reliance on alleged misrepresentations is reasonable in the context of this case

is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").

### 3.      The Claims Are Not Preempted

The Defendants argue that the Plaintiffs' federal and state wage-and-hour claims preempt their unjust enrichment and fraudulent claims.  *See* MTD Br. at 30-31.[35]   The FLSA preempts state common law claims only if the common law claims are "duplicative" of an FLSA claim.  *Mikhaylov v. Y & B Transportation Co.*, No. 15-CV-7109 (DLI)(VMS), 2017 WL 1048071, at *5-6 (E.D.N.Y. Mar. 17, 2017).  FLSA and common law claims are not duplicative when the behavior challenged or relief sought in the common law claim is distinct from what the plaintiff would have been entitled to had the employer complied with the FLSA.  *See id.*  For example, in *Mikhaylov*, the plaintiffs' "FLSA [c]laims [sought] unpaid minimum wages that [were] due to them under federal law."  *Id.* (citation omitted). The court held that these claims were distinct from the plaintiffs' breach of contract claims because those common law claims sought "payment under the terms of an oral employment agreement, the rates of which [p]laintiffs have alleged and are more than the minimum wage."  *Id.* at *6 (quotation and citation omitted).  The court also held that the plaintiff's unjust enrichment claim was not preempted because it sought the "reasonable value of services rendered."  *Id.* (quotation and citation omitted); *see also Chalusian v. Simsmetal East LLC*, 698 F. Supp. 2d 397, 409 (S.D.N.Y. 2010) (declining to "dismiss Plaintiff's unjust enrichment claim" in favor of discovery to determine whether the common law claim "was duplicative of Plaintiff's FLSA claim"); *see also Ouedraogo v. A-1 Int'l*

---

[35] The Defendants argue in a footnote that "Greene does not appear to assert any Common Law Claims in the [FAC]."  MTD Br. at 30 n.30.  However, because Greene worked for the Defendants in Florida and California, *see* FAC ¶ 18, he qualifies as a member of the putative class of chevre with common law claims of unjust enrichment and fraudulent inducement.  *See id.* ¶ 145.

*Courier Serv., Inc.*, No. 12-CV-5651 (AJN), 2013 WL 3466810, at *6 (S.D.N.Y. July 8, 2013) (permitting the plaintiff to amend his complaint to add a common law claim, over the defendants' objection, because

there was an "independent basis for the state law claims" and, thus, they were not "coextensive" with the FLSA claim (quotation and citation omitted)).

Here, the Plaintiffs' unjust enrichment claims are not based just on the value of their labor, but on the increase in the Individual Defendants' wealth on account of the free labor the Plaintiffs provided.  In other words, the measure of damages for the unjust enrichment claim is not the same as the measure of damages for the wage-and-hour claims. The fraudulent inducement claims are also based on facts and conduct that are entirely distinct from the Defendants' failure to pay wages.  The claim is that the Defendants told the chevre that the Centre would take care of their needs, *i.e.*, that it would pay their medical expenses, provide housing, etc.  In contrast, the Plaintiffs' federal and state statutory claims are based on the Defendants' failure to pay wages and overtime as required by law.

Thus, the common law claims are plainly distinct from the statutory wage and overtime claims and are not preempted.  *See Davis v. Lenox Hill Hosp.*, No. 03-CV-3746 (DLC), 2004 WL 1926087, at *7 (S.D.N.Y. Aug. 31, 2004) (finding that "[t]he defendants mistakenly contend[e]d" that the plaintiff "cannot simultaneously assert claims for unjust enrichment and violation of the FLSA" when the unjust enrichment claims pertain to matters that "the FLSA does not regulate").

In any event, even if the common law claims are not distinct from the wage-and-hour claims, the Plaintiffs nevertheless have the right to plead them in the alternative, even if, at the end of the day, they could not recover on both sets of claims. *See Wilk v. VIP Health Care Services, Inc.*, No. 10-CV-5530 (ILG)(JMA), 2012 WL 560738, at *5 (E.D.N.Y. Feb. 21, 2012) (Glasser, J.) ("The same is true with respect to [the plaintiff's common law claim], NYLL, and FLSA claims; [the plaintiff] may plead these causes of action in the alternative as well."); *see also Mikhaylov*, 2017 WL 1048071, at *6 (finding that common law claims pleaded in the alternative are not preempted).[36]

Second, the Defendants assert that the Plaintiffs' "fraudulent inducement claims are deficiently pled" under California law.[37]   MTD Br. at 31.[38]   "In California, fraud must be pled specifically," which "necessitates pleading *facts* which show how, when, where, to whom, and by what means the representations were tendered."   *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (C.A. 1996) (quotation and citations omitted).   This requirement is not absolute.   One instance in which "less specificity is required of a complaint [is when] it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy."   *Tenet Healthsystem Desert, Inc. v. Blue Cross of California*, 245 Cal. App. 4th 821, 838 (Cal. Ct. App. 2016).[39]

---

[36] The cases the Defendants cite do not warrant a different result.  Three of the four cases explicitly recognize that common law claims are not preempted where—as here—they are not duplicative of the plaintiff's wage-and-hour claims.  *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007) ("Our conclusion is consistent with the rulings of several district courts deeming state claims to be preempted by the FLSA where those claims have merely duplicated FLSA claims."); *Griffin v. Aldi, Inc.*, No. 5:16-CV-00354 (LEK) (ATB), 2016 WL 7235787, at *3 (N.D.N.Y. Dec. 14, 2016) ("Under this approach, where the state common law claims are distinct from the FLSA claims, the latter do not preempt the former.  In other words, the question is whether in the absence of an FLSA claim, the plaintiff would have a viable state common law claim." (citation omitted)); *Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 470 (E.D.N.Y. 2011) (permitting the plaintiff time to amend the complaint to "identify[ ] a non-statutory basis for" his claim).  Unlike here, in the fourth case, *Petras v. Johnson*, No. 92-CV-8298 (CSH), 1993 WL 228014 (S.D.N.Y. June 22, 1993), the *fraud* at issue was "concealing plaintiff's rights under the FLSA."  *Id.* at *3.  As explained above, the Defendants' fraudulently concealed the Centre's purpose and the treatment the Plaintiffs would receive if they became chevre.

– 47 –

In *Tenet*, the defendant, Anthem, argued that the plaintiff's "amended complaint is insufficient because it does not identify each individual and defendant entity that is alleged to have engaged in communications with" the plaintiff hospital about a patient.  *Id*. at 840. The court rejected this argument.   It held that the plaintiff's reliance on fraudulent communications that lacked certain elements of specificity were sufficiently pleaded because Anthem, "the party with superior knowledge," was better placed to fill in any gaps in the plaintiff's allegations.  *See id*.[40]  The same reasoning applies here.  Like Anthem, the Defendants argue that the Plaintiffs' claims lack the requisite specificity.  *See* MTD Br. at 31-32.

---

[37] The Plaintiffs do not understand why the Defendants have argued the sufficiency of the pleading of fraud under California substantive law, but as that is the argument they have made, that is the argument to which the Plaintiffs respond.

[38] Though the Plaintiffs have pleaded common law claims under the laws of four states, the Defendants only challenge the sufficiency of the pleadings under California law.  Accordingly, they have waived any similar arguments they may make under New York, Illinois, or Florida law.  *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297 n.4 (S.D.N.Y. 2015) ("Although Defendants do not explicitly state that they are challenging only the New York unjust enrichment claims, they cite only New York law and make no specific reference to the California claims. Thus, Defendants have forfeited any challenge to the unjust enrichment claims brought against Karkus under California law."); *see Mraz v. JPMorgan Chase Bank, N.A.*, No. 17-CV-6380 (ILG), 2018 WL 2075427, at *6 n.5 (E.D.N.Y. May 3, 2018) (Glasser, J.) ("The Court will not consider this new theory, as arguments may not be made for the first time in a reply brief."); *see also Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, No. 15-CV-6519 (ILG)(RLM), 2019 WL 5103870, at *20 (E.D.N.Y. Oct. 11, 2019) (Glasser, J.) (same).  Thus, the Defendants have waived any argument contesting the adequacy of the Plaintiffs' pleadings regarding causes of action 20, 22, and 23 with particularity.

[39] The Defendants' citation to *McKeon v. Risner* is unhelpful.  MTD Br. at 31 (quoting No. 16-CV-02467 (JEK), 2017 Cal. Super. LEXIS 6276, at *4-5 (Cal. Dec. 4, 2017)).  *McKeon* involved a claim for rescission and concluded that the plaintiff could not state a claim for rescission based upon fraudulent inducement for statements made to a third party (the police) rather than to the plaintiff.  *McKeon*, 2017 Cal. Super. LEXIS 6276, at *5.  The allegations here are not based on statements made to third parties but to the chevre themselves.

[40] *Tenet Healthsystem* is also instructive because the defendant health insurance company attempted to attack the factual allegations in the complaint using outside evidence at the demurrer, *i.e.*, motion to dismiss, stage. *See Tenet Healthsystem*, 245 Cal. App. 4th at 842.  The Court of Appeals explained that the demurrer "exists as a procedural mechanism to determine whether, *if the allegations of the operative complaint are presumed to be true*, the plaintiff has sufficiently stated a cause of action.  It is not the appropriate procedural vehicle to argue the merits of the plaintiff's allegations."  *Id*.  As this opposition demonstrates, the Defendants have repeatedly attempted this forbidden practice.  *See generally infra*; *id. supra*.

It held that the plaintiff's reliance on fraudulent communications that lacked certain elements of specificity were sufficiently pleaded because Anthem, "the party with superior knowledge," was better placed to fill in any gaps in the plaintiff's allegations.  *See id*.[41] The same reasoning applies here.  Like Anthem, the Defendants argue that the Plaintiffs' claims lack the requisite specificity.  *See* MTD Br. at 31-32.  And, just like Anthem, the Defendants are the parties with superior knowledge as to the falsity of their statements. Accordingly, the Court should reject this argument.

The Defendants' contention that the fraudulent inducements allegations turn solely on the Plaintiffs' personal opinions that the Centre was not as holy as they thought is clearly wrong.  MTD Br. at 32 (not citing the FAC).  None of the cases the Defendants cite support their argument.  First, *Cohen v. Avanade, Inc.* has nothing to do with whether a plaintiff may have believed something or not.  Instead, *Cohen* concerned whether the defendants knew their statements—largely statements of subjective opinion—were false.  874 F. Supp. 2d 315, 323 (S.D.N.Y. 2012).  The Plaintiffs have alleged this requisite knowledge, *see supra*; FAC ¶¶ 1-8, 10-11, 45-60, 76, 320-21, 329-30, 338-39, 347-48, even though they are not required to allege it given the Defendants' superior knowledge.  *See Tenet*, 245 Cal. App. 4th at 838-40.  Second, *International Finance Corp. v. Carrera Holdings Inc.*, states the law in a conclusory fashion, without considering the facts.  82 A.D.3d 641, 642 (1st Dep't 2011).

The Supreme Court opinion that it affirmed, however, shows that the "alleged

---

[41] *Tenet Healthsystem* is also instructive because the defendant health insurance company attempted to attack the factual allegations in the complaint using outside evidence at the demurrer, *i.e.*, motion to dismiss, stage. *See Tenet Healthsystem*, 245 Cal. App. 4th at 842.  The Court of Appeals explained that the demurrer "exists as a procedural mechanism to determine whether, *if the allegations of the operative complaint are presumed to be true*, the plaintiff has sufficiently stated a cause of action.  It is not the appropriate procedural vehicle to argue the merits of the plaintiff's allegations." *Id*.  As this opposition demonstrates, the Defendants have repeatedly attempted this forbidden practice.  *See generally infra*; *id. supra*.

misrepresentations all relate to matters that are the subject of the agreements at issue" and are therefore duplicative of a breach of contract claim. *Int'l Finance Corp. v Carrera Holdings Inc.*, No. 601705/2007 (EB), 2009 WL 6442869, at *10 (N.Y. Sup. Ct. Sep. 28, 2009); *id.* at *11 ("Because the alleged misrepresentations are not distinct from or collateral to the alleged contracts at issue, Carrera fails to state a cause of action for fraudulent inducement and the claim is dismissed."). The court, in dictum, reasoned that the statements were "too vague" to be actionable. *Id.* Not so here. *See, e.g.,* FAC ¶ 11 ("[Chevre] were uniformly told by the Centre that they were not entitled to compensation for their work."); ¶ 76 ("Chevre were told that they were working together to build a bright future, and that they did not have to worry for their basic needs anymore – including housing, food, and clothing – as these would be provided by the Centre for the rest of their lives. This would free the chevre up to focus on their personal growth and spreading the teachings of the Centre. The reality was much darker. Chevre were lulled into becoming completely dependent upon the Defendants for their survival. Chevre were purposefully isolated, cut off from friends and loved ones, and forced to endure extreme working and living conditions.").[42] Third, the Defendants cite *Rezvani v. Jones*, but that case discusses the Private Securities Litigation Reform Act's safe harbor provision, and in particular the law about whether "puffery" is actionable. No. 2:18-CV-06244 (CAS), 2018 WL 6680568, at *6 (C.D. Cal. Dec. 17, 2018). But the Defendants' statements plainly were not commercial puffery of the kind that plays a role in securities cases.

---

[42] *See also* FAC ¶ 93 ("Chevre were constantly told that they were worthless, they were wrong, and that they had no rights of any kind."); ¶ 94 ("The Centre told chevre of the frightening consequences that would befall them if they left. This included 'joining Satan' and coming down with diseases from which the Centre supposedly protected them.").

F.      Greene's and Ezra Michaeli's Claims Are Not Time-Barred[43]

      1.      Consideration of the Statute of Limitations Defense at this Stage
          Is Premature

Statute of limitations defenses, which typically require a court to scrutinize the facts, only may be decided at the motion to dismiss stage "if it is clear on the face of the complaint that the statute of limitations has run." *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013); *see also Montgomery v. Commissioner of Social Security*, 403 F. Supp. 3d 331, 339 (S.D.N.Y. 2018) (resolution of a statute of limitations defense at the motion to dismiss stage appropriate only after an evidentiary hearing).  But "a statute of limitations cannot begin to run until the plaintiff's claim has accrued," *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 176 (2d Cir. 2011), so if the date of accrual of the plaintiffs' claims cannot be determined from the face of the complaint, the court cannot dismiss the complaint on limitations grounds on a motion to dismiss.  *See Wang v. Palmisano*, 51 F. Supp. 3d 521, 536–37 (S.D.N.Y. 2014) (denying dismissal of certain employment claims based on the statute of limitations because the dates of accrual were uncertain on the face of the complaint); *see also Frankel v. Cole*, 313 F. App'x 418, 420 (2d Cir. 2009).

"The courts have held that a cause of action under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation and for liquidated damages 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends."  29 C.F.R. § 790.21(b).

---

[43] Defendants make the odd assertion that Greene does not bring state wage and hour claims, and that Ezra Michaeli only has brought claims under California law.  *See* MTD Br. at 33 n.32-35.  However, both Greene and Ezra Michaeli are covered by the class definitions pertaining to, in Greene's case, California and Florida wage and hour and common law claims, and in Ezra Michaeli's case, California, Florida, and New York wage and hour and common law claims.

Here, where it is undisputed that the Plaintiffs were not paid wages at all and thus had no regular pay day, determining the date of accrual from the face of the complaint is impossible. *See* FAC ¶ 44; MTD Br. at 38.  Moreover, where equitable tolling may apply to a statute of limitations defense, as the Plaintiffs allege here, *see, e.g.*, FAC ¶¶ 103-20, a dismissal under Rule 12 based on the timeliness of the Plaintiffs' claims would be particularly inappropriate: "[t]he resolution of [whether to equitably toll the statute of limitations] is . . . heavily dependent on the facts of the case and cannot be decided on a motion to dismiss." *Upadhyay v. Sethi*, 848 F. Supp. 2d 439, 445 (S.D.N.Y. 2012); *see Garcia v. Pancho Villa's of Huntington Village, Inc.*, 268 F.R.D. 160, 166 (E.D.N.Y. 2010) ("[W]hether or not the statute of limitations should be equitably tolled here is an issue of fact better addressed on a motion for summary judgment or at the time of trial."); *accord*, *Kattu v. Metro Petroleum, Inc.*, No. 12-CV-54 (RJA), 2013 WL 4015342, at *4 (W.D.N.Y. Aug. 6, 2013).  The Court should decline to consider the Defendants' statute of limitations defense on a motion to dismiss.

### 2.      Equitable Tolling Clearly Applies To Greene And Ezra Michaeli

Nonetheless, if the Court chooses to analyze the Defendants' statute of limitations defense, can discern a claim accrual date, and concludes that the statute of limitations would preclude Greene's and Ezra Michaeli's claims from proceeding, Plaintiffs' would preclude Greene's and Ezra Michaeli's claims from proceeding, Plaintiffs' allegations

warrant equitable tolling of the statute of limitations.[44]

"Statutes of limitations are generally subject to equitable tolling where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing." *Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004).  The doctrine "allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances," *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996), and is "generally considered appropriate where the plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period; [or] where plaintiff was unaware of his or her cause of action due to misleading conduct of the defendant; or where a plaintiff's medical condition or mental impairment prevented her from proceeding

---

[44] In a series of footnotes, the Defendants claim that the statute of limitations also bars the Plaintiffs' claims under California and Florida law.  *See* MTD Br. at 33 n.32-35.  For the reasons articulated *supra*, any decision on a statute of limitations defense would be premature at this stage of the case.  However, should the Court consider the defense, the Plaintiffs also clearly meet the requirements for equitable tolling under the laws of those states.  In California, "[e]quitable tolling requires: (1) timely notice to the defendants of the claim; (2) lack of prejudice to the defendant; [and] (3) reasonable and good faith conduct on the part of the plaintiff."  *Bakalian v. Central Bank of Republic of Turkey*, 932 F.3d 1229, 1235 (9th Cir. 2019).  In Florida, equitable tolling is available when, *inter alia*, "a plaintiff has been misled or lulled into inaction and has in some extraordinary way been prevented from asserting his rights."  *Aruanno v. Martin Cty. Sheriff*, 343 F. App'x 535, 537 n.2 (11th Cir. 2009).  The Plaintiffs easily satisfy both standards.  The Defendants actively took numerous steps to conceal from the Plaintiffs that they had claims under federal and state wage-and-hour laws.  For example, the Centre told Plaintiffs Shmilovich and Ezra Michaeli that it did not owe them any compensation.  FAC ¶ 111.  The Centre also failed to post FLSA-mandated notices in conspicuous locations in each workplace.  *See id.* ¶¶ 111-12, 115-18.  The fact that the Defendants required the chevre to sign broad liability releases hastily on their way out the door without the opportunity for legal assistance or, in many cases, to review the documents themselves, shows that the Defendants were aware that the chevre may have legal claims against them.  *See id.* ¶¶ 113-14, 119.  It also shows that the Defendants were taking steps to prepare for and insulate themselves from legal claims precisely of the type the Plaintiffs brought here.  *See id.* ¶ 116.  Thus, the Defendants have received timely notice of the Plaintiffs' claims and have not suffered any prejudice as a result of the tolling.  Finally, the Plaintiffs have acted reasonably and in good faith.  As a result of the Defendants' actions, many of the Plaintiffs and other chevre were demoralized when they finally managed to leave the Centre.  They also essentially did not exist in the real world.  They had no money, no possessions, no credit history, and very few ties to prior friends and family.  *See id.* ¶¶ 103-10.  Thus, it is reasonable that it took them some time to re-establish their lives and to learn of their rights.  Once they did and they learned about their legal rights, the Plaintiffs moved quickly and diligently to vindicate those rights.  *See id.* ¶¶ 117-18.

in a timely fashion." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (internal citations omitted).

Equitable tolling "is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances," *Veltri*, 393 F.3d at 322, but is not subject to "bright line" rules. *See Kassman v. KPMG LLP*, No. 11-CV-3743 (LGS), 2015 WL 5178400, at *5 (S.D.N.Y. Sept. 4, 2015). "Courts do not apply equitable tolling's requirements mechanistically, and the exercise of a court's equity powers must be made on a case-by-case basis, mindful that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Id.* (quoting *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011)) (alterations omitted) (internal quotation marks omitted).

"Where defendant is responsible for concealing the existence of plaintiff's cause of action, this Court has held equitable tolling appropriate." *Veltri*, 393 F.3d at 323. Although this doctrine is sometimes referred to "as 'fraudulent concealment,' defendants' conduct need not be actually fraudulent." *Id.* Here, the Plaintiffs have alleged myriad ways in which the Defendants prevented the Plaintiffs from learning of their legal rights. *See, e.g.*, FAC ¶¶ 91, 103, 111. The Defendants' arguments on this point misstate the Plaintiffs' allegations. The Plaintiffs do not allege, for example, that they were aware of the Centre's paying chevre wages, as the Defendants claim. *See* MTD Br. at 35. Rather, the Plaintiffs allege that the Centre concocted W-2 forms *claiming* to have paid such wages while, on occasion, disbursing cash to chevre that the Centre ordered them to return immediately. *See* FAC ¶ 9. As a result, the Court should assess the "extraordinary circumstances" of the

chevre, and the "reasonable diligence" they exercised in light of those circumstances. *See Kassman*, 2015 WL 5178400, at *4-5.

First, the Defendants' failure to post legally mandated FLSA and state wage and hour notices constitutes "extraordinary circumstances" that warrant equitable tolling. *See* FAC ¶¶ 103, 112; *Upadhyay*, 848 F. Supp. 2d at 445. This is particularly true where, as here, the Defendants also "made no effort to provide any other form of notice to the [P]laintiffs about their rights and the requirements of the FLSA." *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 259-60 (S.D.N.Y. 2008).[45] The Centre not only failed to post FLSA-mandated notices in conspicuous locations in each workplace,[46] but also took many additional steps to successfully prevent the Plaintiffs from learning of their statutory rights. *See* FAC ¶¶ 91, 103, 111-12, 115-18. As the Second Circuit has recognized, although a failure to inform a plaintiff of his rights "is not the kind of concealing activity that would normally be held to mandate equitable tolling," when informing a plaintiff of his rights is *legally mandated*, the failure to do so must be assessed in light of the Congressional policy mandating that the plaintiff be informed. *See Veltri*, 393 F.3d at 324 (finding equitable tolling warranted). As in *Veltri*, the Congressional policy underlying the statute, in this case the FLSA, compels the conclusion that extraordinary circumstances warranting equitable tolling are present here.

---

[45] Indeed, some courts in the Second Circuit find that the failure to post these notices, even absent other failures by an employer, in and of itself is sufficient for equitable tolling where the plaintiff did not know of the rights outlined in such notices. *See, e.g.*, *Chen v. Grand Harmony Rest., Inc.*, 2011 WL 4703074, at *2 (S.D.N.Y. Aug. 10, 2011), *report and recommendation adopted*, No. 04-CV-6579 (GBD)(THK), 2011 WL 4636603 (S.D.N.Y. Oct. 6, 2011); *Saunders v. City of New York,* 594 F. Supp. 2d 346, 359 (S.D.N.Y. 2008); *see also Summa v. Hofstra Univ.,* No. 07-CV-3307 (DRH)(ARL), 2008 WL 3852160, *6-7 (E.D.N.Y. Aug. 14, 2008) (noting failure to post FLSA notices subjects suits to tolling).

[46] The Defendants' response to this allegation, which is that it is "untrue," *see* MTD Br. at 37, is part and parcel of their desire to argue this motion outside the parameters of Rule 12, refusing to engage with the FAC, and attempting to rely on facts outside the FAC.

Second, the facts of this case represent precisely the sort of circumstances that are "hard to predict in advance" but "warrant special treatment." *See Kassman*, 2015 WL 5178400, at *5. The Plaintiffs in this case are the victims of a cult that controlled every aspect of their lives, from the identity of their spouse to the amount of toilet paper they used. *See* FAC ¶¶ 1, 76, 79-80. The Centre stripped them of their possessions, families, dignity, and agency, so that when they were finally able to escape it, they did not know how to function in the outside world. *See id.* ¶¶ 86, 106-10. Reasonable diligence is determined on a case-by-case, fact-intensive basis, and is demonstrated "where a reasonable plaintiff *in the circumstances* would have been unaware of the existence of a cause of action." *Boyd v. J.E. Robert Co.*, No. 05-CV-2455 (KAM)(RER), 2011 WL 477547, at *8 (E.D.N.Y. Feb. 2, 2011) (emphasis added). It is reasonable that the Plaintiffs, the victims of the very cult that now insists they did not act "reasonably," were unaware of the existence of their legal rights.[47] Although the Defendants complain that the Plaintiffs made no "efforts to understand their rights," MTD Br. at 35, the Plaintiffs' allegations make clear that they *were actively* prevented from learning that they had any rights at all. *See* FAC ¶¶ 91, 103, 111-12, 115-18.[48] The Defendants claim that Ezra Michaeli "admits that she was on notice of her rights when she left the Centre," *see* MTD Br. at 38 n.38, seemingly because she inquired as to whether she was entitled to compensation. The Centre then *explicitly told her that she was not*. *See* FAC ¶ 111.

---

[47] The Defendants make much of the fact that Greene and Ezra Michaeli were "professionals." *See* MTD Br. at 34-35. But "professional" training could not have prepared them for the complete control the Centre exercised over them for years. *See, e.g.*, FAC ¶¶ 1, 76, 79-80. The Defendants also emphasize, in particular, that Ezra Michaeli was trained as an attorney in Israel. *See* MTD Br. at 9, 35. First, there is no reason that Ezra Michaeli's Israeli education would have made her aware of United States labor law. Second, the Defendants claim that Ezra Michaeli made no effort to "investigate" her rights, *see id.* at 35, while conveniently ignoring that when she explicitly asked one of the Centre's head administrators about her entitlement to pay, she was explicitly told that she had none. *See* FAC ¶ 111.

### 3.     The Statute of Limitations For The Plaintiffs' FLSA Claims Should Be Three Years

The Defendants contend, in a footnote, that the statute of limitations for the FLSA claims in this case should be two years.  *See* MTD Br. at 33 n.31.  However, the FLSA's statute of limitations is three years when a violation is willful.  *Parada v. Banco Industrial De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (citing 29 U.S.C. § 255(a)).  A violation is willful when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir. 1995); *see also Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 191 (E.D.N.Y. 2015).  Allegations of willfulness may be "in general terms and nonetheless meet their burden of demonstrating a willful violation of the FLSA . . . ." *Chime*, 137 F. Supp. 3d at 191 (citing cases).

The Plaintiffs have plainly met this requirement.  *See* FAC ¶¶ 123-24, 141, 166, 175.  Specifically, they have alleged that the Defendants described the chevre to others as employees, that they paid non-chevre in identical roles regular wages, and that they did not post wage notices or otherwise inform chevre of their FLSA rights, instead concealing those rights from chevre.  *See* FAC ¶¶ 111-12, 123-24;[49] *see also Shu Qin Xu v. Wai Mei Ho*, 111 F.Supp.3d 274, 280 (E.D.N.Y. 2015) (failure to post wage notices can indicate willfulness).

---

[48] The Defendants argue that the Centre's failure to pay its chevre employees *at all* is a point in the Defendants' favor when assessing equitable tolling.  *See* MTD Br. at 38.  That is absurd.  The Defendants actively concealed from the Plaintiffs that they had any legal rights, and now seek to blame the Plaintiffs for their egregious flouting of the law.

[49] As explained *supra*, these facts also warrant equitable tolling.

Moreover, "[c]ourts considering this question on motions to dismiss tend to favor findings of willfulness," because "whether or not a violation of the FLSA is 'willful' is a fact-intensive inquiry not appropriately resolved on a motion to dismiss." *Chime*, 137 F. Supp. 3d at 191 (internal quotation marks omitted).[50]  The statute of limitations is three years, not two.

---

[50] The Defendants claim that because the instant motion is being briefed, the law on this issue is unsettled and, as a result "the Centre's decision not to pay its religious workers was not a willful violation of the FLSA."  MTD Br. at 33 n.31.  First, the Defendants' choice of language is telling, characterizing the chevre as "workers," and the Centre's position as a "decision."  *Id.*  Second, the Centre's current refusal to admit that it was legally required to pay the chevre, but did not, does not create an unsettled question of law.  Third, *Reich*, cited by the Defendants, is inapposite: it holds that an employer's claimed confusion over the law amounted to reckless disregard and finds the violation willful.  *See Reich*, 52 F.3d at 40-41.

### G.     Green has not Released His Claims

#### 1.     Greene's Agreement was the Product of Undue Influence and is Unenforceable[51]

A contract which is the product of undue influence is no contract at all.  *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y. 1993).  A contract is the product of undue influence when a party can show "that it contracted under circumstances indicating that a relationship of control existed and that the stronger of the two parties had exerted influence over the other to destroy the weaker party's free will and substitute for it the will of the other." *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 393 (S.D.N.Y. 2001) (quotations omitted). The question of undue influence becomes one for the fact finder when there are "significant disputed issues of fact regarding the [contesting party's] condition and the circumstances surrounded the execution of [the] document. . . ."  *Medeiros v. John Alden Life Ins. Co. of New York*, No. 88-CV-4399 (KMW), 1990 WL 115606, at *4 (S.D.N.Y. Aug. 10, 1990).  While the burden of proving undue influence ordinarily rests with the party asserting its existence, "if a confidential relationship exists, the burden is shifted to the beneficiary of the transaction to prove the transaction fair and free from undue influence." *D'Onofrio v. Mother of God with Eternal Life*, 79 N.Y.S.3d 902, 920 (N.Y. Sup. Ct. 2018).  "[A] confidential relationship may be inferred if one party has disparate power over the other such as the power of an attorney, guardian, clergymen, doctor or nursing home director," *Weber v. Burman*, 880 N.Y.S.2d 228, at *6 (N.Y. Sup. Ct. 2008) (quotation omitted).

---

[51] The Defendants argue the enforceability of Greene's Separation Agreement under New York law.  *See* MTD Br. at 39.  Without taking a position on whether New York law correctly applies, the Plaintiffs are responding accordingly.

The appellate division has recognized undue influence as a basis for setting aside a contract on multiple occasions. *D'Onofrio*, 79 N.Y.S.3d at 909-10, citing *Weinberg v. Sultan*, 142 A.D.3d 767 (1st Dep't 2016); *Kazaras v. Manufacturers Trust Co.*, 4 A.D.2d 227 (1st Dep't 1957); *Robinson*, 103 A.D.3d 584.

The unusual and egregious facts of this case show that the separation agreement containing the release was a product of undue influence and is therefore void. The Centre was cult-like, and the chevre were inculcated with the idea that the Bergs were awe-inspiring, capable of performing miracles, and above reproach. *See* FAC ¶ 60. The importance of loyalty to the Bergs was fundamental. *Id.* It was dangerous to be disloyal to the Bergs. If a chevre questioned the leadership, the chevre would be ostracized, blacklisted and moved to a different location. *See id.* ¶ 91.

The chevre were lulled into complete dependency on the Centre for all of their needs. *See* FAC ¶ 76. Chevre were purposefully isolated, cut off from friends and loved ones, and forced to endure extreme working and living conditions. *Id.*

The Centre, and especially its leaders, retained control over all decisions in chevre lives. The Centre dictated the chevre's clothing, when they could buy new shoes, and even how much toilet paper they could use. *Id.* Chevre could not leave the Centre without permission. *See id.* ¶ 83.

The Centre kept its chevre on a tight leash, forbidding relationships with friends and family outside of the Centre to ensure that chevre would be isolated from those outside of the Centre's control. *See* FAC ¶ 84. Centre astrologers performed "readings" for chevre, during which the chevre were informed that their family members were "bad" people. *See id.* ¶ 86.

Chevre were repeatedly told they were worthless, that they were wrong, and that they had no rights.  They were under extreme psychological pressure not to leave the Centre. They were warned that terrible fate would befall them if they left—they would "join Satan" or contract disease. *See* FAC ¶ 94.  For example, the Bergs recorded fabricated horror stories about chevre who left the Centre and found themselves imprisoned or dead shortly after their departure.  The Bergs distributed these recordings among chevre.  *See id.* ¶¶ 95-96.  Many chevre were told that K. Berg could "do magic" and had an ability to make such things happen to people who "betrayed" her.  *Id.*

When Greene finally had enough courage to leave the grip of Centre, the Defendants represented to him that he was entitled to nothing and that the only money he would receive would come through the voluntary "generosity" of the Centre. *See* FAC ¶ 111.  The Defendants thus exploited the financial desperation and psychological dependency they had cultivated for years.

On the facts alleged in the FAC, a "relationship of control" plainly existed between the Defendants and Greene. *Sun Forest Corp.*, 152 F. Supp. 2d at 393 (S.D.N.Y. 2001).  In view of the years-long psychological control which the Defendants exerted over him, the weaker party's free will was practically extinguished and replaced by the "will of the other." *Id.*; *see also Matter of Collins,* 124 A.D.2d 48, 53, 510 N.Y.S.2d 940 (1987) ("Undue influence is 'the product of persistent and subtle suggestion imposed upon a weaker mind and calculated, by the exploitation of a relationship of trust and confidence, to overwhelm the victim's will to the point where it becomes the willing tool to be manipulated for the benefit of another.'")

Furthermore, the relationship of the Defendants to Greene is the sort of "confidential relationship" which is of grave concern in evaluating whether a contract is void as the product of undue influence.  A confidential relationship may be inferred "if one party has disparate power over the other such as the power of an attorney, guardian, clergymen, doctor or nursing home director." *Weber*, 880 N.Y.S.2d 228, at *6. The Centre and its leaders, after years of psychological control, had disparate power over him.

A recent case, *D'Onforio,* is particularly apt. There, the court held that the transfers in question were the product of undue influence.  In that case, the defendant forced the plaintiff to reside in small and unsuitable rooms and, as in our case, isolated the plaintiff from her family. The defendant also represented that she had supernatural powers and kept the plaintiff under her control and evil spell, just as in this case, constantly telling the plaintiff that terrible things would happen to her if she did not abide by the defendant's direction. *D'Onforio,* 79 N.Y.S.3d at 906. The court held that the plaintiff had a "confidential relationship" with the defendant, and the burden shifted to the defendant to show that that transfer were not the product of undue influence. *Id.* at 921-22.

At the time that Greene signed the separation agreement, he was under extreme psychological pressure already for having decided to leave the Centre.  In order to avoid the dangerous consequences of Karen Berg's "magic," he was under psychological duress to accept this non-negotiable separation agreement.  Much like the weaker party in *D'Onforio,* Greene was in a "confidential relationship" with the Defendants.

And as in *D'Onforio,* the Defendants abused this relationship and exerted undue influence to protect themselves against future claims, should the weaker parties eventually free themselves of the psychological domination the Centre had exerted for so long.[52]

### 2.   Greene Could Not Have Released His FLSA Claims Because There Was No Court Approval

In *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982), the court held that "an 'agreement' [to waive any claim for compensation arising under the FLSA in exchange for limited compensation] between an employer and employees outside of the adversarial context of a lawsuit brought by the employees would be in clear derogation of the letter and the spirit of the FLSA" and, thus, is invalid. *See id.* at 1352, 1354.  It noted that the employees "seemed unaware . . . that they had any rights at all under the statute" and that "[t]here [was] no evidence that any of the employees consulted an attorney before signing the agreements." *Id.* at 1354.  These same problems plague Greene's purported release.  The chevre were unaware that they had rights under the FLSA.  *See* FAC ¶¶ 103, 111-13, 115-17.  Further, the Centre frequently presented the Plaintiffs and other former chevre with legal documents and told them they had no choice but to sign.  *Id.* ¶ 113.  The Centre provided no explanation of the documents and never returned copies of the documents to them.  *Id.*   In some cases, the chevre were not even given a chance to read the documents.  *Id.*  Though the Centre, a sophisticated corporation with significant

---

[52] The Defendants' contention that Greene's training as a psychotherapist erases the undue influence and disparate bargaining power held over him by the Defendants, *see* MTD Br. at 39 n.39, in addition to inappropriately relying on documents extraneous to the FAC, purposefully misunderstands the nature of undue influence and disparate bargaining power, as the Plaintiffs explain in this section.

revenue, had access to the counsel, they never told the chevre that they could and should consult an attorney before signing the documents.  *Id.*

Though the Second Circuit has not yet considered this issue, precedent from the Supreme Court and the Second Circuit make it clear that the Second Circuit would agree with the Eleventh Circuit.  In *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945), the Supreme Court held that, "in absence of a bona fide dispute between the parties as to liability, [an employee's] written waiver of his right to liquidated damages under Section 16(b) [does not] bar[ ] a subsequent action to recover liquidated damages."  *Id.* at 704.  The Court drew heavily on the FLSA's legislative history, which "show[ed] an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours."  *Id.* at 706.  Congress recognized that "federal compulsory legislation" was needed to serve as a counter "to the unequal bargaining power [ ] between the employer and employee."  *Id.*  Similarly, in *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108 (1946), the Supreme Court barred settlements of "bona fide dispute[s] over the coverage of the [FLSA] on [ ] claim[s] for overtime compensation and liquidated damages where the employees receive the overtime compensation in full."  *Id.* at 110, 114-16.[53]  The Supreme Court again stressed the legislative purpose of the FLSA, which "was to secure for the lowest paid segment of the nation's workers a subsistence wage."  *Id.* at 116.

In *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015), the Second Circuit held that absent approval by a district court or the Department of Labor, "parties cannot settle their FLSA claims through a private stipulated dismissal with prejudice."  *Id.* at 200.  The Second Circuit found that this holding was necessary to effectuate the "unique policy considerations underlying the FLSA," which included its purpose of

---

[53] Thus, there can be no question that Greene, and others situated liked him, has not waived his right to liquidated damages in causes of action one, two, seven, eight, and thirteen.

"extend[ing] the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *Id*. at 206 (quotation and citation omitted). In recognition of "the statute's remedial and humanitarian goals," the FLSA is to be interpreted "liberally" to "afford[ ] its protections exceptionally broad coverage." *Id*. (quotation and citation omitted).

Effectuating the FLSA's "unique policy considerations" here requires finding that Greene, and those situated similarly to him, have not waived their FLSA rights. A key purpose of the FLSA is to right the imbalance of power that is found in many employer/employee relationships. This imbalance is particularly acute in the relationship between the Defendants and the chevre. The chevre were overworked, tired, dehumanized, often hungry, isolated from friends and family, and broke. *See* FAC ¶¶ 6, 8, 71, 75-82, 84-89, 92-99, 101-02. Because of the Defendants' actions, the chevre often lacked the ability to obtain basic medical care. *See id*. ¶¶ 6, 83. These are precisely the types of employees the FLSA was designed to protect and, just as court approval of a settlement was necessary to safeguard those protections in *Cheeks*, court approval is necessary here. *See Cheeks*, 796 F.3d at 207 (explaining that court supervision of settlements is necessary to ensure "the FLSA's primary remedial purpose: to prevent abuses by unscrupulous employers, and remedy the disparate bargaining power between employers and employees").

This conclusion is reinforced by the Defendants' description of Greene's release in the Motion. The Defendants repeatedly stressed the release's breadth. For example, the Defendants claimed that "Greene expressly agreed to release 'any and all claims (known or unknown)' against the Centre, including, as pertinent here, any claims under the FLSA or California Labor Code, as well as any claims for fraudulent inducement, breach of implied or express contract, and 'any other tort.'" MTD Br. at 8 (citing Bloom Decl., Ex. J); *see also* MTD Br. at 38 ("Greene (as well as each of the Arbitration Plaintiffs) entered into

– 65 –

a broad and enforceable agreement with the Centre in which he agreed to release any and all claims against the Centre"), 39 ("Greene entered into a broad agreement with the Centre in which he agreed to release 'any and all claims (known or unknown)' against the Centre" (footnote and citation omitted), 39-40 n.40 ("Moreover, to the extent that the [FAC] can be construed to assert Common Law Claims on behalf of Greene, such claims unquestionably fall within the scope of the broad general release.").

Expansive releases like the one the Defendants made Greene sign are one of the reasons the Second Circuit adopted the rule in *Cheeks*. The Second Circuit found that judicial approval of FLSA settlements is "necessary" to prevent "abuse in such settlements," including "overbroad release[s] that would waive practically any possible claim against the defendants, including unknown claims and claims that have no relationship whatsoever to wage-and-hour issues." *Cheeks*, 796 F.3d at 206 (quotation and citation omitted).[54] The same abuse is present here. After subjecting Greene to years of demoralizing treatment, the Defendants required that he sign a "broad" release before Greene could start to rebuild his life. This release purported to waive any and all claims, including claims that have no relationship whatsoever to wage-and-hour issues and irrespective of whether

---

[54] *See also Lopez v. Nights of Cabiria, LLC*, 96 F. Supp. 3d 170, 181 (S.D.N.Y. 2015) ("An employee who executes a broad release effectively gambles, exchanging unknown rights for a few hundred or a few thousand dollars to which he is otherwise unconditionally entitled. In effect, the employer requests a pervasive release in order to transfer to the employee the risk of extinguishing an unknown claim. Although inconsequential in the typical civil case (for which settlement requires no judicial review), an employer is not entitled to use an FLSA claim to leverage a release from liability unconnected to the FLSA." (quotation, citation, and alterations omitted).

Greene knew about them at the time of the waiver.  Just as in *Cheeks*, Greene's abusive

release should not be binding, as there was no court supervision.[55]

### 3. The Cases The Defendants Cite Do Not Warrant A Different Result

Of the cases that the Defendants rely on to support their argument that Greene's

release is valid, only four pertain to employment law.  *See* MTD Br. 39 & n.40.[56]  None of

their cases is relevant here.  *Gaughan v. Rubenstein*, 261 F. Supp. 3d 390 (S.D.N.Y. 2017),

considers whether a pre-suit release of labor law claims is valid.  After reviewing the rele-

vant facts and case law, the court found that the release was valid because "[t]here [was]

no reason to view that agreement as the product of one-sided bargaining."  *Id*. at 402.  The

court distinguished the case before it from *Lynn's Food Stores*, explaining that the plaintiff

"was made aware of her FLSA rights," as evidenced by a "pre-settlement demand letter"

to the defendant, "prepared by [the plaintiff's] counsel, [which] sought the FLSA remedies

of back pay and liquidated damages."  *Id*.  Unlike the employees in *Lynn's Food Stores*,

Gaughan received "significant consideration" in exchange for signing the release.  *Id*.  The

parties engaged in "months of negotiation" and the defendant "also agreed to relinquish

any claim she had against" the plaintiff.  *Id*.

*Matamoro v. Khomari*, No. 16-CV-9004 (KBF), 2017 WL6542954 (S.D.N.Y. Dec.

19, 2017), and *Young Min Lee v. New Kang Suh Inc.*, No. 17-CV-9502 (NSR), 2019 WL

689085 (S.D.N.Y. Feb. 15, 2019), analyze the pre-suit releases using the fact-specific

---

[55] The fact that Greene and his wife may have received some minor compensation in exchange for releasing their claims, does not warrant a different result.  *See* Bloom Declaration, Ex J at 1; *Lopez*, 96 F. Supp. 3d at 181 (finding that partial payment of back wages in exchange for entering into a settlement of FLSA claims containing a broad release of liability is insufficient to remove the need for court supervision).

[56] Most of the cases on which the Defendants rely for their argument that Greene waived his claims are not FLSA claims.  Given the "unique policy considerations underlying the FLSA," *see Cheeks*, 796 F.3d at 206, these cases are irrelevant to the issue of whether Greene's release is valid.

rubric of *Gaughan*.  *See Matamoro*, 2017 WL6542954, at *2; *Young Min Lee*, 2019 WL
689085, at *2.  In *Matamoro*, the court deferred to a pre-suit release because "there [was]
no reason to view the agreement as the product of one-sided bargaining," as both sides
were represented by counsel.  2017 WL6542954, at *2 (quotation, citation, and alteration
omitted).  In *Young Min Lee*, the court upheld the release but only because the plaintiff
provided "no facts surrounding the circumstances of the [settlement a]greement" in the
complaint.  2019 WL 689085, at *2.  The court stressed, however, the such releases must
"be analyzed on a case-by-case basis."  *Id*. at *2.  That is, the court did not announce a
blanket rule that all pre-suit releases were valid.

Thus, these three cases stand for nothing more than the proposition that whether a
pre-suit release of all claims is valid is analyzed on a case-by-case basis.  Unlike *Young
Min Lee*, the FAC is replete with facts showing that the Greene release was the product of
a gross imbalance between the Defendants and Greene.  Unlike the plaintiffs in *Gaughan*
and *Matamoro*, the Defendants have not shown based on the facts in the FAC that all the
parties to the release were represented by counsel, understood the rights that were at issue,
and received significant consideration in exchange for giving up their rights.   Further,
unlike the defendant in *Gaughan*, the Defendants have not established that they too relin-
quished any claims.

Finally, the Defendants cite *Gortat v. Capala Brothers, Inc.* for the proposition that
"New York courts will enforce valid releases that are clear and unambiguous on their face."
MTD Br. at 39 (quotation and citation omitted).  However, *Gortat* is inapplicable on its
facts.  The issue in *Gortat* was whether the defendants could use affidavits supposedly
signed by members of a purported New York state labor law class to opt out of the class.
*See Gortat v. Capala Bros., Inc.*, No. 07-CV-3629(ILG), 2010 WL 1423018, at *2-3
(E.D.N.Y. Apr. 9, 2010), *aff'd*, 568 F. App'x 78 (2d Cir. 2014) (Glasser J.).  The Court

– 68 –

rejected the defendants' argument and held that, it was "for this Court, not the defendants, to designate the appropriate means by which class members may opt out of a certified class action." *Id.* at *3. Indeed, if anything, *Gortat* shows the need for courts to maintain supervision over class certification and labor law.

### H.   Should The Court Grant The Defendants' Motion, It Should Provide Leave To Amend

The Defendants' motion to dismiss should be denied. If, however, the Court is inclined to grant it, it should do so with leave to amend. Courts should freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2). Courts construe this requirement liberally because "the purpose of Rule 15 is to allow a party to correct an error that might otherwise prevent the court from hearing the merits of the claim." *Mears v. Allstate Indem. Co.*, 336 F. Supp. 3d 141, 152 (E.D.N.Y. 2018). Indeed, "[i]n the Second Circuit, it is the usual practice upon granting a motion to dismiss to allow leave to replead." *Id.* (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

Leave to amend should be denied "only in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party," *id.* (quotation omitted), and the Defendants have the burden of "showing . . . prejudice or bad faith." *Michael Miller Fabrics, LLC v. Studio Imports Ltd.*, No. 12-CV-3858 (KMW)(JLC), 2012 WL 4513546, at *2 (S.D.N.Y. Oct. 1, 2012). The Defendants have made no such showing here. *See, e.g., Giordano v.*

*Legal Aid Soc'y*, No. 17-CV-5569 (ILG), 2018 WL 6199553, at *3 (E.D.N.Y. Nov. 27, 2018) (Glasser, J.).[57]

Should it grant the Defendants' motion to dismiss, the Court should permit the Plaintiffs 30 days in which to file a Second Amended Complaint.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny the Motion to dismiss the FAC.

---

[57] To the extent that the Defendants' cases suggest to the contrary, they are distinguishable.  In *Jeune v. Crew*, the court denied the plaintiffs leave to amend their complaints (their third and fourth attempts).  No. 16-CV-1107 (MKB), 2017 WL 4357382, at *17-18  (E.D.N.Y. Sept. 29, 2017).   The amended pleadings were filed after a pre-motion conference in which "the Court discussed the deficiencies in Plaintiffs' complaints."  *Id.* No such discussion has occurred here.  In both *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*, No. 90-CV-4406 (ILG), 1994 WL1743983 (E.D.N.Y. Feb. 7, 994) (Glasser, J.)., and *Magnoti v. Crossroads Healthcare Management, LLC*, 126 F. Supp. 3d 301 (E.D.N.Y. 2015) (Glasser, J.), this Court granted the defendants' motion to dismiss with prejudice, finding that amending was futile.  *See Barr Laboratories, Inc.*, 1994 WL1743983, *10 n.15; *Magnoti*, 126 F. Supp. 3d at 317-18.  In contrast, given the numerous, complicated issues here, amendment would not be futile.

Dated: New York, New York
December 23, 2019

Respectfully submitted,

**PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

By:  /s/ Theodore J. Folkman
Theodore J. Folkman
One Liberty Square, 13th Floor
Boston, MA 02109
Telephone: (617) 229-5415
Fax: (617) 313-7837
tfolkman@piercebainbridge.com

Shira Lauren Feldman
277 Park Avenue, 45th Floor
New York, NY 10172
Telephone: (212) 484-9866
Fax: (646) 968-4125
sfeldman@piercebainbridge.com

Matthew P. Rand
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Telephone: (213) 262-9333
Fax: (213) 279-2008
mrand@piercebainbridge.com

*Attorneys for Plaintiffs and the Proposed Collective and Class*