UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
JAMES GREENE, ET AL.,

                Plaintiffs,                     **MEMORANDUM AND
ORDER**
19-CV-4304-ILG-SJB

    - against -


KABBALAH CENTRE INTERNATIONAL,
INCORPORATED, ET AL.,

                Defendants.
---------------------------------------------------------x
**BULSARA, United States Magistrate Judge:**

       This is a wage and hour lawsuit brought by former employees and members of

the Kabbalah Centre, a "spiritual organization" dedicated to spreading "the teachings of

the Kabbalah, a form of Jewish mysticism."  (Am. Compl. dated Nov. 4, 2019 ("Am.

Compl."), Dkt. No. 44 ¶ 1).  The Kabbalah Centre has moved to enforce separation and

arbitration agreements they have with several of the plaintiffs, who allege these

contracts were the product of coercive tactics and are unenforceable.  These arguments

could have merit and the contracts may well be unenforceable.  But because the

contracts delegate questions of enforceability to arbitrators, the issues raised by the

plaintiffs must be decided in the first instance by the arbitrators.  *See Rent-A-Center,*

*West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010).

       For two plaintiffs who lack such agreements, the Centre seeks to dismiss their

claims on the grounds that their claims are untimely.  Because they filed their claims

well outside of the statute of limitations, they are time barred and must be dismissed.

As such, the Court grants the motions to compel arbitration and to dismiss.

Plaintiffs James Greene ("Greene"), Einat Ezra Michaeli ("Michaeli"), Jennifer Shaal and Ofer Shaal (together, "the Shaals"), Yifat Shmilovich ("Shmilovich"), Jake Stone ("Stone"), and Guy Shoshan ("Shoshan") (together, "Plaintiffs") allege violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the laws of New York, California, Florida, and Illinois by three groups of defendants: (i) Kabbalah Centre International, Incorporated, Kabbalah Centres of the United States, Incorporated, Kabbalah Centre of New York, Incorporated, The Kabbalah Centre of Florida, Inc., Kabbalah Children's Academy, Spirituality for Kids International, Inc. (collectively, "Non-Profit Defendants"); (ii) Kabbalah Enterprises, Incorporated, KAF Investments, LLC, and 501 N. La Cienega, LLC (collectively, "For-Profit Defendants," and together with the Non-Profit Defendants, "the Centre"); and (iii) Karen Berg, Yehuda Berg, and Michael Berg (collectively, the "Individual Defendants" or "the Bergs," and jointly with the Non-Profit Defendants and For-Profit Defendants, "Defendants"). (*See* Am. Compl. ¶¶ 158–354).

Defendants have moved to compel arbitration of the claims brought by five plaintiffs, the Shaals, Shmilovich, Stone, and Shoshan (the "Arbitration Plaintiffs"), and to dismiss the claims brough by Greene and Michaeli. (Notice of Mot. to Compel Arbitration dated Nov. 25, 2019, Dkt. No. 50; Notice of Mot. to Dismiss dated Nov. 25, 2019, Dkt. No. 51). For the reasons stated below, the motions are granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of the motion to dismiss, the Court is "required to treat" the Amended Complaint's "factual allegations as true, drawing all reasonable inferences in favor of Plaintiffs to the extent that the inferences are plausibly supported by allegations of fact." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). The

Court "therefore recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the court, as we have no way of knowing at this stage what are the true facts." *Id.* As for the motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment . . . Courts must consider all relevant, admissible evidence submitted by the parties[.]" *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (quotations omitted). In practical effect, this means here the Court considers, in deciding the arbitration motion, the Amended Complaint's allegations and the contracts between the Arbitration Plaintiffs and the Centre.

The Kabbalah Centre was founded in 1922. (Am. Compl. ¶ 42). Philip Berg ran the Centre from 1969 until 2013, alongside his wife, Karen Berg, and their sons, Michael and Yehuda Berg. (*Id.*). Karen Berg has run the Centre since 2013. (*Id.*). Karen Berg is the "ultimate authority" on decision-making at the Centre, although she is assisted by her sons. (*Id.* ¶ 2).

The Centre spreads the teachings of Kabbalah by offering spiritual classes and events and selling books and other products. (*Id.* ¶¶ 5, 21, 54, 129, 134). Its operations are conducted by a mix of "regular employees," who are paid regular wages, and "chevre," who are not paid regular wages, but as alleged, received cash allowances or monthly stipends. (*Id.* ¶¶ 4, 44, 89, 123–24, 139). "Chevre" is a secular Hebrew term that translates roughly to "a small community of friends." (Am. Compl. ¶ 3). Chevre lived and worked full time at the Centre. (*Id.* ¶ 6). Upon joining the Centre, they gave up their personal possessions, signed "vows of poverty" and were told that their basic needs—housing, food, and clothing—would be provided for by the Centre. (*Id.* ¶¶ 76, 78). The Centre had control over daily life for the chevre, determining where chevre

could live, what they could eat or buy, and where they could travel and who they could visit, including family. (*Id.* ¶¶ 79–88).

The Centre operates in several locations across the United States. (*See id.* ¶¶ 18–24, 127). Kabbalah Centre International, Incorporated, Kabbalah Centres of the United States, Incorporated, Kabbalah Children's Academy, and Spirituality for Kids International, Inc. are California non-profit organizations. (*Id.* ¶¶ 25–26, 29, 33). Kabbalah Centre of New York, Incorporated is a New York not-for-profit organization. (Am. Compl. ¶ 27). The Kabbalah Centre of Florida, Inc. is a Florida not-for-profit corporation. (*Id.* ¶ 28). Kabbalah Enterprises, Incorporated is a California profit-sharing Corporation, and KAF Investments, LLC and 501 N. La Cienega, LLC are California investment businesses. (*Id.* ¶¶ 30–32). The Non-Profit Defendants and For-Profit Defendants "functionally operated as a single corporate entity, under the control of the Bergs." (*Id.* ¶ 35). Karen Berg is the Centre's Chief Executive Officer; Yehuda Berg and Michael Berg are involved in operations and decision-making. (*Id.* ¶¶ 38–40). Together, they determined chevre's work assignments, monitored their performance, and determined the nature and amount of their compensation. (*Id.* ¶ 41).

Chevre were trained to handle and were responsible for various tasks including: managing facilities and events, soliciting donations, and monitoring fundraising efforts while working towards fundraising goals. (*E.g.*, Am. Compl. ¶¶ 4–5, 48–53, 59, 72). Donations made to the Centre were used for a variety of purposes, including for the purchase of personal items for the Individual Defendants and real estate investments made by the For-Profit Defendants. (*E.g.*, *id.* ¶¶ 10, 62). The chevre also worked as "personal assistants" and performed "household work" for the Individual Defendants.

(*Id.* ¶¶ 4, 8, 73).  Chevre were "always on call," working "seven days a week, often for 16 to 20 hours a day[.]"  (*Id.* ¶¶ 6, 75, 122).

Chevre were told that they were not entitled to compensation for their work and that they had "no rights of any kind[;]" they were threatened and told that they would be considered "enemies" and cut off from support if they left the Centre.  (*Id.* ¶¶ 11, 93–97, 103, 111–12).  Chevre were presented with various documents for signature that the Centre alleged were required for continued employment, but chevre were not instructed or given the chance to consult with an attorney prior to signing.  (*Id.* ¶ 113).  They were not paid regular wages for their work until 2011, when, following an IRS investigation, the Centre began reporting a "salary" on W-2 forms, calculated based on room and board provided to chevre.  (Am. Compl. ¶¶ 8–9, 89, 124).  Chevre were instructed to return this compensation back to the Centre.  (*Id.* ¶ 9).

Greene was a chevre from 2004 through 2009 at the Centre's locations in Los Angeles, California, and Boca Raton, Florida.  (*Id.* ¶ 18).  Greene has a Bachelor of Science degree in Sports Medicine, a Master's degree in marriage, family, and child therapy, and is a certified alcohol and drug addiction counselor.  (*Id.*).  At the Centre, Greene traveled across the country and worked "mainly [as] a fundraiser and emcee for major Centre events."  (*Id.*; *see also id.* ¶ 128).  After leaving the Centre, he resumed his work running a private psychotherapy practice.  (Am. Compl. ¶ 18).

Jennifer Shaal was a chevre from 2005 through 2015 at the Centre's locations in Los Angeles, Boca Raton, and Miami, Florida.  (*Id.* ¶ 19).  In this role, she was primarily a "facilities and office manager[.]"  (*Id.*).  She was also a "personal assistant to Monica Berg[.]"  (*Id.* ¶¶ 19, 131).  Prior to her role as a chevre, she worked as a paid employee of the Centre in donor relations at the New York City location.  (*Id.* ¶ 19).  Jennifer Shaal

entered into a separation agreement with the Centre in December 2015.  (Letter re: Separation Agreement executed Dec. 29, 2015 ("Shaal Agreement"), attached as Ex. C to Decl. of Elise M. Bloom in Supp. of Mot. to Compel Arbitration dated Nov. 25, 2019 ("Bloom Decl."), Dkt. No. 50-2 at 6).

Ofer Shaal was a chevre from 2002 through 2015 in the same locations: Los Angeles, Boca Raton, and Miami.  (Am. Compl. ¶ 20).  He was the functional head of the Centre's Information Technology department and also performed personal services for the Bergs.  (*Id.* ¶¶ 20, 132).  Prior to joining the Centre, Ofer Shaal served in the Israeli Air Force.  (*Id.* ¶ 20).  Ofer Shaal also entered into a separation agreement in December 2015 upon departing the Centre, which was identical to the agreement signed by Jennifer Shaal.  (Shaal Agreement at 6).  He currently owns a web-design company with Jennifer.  (Am. Compl. ¶ 20).

Stone was a chevre from 2008 through 2015 at the same locations as well.  (*Id.* ¶ 21).[1]  Stone dropped out of college to become a chevre.  (*Id.*).  He was responsible for janitorial work, telemarketing, managing a bookstore, and teaching classes.  (*Id.* ¶¶ 21, 129).  He lacked credit history and had an "intense" fear upon leaving the Centre.  (*Id.* ¶ 106).  Stone entered into a separation agreement with the Centre when he left.  (Letter re: Change in Status executed Oct. 12, 2015 ("Stone Agreement") attached as Ex. B to Bloom Decl. at 3).  After leaving the Centre, he became a life coach and motivational speaker.  (Am. Compl. ¶ 21).

Shoshan was a chevre from 1998 through 2018 at the Centre's locations in New York and Los Angeles.  (*Id.* ¶ 22).  At the Centre, he was responsible for the Centre's

---

[1] Although the Amended Complaint alleges that he worked at the Centre until 2016, his separation agreement is dated October 12, 2015.

video production services, and performed other personal services for the Bergs.  (*Id.* ¶¶
22, 133).  After leaving the Centre, Shoshan entered into a separation agreement.
(Letter re: Separation Agreement and General Release executed May 18, 2018 ("Shoshan
Agreement") attached as Ex. D to Bloom Decl. at 7).

      Michaeli was a chevre from 2005 through 2016 at the Centre's locations in New
York, Los Angeles, and Boca Raton.  (Am. Compl. ¶ 23).  She did janitorial work, food
preparation, building maintenance, coordinated students, classes and volunteers,
performed telemarketing calls, and managed teachers' revenue records.  (*Id.* ¶¶ 23, 130).
Before joining the Centre, Michaeli was trained in Israel as an attorney.  (*Id.* ¶ 23).  For a
period of time, she worked in the Centre's legal department.  (*Id.*).  Upon leaving the
Centre, she was told that she was owed "nothing" by way of compensation, and "[s]he
was terrified of the potential health problems and personal problems she might
suffer[.]"  (*Id.* ¶¶ 109, 111).

      Shmilovich was a chevre from 2004 through 2015 at the Centre's New York and
Los Angeles locations.  (*Id.* ¶ 24).  At the Centre, she managed volunteers, maintained
the Centre's database, organized fundraising, and performed other maintenance tasks.
(Am. Compl. ¶ 24).  Schmilovich entered into a separation agreement with the Centre in
February 2015.  (Letter re: Change in Status executed Feb. 1, 2015 ("Shmilovich
Agreement") attached as Ex. A to Bloom Decl. at 3).  After leaving her role as a chevre in
2015, she worked at the Centre as an hourly paid employee, performing the same kinds
of tasks, until 2018.  (Am. Compl. ¶ 24).

      The Amended Complaint includes 23 causes of action: minimum wage violations
under FLSA, (*id.* ¶¶ 158–66); overtime violations under FLSA, (*id.* ¶¶ 167–75);
minimum wage violations under New York Labor Law ("NYLL") (*id.* ¶¶ 176–84);

overtime violations under NYLL, (*id.* ¶¶ 185–97); spread-of-hour violations under NYLL, (*id.* ¶¶ 198–206); violations of the wage statement provisions under NYLL, (Am. Compl. ¶¶ 207–15); minimum wage violations under the California Labor Code ("CLC"), (*id.* ¶¶ 216–23); overtime wage violations under CLC, (*id.* ¶¶ 224–34); violations of wage payment provisions under CLC, (*id.* ¶¶ 235–44); violations of record-keeping provisions under CLC, (*id.* ¶¶ 245–54); violations of meal break and rest period provisions under CLC, (*id.* ¶¶ 255–64); unfair competition under California Business and Professions Code, (Am. Compl. ¶¶ 265–71); minimum wage violations under the Florida Constitution, (*id.* ¶¶ 272–76); minimum wage violations under Illinois Minimum Wage Law ("IMWL"), (*id.* ¶¶ 277–86); overtime violations under IMWL, (*id.* ¶¶ 287–97); unjust enrichment under New York law, (*id.* ¶¶ 298–303); unjust enrichment under California law, (*id.* ¶¶ 304–08); unjust enrichment under Illinois law, (Am. Compl. ¶¶ 309–12); unjust enrichment under Florida law, (*id.* ¶¶ 313–18); fraudulent inducement under New York law, (*id.* ¶¶ 319–27); fraudulent inducement under California law, (*id.* ¶¶ 328–36); fraudulent inducement under Illinois law, (*id.* ¶¶ 337–45); fraudulent inducement under Florida law, (*id.* ¶¶ 346–54).  Plaintiffs seek damages under federal and state law, certification as a class action and appointment of class representatives and class counsel, permission to give notice of a collective action, attorney's fees and costs, and interest.  (Prayer for Relief).

On November 25, 2019, Defendants filed a motion to compel arbitration, (Notice of Mot. to Compel Arbitration dated Nov. 25, 2019, Dkt. No. 50), and a motion to dismiss.  (Notice of Mot. to Dismiss dated Nov. 25, 2019, Dkt. No. 51)  On December 23, Plaintiffs filed an opposition to the motion to compel, (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Compel Arbitration dated Dec. 23, 2019 ("Opp'n to Mot. to Compel"), Dkt.

No. 53) and an opposition to the motion to dismiss.  (Opp'n to Mot. to Dismiss dated

Dec. 23, 2019 ("Opp'n to Mot. to Dismiss"), Dkt. No. 54).  In March 2021, Plaintiffs

moved for conditional certification of their FLSA claims as a collective action pursuant

to 29 U.S.C. § 216(b).  (Notice of Mot. for Conditional Cert. and Court-Authorized Notice

dated Mar. 26, 2021, Dkt. No. 94).  The motion was denied without prejudice to

renewal, and the Court ordered the parties to complete briefing on any renewed motion

after resolution of the present dispositive motions.  (Order dated Oct. 22, 2021, Dkt. No.

97).  In March 2022, the parties informed the Court that they would consent to

jurisdiction of the undersigned Magistrate Judge for the purposes of reviewing and

deciding the motions addressed in this opinion.  (Letter dated Mar. 8, 2022, Dkt. No.

100).

## **DISCUSSION**

I.  **Motion to Compel Arbitration**

In a contractual dispute implicating interstate commerce, an arbitration

provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist

at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *All. Bernstein Inv.

Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) ("[T]he Federal

Arbitration Act (the 'FAA') creates a 'body of federal substantive law of arbitrability'

applicable to arbitration agreements . . . affecting interstate commerce.") (quoting

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also

Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919 (2022).[2]

---

[2] "The parties do not dispute that the agreement at issue here affects interstate
commerce and, accordingly, there is no question that the FAA applies."  *Ragone v. Atl.
Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010).

Section 2 of the FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001); *see Man Fong Wong v. 1st Disc. Brokerage, Inc.*, No. 10-CV-1487, 2011 WL 1298857, at *2 (E.D.N.Y. Jan. 6, 2011) ("The Federal Arbitration Act . . . establishes a 'federal policy favoring arbitration,' requiring federal courts to 'rigorously enforce agreements to arbitrate.'") (quoting *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226, 107 S. Ct. 2332 (1987)), *report and recommendation adopted*, 2011 WL 1235756, at *1 (Mar. 31, 2011).  Indeed, Section 2 "renders agreements to arbitrate enforceable as a matter of federal law[.]" *Moriana,* 142 S. Ct. at 1917.

> Parties may generally shape [arbitration] agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes.  Whatever they settle on, the task for courts and arbitrators at bottom remains the same: to give effect to the intent of the parties.

*Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (quotations and citations omitted).[3]

Because arbitration agreements are subject to the same principles as other contracts, "a party may be compelled to arbitrate a dispute only to the extent he or she has agreed to do so." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 569 (S.D.N.Y. 2009) (citing *Bell v. Cendant Corp.*, 293 F.3d 563, 566–67 (2d Cir. 2002));

---

[3] Under the FAA, a party may petition the court "for an order directing . . . arbitration [to] proceed in the manner provided for in [an] agreement," and once the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, [it] shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  Defendants request an order under Section 4 compelling the parties to arbitrate.  (Mem. of Law in Supp. of Mot. to Compel dated Nov. 25, 2019, Dkt. No. 50-1 at 7).

*see also Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533–34 (E.D.N.Y. 2016)
("Arbitration is a matter of contract.  When enforcing an arbitration agreement, as with
any other contract, the parties' intentions control.") (quotations and citations omitted).

"In deciding whether a dispute is arbitrable, [the Court] . . .  must answer two
questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of
that agreement encompasses the claims at issue." *Holick v. Cellular Sales of New York,
LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

Defendants seek to enforce the arbitration agreements entered into between the
Centre and five of the plaintiffs—the Arbitration Plaintiffs.  Each of those agreements is
virtually identical to the others and they have several common features.  They were
signed upon their departure from the Centre; involve a waiver of rights under a bevy of
federal statutes, including FLSA; and provide that any disputes related to employment
or the separation agreement itself are to be decided in arbitration.  (*See generally*
Schmilovich Agreement; Shaal Agreement; Stone Agreement; Shoshan Agreement
(together, the "Separation Agreements")).

For four of the Arbitration Plaintiffs—Shmilovich, Stone, and the Shaals—their
agreements all contain arbitration agreements.  That satisfies the first inquiry.  As to the
second, the language in their agreements requiring that all controversies related to
services rendered to the Centre be arbitrated is "classically broad" and triggers a
presumption of arbitrability for the wage and hour claims asserted in this lawsuit.  *See
Holick,* 802 F.3d at 393–94 (affirming conclusion that agreement providing for
arbitration of all claims, disputes or controversies "arising out of, or in relation to this
document or Employee's employment" was broad arbitration clause).  "[T]he existence
of a broad agreement to arbitrate creates a presumption of arbitrability which is only

overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 395 (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88, 99 (2d Cir. 1999)).

Shmilovich agreed that any disputes related to her employment with or services provided to the Centre would be resolved in arbitration; furthermore, disputes about the agreement itself are also to be resolved in arbitration.  (Shmilovich Agreement at ¶ 6) ("[A]ny dispute arising out of this agreement or services you have provided to The Kabbalah Centre shall be resolved by binding arbitration under the rules and procedures of the American Arbitration Association, and the findings of the arbitrator shall be binding[.]").  Stone's agreement with the Centre is identical.  (Stone Agreement ¶ 6).

 Ofer Shaal and Jennifer Shaal and the Centre agreed to the same in a contract referring disputes to a different arbitration provider.  (Shaal Agreement ¶ 10) ("[A]ny dispute that may arise from or relate to this agreement, your relationship with, services provided to, or participation in activities of the Centre, shall be resolved by final, binding, and confidential arbitration by a single arbitrator in Miami, Florida under the rules and procedures of Judicial Arbitration and Mediation Services, Inc. ("JAMS")[.]") (emphasis omitted).

FLSA claims have been found to fit comfortably within broad clauses like those in these four plaintiffs' agreements.  There can be little doubt that a wage and hour dispute fits within clauses providing for arbitration of disputes arising out of services provided to the Centre.  *E.g.*, *Bynum*, 160 F. Supp. 3d at 541 ("The dispute 'arises out of' or relates to the services performed by plaintiff; it requires inquiring into the nature of plaintiff's employment and whether she was afforded proper compensation.  Plaintiff's claims fall

within the scope of the arbitration agreement."). Shmilovich, Stone, and the Shaals do not dispute any of this. That is, they do not dispute that their agreements with the Centre contain arbitration clauses, those clauses are broad, and the claims in their lawsuit fall within their scope.

What about the remaining Arbitration Plaintiff, Shoshan? Shoshan's agreement is somewhat different. It does not provide that any disputes related to his employment or work with the Centre be handled in arbitration. Instead, in his separation agreement, any disputes about the meaning of that *agreement* are to be resolved through JAMS arbitration. (Shoshan Agreement ¶ 13) ("[A]ny and all claims, disputes or controversies of any nature whatsoever arising from or regarding the interpretation, performance, negotiation, execution, enforcement or breach of this Agreement shall be resolved by confidential, final and binding arbitration conducted before a single arbitrator with JAMS, Inc. ("JAMS") in the New York, New York area, in accordance with JAMS' then-applicable arbitration rules[.]").

Yet Shoshan, like the other Arbitration Plaintiffs, does not dispute that his claims here fit within the arbitration clause. And in any event, after an employee enters into a comprehensive separation agreement, and thereafter brings an employment lawsuit—challenging the very conditions or claims resolved by the agreement—the claims arise out of that contract. Here, Shoshan resolved his FLSA claims in his separation agreement. (*Id.* ¶ 3). It would be a curious result—indeed a logically invalid one—to then conclude that his subsequent FLSA lawsuit related to his employment, but not to the separation agreement, in order to avoid the coverage of the arbitration provision. Ultimately this is academic because he does not advance such a position.

All of the Arbitration Plaintiffs do argue that the contracts and their arbitration clauses are unenforceable. "'[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements' in accordance with § 2 of the FAA." *Nayal*, 620 F. Supp. 2d at 570 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Section 2 of the FAA, therefore, "permits invalidation of arbitration clauses on grounds applicable to 'any contract.'" *Moriana*, 142 S. Ct. at 1917 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339–40). In *Rent-A-Center*, the Supreme Court explained that there were two types of challenges to arbitration clauses: the first type challenges "'specifically the validity of the agreement to arbitrate,'" while the second challenges "'the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" *Rent-A-Center*, 561 U.S. at 70 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)).

"If a party challenges the validity . . . of the precise agreement to arbitrate at issue,"—that is, makes the first type of challenge—"the federal court must consider the challenge before ordering compliance with that agreement[.]" *Id.* at 71. However, parties may delegate the question of whether the arbitration provision is enforceable for decision by the arbitrator. *Id.* at 71–72. That is, courts are generally tasked with deciding whether a dispute is arbitrable, unless "the parties agreed to submit the question of arbitrability itself to arbitration." *All. Bernstein Inv. Research & Mgmt.*, 445 F.3d at 125. "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019); *see also*

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) ("The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.").  And a federal court must honor that contractual choice under Section 2 of the FAA, unless the party challenging arbitration challenges the delegation provision specifically.  *Rent-A-Center*, 561 U.S. at 72 ("Unless [plaintiff] challenged the delegation provision specifically, we must treat it as valid . . . and must enforce it . . . , leaving any challenge to the validity of the Agreement as a whole for the arbitrator."); *McCoy v. Dave & Buster's, Inc.*, No. 15-CV-465, 2018 WL 550637, at *7 (E.D.N.Y. Jan. 24, 2018). This separation is consistent with the nature of an arbitration agreement which is "'a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.'"  *Moriana*, 142 S. Ct. at 1919 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)).

"[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (citing *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) and *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir. 1996)).

Here, all four of the Separation Agreements delegate to the arbitrators the question of deciding whether their controversy is arbitrable.  They do so by incorporating the rules of the AAA or JAMS, which provide that arbitrability issues should be decided by their arbitrators.  (Schmilovich Agreement ¶ 6 (AAA); Stone Agreement ¶ 6 (AAA); Shaal Agreement ¶ 10 (JAMS); Shoshan Agreement ¶ 13 (JAMS)).

The AAA rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  American Arbitration Association, Employment Arbitration Rules & Mediation Procedures, Rule 6(a) (2009), www.adr.org/sites/default/files/EmploymentRules_Web2119.pdf (last visited Aug. 30, 2022).  Thus, the enforceability of the Shmilovich Agreement and the Stone Agreement has been delegated to the arbitrator for decision.  *See, e.g., McCoy*, 2018 WL 550637, at *7 ("[T]he arbitration agreement incorporates the Employment Arbitration Rules of the [AAA.] . . . Accordingly, plaintiff and D&B agreed to arbitrate disputes regarding the enforceability of the arbitration agreement."); *Lismore v. Société Générale Energy Corp.*, No. 11-CV-6705, 2012 WL 3577833, at *5 (S.D.N.Y. Aug. 17, 2012) ("[A] party who signs 'a contract containing an arbitration clause and incorporating by reference the AAA rules . . . cannot [later] disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability.'  The 2010 Written Agreement's arbitration clause incorporates by reference the AAA's Rules for the Resolution of Employment Disputes [and thus] delegates to arbitrators the decision on arbitrability, including the question of the agreement's continued existence and viability.") (citations omitted) (quoting *Contec Corp.*, 398 F.3d at 208).

The JAMS rules provide that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."  Judicial Arbitration and Mediation Services, Inc., JAMS Comprehensive Arbitration

Rules & Procedures, Rule 11(b) (2021),

https://www.jamsadr.com/files/Uploads/Documents/JAMS-

Rules/JAMS_Comprehensive_Arbitration_Rules-2021.pdf (last visited Aug. 30, 2022).

Thus, the enforceability of the Shaal Agreement and the Shoshan Agreement has been

delegated to the arbitrator. *See, e.g., Mackris v. O'Reilly*, No. 17 CIV. 9483, 2019 WL

11000205, at *6 (S.D.N.Y. Mar. 6, 2019) ("The Arbitration Clause in the Diamond

Agreement incorporates the JAMS Comprehensive Arbitration Rules. . . . [T]here is no

doubt that the Diamond Agreement also clearly and unmistakably delegates, in writing,

the threshold question of arbitrability to an arbitrator.").

  The Arbitration Plaintiffs, although disputing the overall validity of the

Separation Agreements, do not dispute that the Separation Agreements delegate the

question of enforceability to the arbitrator. (Opp'n to Mot. to Compel at 13). Nor could

they. *Cartagena Enters., Inc. v. J. Walter Thompson Co.,* No. 13 Civ. 4238, 2013 WL

5664992, at *3 (S.D.N.Y. Oct. 16, 2013) ("[P]arties who incorporate AAA rules into their

Agreement are assenting to arbitrate issues of arbitrability."); *Simon J. Burchett*

*Photography, Inc. v. Maersk Line Ltd.*, No. 20-CV-3288, 2020 WL 8261580, at *7

(S.D.N.Y. Dec. 30, 2020) (applying same principles when dealing with incorporation of

JAMS rules), *report and recommendation adopted*, 2021 WL 1040472, at *1 (S.D.N.Y.

Mar. 18, 2021); *Mackris*, 2019 WL 11000205, at *6 (same).

  Consequently, under *Rent-A-Center* the only means for the Court to decide the

general challenges raised by these Plaintiffs—asserting unconscionability, coercion, and

the like—is if these challenges are directed to the delegation clause specifically. *See*

*Rent-A-Center*, 561 U.S. at 72.

The Arbitration Plaintiffs only make a series of general attacks on the Separation Agreements as a whole.  Though they purport to challenge the delegation provision, they do not do so in fact.  For example, the Arbitration Plaintiffs argue that the agreements are unenforceable because they are procedurally and substantively unconscionable under California and Florida law.  (Opp'n to Mot. to Compel at 5–13).  The section headings in the Arbitration Plaintiffs' brief refer to "Agreements to Arbitrate," (*id*. at 5, 9), but their argument challenges the Separation Agreements as a whole on the basis of unconscionability.  (*E.g*., *id*. at 6 ("The separation agreements in this case were presented to the Plaintiffs as documents they were required to sign in order to receive any assistance."); *id*. at 8 ("These separation agreements were entered into after years in which Defendants controlled every aspect of the Plaintiffs' lives . . . . The only way to leave the Centre amicably, with the blessing of the Centre, was to sign the take-it-or-leave it separation agreement."); *id*. at 11–12 (same)).

Similarly, the Arbitration Plaintiffs argue that the Separation Agreements are not contracts at all because Defendants' pressure and undue influence prevented formation of a consensual agreement.  (*Id*. at 14–22).  Again, the assertion of undue influence is lodged against the Separation Agreements as a whole—not the delegation provision specifically.  (*E.g*., Opp'n to Mot. to Compel at 15 ("The unusual and egregious facts of this case show that the separation agreement *containing* the arbitration clause was a product of undue influence and is therefore void.") (emphasis added); *id*. at 16 ("In having the Plaintiff sign the separation agreements, the Defendants exploited the financial desperation and psychological dependency of the Plaintiffs[.]"); *id*. at 17 ("At the time the Plaintiffs signed the separation agreements, they were under extreme psychological pressure already for having decided to leave the Centre."); *id*. at 18 ("[T]he

18

Plaintiffs were under psychological duress to accept this non-negotiable separation agreement."); *id.* at 21 ("The Plaintiffs also had no independent advice when entering into these separation agreements—a factor indicating undue influence.")).  The law is clear that absent a specific challenge, the delegation of the questions of unconscionability and enforceability of an arbitration agreement to an arbitrator must be upheld.  *See Rent-A-Center*, 561 U.S. at 72–74 (determining that unconscionability challenges to portions of an arbitration agreement—other than the delegation provision—constitute challenges to the agreement as a whole and thus should be left to the arbitrator); *Duran v. J. Hass Grp., L.L.C.*, 531 F. App'x 146, 147 (2d Cir. 2013) ("[T]he Supreme Court has explained that a challenge to arbitration on the basis of unconscionability must be directed at the agreement to arbitrate itself."); *compare Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("Plaintiffs mount a convincing challenge to the arbitration clause itself.  Their complaint alleges that '[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent.'  That specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court.") (internal citations omitted).

The arguments the Arbitration Plaintiffs make in response are meritless.  The Arbitration Plaintiffs assert that "if an agreement to arbitrate is void under state law, because it is the product of fraud, duress, or unconscionability, the agreement to arbitrate cannot be enforced."  (Opp'n to Mot. to Compel at 4).  Similarly, they contend that "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements[.]"  *Doctor's Assocs., Inc.*, 517 U.S. at 686.  These arguments ignore *Rent-A-Center*, which clarified that while contract defenses can be asserted to arbitration contracts, absent a specific

challenge to the delegation provision, such challenges must decided by the arbitrator. And so, while the Arbitration Plaintiffs may prevail on their general enforcement challenges to the arbitration agreement, those arguments are not cognizable in this forum.

The cases the Arbitration Plaintiffs cite are unpersuasive.  For example, they rely on *Paduano v. Express Scripts, Inc.,* 55 F. Supp. 3d 400 (E.D.N.Y. 2014) for the proposition that the Court retains jurisdiction to consider an unconscionability challenge to an arbitration provision.  But *Paduano*, in addressing unconscionability challenges on the merits despite concluding it lacked the power to do so—"because [HMC]'s procedural and substantive unconscionability challenges are not specific to the delegation provision, the Court [would] not consider them[,]"  55 F. Supp. 3d at 424 (first alteration in original)—acted contrary to *Rent-A-Center*.  *See Rent-A-Center*, 561 U.S. at 73 ("As required to make out a claim of unconscionability under Nevada law, he contended that the Agreement was both procedurally and substantively unconscionable. It was procedurally unconscionable, he argued, because it 'was imposed as a condition of employment and was non-negotiable.'  But we need not consider that claim because none of Jackson's substantive unconscionability challenges was specific to the delegation provision.") (internal citations omitted).

In *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245 (2d Cir. 2019), the agreements at issue did not contain a delegation provision, and the court had no occasion to, and did not, address the question of whether an undue influence challenge could be decided by an arbitrator.  In *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2016 WL 4617159, at *10 (E.D.N.Y. Sept. 2, 2016), the plaintiff raised a "challenge alleging fraud in the factum."  But again, in *Delgado* the Court made no

mention of a valid delegation provision.  And *Buckeye Check Cashing, Inc.* does not compel a different result either.  In *Buckeye Check Cashing, Inc.*, which predates *Rent-a-Center*, the Supreme Court held that "unless the challenge is to the arbitration clause itself, the issue of [a] contract's validity is considered by the arbitrator in the first instance."  546 U.S. at 445–46.  In other words, the case supports this Court's conclusion rather than undermines it.

For the reasons stated above, the Court has concluded that the Arbitration Plaintiffs have not challenged the arbitration clauses themselves, but rather, challenge the Separation Agreements as a whole.  The challenges made by the Arbitration Plaintiffs must, therefore, be addressed by an arbitrator in the first instance.  *E.g.*, *Vargas v. Bay Terrace Plaza LLC*, 378 F. Supp. 3d 190, 197 (E.D.N.Y. 2019); *McCoy*, 2018 WL 550637, at *8 ("[B]ecause plaintiff does not separately challenge the enforceability of the delegation clauses, the court treats the delegation clauses as valid and delegates any enforceability challenges to the arbitrator.").

Separately, the Arbitration Plaintiffs contend that because the Individual Defendants—Karen Berg, Yehuda Berg, and Michael Berg—were not signatories to the Separation Agreements, the claims against them cannot be arbitrated.  The agreements were between The Kabbalah Centre and Schmilovich, Stone, the Shaals, and Shoshan. (Schmilovich Agreement at 1, 3; Stone Agreement at 1, 3; Shaal Agreement at 1, 6; Shoshan Agreement at 1, 7).  And each was signed by a representative on behalf of the Centre—Miriam Dan, (Schmilovich Agreement at 3; Shaal Agreement at 6), Batya Solomon, (Stone Agreement at 3), or Hannah Schneck.  (Shoshan Agreement at 7). Nonetheless, the Arbitration Plaintiffs' claims against the Individual Defendants are subject to arbitration.

*First*, three of the Separation Agreements define the "Centre" to include its employees or directors.  (*See* Schmilovich Agreement at 1 (defining "The Kabbalah Center" as "The Kabbalah Centre or any of its employees, directors, and/or related entities of any nature."); Stone Agreement at 1 (same); Shoshan Agreement at 2 (defining the party to the agreement against whom claims were released as The Kabbalah Centre International and "its affiliated, related, and subsidiary entities, and its and their current and former directors, officers, . . . employees, instructors, staff, donors, shareholders, partners, [and] agents[.]")).  The Individual Defendants—Karen Berg, the Chief Executive Officer of the Centre, and Yehuda Berg and Michael Berg, who were involved in managerial decision-making at the Centre—are members of the Centre's leadership.  (Am. Compl. ¶¶ 38–42).  As such, even though they did not sign each agreement, they are covered by plain terms of the agreement, and entitled to have the claims against them heard in arbitration.  *See, e.g.*, *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 75 (S.D.N.Y. 2012) (finding that arbitration agreement which extended to "officers, directors, shareholders, employees, [and] agents" of corporate entity covered, by its terms, non-signatory individual defendants who served as officers).

*Second*, signatories to an arbitration agreement may be compelled to arbitrate claims with a non-signatory.  "Under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"  *Ragone*, 595 F.3d at 126–27 (quoting *Choctaw*

*Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).
"In addition to the 'intertwined' factual issues, there must be a relationship among the
parties of a nature that justifies a conclusion that the party which agreed to arbitrate
with another entity should be estopped from denying an obligation to arbitrate a similar
dispute with the adversary which is not a party to the arbitration agreement." *Doe v.
Trump Corp.*, 6 F.4th 400, 412–13 (2d Cir. 2021) (quotations omitted).  Ultimately, "to
establish equitable estoppel in the present context so as to bind a signatory of a contract
(here, the plaintiffs) to arbitrate with one or more non-signatories . . ., there must be a
close relationship among the signatories and non-signatories such that it can reasonably
be inferred that the signatories had knowledge of, and consented to, the extension of
their agreement to arbitrate to the non-signatories." *Id.* at 414.

Here, "[t]he Individual Defendants had total control over the Centre," and the
"Corporate Defendants functionally operated as a single corporate entity, under the
control of the Bergs." (Am. Compl. ¶¶ 10, 35).  The Amended Complaint alleges that
Karen Berg was the Centre's CEO and that Yehuda Berg and Michael Berg were
"intimately involved in Centre operations and decision-making." (*Id.* ¶¶ 38–40).  Each
"led the Centre" and exerted "significant control over Centre operations" and the
chevre's assignments. (*Id.* ¶¶ 41–42).  This alleged relationship resolves both the
"intertwinement" and close relationship prongs of the estoppel test.  The five Arbitration
Plaintiffs assert that the Centre engaged in unlawful wage and hour practices—and the
factual predicate for those claims (the hours worked, for example) are the same as
against Centre and the Individual Defendants.  In other words, the claims against the
Individual Defendants do not arise from a separate set of factual allegations from those
against the Centre—it is the treatment of the Arbitration Plaintiffs by the Individual

Defendants that is the basis for the claims against the Centre.  (*See, e.g.*, *id.* ¶ 2 ("The Centre revolves around the Bergs, their families, and their demands"); *id.* ¶ 10 ("The Individual Defendants had total control over the Centre, and they used that control to enrich themselves."); *id.* ¶ 74 ("The Centre required chevre to prioritize personal tasks for the Individual Defendants over other Centre duties.  Other activities were put on hold whenever an Individual Defendant or other Berg family member needed something.  The Centre is run as a family business by the Bergs, rather than as a functioning charitable organization or religious movement.").  *See Ragone*, 595 F.3d at 128.

    And the relationship between the Individual Defendants and the Centre, according to the Arbitration Plaintiffs' own allegations, overlaps entirely.  Indeed, the core theory of the Amended Complaint is that the Bergs and the Individual Defendants were using the Centre to advance their own personal aims and exercised closely held control over the Centre's operations.  Given this relationship, it is appropriate to require the claims against the Individual Defendants to proceed to arbitration.  *E.g.*, *Lee v. Engel Burman Grande Care at Jericho, LLC*, 20-CV-3093, 2021 WL 3725986, at *5 (E.D.N.Y. Aug. 23, 2021) ("The relationship between the signatory and non-signatory defendants is close: plaintiff alleges that Engel and Ultimate were her co-employers, and that Mularchuk was an employee of Engel and Ultimate who had the authority to supervise, hire, fire, demote, and promote plaintiff.  Moreover, plaintiff's claims against all defendants stem from the same alleged conduct by Mularchuk.  Because plaintiff's claims against the non-signatory defendants are 'intertwined' with the claims she agreed to arbitrate, Mularchuk and Ultimate may invoke arbitration.") (internal citations omitted).

24

The Arbitration Plaintiffs do not contend that the relationship between the Centre and the Individual Defendants was so attenuated or unrelated that estoppel could not apply.  Instead, they argue that because they performed a bevy of personal services for the Individual Defendants, claims related to such personal services fall outside the scope of the Separation Agreements and are not subject to arbitration. (Opp'n to Mot. to Compel at 28–29).  This argument is meritless.

The Amended Complaint does not contain separate claims or causes of action related to personal services.  The wage and hour claims are consolidated as single overarching claims against all Defendants.  (*See, e.g.*, Am. Compl. ¶¶ 158–75).  In other words, to the extent that these Plaintiffs are now asserting a separate theory of recovery against the Individual Defendants, the Amended Complaint does not reflect such a distinction.  And to the extent there are separate personal services claims, by asserting such claims against all "Defendants," Plaintiffs are attempting to hold the Centre responsible for the conduct of the Individual Defendants.  And where the Centre is proceeding to arbitration, the same exact claims against the Individual Defendants should also.

There is an equally fundamental problem with the Arbitration Plaintiffs' opposition to arbitration: it ignores the language of the Separation Agreements.  Those agreements provide that "any dispute arising out of this agreement or services you have provided to The Kabbalah Centre shall be resolved by binding arbitration[.]" (Shmilovich Agreement ¶ 6; Stone Agreement ¶ 6; *see also* Shaal Agreement ¶ 10 ("any dispute that may arise from or relate to this agreement, your relationship with, services provided to, or participation in activities of the Centre, shall be resolved by final, binding, and confidential arbitration[.]"); Shoshan Agreement ¶ 13 ("any and all claims,

disputes or controversies of any nature whatsoever arising from or regarding the interpretation, performance, negotiation, execution, enforcement or breach of this Agreement shall be resolved by confidential, final and binding arbitration[.]")).  Any alleged personal services provided directly to the Individual Defendants fall within the scope of the work provided to the Centre and these Plaintiffs' relationships to the Centre.  After all, this is, again, a core theory of the Amended Complaint—that the personal work overlapped with the Centre's work because the personal tasks were in furtherance of the Centre's operations.  (Am. Compl. ¶ 4 ("When they were not serving as facilities managers at the Centre's far-flung offices or as personal assistants catering to the whims of the Individual Defendants, chevre worked tirelessly to raise money for the Centre and, by extension, the Individual Defendants); *id*. ¶ 8 ("Yet the Centre did not pay chevre wages.  Instead, it essentially used them as the slave labor needed to operate the cult and enrich the Bergs."); *id*. ¶ 62 ("The Individual Defendants did not respect the distinction between their own assets and those of the Corporate Defendants, nor did they differentiate between the Not-for-Profit Affiliated Entities and the For-Profit Affiliated Entities."); *id*. ¶ 64 ("The Centre also paid for many of the Individual Defendants' personal expenses.")).  Given this premise, any personal services allegations are directly related and intertwined with the allegations against the Centre and fall within the scope of the claims subject to arbitration under the Separation Agreements. Despite their not formally signing the Separation Agreements, the Individual Defendants are entitled to rely on their terms and have the claims against them sent to arbitration.  *E.g.*, *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12 CIV. 5651, 2014 WL 1172581, at *5 (S.D.N.Y. Mar. 21, 2014) (finding in FLSA action relationship sufficiently

factually intertwined to compel arbitration with non-signatory where plaintiff failed to make "any distinction between the entity and individual defendants.").

For the reasons stated above, the Court grants Defendants' motion to compel arbitration pursuant to 9 U.S.C. § 4.

II.   **Motion to Dismiss**

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of . . . claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).  In deciding such a motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quotations and alteration omitted)*; Amadei*, 348 F. Supp. 3d at 155 ("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of [the non-moving party].").

Once the facts are construed in the light most favorable to the non-moving party—here, Greene and Michaeli—to avoid dismissal there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal citation and quotations omitted).  "[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.  Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.*

(citation and quotations omitted).  In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; Fed. R. Civ. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (internal citations omitted).  The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679; *see also Escamilla v. Young Shing Trading* Co., No. 17-CV-652, 2018 WL 1521858, at *2 (E.D.N.Y. Jan. 8, 2018), *report and recommendation adopted*, 2018 WL 1033249, at *3 (Feb. 23, 2018).

A court "may dismiss a claim on statute-of-limitations grounds at the pleadings stage 'if [the] complaint clearly shows the claim is out of time.'"  *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)).  "A complaint that is time-barred fails to state a claim on which relief may be granted[.]"  *Khalil v. Pratt Inst.*, 818 F. App'x 115, 116 (2d Cir. 2020).

### A. <u>Greene's Claims</u>

Greene alleges violations of FLSA's minimum wage provisions and overtime provisions.  (Am. Compl. ¶¶ 158–75).  Greene's FLSA claims are barred by the statute of limitations.

Under FLSA, a plaintiff may file a claim two years after the cause of action accrues or three years if the violation is willful.  29 U.S.C. § 255(a).  A violation is willful if the "employer either knew or showed reckless disregard for the matter of whether its

conduct was prohibited by the statute[.]" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009). "A cause of action under the FLSA accrues on the regular payday immediately following the work period for which services were rendered and not properly compensated." *Shu Qin Xu v. Wai Mei Ho*, 111 F. Supp. 3d 274, 277 (E.D.N.Y. 2015) (quoting *D'Arpa v. Runway Towing Corp.*, 12–CV–1120, 2013 WL 3010810, at *5 (E.D.N.Y. June 18, 2013)).

Greene left the Centre in 2009. (Am. Compl. ¶ 18). This action was commenced on July 25, 2019, thus, any claims arising prior to July 25, 2017 are time-barred.[4] Greene's last pay period was sometime in 2009. Regardless of when in 2009 Greene left the Centre, whether the Court applies a two- or three-year statute of limitations, his FLSA claims are plainly untimely and must be dismissed with prejudice.[5] *E.g.*, *Bonaparte v. Tri-State Biodiesel, LLC*, No. 17-CV-2353, 2018 WL 4538895, at *4 (S.D.N.Y. Sept. 20, 2018).

---

[4] There is nothing in the record that would support an application of equitable tolling of the amount required to save these claims from dismissal.

[5] Plaintiffs argue that the Court should not consider statute of limitations defenses at this stage, since, because Plaintiffs did not have a "regular pay day" it is "impossible" to determine the date of accrual of the claims from the face of the complaint. (Opp'n to Mot. to Dismiss at 51–52). This is an irrelevant point, since both Greene and Michaeli allege their dates of affiliation and employment with the Centre, which the Court accepts as true for statute of limitations purposes.

The Court grants Plaintiffs' unopposed motion to amend their memorandum of law in opposition to Defendants' motion to dismiss. *See* Letter dated Dec. 26, 2019, Dkt. No. 58. Therefore, the Court refers to and cites to the page numbers of the corrected pleading attached as Ex. A to the motion to amend. *See id.*

Greene has not alleged any state or common law claims.  Plaintiffs argue that Greene is "covered by" the class definition pertaining to "California and Florida wage and hour and common law claims[.]"  (Opp'n to Mot. to Dismiss at 51 n.43; *see also id.* at 45 n.35).  Greene is included as a proposed class representative of a putative "Chevre Class" seeking to bring common law claims of unjust enrichment and fraudulent inducement under New York, California, Florida, and Illinois law, (*see* Am. Compl. ¶ 145), but he is not named as a plaintiff bringing any of those relevant causes of action, nor are any of the causes of action brought on behalf of the "Chevre Class."  (*See id.* ¶¶ 298–354).  In any event, the Court dismisses with prejudice the only federal wage and hour claim asserted by Greene, brought pursuant to FLSA, and as stated herein, declines to exercise supplemental jurisdiction over any state claim.

### B. <u>Michaeli's Claims</u>

Michaeli also alleges violations of FLSA's minimum wage provisions and overtime provisions.  (Am. Compl. ¶¶ 158–75).

Michaeli left the Centre at an unknown time in 2016.  (*Id.* ¶ 23).  Under a two-year statute of limitations, FLSA claims arising prior to July 25, 2017 are time-barred, because the Complaint was filed on July 25, 2019.  And Michaeli has not adequately pled willfulness to get the benefit of a three-year FLSA statute of limitations.

"[A] court need not accept as true a plaintiff's conclusory allegation that a defendant willfully violated the FLSA."  *Whiteside*, 995 F.3d at 321.  The allegations must "permit a plausible inference that Defendants *willfully* violated the statute— whether by actual knowledge or . . . by reckless disregard."  *Id.* at 324.  That is, there must be an allegation that Defendants "acted in any manner suggesting an awareness that their actions violated or could violate" FLSA.  *Id.* (emphasis omitted).

Greene and Michaeli argue Defendants displayed willfulness in several ways: by "refer[ing] to chevre as employees" without paying them regular wages while simultaneously employing "non-chevre employees" who were paid an hourly wage; by shifting to a practice of issuing W-2 wage statements sometime after 2011, but directing the wages to be donated back to the Center; and by telling chevre they were not entitled to compensation, and otherwise concealing chevre's rights by, for example, failing to conspicuously post "FLSA-mandated notices[.]" (*E.g.*, Am. Compl. ¶¶ 9, 11, 111–12, 123–24).

The Court need not resolve whether these allegations are sufficient, because even if a three-year statute of limitations period applied, it would not give rise to any viable FLSA claim here.  The Amended Complaint does not allege when Michaeli left the Centre.  In their opposition to the motion to dismiss, Greene and Michaeli do not elaborate on, or point to any facts whatsoever that would suggest that Michaeli left the Centre *after* July 25, 2016.  It only vaguely and generally alleges that she left sometime in 2016, on some unspecified and unidentified date.  In other words, the Amended Complaint does not plausibly allege a violation of FLSA within a three-year limitations period.  *E.g.*, *Herrera v. Comme Des Garcons, Ltd.*, No. 21-CV-4929, 2022 WL 3348099, at *2 n.5 (S.D.N.Y. Aug. 12, 2022) ("Even if the more permissive three-year statute of limitations were to apply, the FLSA claims of ten of the fourteen Plaintiffs are entirely time barred because they left the Defendants' employ before June 3, 2018 (three years before the complaint was filed).").

Michaeli contends, nonetheless, that the statute of limitations should be tolled—presumably so that FLSA claims relating to her entire employment could be pursued. There is no basis for equitable tolling on the present record.

32

"[E]quitable tolling is considered a drastic remedy applicable only in 'rare and exceptional circumstance[s.]'" *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)). "[T]he doctrine of equitable tolling applies *after* the claim has already accrued, suspending the statute of limitations 'to prevent unfairness to a diligent plaintiff[.]'" *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). "Equitable tolling is generally considered appropriate 'where the plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period[;]' 'where plaintiff was unaware of his or her cause of action due to misleading conduct of the defendant[;]' 'or where a plaintiff's medical condition or mental impairment prevented her from proceeding in a timely fashion[.]'" *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (internal quotations omitted). "When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has 'acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Id.* (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)).

Michaeli has not established that she acted with reasonable diligence during the time period she seeks to have tolled. "When deciding . . . whether a plaintiff acted with reasonable diligence under the circumstances—a court may consider (i) the party's

'efforts at the earliest possible time to secure counsel,' (ii) the party's lack of education or funds to consult a lawyer, and (iii) the party's 'direct access to other forms of legal assistance.'" *Zhongwei Zhou v. Wu*, No. 14-CV-1775, 2017 WL 1233994, at *3 (S.D.N.Y. Mar. 31, 2017) (quoting *Baldayaque v. United States*, 338 F.3d 145, 153 (2d Cir. 2003)). Here, Michaeli does not describe any steps that she took to understand her rights after she left the Centre.  Michaeli understood that she lacked rights under employment law based on Karen Berg's and the Defendants' representation as such.  (Am. Compl. ¶¶ 93, 115).  Michaeli inquired about any compensation she was owed at the time she left in 2016, and Defendants told her that she was not owed anything.  (*Id.* ¶ 111).  But Michaeli apparently made no further inquiries in the years after leaving and prior to bringing this lawsuit some three years later.  Michaeli appears to have been on notice or at least believed she may have had a viable claim, from at least the time she made the inquiry, but despite being trained as an attorney in Israel, (*id.* ¶ 23), did not seek any further legal counsel or take any additional steps.  Together, these facts demonstrate an absence of reasonable diligence.  *E.g.*, *Zhongwei Zhou*, 2017 WL 1233994, at *5 (finding no entitlement to equitable tolling where plaintiffs presented no evidence of reasonable diligence and noting that reasonable diligence is a "prerequisite" for the application of tolling regardless of any exceptional circumstances) (citing *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 157 (2d Cir. 2012)); *Kai Yan Lai v. Wai Mon Leung*, No. CV 11-3561, 2012 WL 4472155, at *5–*6 (E.D.N.Y. Aug. 31, 2012) (declining to apply equitable tolling where plaintiff knew of potential FLSA claims for one year before bringing suit and where she "should have learned that she had a claim much earlier," as a result of not being paid for extended period of time), *report and recommendation adopted*, 2012 WL 4472143, at *1 ( Sept. 26, 2012).

Michaeli makes a series of arguments to explain how Defendants presented obstacles to her raising her claim.  Specifically, Michaeli argues the Centre prevented her from learning of her rights, and, by exerting so much control over her life, altered her mindset such that upon leaving, she was terrified and distrustful of her family, (*e.g.*, Am. Compl. ¶¶ 86, 109), and no longer knew "how to function" in the world.  (Opp'n to Mot. to Dismiss at 56).  Accepting this as true, however, is unfortunately not enough. All of these allegations relate to conduct prior to her departure.  Michaeli does not say specifically how her functioning was impaired by the Centre, or what tasks she was no longer able to accomplish *after* she left, including how or why her fear and terror prevented her from bringing a FLSA lawsuit for three plus years after her departure. Nor does it suggest that she was interested in bringing a suit after she left the Centre but before the limitations period expired, and that her impairments or some ongoing interference from the Centre prevented her from diligently pursuing her rights.  In other words, Michaeli left the Centre in 2016, yet the Amended Complaint cites to no attempt after that date to investigate or inquire about the possibility of bringing a claim for unpaid wages.  In other words, even if there were "extraordinary circumstances," Michaeli has still failed to demonstrate any reasonable diligence in taking efforts to pursue her claims, and that forecloses any equitable tolling.

Michaeli cites to *Boyd v. J.E. Robert Co.*, No. 05-CV-2455, 2011 WL 477547, at *8 (E.D.N.Y. Feb. 2, 2022), as further support for the notion that diligence is determined based on the special circumstances present, *e.g.*, the context of having their "life decision[s] . . . control[led]" by the Centre—but in *Boyd*, those circumstances were not present, and the court found equitable tolling did *not* apply because the plaintiffs failed

to demonstrate diligence. *Id.* at *9.[6] Given the absence of diligence, here there is no

basis to apply equitable tolling. *See, e.g.*, *Zhongwei Zhou*, 2017 WL 1233994, at *5.

Michaeli, like Greene, refers to violations of state laws. The Court may "decline to

exercise supplemental jurisdiction" over a claim if it "substantially predominates over

the claim or claims over which the district court has original jurisdiction," if "the district

court has dismissed all claims over which it has original jurisdiction," or if "in

exceptional circumstances, there are other compelling reasons for declining

jurisdiction." 28 U.S.C. § 1367(a). Having dismissed all federal claims for her and

Greene,[7] the Court declines to exercise supplemental jurisdiction over either Michaeli or

Greene's non-federal claims. *See, e.g.*, *Cajero Torres v. Sushi Sushi Holdings Inc.*, No.

19 Civ. 2532, 2021 WL 2158017, at *6 (S.D.N.Y. May 27, 2021) (declining supplemental

jurisdiction over timely state law claims where FLSA claims time barred); *Camara v.*

*Kenner*, No. 16-CV-7078, 2018 WL 1596195, at *6 (S.D.N.Y. Mar. 29, 2018) (declining to

exercise supplemental jurisdiction over state claims where FLSA claims dismissed as

---

[6] Michaeli also relies on *Kassman v. KPMG LLP*, No. 11 CIV. 03743, 2015 WL 5178400 (S.D.N.Y. Sept. 4, 2015) to argue that this case involves "specific circumstances" which are "hard to predict" and require "special treatment." But *Kassman* is inapposite: it is a case involving thousands of opt-in plaintiffs whose diligence was thwarted by Court delays. *Id.* at *5.

[7] The stay of the Arbitration Plaintiffs' claims does not change this result. The FAA does not itself confer subject matter jurisdiction. *See Durant, Nichols, Houston, Hodgson & Cortese–Costa, P.C. v. Dupont*, 565 F.3d 56, 63 (2d Cir. 2009). Courts have analyzed agreements to arbitrate as "a type of forum-selection clause."

time-barred).[8]  Accordingly, Michaeli and Greene's federal claims are dismissed with prejudice, and any state law claims are dismissed without prejudice for lack of supplemental jurisdiction.[9]

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is granted.[10]

Defendants' motion to dismiss is also granted.  Greene's claims are dismissed with prejudice.  *E.g.*, *Cajero Torres*, 2021 WL 2158017, at *6.  Michaeli's FLSA claims are also dismissed with prejudice.  Their state law claims are dismissed without prejudice to renewal for lack of jurisdiction.  Neither Greene nor Michaeli has sought leave to amend and each has amended once already, after being alerted to Defendants' limitations defense.  (*See* Letter-Mot. to Stay Discovery dated Sept. 23, 2019, Dkt. No. 40 at 3; Mem. of Law in Supp. of Mot. to Dismiss dated Sept. 23, 2019, Dkt. No. 39 at 27–31).  As such, the Court finds that permitting either leave to state a non-time barred

---

[8] Plaintiffs have also moved to strike Exhibits A–I and K–M attached to Defendants' declaration in support of Defendants' motion to dismiss.  *See* Pls.' Mot. to Strike dated Dec. 23, 2019, Dkt. No. 52-1.  The Court denies the motion as moot since it did not rely on any of the exhibits sought to be struck in reaching its conclusion in this Memorandum and Order.

[9] As a result of this ruling, the Court need not address Greene and Michaeli's arguments with respect to the law of unjust enrichment in New York, Illinois, and Florida or fraudulent inducement in New York, California, Illinois, or Florida.  *See* Opp'n to Mot. to Dismiss at 39–45.

[10] The Arbitration Plaintiffs and Defendants both indicated that if the motion to compel arbitration were granted, the Court should dismiss the claims.   Neither has asked for a stay of the proceedings pending arbitration.   The Court finds that administrative closure of the case is appropriate, and either side may seek to re-open the case following completion of arbitration, either to confirm or vacate any arbitration award.  *E.g.*, *Guerriero v. Sony Elecs. Inc.*, No. 21 CV 2618, 2022 WL 736428, at *4 (S.D.N.Y. Mar. 11, 2022); *Feuer v. Stoler of Westbury, Inc.*, No. 20-CV-6094, 2021 WL 4820605, at *5 (E.D.N.Y. Oct. 15, 2021).

FLSA claim is inappropriate.  *See Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71, 75–76 (2d Cir. 2019) (finding no abuse of discretion where district court dismissed FLSA and NYLL claims for overtime and minimum wage violations and closed the case without *sua sponte* granting further leave to amend); *see also Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 n.3 (2d Cir. 1997) (finding no abuse of discretion where district court dismissed "claims outright without leave to amend" where there was "no indication in the record that appellants even sought leave to replead before the District Court").  Given the dismissal of the claims brought by Michaeli and Greene, and the arbitration of the claims of the Arbitration Plaintiffs, the Clerk of Court is directed to close this case.

SO ORDERED.

/s/ *Sanket J. Bulsara*  September 1, 2022
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York